**FILED**

JUN 1 5 2007



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Antoine Jones )
2411 912 )
1901 D St SE )
WDC 20003 )

(Enter your full name, prison number
and address)

v.

Case: 1:07-cv-01068
Assigned To : Kennedy, Henry H.
Assign. Date : 06/15/2007
Description: PRO SE GEN. CIVIL

SAICE, KARRINA G.HAS )
I.C.E. )
Baltimore MO )
_____ )

(Enter the full name and address(es),
if known, of defendant(s) in this
action)

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### Instructions for filing a Complaint by a Prisoner
### Under the Civil Rights Act 42 U.S.C. §1983

This packet contains one copy of a complaint form and one copy of an application to proceed *in forma pauperis*. To start an action, you must file an original and one copy of this complaint form.

Your complaint must be clearly handwritten or typewritten and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use another blank page.

Your complaint can be brought in this Court only if one or more of the named defendants is located within the District of Columbia. Further, you must file a separate complaint for each claim that you have unless they are related to the same incident or problem. The law requires that you state only facts in your complaint.

You must supply a certified copy of your prison trust account, pursuant to the provisions of 28 U.S.C. §1915, effective April 26, 1996. The filing fee is $150.00.. If insufficient funds exist in your prison account at the time of filing your complaint, the court *must* assess, and when funds exist, collect an initial filing fee equal to 20 percent of the greater of:

**RECEIVED**

MAY 1 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(1) the average monthly deposits to your prison account, or
(2) the average monthly balance of your prison account for the prior six-month period.

Thereafter, you are required to make monthly payments of 20% of the preceding month's income. The agency having custody over you must forward payments from your account to the clerk of the court each time the amount in the account exceeds $10.00 until the filing fees are paid.

Therefore, before an assessment can be made regarding your ability to pay, you must submit a certified copy of your prison account for the prior six-month period.

When this form is completed, mail it and the copies to the Clerk of United States District Court for the District of Columbia, 333 Constitution Ave., NW, Washington, D.C. 20001.

## I.   SUCCESSIVE CLAIMS

Pursuant to the Prison Litigation Reform Act of 1995, unless a prisoner claims to be in "imminent danger of serious physical injury," he or she may not file a civil action or pursue a civil appeal *in forma pauperis* "if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or they failed to state a claim upon which relief could be granted."

## II.   PREVIOUS LAWSUITS

A.   Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?     Yes ( )     No (✓)

B.   Have you begun other lawsuits in state or federal court relating to your imprisonment? Yes (✓)   No ( )

C.   If your answer to A or B is Yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.   Parties to this previous lawsuit.

Plaintiffs: Antoine Jones, 241912

Defendants: MRS Rachel Lieber - Government Prosecutor

2.   Court (if federal court, name the district; if state court, name the county) District of columbia

3.   Docket number Haven't receive this information

4.   Name of judge to whom case was assigned: Haven't receive information

5.   Disposition (for example: Was the case dismissed? Was it appealed? Is it still
     pending?) _Havent recieve any information._
     _____

6.   Approximate date of filing lawsuit: _Week of April 9 2 2007_

7.   Approximate date of disposition: _Havent recieve any_
     _information_

## III. PLACE OF CONFINEMENT

_C.D.F. DCJail 1901 DST SE WDC 20003_
_____

A.   Is there a prisoner grievance procedure in this institution?    Yes ( ✓ )    No ( )
     If your answer is Yes, go to Question III B. If your answer is No, skip Question III B,C
     and D and go to Question III E.

B.   Did you present the facts relating to your complaint in the prisoner grievance procedure?
          Yes ( )    No ( ✓ )

C.   If your answer is Yes to Question III B;

     1.   To whom and when did you complain? _N|A_
          _____

     2.   Did you complain in writing? (Furnish copy of the complaint you made, if you
          have one.)   Yes ( )    No ( )    _N|A_

     3.   What, if any, response did you receive? (Furnish copy of response, if in
          writing.) _____ _N|A_ _____

     4.   What happened as a result of your complaint? _____
          _____ _N|A_ _____
          _____

D.   If your answer is No to Question III B, explain why not. _These incident_
     _Happen before my incarceration_
     _____

E.   If there is no prison grievance procedure in the institution, did you complain to prison
     authorities?   Yes ( )    No ( )    _N|A_

1. To whom and when did you complain? _N/A_

2. Did you complain in writing? (Furnish copy of the complaint you made, if you have one.)

3. What, if <u>any, response did you receive? (Furnish copy of response if in writing)</u> _N/A_

4. What happened as a result of your complaint? _N/A_

## IV. PARTIES

In item A below, place your name and prison number in the first blank and your present address in the second blank. Do the same for additional plaintiffs, if any.

A. Name of Plaintiff: _Antoine Jones 241912_
   Address: _1901 DSt SE WDC_

In item B below, place the full name of the defendant(s) in the first blank, their official position in the second blank, their place of employment in the third blank and their address in the fourth blank. Do the same for additional defendants, if any.

B. Defendant: _SA, Katerina Gikas_____ is employed as
   _ICE Agent_____ at _Immigration custom enforcement_
   Address: _Baltimore MD_

   Defendant: _Unknown ICE Agents_____ is employed as
   _Immigration custom enforcement_ at _____
   Address: _Baltimore MD_

   Defendant: _Unknown I.C.E. Agents_____ is employed as
   _Immigration custom enforcement_ at _____
   Address: _Unknown I.C.E Agents_
   _Baltimore MD_

   Defendant: _Unknow ICE Agents_____ is employed
   as _Immigration custom enforcement_ at _____
   Address: _Baltimore MD_

## V.    STATEMENT OF CLAIM

State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include the names of other persons involved, dates and places. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach extra sheets if necessary.    I.C.E.

Agent Katerina Ginas and Her I.C.E. Team illigally enter my apartment   .summit circle and the ICE agent Brown into my warehouse 400 Hampton Blvd. See attachment.

## VI.    RELIEF

State briefly exactly what you want the Court to do for you. I am asking for an internal investigation on these ICE agents and to be awarded for damages. $1,000,000⁰⁰

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED BEFORE ME this ___ DAY OF ___ YEAR ___

NOTARY PUBLIC FOR THE DISTRICT

MY COMMISSION EXPIRES

Signed this ___ day of May 2007

Antoine Jones
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

MAY 7 2007

Antoine Jones
(Signature of Plaintiff)

**Complaint filed by Antoine Jones (pro se)**

ICE (Immigration & Customs) Investigation
9719 Summit Circle, Largo, (apartment)  and  400 Hampton Park Blvd, Capitol Heights (warehouse)
Trespassing, Intrusion and Breaking and Entering

**Complaint 1:**

I, Antoine Jones, hereby charge that ICE agents broke the law and violated my constitutional rights, by trespassing and breaking and entering into the apartment which was leased by me located at **9719 Summit Circle, Largo, Maryland** on February 7, 2005.

Illegal Search – Agent Gikas testified in trial, under oath, the ICE Agents went into the Summit Circle apartment without a search warrant. (Agent Katerina Gikas, Thursday November 16, 2006 10:00 a.m. testimony.) Agent Gikas first perjured herself when Mr. Balarezo questioned her, asking her "now, your team never went into Summit Circle, correct, into the apartment itself? Agent Gikas responded, correct (perjury). See trial transcript page 72, lines 13 & 14.

Mr. Balarezo asked her the question again, Did any of your agents go into the apartment? Agent Gikas responded, "I think some did."

Mr. Balarezo then questioned her again, Do you know when they went into that apartment? Her answer: "I'm not exactly sure of the date, it might have been February 7th, the second day. Mr. Balarezo further questioned: "Was that pursuant to a warrant Agent Gikas?" Agent Gikas' replied, "no". He then asked: How did you get into there? She answered: The maintenance man. (This is clearly perjury because it was a Sunday night, the office was closed and no maintenance man was working on Sunday night.)

I therefore submit that the entry and search of the Summit Circle apartment as an illegal entry and search; and hereby moves to suppress evidence from the Summit Circle apartment.

Mr. Balarezo orally moved to suppress evidence from the Summit Circle apartment B3, (see trial transcript page 102, line 16). (Refer to Agent Gikas' trial testimony, Thursday November 16, 2006, 10:00 a.m., pages 72 through 106.)

I further charge that ICE agents broke the law and violated my constitutional rights by trespassing and breaking and entering into warehouse space which was leased by me located at **400 Hampton Park Blvd., Capitol Heights, Maryland**. Katerina Gikas, Special Agent for the US Immigration and Customs Enforcement testified that she and other agents along with a trained dog entered into the warehouse and photographed the contents.

Illegal Search –Before vacating the warehouse, Mr. Schaffer (the property manager) and I went on a walk-through to inspect and make sure the place was cleaned out before he would agree to return the security deposit. The photos presented at trial which were taken by the ICE agents during their investigation show a lot of items (including some Valentine's Day gift baskets). All of these items were in the warehouse while we were still tenants. This demonstrates that the ICE agents went into the warehouse while my lease was still in effect and clearly before the last day or the day after I moved out as Agent Gikas stated in her testimony. When Mr. Schaffer and I conducted the walk-through the warehouse was vacant and completely cleaned out.

Also, Scott, the new tenant moved into the space (May 1, 2004) the day after we moved out of the space. Scott is my witness to collaborate the truth about the "cleaned-out" condition of the warehouse.

F
09-1068
HHK

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**

Antoine Jones

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  11001
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE (PR)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
# 241-912

**DEFENDANTS**

SA ICE Katerian Gikas, et al,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:07-cv-01068
Assigned To : Kennedy, Henry H.
Assign. Date : 06/15/2007
Description: PRO SE GEN. CIVIL

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant
□ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZE**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**□ A. Antitrust**

□ 410 Antitrust

**□ B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**□ C. Administrative Agency Review**

□ 151 Medicare Act

Social Security:
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

Other Statutes
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

**□ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**□ E. General Civil (Other)  OR  ☒ F. Pro Se General Civil**

Real Property
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

Personal Property
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

Bankruptcy
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

Prisoner Petitions
□ 535 Death Penalty
□ 540 Mandamus & Other
☒ 550 Civil Rights
□ 555 Prison Condition

Property Rights
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

Federal Tax Suits
□ 870 Taxes (US plaintiff or defendant
□ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

Other Statutes
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.
□ 460 Deportation

□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255* | ☐ **F.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

## V. ORIGIN

☒ 1 Original    ☐ 2 Removed    ☐ 3 Remanded from    ☐ 4 Reinstated    ☐ 5 Transferred from    ☐ Multi district    ☐ 7 Appeal to
Proceeding     from State     Appellate Court     or Reopened     another district     Litigation     District Judge
     Court                                             (specify)                                from Mag.
     Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS     ☐     ACTION UNDER F.R.C.P. 23         **DEMAND $** 0

Check YES only if demanded in complaint
**JURY DEMAND:** ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY

(See instruction)     ☐ YES   ☒ NO     If yes, please complete related case form.

**DATE**              **SIGNATURE OF ATTORNEY OF RECORD**

NCD

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

SPEcial Weapons, Firearms and Luc. E. Events

~~Boot Legging~~ Breaking And Entering

(A) Summit Circle Apt ( Trial transcript Pg 72, line 22)

(B) 400 Hampton Blvd - Mr Andrew Schaeffer Trial Transcript Pg 90, Line 10

(C) Myrtle Ave, Bowie MD    Mr William Kelly Pg 24, line 17

(E) Two Photo of Myrtle Ave

(F) Photo from 400 Hampton Blvd - Breaking and entering.

1    THE COURT: The tag, just to remind me, was what, a
2  temporary Delaware tag?
3    THE WITNESS: Yes, Your Honor.
4    THE COURT: Okay.
5  BY MS. LIEBER:
6    Q  So this is the Impala, is that right?
7    A  Yes.
8    Q  What are these two bottom numbers?
9    A  The numbers from the tags that were in the Plymouth van
10  that was parked outside of Myrtle Avenue, 6550 Myrtle Avenue
11  in Bowie. The one beginning with XA again is the Delaware
12  temporary tag. The other one was a permanent tag that was
13  stuck on the dash but it was expired.
14    THE COURT: What color is the Plymouth van? I'm
15  having better luck with colors. Do you remember?
16    THE WITNESS: Blue.
17    MS. LIEBER: Thank you very much, Agent Gikas.
18  That's all I have.
19    THE COURT: Thirty-nine is in. Cross?
20    MR. BALAREZO: Yes, Your Honor, thank you. Good
21  morning, ladies and gentlemen.
22    CROSS EXAMINATION
23  BY MR. BALAREZO:
24    Q  Good morning, Agent Gikas.    *My Lawyer*
25    A  Good morning.

---

1    Q  You were on this, let's call it the ICE investigation,
2  that we've been talking about, since February '04 until about
3  May or so, you said?
4    A  Yes, sir.
5    Q  So for a period of about three months, three and a half
6  months or so?
7    A  About that, yes.
8    Q  Before I continue, let me just make sure you understand.
9  When I ask you a question, if you could just answer about
10  something that you know through personal knowledge, not about
11  what somebody else told you or what you read. Do you
12  understand what I'm saying?
13    A  From personal observation.
14    Q  Right.
15    A  Okay.
16    Q  Now, so you conducted this investigation for about
17  three, three to four months, let's say, right?
18    A  Yes.
19    Q  During your conduct of this investigation, you employed
20  technology, like these pen registers that you talked about,
21  right?
22    A  Yes.
23    Q  And you employed technology like the cell tower pinging
24  thing that you talked about, right?
25    A  That's part of the pen register.

---

1    Q  You employed video surveillance of Mr. Jones, of the
2  warehouse, correct?
3    A  Yes.
4    Q  That was about _35 days'_ worth of video surveillance?
5    A  Yes.
6    Q  That was 24-7, you said. Twenty-four hours a day, 7
7  days a week for 35 days; is that right?
8    A  Yes.
9    Q  And you've viewed all of these _tapes?_
10    A  Yes.
11    Q  Although Ms. Lieber didn't mention it, you also employed
12  a GPS tracker in this case, right, in your investigation?
13    A  Yes.
14    Q  And just so the jury is clear, that's a _separate GPS_
15  tracker than the one the FBI employed later, correct?
16    A  Yes.
17    Q  And you had that tracker in place for about three to
18  four months?
19    A  No, no, not that long.
20    Q  Do you recall how long it was?
21    A  _Several weeks,_ I don't recall exactly.
22    Q  Let me show you what I'll mark as Jones Exhibit 26.
23  I'll show it to Ms. Lieber.
24      During the course of this case, you completed
25  what's called a case chronology and review form. Do you

---

1  remember that?
2    A  Yes.
3    Q  Where you wrote down by hand observations, that kind of
4  thing?
5    A  Yes.
6    Q  Let me show you what I've marked as Jones Number 26.
7  I'll point your attention to the third line from the bottom
8  that's highlighted. Does that refresh your recollection as
9  to how long you had the GPS tracker in place?
10    A  Yes.
11    Q  How long did you have that tracker in place?
12    A  It is several months.
13    Q  That's in fact from March 5th through July 7, 2004,
14  right?
15    A  Yes.
16    Q  So that's approximately _four months_ that you had this
17  tracker in place?
18    A  Yes.
19    Q  Do you remember what vehicle in particular?
20    A  It was the Isuzu box truck.
21    Q  This is the white truck that you've mentioned several
22  times?
23    A  Yes, the one drove, driven by Lawrence Maynard.
24    Q  You didn't employ a _wiretap_ in this investigation,
25  correct, at least with respect to Mr. Jones?

He could be in a Big lie

**65**

1  A  No.

2  Q  Did you employ a wiretap at all?

3  MR. LIEBER:  Objection.

4  THE COURT:  What's the relevance?  It doesn't

5  relate to any of these people here.

6  MR. BALAREZO:  I'm just trying to make sure it

7  doesn't relate to my client, Your Honor.

8  THE COURT:  Well then ask about Jones which she

9  said she didn't.

10  BY MR. BALAREZO:

11  Q  There was no wiretap on Mr. Jones, right?

12  A  On a telephone belonging to Mr. Jones, no.

13  Q  You also, related to this investigation, you received

14  information from informants, correct?

15  A  Yes.

16  Q  None of those informants gave you information relating

17  to Mr. Jones, correct?  I'm talking about the ICE

18  investigation when you conducted it back in 2004 that you

19  testified about.

20  A  Not identifying him by name but describing him, yes.   *Lies*

21  Q  Is that in any of the reports that you wrote, the

22  reports of incidents, I believe?  Let me reask that question.

23  You completed some reports, report of

24  investigations?  I'm sorry.

25  A  Yes.

---

**66**

1  Q  ROIs I think you call them?

2  A  Uh-huh.

3  Q  All right.  And in there, you do list things that you

4  have done, observations that you've made, investigative

5  techniques that you've employed, right?

6  A  Yes.

7  Q  You do mention informants in those reports, correct?

8  A  Yes.

9  Q  Not by name but by number?

10  A  Yes.

11  Q  Like informant number such and such?  All right.  At

12  least what I have before me, I have four reports that contain

13  your name, Report Number One, 001, from April 26, 2004.  Do

14  you remember completing one then?

15  A  Yes.

16  Q  There was a Report Number Two?

17  A  Yes.

18  Q  There is also a Report Number Four, and there was a

19  Report Number Five.

20  A  Correct.

21  Q  You're familiar with those, right?

22  A  Yes.  I wrote them.

23  Q  No where in those reports does it mention any informants

24  identifying Mr. Jones in any manner, does it?

25  A  Not directly, no.

---

**67**

1  Q  No, that's not my question.  No where in your reports,

2  which are very detailed and multiple pages in length, does it

3  indicate that any informant said anything about Mr. Jones,

4  correct?

5  A  Well, the information received from the informant was

6  that individuals from McAllen, Texas, were coming to meet

7  with and collect proceeds from individuals from Maryland.

8  That individual was Mr. Jones.  Again, it was not identified

9  by name but --

10  Q  Did any informant say Antoine Jones?

11  A  No.

12  Q  Did any informant say Levels Night Club?

13  A  No.

14  Q  Did any informant say Hampton Park?

15  A  No.

16  Q  Did any informant say Brandywine?

17  A  No.

18  Q  Did any informant say Summit Circle?

19  A  No.

20  Q  You didn't know it was Antoine Jones.  They said some

21  guy in Maryland.  It could be anybody, right?

22  A  Yes.

23  Q  Now, you said --

24  A  According to the informant, we identified on our own who

25  it was.

---

**68**

1  Q  I'm not asking what you did.  I'm asking what the

2  informant told you?

3  A  Yeah, not from the informant.

4  Q  As I said when I began this, you're an experienced

5  agent, correct?

6  A  Yes.

7  Q  This is not the first time you're testifying, right?

8  A  Yes.

9  Q  I asked you just to answer my question.  I don't want to

10  hear your opinion.  I don't want to hear anything else but

11  just the answer to my question.

12  THE COURT:  I instruct the witness, not you.  If

13  you need something from the witness, let me know.

14  MR. BALAREZO:  Well then I would ask the Court to

15  instruct the witness to answer the question.

16  THE COURT:  Yes, but when you asked the question

17  the way you did.  Overruled, go ahead.

18  BY MR. BALAREZO:

19  Q  Now, you said that, on the February the 6th is when you

20  first began your surveillance of this Javier guy, correct?

21  A  Yes.

22  Q  That was because you received a call from an Agent in

23  McAllen saying he was coming wearing the fancy ostrich boots

24  and all those things, correct?

25  A  Yes.

69

1  Q   That's when you went to the airport and made eye ball
2  surveillance, as Mr. Lieber likes to call it --
3       MR. LIEBER:  Objection.
4       THE COURT:  All right.
5  BY MR. BALAREZO:
6  Q   Did Ms. Lieber call it eye ball surveillance?
7       THE COURT:  Let's just go ahead.  She called it eye
8  ball.  Let's go ahead.
9  BY MR. BALAREZO:
10 Q   You made eye ball surveillance, right?
11 A   Yes.
12 Q   Of this Javier person, and you followed him from the
13 airport to Arundel Mills?
14 A   Yes.
15 Q   They had dinner then they went on to the Summit Circle
16 location, right?
17 A   Yes.
18 Q   And you yourself observed all of this?
19 A   Yes.
20 Q   Simple question, did you yourself, with your two eyes,
21 observe this Javier person from the airport to Summit Circle?
22 A   Yes.
23 Q   Mr. Jones was no where, at least that you could tell, at
24 Arundel Mills, was he?
25 A   No.

70

1  Q   When you got to Summit Circle, you indicated that you
2  saw the individual get out of the car, or three individuals
3  get out of the car, climb up the garden-style apartments to
4  the third floor.  At no point did you actually see what
5  apartment they went in; is that correct?
6  A   Correct.
7  Q   All you knew is that they went up to the third floor.
8  You never saw Mr. Jones up until that point, correct?
9  A   Correct.
10 Q   At some point thereafter, you indicated that the
11 individuals left the apartment; is that correct?
12 A   Correct.
13 Q   This was after you and your team were there I think over
14 night more than 24 hours conducting eye ball surveillance?
15 A   Yes.
16 Q   You guys didn't fall asleep, right?
17 A   I didn't.
18 Q   As far as you know, your agents didn't either.  I mean,
19 you're doing surveillance.  You're not falling asleep, right?
20 A   I would hope not.
21 Q   Well, you never saw Mr. Jones at Summit Circle, did you?
22 This is Mr. Jones.  You never saw this person at Summit
23 Circle?
24 A   No.
25 Q   While you were conducting your surveillance that night

*No search warrant - Summit circle*

71

1  or the next day, right?
2  A   No.
3  Q   You also mentioned that the Javier guy left with one of
4  the other two individuals and took off, right?
5  A   Yes.
6  Q   And then the third individual from the apartment was
7  picked up and taken to an airport; is that correct?
8  A   Yes.
9  Q   You didn't see Mr. Jones driving up to pick up that
10 individual, correct?
11 A   No, I wasn't there at that time.
12 Q   Okay.  You've testified based -- when you testified on
13 direct examination about that particular incident, again,
14 that wasn't your direct knowledge.  That was what somebody
15 else told you?
16 A   Yes.
17 Q   Now you've had access to all the technology that we've
18 discussed, the pen registers, all those things.  Did you have
19 a camera when you were conducting that surveillance?
20 A   That initial surveillance?
21 Q   Yes, on February 6th and 7th.
22 A   No, I didn't.
23 Q   Well, you just didn't happen into that location.  I mean
24 you went there for a purpose, right?
25 A   We were following, we followed Javier there, yes.

72

1  Q   Right.  When you went to the airport, you knew what you
2  were going to do.  It's not like it was serendipity.  It
3  wasn't coincidence, right?
4  A   Yes.
5  Q   So you didn't have a camera.  You didn't have a video
6  camera, right?
7  A   Right.
8  Q   You don't have a camera [sic] of this car picking up
9  this third person and going to the airport, right?  You don't
10 have a picture of Javier with his ostrich boots going up to
11 the third floor.  You don't have any of that?
12 A   No.
13 Q   Now, your team never went into Summit Circle, correct,
14 into the apartment itself?
15 A   Correct.    *IMPEACHMENT*
16 Q   That you subsequently identified Number Three -- what
17 was the number?  What was the apartment you later identified
18 as being rented by Antoine Jones?
19 A   38.
20 Q   You never went into that apartment, right?
21 A   I didn't, no.
22 Q   Did any of your agents go into that apartment?
23 A   I think some did.   *Illigal search*
24 Q   Do you know when they went into that apartment?
25 A   I'm not exactly sure of the date.  It might have been

*[handwritten annotations: "within the Angel", "MESTREAL", "Lie", "MESTREAL", "NO SEARCH WARRANT"]*

**[Column 1 — page 73]**

1  February 7th, the second day.

2  Q  Was that pursuant to a warrant?

3  A  No, sir.

4  Q  How did they get into there?

5  A  The maintenance man.

6  Q  So, you have an apartment that's rented presumably by

7  Mr. Jones, am I correct there?  You have some interest in

8  that apartment and your law enforcement capacity; is that

9  correct?

10  A  Yes.

11  Q  Did you understand the question?

12  A  Yes.

13  Q  Okay.  You want to see what's going on in the apartment,

14  right?  You're interested in what's going on in there, right?

15  You can't see from outside.

16  A  Yes.

17  Q  So you don't go to a court and get a search warrant; is

18  that correct?

19      MS. LIEBER:  Objection, Your Honor.

20      THE COURT:  Wait a second.  Let's approach.

21      (Bench conference.)

22      MR. BALAREZO:  You are objecting?

23      MS. LIEBER:  Just to, she can testify about what

24  she did.  Whether or not she got a search warrant, she didn't

25  do all of this.

**[Column 2 — page 74]**

1      THE COURT:  He's asking for all this hearsay.

2      MR. BALAREZO:  This is new to me, Your Honor.

3      THE COURT:  They didn't introduce anything that was

4  found there.  I suspect your guy is not going to stand up and

5  say.  If they don't introduce anything, so you have some kind

6  of possible, in a civil action, I don't know.  But what good

7  does it, where are we?  *[handwritten: SUPPRES!]*

8      MR. BALAREZO:  Your Honor, it just shows the

9  conduct of these investigations of my client.  They're going

10  into an apartment without a warrant.

11      THE COURT:  I don't know that they are or not.

12      MR. BALAREZO:  She just said that they didn't have

13  one.

14      THE COURT:  It is not for the jury to pass on the

15  legality.

16      MR. BALAREZO:  I'm not asking that.  I think the

17  jury should be aware of the steps these people took to

18  investigate my client.

19      THE COURT:  That may be fine.  Maybe the Government

20  wants people to know, but they're not going to be told.  You

21  can't argue the legality of it.

22      MR. BALAREZO:  I'm not doing that.  I'm trying to

23  get the facts out.  I just found out about this.

24      THE COURT:  The more you ask, the more you learn.

25  Sometimes it doesn't actually turn out to be that helpful.

*[handwritten: NO SEARCH WARRANT]*

**[Column 3 — page 75]**

1      MS. LIEBER:  Your Honor, the reason I let it go

2  that far, now I'm going to ask her on redirect what did they

3  see.

4      THE COURT:  What did she see?

5      MS. LIEBER:  Air mattresses, shrink wrap and

6  devotional candles.  I didn't seek to put that in my case

7  because --

8      MR. BALAREZO:  Did she see it?  Was she there?

9  Your Honor, if the Government gave me this information from

10  the beginning, then I would know where I'm going.

11      THE COURT:  You are asking for hearsay.  Why are

12  you inviting it?  She doesn't have any first-hand knowledge.

13      MR. BALAREZO:  Your Honor, she was testifying about

14  not first-hand knowledge during the, this is not for the

15  truth of the matter, so she saw she did what she

16  did, to show her investigative technique.

17      MR. NORRIS:  If this line of questioning is opening

18  up the credibility, I don't see why that would open the door

19  to what they found from the illegality.

20      THE COURT:  You are suggesting that it is illegal.

21  We have not determined that.  We can't determine that here

22  because it can't be a motion to suppress unless they put the

23  stuff in.  But if you want to know --

24      MR. NORRIS:  They went into the requirements for

25  the search warrant for the sneak and peek investigation.  So,

*[handwritten: THe JUDGE is PReJUDiCe]*

**[Column 4 — page 76]**

1  it's already out there.  The fact that these agents follow

2  the letter of the law and get these warrants for sneak and

3  peeks, their credibility is at issue at that point, not what

4  they found illegally or not illegally inside.  *[handwritten: PreJudice]*

5      THE COURT:  First of all, your guy doesn't have any

6  standing here.  But I think it's a terrible mistake to keep

7  on opening all these big fat doors over nothing.  She doesn't

8  have first-hand knowledge.  She isn't there.  So you can't

9  keep asking her what did she learn.  I don't want her to go

10  into what she saw.  *[handwritten: MISTRIAL]*

11      MR. BALAREZO:  She was not there for a lot of what

12  she testified about.

13      THE COURT:  Why are you going backward?  As far as

14  I can tell, she saw what she saw.  And I don't have any

15  problem with the testimony to date.  If you keep talking

16  about this one, they'll be able to bring out what she found.

17  Otherwise we're stopping it.  *[handwritten: PreJudice]*

18      MR. BALAREZO:  Can I at least confirm that they

19  didn't have a warrant and I'll move on then?

20      THE COURT:  She told you.

21      MR. BALAREZO:  Was she the lead agent?

22      THE COURT:  I don't know how much of this argument

23  about her credibility based on some people going into an

24  apartment without a warrant when, first of all, the legality

25  is not before the jury.  So what are you going to make of it?

*[handwritten: PReJUDiCe — MiStRiAl]*

G. KDS

**77**

1    MR. BALAREZO:    Your Honor, I would probably then
2    move to suppress whatever was found there.
3    THE COURT:    It has not been introduced.
4    MR. BALAREZO:    If I want to ask the question,
5    they're going to introduce it.
6    THE COURT:    I'm not going to let them.  So you are
7    not going to have any argument about the legality of this
8    search warrant.  Somebody would have to, I'm the only one
9    that can pass on it.  I don't think you can make any argument
10   about this witness' credibility based on some allegation that
11   somebody on her team may or may not have entered with the
12   permission of the maintenance man.    *Prejudice*
13   MR. NORRIS:    There is all this testimony about what
14   she learned and how it affected the investigation.  I think
15   what is relevant is what she believes about the search, not
16   whether or not it is actually legal.
17   THE COURT:    I don't care what she thinks about the
18   legality of the search, unless you want to bring in
19   everything they found there.  You can't have it both ways.
20   Do you want everything to come in that they found?  Then we
21   can figure out what she believed.    *Prejudice*
22   MR. NORRIS:    I think just because someone is caught
23   with their hand in the cookie jar does not open the door to
24   what flavor the cookie was.
25   THE COURT:    I don't agree.  You are trying to

**78**

1    suggest something that is terribly illegal.  I have not ruled
2    on it.  Who can make that argument?  I don't even know except
3    for maybe your client.
4    But the only way you can argue the legality of what
5    they see is if we let in what they seize.  You can't have it
6    both ways.  You can't argue to this jury the legality.
7    MR. BALAREZO:    The problem I'm having with all
8    this, the paperwork that I got regarding the ICE
9    investigation, everything I saw about what was in that
10   apartment is written as if the, Summit Circle, the
11   maintenance man told us this, the maintenance man told us
12   that.
13   So based on what I've gleaned from this report, I
14   have no idea they're in there with the maintenance man.  Now
15   this witness said I'm there and they want to bring in all
16   these other things.    *illegal search*
17   THE COURT:    She's not saying that, listen to her.
18   Do you want to voir dire her whether or not the maintenance
19   man told her, the agents told her?  But you are not going to
20   get it in before the jury.  It is completely inadmissible.
21   If you want it for truth, which you must be --
22   Sustained, move on.    *Prejudice*
23   (Open Court.)
24   THE COURT:    Go ahead.
25   MR. LIEBER:    Your Honor with respect to an

**79**

1    instruction, perhaps?
2    THE COURT:    We can think about it later, thank you.
3    BY MR. BALAREZO:
4    Q    Now, with respect to this Summit Circle, which is the
5    only location we're talking about at this point, the
6    information that you had gotten up until this point was that
7    Javier was going to come to collect money, right?
8    A    Yes.
9    Q    Money for drugs in effect is what you understood?
10   A    Money from the proceeds of the sale of drugs, yes.
11   Q    At least to your knowledge, and let's get this out, were
12   you the lead agent, in a way, of this investigation?  Were
13   you in charge?
14   A    This was a phone call that came in --
15   Q    I'm not asking about the phone call.  I'm asking about
16   the ICE investigation from February until May or whenever it
17   was that you left, were you the lead agent?
18   A    Yes.
19   Q    You were in charge of the investigation?
20   A    Yes.
21   Q    You were familiar with all the details of the
22   investigation, right?
23   A    Yes.
24   Q    Up until that point of February the 7th, let's say, when
25   Javier left the location at Summit Circle and the other two

**80**

1    individuals left the location at Summit Circle, you never
2    placed Mr. Jones at that location physically, correct?
3    A    Correct.
4    Q    And as far as you know, no money was ever seized at that
5    location, correct?
6    A    Correct.
7    Q    As far as you know, no drugs were ever seized at that
8    location, correct?
9    A    Correct.
10   Q    Now, there were some items that were in that location,
11   is that true, when you went in?
12   THE COURT:    She didn't go in.
13   THE WITNESS:    I didn't go in.
14   BY MR. BALAREZO:
15   Q    Well, as case agent or lead agent, you are aware the
16   THE COURT:    We discussed this, Mr. Balarezo.  If
17   you want to pursue that question, I've told you.  You'll
18   proceed at your risk.    *Prejudice*
19   BY MR. BALAREZO:
20   Q    So no money, no drugs, we're clear on that?
21   A    Correct.
22   Q    Now, after that, you began following up on tag numbers
23   and Mr. Jones.  I think you said you went to the apartment
24   and got the lease for the apartment, right?
25   A    Yes.    *Very Important*

*The Judge tries to save her*

1 Q    And you found out that Mr. Jones, or at least someone by
2 the name of Jones, rented that apartment 3 B?
3 A    Yes.
4 Q    But you can't say that that's the apartment that Javier
5 and the other Mexican, whoever they were, were in; is that
6 correct?
7 A    Correct.
8 Q    Either you can or you can't?
9 A    Well, I didn't physically see them go into that door.
10 Q    I don't want your belief?
11        THE COURT:  Let's approach.  Excuse us, ladies and
12 gentlemen.
13        (Bench conference.)  *Prejudice*
14        THE COURT:  You are trying to insinuate that they
15 have no good basis for fingering 3B.  But if they went in
16 there and found stuff in there, whether or not it is a good
17 or bad search, you are begging for it.  *Prejudice*
18        MR. BALAREZO:  She already said she didn't see any
19 of these guys go into apartment 3B.  All, she got the
20 information on Jones.  She can't say it was the same
21 apartment.  She can say it on an assumption
22        THE COURT:  Not on assumption.
23        MR. BALAREZO:  She never saw it.  No agent saw the
24 three Mexicans go into that apartment.  It's a stupid little
25 point.

        THE COURT:  No, it's not stupid.  They didn't see
three people go into 3B.  But they went in there and saw the
remains of what people were doing.  It is clear.  So if you
want the inference to get in there, you can't keep going at
her as if she doesn't know things and then suggest that
they're doing something without a basis to connect this
apartment to him.  He is clearly associated with your client
in this evidence.  *It is not going to get any better.*  *Prejudice*
10 disputing that Jones is associated somehow with 3B or that
11 the Mexicans were seen going to the third floor.  All I'm
12 saying is she can't say they were going to 3B.
13        THE COURT:  I think the remains is consistent with
14 every other address, the warehouse, the Myrtle Avenue
15 apartment, the candles.  *Bull CRAP*
16        MR. BALAREZO:  The religious candles don't have to
17 be Mexican.  *Prejudice*
18        THE COURT:  You can make that argument, the
19 Government can make these other arguments.  So keep
20 suggesting that 3B didn't have the Mexicans in there because
21 then she'll be able to put this stuff in.  Then you'll be
22 able to criticize the tactics but not the evidence that comes
23 in.  *THE JUDGE WAS BLUFFING*
24        MR. BALAREZO:  So I can make my decision, can the
25 Government tell us what was found in 3B?

*Motion to suppress?*

1        THE COURT:  Inflatable mattresses, candles, similar
2 to the candles found in two other locations.
3        MR. LIEBER:  Shrink wrap.  I think the bags of  *Bull CRAP*
4 clothes were still there just like Myrtle.
5        THE COURT:  It is a pretty similar course of
6 conduct is the problem.
7        MR. NORRIS:  I think the argument is even stronger,
8 now that she has testified that she was the lead agent.  If
9 she authorized this search, which is illegal.
10        THE COURT:  You are assuming something that I have
11 not ruled on.
12        MR. NORRIS:  I understand.  It might be worth the
13 hearing out of the presence of the jury.
14        THE COURT:  Wait.  Let me tell you.  How can we
15 have a hearing unless there is a motion to suppress?  Who has
16 the standing to suppress if they don't introduce the
17 evidence?  Since when do we get to have hearings about
18 evidence?
19        MR. NORRIS:  I think it effects her credibility.
20 If their decision is we're going to do something illegal, we
21 won't use the proceeds of it, but we're going to do it for
22 our own knowledge.
23        THE COURT:  They're saying, she authorized an
24 illegal search.  We'll have to take it up outside the
25 presence of the jury.

1        MR. LIEBER:  This is an area I never went into
2 because I was not intending to use this information.  She has
3 testified this was February 7th.  She got the call, the
4 triggering call late in the day on February 6th.  So, the
5 notion that she was the lead agent and she authorized this is
6 nonsense.  It does not go to her credibility.  That's the
7 issue.
8        THE COURT:  Mr. Norris' point is what if they said
9 to her, should we go in there without a search warrant.  I
10 don't know if it is illegal because I don't know enough about
11 facts.  Assuming that is, you can't hold her responsible if
12 nobody asked, just because she got the call and thereby
13 became the lead agent.  I don't buy that.  She has to have
14 some involvement.
15        We'll take it up outside the presence of the jury.
16 Her credibility in a sense is clearly at issue.  But I think
17 you are going to hear a lot of stuff about what is in this
18 apartment.  I'm not going to let you pick and choose these
19 arguments.
20        MR. GEISE:  Your Honor, I would just say this, if
21 the motion is that someone's credibility is at stake because
22 they authorized an illegal search.
23        THE COURT:  I don't know that it is.
24        MR. GEISE:  I'm just saying he begins to perhaps --
25        THE COURT:  You are assuming.

**85**

```
1    We'll let them go to lunch. We'll only take this
2  outside of the presence of the jury. If it gets in front of
3  the jury, there are consequences of what they found in there,
4  which is going to be remarkably similar. So I think you have
5  to figure out whether or not you care about this.
6         MR. BALAREZO: If I go into the warrant thing --
7         THE COURT: I'm not going to let you go into the
8  warrant anymore unless we have some basis for Mr. Norris'
9  argument. Then you have to decide whether you really want to
10 go into it in some fashion in front of the jury to insinuate
11 her people searched.
12        But once you get into her people's search being
13 good, bad or indifferent, the consequences of the search are
14 going to come out too. That's part of it. Okay.
15        (Open Court.)
16        THE COURT: Ladies and gentlemen, we're taking a
17 slightly long lunch. We have to take up a short legal issue.
18 We hope it's short. So I'm going to, instead of holding you
19 here, ask you to return please at 2:00. Have a good lunch.
20 Don't discuss the case and keep dry.
21        (Jury Out.)
22        THE COURT: Agent, would you take the stand again,
23 just a couple of quick questions.
24        Could you tell us, do you know from your, any of
25 the people on your investigation, did they report to you what
```

**86**

```
1  they found in the apartment at Summit Circle?
2         THE WITNESS: What they told me was that, the
3  candles were burning. They, I believe, saw a money counter
4  and ammunition boxes, cartridges, not cartridges, but empty
5  ammo boxes, ammunition boxes.
6         THE COURT: Anything else that you recall being
7  told that they saw in there?
8         THE WITNESS: Inflatable mattresses.
9         THE COURT: As far as you understand, the
10 maintenance man let them in?
11        THE WITNESS: Yes.
12        THE COURT: This was on the 7th?
13        THE WITNESS: Yes.
14        THE COURT: Okay. Mr. Norris, go ahead.
15                    VOIR DIRE
16 BY MR. NORRIS:
17 Q   Good day, Agent Gikas. So you received a call the
18 previous day on the 6th, is that correct?
19 A   Yes.
20 Q   That's when all your surveillance work began was on the
21 6th, correct?
22 A   Yes.
23 Q   Is it fair to say that, because you received the call,
24 you were the agent that instigated the investigation that
25 followed, the surveillance that day and the surveillance that
```

**87**

```
1  led to Summit Circle?
2  A   The call -- let me back up -- actually my supervisor
3  received from the agent.
4         THE COURT: What's that person's name?
5         THE WITNESS: Bill Water.
6  BY MR. NORRIS:
7  Q   What did Mr. Water ask you to do in relation to the
8  call you received?
9  A   Well, he got the group together, to organize activity.
10 And it was, you know, informally, out, you take the lead on
11 this, but the whole group was summoned.
12 Q   And that you take the lead on this, occurred before
13 Javier actually arrived at the airport, is that fair to say?
14 A   I honestly don't remember. I honestly don't remember.
15 We were scrambling that evening just to get ready for the
16 arrival, but it was that day or shortly thereafter.
17 Q   That you took the lead on the investigation?
18 A   Yes.
19 Q   When did the maintenance man and the other agents go
20 into the apartment, if you know?
21 A   I don't know. I don't know what time. I was told, I
22 don't know if it was the next day or Monday, that some people
23 went into the apartment and observed those items.
24 Q   Okay.
25        THE COURT: Did you learn after the fact or before
```

**88**

```
1  the fact?
2         THE WITNESS: After the fact. After the fact.
3         THE COURT: Somebody told you what they saw in the
4  apartment and how they got in?
5         THE WITNESS: Yes, Your Honor.
6         THE COURT: Can I see the lease a minute, please,
7  for this apartment on Summit Circle and any other documents
8  that came in?
9         MS. LIEBER: The other documents also, Your Honor.
10        THE COURT: Two and three and I don't know what
11 else, two and three, please.
12 BY MR. NORRIS:
13 Q   Now, when you were conducting the surveillance at Summit
14 Circle before you left, that would have been up until the
15 morning of the 7th; is that correct?
16 A   Early, late morning, yes.
17 Q   You actually saw individuals go up to the third floor;
18 is that correct?
19 A   Yes.
20 Q   That's the point you didn't know which apartment, but
21 you knew it was third floor?
22 A   Correct.
23 Q   Was there a discussion amongst yourself and the agents
24 that were with you as to, you know, we wonder which
25 apartment. We want to know what's in the apartment. We're
```

1  curious what was in the apartment?
2  A  We want to know which apartment, yes.
3  Q  And did you also want to know what was going on in the
4  apartment?
5  A  Well, we pretty much, you know, we were thinking that
6  there was money in the apartment, yes.
7  Q  Okay.  And money, the proceeds of drug sales?
8  A  Yes.
9  Q  And were you also assuming that there could be drugs in
10 the apartment as well?
11 A  Possibly.
12 Q  Was there any discussion that you had as to ways in
13 which you could answer that question, how you could find out
14 what was in the apartment?
15 A  No.
16 Q  Any discussion about the need for a warrant or the way
17 to go in there without a warrant?
18 A  Did I have any discussions?
19 Q  Yes.
20 A  No, I wasn't part of that at all.  No.
21 Q  Do you know how it is the maintenance man came to let
22 the other agents in?
23 THE COURT:  That's hearsay. — Prejudice
24 MR. LIEBER:  I object to this point because if the
25 point is voir dire --

1  THE COURT:  I know.  Overruled.
2  What did they tell you after the fact regarding how
3  they got in there?
4  THE WITNESS:  That the maintenance guy had let them
5  in.  There was some discussion about immigration authority,
6  which I'm from the custom background, so I'm not extensively
7  knowledgeable on the immigration authorities we have, as far
8  as, you know, if there is a belief that there are illegal
9  aliens.
10 THE COURT:  This is all stuff that came to you some
11 time after the event?
12 THE WITNESS:  Yes, Your Honor.  I found out about
13 it after.
14 THE COURT:  I have one other question though.  So,
15 when did you piece together who was the lessee of this place?
16 THE WITNESS:  From the registrant of the Cadillac
17 matching one of the renters in that building.
18 THE COURT:  Cadillac?
19 THE WITNESS:  The black Cadillac that picked up the
20 third individual and took them to SW.
21 THE COURT:  I'm sorry, I'm having some difficulty
22 remembering that in prior testimony.  So a black Cadillac
23 picked up the third individual at SW?
24 THE WITNESS:  I'm sorry.  When the three
25 individuals fled that location on Saturday afternoon at some

1  time, Javier and one of the other individuals got into the
2  silver Impala and drove off.
3  The third individual was picked up by someone
4  driving a black Cadillac, and that black Cadillac was
5  registered to Antoine Jones.  Lives-out-of-town
6  THE COURT:  And that pick-up occurred at the Summit
7  Circle address?
8  THE WITNESS:  Yes, Your Honor.  And it went, the
9  black Cadillac went from the Summit Circle address to SW.
10 THE COURT:  Okay.  So, that's how you, when you ran
11 those tags on the black Cadillac, that's what got you to,
12 that revealed Jones's name?
13 THE WITNESS:  Yes, I mean the match.
14 THE COURT:  All right.  Go ahead, Mr. Norris,
15 finish it up.
16 BY MR. NORRIS:
17 Q  When did that occur in terms of running of the tags?
18 A  As soon as they saw the car.  Again, I wasn't there at
19 that point, but the agent who actually followed the car to
20 the airport or agents, they would have, we run tags by making
21 a phone call to our central communication.
22 THE COURT:  WALES, I take it.
23 THE WITNESS:  Sector, we call it.
24 THE COURT:  Okay.
25

1  BY MR. NORRIS:
2  Q  As to the maintenance man, I'm assuming that the
3  maintenance man going into the apartment with the agents was
4  done at the agent's request?
5  MR. LIEBER:  Objection.
6  MR. NORRIS:  It's hearsay but it's for the purposes
7  of the hearing?
8  THE COURT:  Only if somebody told her.
9  BY MR. NORRIS:
10 Q  You were told that the agents asked the maintenance man
11 to let them in?
12 THE COURT:  What were you told about this?
13 THE WITNESS:  I asked, you know, how did you guys
14 get in.  The maintenance man let us in.  I don't know what
15 was asked of the maintenance man.  I don't know, you know,
16 there was a candle burning, and, you know, the candles were
17 left burning.  I don't know.  I don't know.  You know, you
18 are going to have to ask the maintenance man.  I don't know.
19 MR. NORRIS:  Thank you.  Nothing further.
20 THE COURT:  Okay.  Mr. Norris.
21 MR. Balarezo, anything further?
22 MR. BALAREZO:  Your Honor, number one, we may need
23 to continue this hearing because we have spoken to the
24 maintenance man and he indicated that he never let anybody
25 in.  I can tell you that.  Important

THE COURT: All right. Do you have any more questions for the witness? I am going to excuse the agent.

MR. BALAREZO: I think Mr. Norris covered it.

THE COURT: Fine. All right.

That's good. Thank you.

(Witness excused.)

THE COURT: Mr. Norris, I'll hear from you as soon as the agent walks out. *Prejudice*

I don't really know where we're going except opening doors that I don't see in anyone's interest to open. But that's your choice, not mine. *Prejudice*

MR. NORRIS: Your Honor, I think any arguments to be made as Mr. Balarezo's.

THE COURT: Okay.

MR. BALAREZO: Your Honor, I would like, number one, to continue my examination with respect to the procedure of this warrant, or warrantless search that they conducted for various reasons. As Mr. Norris explained at the bench, I think a lot of it has to do with the conduct of the investigation, number one, the steps that they took, why they did certain things that they did, and, quite frankly, how they got to know certain things that they came to know.

I've consulted with my client with respect to the Court's indication that if we continue down this road that the things that were found are going to get before the jury.

---

I hope I'm not violating attorney/client, but we don't have a problem with that. But I think it's important for us --

THE COURT: What is the relevance that some agents may or may not have entered an apartment without proper authority. I don't know whether they did or they didn't. So you can't really argue it to the jury. It seems to me you're asking some, you're trying to make an argument that somebody has done something wrong without a Court ruling.

They're not in a position. She hasn't lied. She didn't order it. There is no evidence before me that she either authorized or ordered an unlawful search. There is not going to be any evidence of the search coming in.

I don't see, based on the record in front of me, that her credibility is affected one iota. So I don't understand where we're going. *Prejudice*

MR. BALAREZO: Your Honor, I think her credibility is affected for this simple reason. She has written several voluminous reports, these reports of investigation. She testified at the Grand Jury. At no point, and I know the Government is going to say, well, she wasn't asked, at no point did she mention that they went into the house.

In the Grand Jury, she was specifically asked about what was in the apartment. And basically, what she said is that the maintenance man told us that there was -- and I'll quote, this is Page 12 of the March 14, 2006, Grand Jury

*Very important. Grand Jury*

---

testimony.

THE COURT: Do you have a copy that I can look at?

MR. BALAREZO: Do you want me to put it on the Elmo?

THE COURT: That's fine.

MR. BALAREZO: I'll have this marked as Hearing Exhibit 1?

THE COURT: Call it Jones, what's the next number?

MR. BALAREZO: 27.

THE COURT: Twenty-seven is the Grand Jury testimony of the agent from what date? Okay.

MR. BALAREZO: March 14, '06, Your Honor.

THE COURT: Fine.

MR. BALAREZO: And here at Page 11, she's asked questions about how -- I'll read it, When you want, when you sort of began to conduct some further investigation of this apartment and what was going on there, did you have a chance to talk to the grounds keeper: Yes, I interviewed both the property manager and one of the maintenance persons. Question, and what specifically, first --

THE COURT: I'm sorry. I don't even know where you are.

MR. BALAREZO: I'm right here, Your Honor. I'll turn it back so the Court can read it.

THE COURT: Bring it up. I never saw the bottom

*Property manager - who?*

---

Fine.

MR. BALAREZO: I'm sorry.

THE COURT: Could you make sure the agent is still around out there in case I have a question for her?

All right. When you began conducting the investigation -- go ahead.

MR. BALAREZO: Your Honor, if I could have this admitted as an exhibit, or admitted into evidence for this hearing, not just as an exhibit.

THE COURT: Well, it's an exhibit and it's for this hearing, but I don't want to put it in evidence for the jury. All right. *Important*

Would you remind me. The silver Impala is registered to whom?

MR. BALAREZO: I think eventually it's going to be shown that it was registered to Guadalupe Barrone.

THE COURT: Any more on that page?

MR. BALAREZO: That's it of that page, Your Honor, but the gist of that is that --

THE COURT: She talks to maintenance?

MR. BALAREZO: You know, that she testified under oath that they asked the maintenance man and the maintenance man told them what happened, you know, which may have happened. I don't know. But the fact is now we know that they went in themselves to the apartment, and they're

1   claiming to have seen these things.  So somewhere along the
2   line the truth lies.
3          THE COURT:  Well, I don't know.  You're insinuating
4   that what's in her Grand Jury in some fashion is not
5   accurate.  I don't know whether she talked to the maintenance
6   man or she didn't.
7          MR. BALAREZO:  Well, additionally, Your Honor, in
8   those reports, that's what I was getting at, there's at least
9   four that I have, and you saw the fifth, there's absolutely
10  no mention of them having gone into this apartment, which
11  would lead me to question, why are you hiding it?  Why aren't
12  you putting it down?  We went into the apartment and this is
13  what we found.
14         And I think that goes to credibility.  Do they
15  think or does she think that her agents did something wrong?
16  Why are you not documenting the fact that you went into this
17  apartment that you're investigating?  I think that's, and I
18  know the Court's making faces, Your Honor, but that's the
19  gist of it.
20         THE COURT:  I know.  I don't think it goes to her
21  credibility is the problem.
22         MR. LIEBER:  Your Honor, if I may, with respect to
23  the Grand Jury, I purposely did not ask her about what the
24  other agents told her about that because I don't know whether
25  or not it was a legal search.  We didn't sort of run, look at

*(handwritten: very important)*

---

1   all the immigration issues and other possible authority to do
2   so.  In lieu of that, I just didn't ask about it.
3          THE COURT:  Did she talk to a maintenance man?
4          MR. LIEBER:  Yes.
5          THE COURT:  So the, I mean, the problem of her
6   credibility in the Grand Jury, that may be fair game.  But
7   you can ask her if she talked to a maintenance man and
8   learned these things.  It's getting really cumulative whether
9   or not they learned anything from this search.
10         I find the issue of her credibility so attenuated,
11  not the question of her credibility but the relevance of a
12  search, which I'm not in the position to say whether it's
13  legal or not legal, whether it was improper or not improper,
14  as long as we don't have anybody offering the evidence to go
15  in.
16         If she talked to a maintenance man and learned
17  this, we can verify that because that's what goes to her
18  credibility, what she testified under oath.  I don't think
19  that the absence of a discussion of what was seen in there in
20  her reports is sufficiently probative of her credibility
21  because the suggestion is there's something wrong with this
22  search.
23         And the search is really not before me as long as
24  they don't put in the evidence.  So, if you want to ask her
25  whether she ever talked to a maintenance man and learned

*(handwritten: Impeachment by omission)*

---

1   these things, if she's telling the truth in the Grand Jury.
2   But I wouldn't do it -- you can do it out of the presence of
3   the jury.  Otherwise, you just keep getting more information
4   you don't want.
5          MR. LIEBER:  Your Honor, I would just, just so
6   we're clear, if Mr. Balarezo asks her in front of the jury
7   whether or not she spoke to the maintenance man about what
8   happened in that apartment, I just want to be sure I can then
9   ask her and what did he tell you?  That he has opened --
10         THE COURT:  Right.  It's really a little bit of
11  thin ice here.  If you want to know what the maintenance man
12  told her, if she in fact spoke to the maintenance man, I
13  don't see anything about this Grand Jury testimony that's
14  useful to go into.
15         MR. BALAREZO:  Well, I think we should be able to
16  impeach her by omission, Your Honor.  I mean, she's being
17  asked a specific question, and you know, she's, in effect,
18  saying one thing knowing that they got the information
19  another way.
20         THE COURT:  No.  The latter is if you had any basis
21  for that.
22         MR. BALAREZO:  Well, I do because -- we spoke to
23  the maintenance man.  My investigator spoke with him.  He
24  said the guy who worked there as the maintenance man at that
25  time, he never let anybody in, never spoke to an agent.

*(handwritten: ... Impeachment ...)*

---

1          THE COURT:  Well, you can ask her if she ever
2   talked to a maintenance man and what she learned from the
3   maintenance man.  All that might do is burn you.  But you're
4   suggesting that something about her learning things from the
5   maintenance man is untrue.
6          I don't know what the maintenance man has to say
7   about what the information that she got from the maintenance
8   man.  The impeachment by omission, the fact that she did not
9   include in her report that they had learned something from
10  looking in the apartment, I think is really attenuated.  I'm
11  not going to let you go into it.  *(handwritten: Prejudice)*
12         If you want to ask her out of the presence of the
13  jury, whether she in fact had a conversation with the
14  maintenance man to try to impeach her Grand Jury testimony,
15  that may go to credibility.  That's the only thing I can see.
16         I'm not the least bit persuaded by the argument
17  that somebody, who was working with her, without her
18  authorization, may or may not have conducted a proper or
19  improper search.  In some way or another it's going to go to
20  her credibility and that her failure to include something in
21  a report, that omission should be used to impeach her, I
22  don't see it.
23         MR. BALAREZO:  Well, Your Honor, if I could get the
24  Government to give me the information of who went in the
25  apartment and make them available for me to talk to.

*(handwritten: Prejudice)*

False testimony

**181**

```
1        THE COURT:  You have a subpoena power.
2        MR. GEISE:  I'm going to say, not to be more petty
3   than my nature requires me to be, but I think it's fully
4   appropriate what we did here.  I don't think Mr. Balarezo was
5   entitled to ask this witness out of the presence of the jury
6   whether she talked to the maintenance man.
7        If he wants to ask that in front of the jury and
8   find out and live with the result, that's fine.  I think what
9   we did so far is absolutely appropriate.  But I don't think
10  he's entitled to free questions until he finds out what's
11  going to happen.
12       THE COURT:  I agree that, to the extent that she
13  could have given the Grand Jury false testimony, that's
14  certainly fair game.  But they're representing that she did
15  talk to a maintenance man.  And the problem with all that is,
16  once you open it up, you learn what she learned from the
17  maintenance man.
18       MR. BALAREZO:  I understand, but this is the
19  problem we get when they don't tell us things.  That's why we
20  have discovery.  I know they weren't seeking to introduce the
21  stuff --
22       THE COURT:  They don't have to tell you everything
23  the Government does.  Do they have to tell you everything the
24  Government's going to introduce and everything that is
25  material to the defense?  I don't see that this is --
```

**182**

```
1        MR. BALAREZO:  Well, Your Honor, in this case, I do
2   think it's something that they should have disclosed because,
3   if they saw something as a result of this search which may or
4   may not have been illegal, which caused them or gave them
5   information that they then subsequently used to conduct other
6   investigation, we could argue that it's the fruit of the
7   poisonous tree because of an illegal search initially.
8        So yes, we should have been told that.  Yes, I
9   would have filed a motion to suppress, and we would have had
10  this hearing before the trial.  For them now to say, I can't
11  get a free question because I can't get free discovery from
12  this witness, that's crazy.  Because they don't tell us these
13  things, so yes, I'm flying blind half the time because I
14  don't know.
15       THE COURT:  You can file any motion you want.
16       MR. BALAREZO:  Then I orally move to suppress.
17  I'll move, I'll file a oral motion asking the Judge to
18  disclose, to have the Government disclose this evidence to
19  us, tell me who these people are, when they went in, what
20  they saw, pictures, the whole thing.
21       I've requested all these things.  I haven't been
22  given them before.  Many time that I've asked the Government
23  give them to me.  So I'm asking for them in front of the
24  Court to provide me this information so I'm not flying blind
25  and heading somewhere that perhaps we don't want to go, or
```

**183**

```
1   maybe we do.  I don't know.
2        THE COURT:  You're assuming there are pictures and
3   that they seized things.  I am happy to ask the agent if
4   there are any pictures or have the Government ask that.  But
5   I don't have anything to suppress, sir.  I have no basis to
6   suppress evidence when there was none seized.
7        MR. BALAREZO:  Your Honor, just so I understand
8   again, I can't go into the warrant issue?  That's what I'm
9   being told?
10       THE COURT:  I'm telling you that it doesn't go to
11  her credibility.
12       Mr. Geise, what is it?
13       MR. BALAREZO:  Can I inquire -- I'm sorry.  Can I
14  inquire about, forget the warrant, inquire about what was
15  found in the apartment?  I'm just asking just so I know.
16       THE COURT:  You mean ask her what she learned that
17  they found?
18       MR. BALAREZO:  Yes, do you know that they found
19  mattresses and candles and all this nonsense.
20       THE COURT:  I'm not clear on what, otherwise, if
21  you want to elicit from her --
22       MR. BALAREZO:  I'm just saying, in case we're crazy
23  and we want to elicit, can I do that?  I just want to know
24  before I go there.
25       THE COURT:  Sure, the Government is dying to do it.
```

**184**

```
1        MR. BALAREZO:  That's fine.  They're dying to do a
2   lot.
3        THE COURT:  But I don't understand what you're
4   saying.  I don't even understand.  You mean you want to
5   elicit from her what she learned about what they saw in the
6   apartment?
7        MR. BALAREZO:  I'm saying, if we want to do that,
8   am I allowed to do that?
9        THE COURT:  Does the Government have any objection?
10       MR. GEISE:  No, Your Honor, but as long as it then
11  doesn't open up this whole was it an illegal search question.
12       THE COURT:  No, there's no evidence coming in.  I
13  mean if you bring it out, you can't complain that in some
14  fashion --
15       MR. BALAREZO:  I just want to know the parameters
16  I'm dealing with.
17       THE COURT:  You're welcome to elicit, but you're
18  not going to get, you can't argue in some fashion you should
19  be able to suppress what you elicited.  So, the legality of
20  it and her credibility with respect to what might or might
21  not have been a proper search is not going to be an argument
22  for you.  But you can elicit whatever you want regarding what
23  she learned that they saw there and that will be evidence
24  then.  You can think about it over the lunch.  I would like
25  you just to ask her though whether they took pictures.
```

105

```
 1          Is there anything else for the Government?
 2          MS. LIEBER:  I don't think so.
 3          THE COURT:  You don't have any objection to him
 4   asking the questions about what she saw, I mean, what the
 5   other people saw?
 6          MS. LIEBER:  I have no problem with that at all.
 7          THE COURT:  I'm sure she doesn't.
 8          MR. BALAREZO:  And Your Honor, regarding, let's
 9   move off that subject for one second, regarding the Myrtle
10   Avenue house where there are pictures, we've seen two from
11   the sneak and peek, the Government's telling me that that is
12   the universe of the pictures.
13          I don't want to ask questions and then we get an
14   answer like Agent O'Brien, saying, yeah, we have a clear
15   picture, you know, of your client and we've never seen it.
16   So they're telling me that --
17          THE COURT:  We're going to have a stipulation about
18   that.  You're going to look into it, Mr. Geise, whether there
19   was any better picture than the one of Bermea that was
20   introduced.
21          MR. GEISE:  I've asked her to look, Your Honor, and
22   if there is, everyone will see it.  Of course, the jury will
23   eventually too, but I'm having her look into it.
24          MR. BALAREZO:  Well, Your Honor, the problem I'm
25   having is I'm asking him things before I ask questions, and
```

106

```
 1   they're telling me one thing, I'm relying on that and then
 2   I'm getting burned.  I asked is the picture that was shown to
 3   O'Brien the picture, the best picture, whatever.  Yes.  And
 4   now all of a sudden there's another picture somewhere else.
 5          THE COURT:  No, there isn't.
 6          MS. LIEBER:  I picked the picture.  I picked the
 7   one that I thought was the best.  Everyone has the disk.
 8   We'll deal with that.  With respect to the pictures of Myrtle
 9   Avenue, Mr. Balarezo and I had a conversation about this some
10   weeks ago about whether or not there were any more pictures.
11   I called Special Agent Gikas.  I asked her.  She said she
12   just wasn't sure.  She then tracked down the photographer who
13   said no, those were the only ones.
14          THE COURT:  That's the best we can say.  That these
15   are the only ones of Myrtle.  Okay.  But you will find out
16   whether there were pictures taken at Summit.
17          MS. LIEBER:  Yes.
18          THE COURT:  Thank you.  We'll resume at 2:00.
19          (A luncheon recess was taken.)
20
21
22
23
24
25
```

107

```
 1                C O N T E N T S
 2   WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS
 3
 4   KATERINA GIKAS
 5   By Ms. Lieber       22
 6   By Mr. Balarezo              61
 7
 8   VOIR DIRE -- Page  96
 9
10                    E X H I B I T S
11                                        PAGE:
12
13   Government:
14   ICE 8 and 9                    27
15   ICE 12                         38
16   ICE 13                         40
17   ICE 20, 22 thru 31             48
18   ICE 32                         52
19   ICE 33                         59
20   ICE 39                         60
21
22
23
24
25
```

108

```
 1
 2
 3                CERTIFICATE OF REPORTER
 4          I, Lisa Walker Griffith, certify that the
 5   foregoing is a correct transcript from the record of
 6   proceedings in the above-entitled matter.
 7
 8
 9
10
11
12   Lisa Walker Griffith, RPR        11-17-06
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*[handwritten:]* BY MR. BALAREZO (SS...) (76 RECESS)   BY M... GEISE (ST REDIRECT)

```
 1                    UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF COLUMBIA
 3    ------------------------------x
 4    THE UNITED STATES OF AMERICA  x      Docket No. CR-05386
 5             vs.                  x
                                    x      Washington, D.C.
 6    ANTOINE JONES,               x      Thursday, November 16, 2006
      ADRIAN HUGGINS,              x          2:12 p.m.
 7    MICHAEL HUGGINS,             x
      KEVIN HOLLAND,               x          (Day 13)
 8                                  x
      Defendants.                  x      (AFTERNOON SESSION)
 9    ------------------------------x
10
11                       TRANSCRIPT OF TRIAL
12         BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
             UNITED STATES DISTRICT JUDGE, AND A JURY
13
14    APPEARANCES:
15    For the Government:          JACK GEISE, ESQUIRE
                                    RACHEL LIEBER, ESQUIRE
16                                  Office of the U.S. Attorney
                                    555 Fourth Street, N.W.
17                                  Washington, D.C.  20560
                                    (202) 616-9156
18
19    For the Defendant Jones:     EDUARDO BALAREZO, ESQUIRE
                                    400 Fifth Street, N.W.
20                                  Suite 300
                                    Washington, D.C.  20001
21                                  lawofficebalarezo.net
22
23
24
25
```

```
 1    APPEARANCES:  (Con't.)
 2    For Defendant Jackson:       JON NORRIS, ESQUIRE
                                    641 Indiana Avenue, N.W.
 3                                  2nd Floor
                                    Washington, D.C.  20001
 4                                  (202) 842-2695
 5
 6    For Defendant Jackson:       RUDOLPH ACREE, ESQUIRE
                                    1211 Connecticut Avenue, N.W.
 7                                  Suite 303
                                    Washington, D.C.  20036
 8                                  (202) 331-0739
 9
10    For Defendant Holland:       BRIAN McDANIEL, ESQUIRE
                                    1221 Connecticut Avenue, N.W.
11                                  Suite 506
                                    Washington, D.C.  20036
12                                  (202) 331-0739
13    Court Reporter:              ANNIE R. SHAW, RPR
                                    United States District Court
14                                  District of Columbia
                                    333 Constitution Avenue, N.W.
15                                  Room 6820
                                    Washington, D.C.  20001
16                                  (202) 354-3242
17
18
19
20
21
22
23
24    Proceedings recorded by machine shorthand, transcript produced
25    by computer-aided transcription.
```

*[handwritten:]* WITNESS DONALD HUNTER
BY MS. LIEBER (ST DIRECT)

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                    (Afternoon session 2:12 p.m.)
 3                    (Jury not present.)
 4        THE COURT:  Are we ready to bring in the witness so we
 5    can then bring in the jury?
 6        MS. LIEBER:  We have gone to get the witness right
 7    now.
 8        THE COURT:  Did you make inquiry?
 9        MS. LIEBER:  Your Honor, I'm sorry.  She was gone when
10    I went out.  I can go do that right now.
11        MR. BALAREZO:  The pictures, what about the one
12    question about the maintenance man, can I ask that or not?
13        THE COURT:  Wait for Miss -- you mean whether or not
14    she talked to a maintenance man?
15        MR. BALAREZO:  Right.
16        THE COURT:  I'll ask her.  We will move it along here.
17        MR. GEISE:  I won't object if you ask her, Your Honor.
18        THE COURT:  Move it along.  All right.
19        Can we get the witness and Miss Lieber to come back?
20    Thank you.
21        (Katerina Gikas resumes the stand.)
22        THE COURT:  Good afternoon, one or two little
23    questions remaining whether or not, have you inquired about the
24    pictures?
25        MS. LIEBER:  I have, Your Honor.  And there are no
```

```
 1    pictures of the inside of Summit Circle.
 2        THE COURT:  Okay.  Have a seat if you don't mind.  I
 3    had one further question.  There were no -- no one took
 4    pictures of what was inside, we are now talking Myrtle Avenue
 5    on the -- Summit, sorry.
 6        MS. LIEBER:  Summit Circle on February 7th.
 7        THE COURT:  Correct?
 8        THE WITNESS:  Correct.
 9        THE COURT:  And second of all, did you ever have
10    occasion, you personally, to talk with a maintenance man
11    associated with that apartment?
12        THE WITNESS:  Yes.
13        THE COURT:  Can you give me an approximate date when
14    you might have had that conversation, or do you recall when you
15    had the conversation with the maintenance man?
16        THE WITNESS:  It would have been at least a week
17    later.
18        THE COURT:  Okay.
19        THE WITNESS:  It was long after that, that weekend.
20        THE COURT:  Anything else?  You now know that she
21    talked to the maintenance man later on, so.
22        MR. BALAREZO:  Could I ask one question?
23        THE COURT:  What is it?
24        MR. BALAREZO:  Why is she talking to the maintenance
25    man a week later if they already went into the apartment?
```

*ICE Investigation - Gikas 45 pt [from ICE rpt]* (handwritten)

1  THE COURT:  I don't care.
2  MR. BALAREZO:  I do, Your Honor.
3  THE COURT:  Then ask her.  And then you open the cans.
4  These why's are not useful information. *Sustain Obj.*
5  Okay.  Let's bring in the jury.  It's up to you if you
6  want to ask why she would have talked to the maintenance man,
7  then you can establish what the maintenance man told her.
8  (Jury present at 2:17 p.m.)
9  THE COURT:  Good afternoon, ladies and gentlemen.
10  THE JURORS:  Good afternoon.
11  THE COURT:  I hope that you had a good lunch.  Okay.
12  We are ready to proceed.
13  I believe the ball is in your court.
14  You are still under oath.
15  MR. BALAREZO:  Good afternoon again, ladies and
16  gentlemen.
17  THE JURORS:  Good afternoon.
18  CROSS EXAMINATION
19  BY MR. BALAREZO:
20  Q.  Good afternoon, Agent Gikas.
21  A.  Good afternoon.
22  Q.  Going back to the Summit Street location, I think we have
23  established no drugs, no money found; right?
24  A.  Correct.
25  Q.  Now, you also testified about a vehicle that picked up

1  somebody and took them to the airport?
2  A.  Yes.
3  Q.  To your knowledge was that vehicle ever stopped?
4  A.  Later that evening, yes.
5  Q.  Okay.  Now, the time that the —
6  THE COURT:  Can we describe the vehicle so, perhaps,
7  we can remember exactly what we're talking about?  What was the
8  vehicle?
9  BY MR. BALAREZO:
10  Q.  This is a black Cadillac; correct?
11  A.  Yes.
12  Q.  Is that right?
13  A.  Yes.
14  Q.  All right.  And as I understand it, the black Cadillac went
15  to Summit Circle and picked up this individual about 5:30 in
16  the afternoon; is that correct?  *lie* (handwritten)
17  A.  I'm not exactly sure about the time, but, yes, sometime
18  late afternoon.  *I was out of town at church* (handwritten)
19  Q.  Okay.  And at some point that vehicle was stopped, though.
20  And was that stop directed by you or anyone in your office?
21  A.  No.  I was not there at all the rest of that weekend.  But
22  I was told later that night — it wasn't stopped on the *perjury* (handwritten)
23  way to the airport.  Later that night other agents had gone to
24  the house where the car was registered to, the 12221 Brandywine
25  address.

*A J Jr* (handwritten)

*Note! I was out of town at church, my son told
them that, [crossed out] The ICE investigation report shows it, my
son was driving his son with one of his high school buddy. I don't drive this car.* (handwritten)

1  Q.  All right.
2  A.  And the vehicle was stopped — I don't know if it was — if
3  they saw it approaching the home, but it was stopped late that
4  night near the Brandywine address.
5  Q.  And driving that vehicle — my client, Mr. Jones, this
6  Mr. Jones, was not driving that vehicle; correct?
7  A.  No.  His son was—
8  Q.  Antoine Jones, Jr.—
9  A.  Yes.
10  Q.  — was driving that vehicle?
11  And when he got stopped several police, law enforcement,
12  surrounded the car, pulled him out with weapons drawn; correct?
13  MS. LIEBER:  Objection.
14  THE COURT:  Sustained.  She wasn't even there.
15  BY MR. BALAREZO:
16  Q.  You have knowledge of that; right?
17  MS. LIEBER:  Objection.
18  THE COURT:  You can't pick and choose what she can get
19  into based on what you want on hearsay.  It's hearsay.
20  MR. BALAREZO:  Can I just complete what she has
21  already testified about?
22  THE COURT:  No.  They have objected, and I've
23  sustained it.
24  MR. BALAREZO:  Very good.
25  BY MR. BALAREZO:  *Prejudice* (handwritten)

1  Q.  But it wasn't Mr. Jones driving the vehicle later that
2  night; right?
3  A.  No.
4  Q.  And at no time was that vehicle stopped and Mr. Jones
5  driving the vehicle; correct?
6  A.  Correct.
7  Q.  At any point that you are aware of?
8  A.  Correct.
9  Q.  Now, you are also aware with respect to the Summit Street
10  location that a 1997 white Cadillac was frequently, was
11  associated with that apartment; correct?
12  A.  Yes.
13  Q.  And that's Maryland tags LZB, I think, 244; right?
14  A.  Yes.
15  Q.  From you know this from surveillance basically; right?
16  A.  From surveillance and from an individual that I
17  interviewed.
18  Q.  Okay.  Was that an individual by the name of Gregory Leaks,
19  by any chance?
20  MS. LIEBER:  Objection.
21  THE WITNESS:  No.
22  THE COURT:  Well, too late.  It wasn't.  Okay.
23  I'm sorry.  The white Cadillac, have we spoken about
24  that before or is this the first time we have spoken about the
25  white Cadillac?

*Gregory Leaks*

9

1    MR. BALAREZO:  I believe it's the first time, Your
2  Honor.
3  BY MR. BALAREZO:
4  Q.  So you are aware that this Cadillac frequents that address
5  often; right?
6            MS. LIEBER:  Objection to hearsay.  What she has
7  observed.
8            THE COURT:  You know, I don't –
9  BY MR. BALAREZO:
10  Q.  Have you observed this white Cadillac.
11  A.  I observed it once.  And I was told that –
12            THE COURT:  Let's not – right.  Let's limit ourselves
13  to what you know.  All right.  You saw it once at this address.
14  BY MR. BALAREZO:
15  Q.  And did you become aware that that Cadillac belonged to
16  Gregory Leaks and his wife?
17            MS. LIEBER:  Objection.  Hearsay.
18            THE COURT:  Well, it would be, but I don't – can we
19  approach.
20            (Bench conference)
21            THE COURT:  Are you trying to insinuate something
22  about Gregory Leaks?
23            MR. BALAREZO:  Not about him.  My understanding is
24  that – well, the agent's reports indicates that Gregory Leaks
25  and his wife own this Cadillac which frequents this apartment

*Gregory Leaks*

10

1  regularly, I think is the wording.  My information is that
2  Gregory Leaks, in fact, lived at that apartment, which
3  obviously would counter any suggestion by the agent that
4  Mr. Jones rented this apartment.
5            THE COURT:  You can ask her whether she knows whether
6  or not he lived there.  You can't try to elicit hearsay through
7  her – you are welcome to bring in anybody you want.  You can
8  bring in Gregory Leaks to say he frequented the apartment.  But
9  if she doesn't have any information –
10            MR. BALAREZO:  She does have the information.
11            THE COURT:  Well, did she ask him whether he lived
12  there?
13            MR. BALAREZO:  I haven't had a chance to go there yet.
14            THE COURT:  Well, you can ask him there – I mean, if
15  there is somebody else who lived there and she knows it by
16  interviewing, then – but you have got to lay the foundation.
17  You are doing exactly what you criticized the government for
18  doing.  I have no idea where this information –
19            MR. BALAREZO:  I thought I could do it too, Your
20  Honor.
21            THE COURT:  Pardon?
22            MS. LIEBER:  Just to be clear, I was very careful in
23  my questions to not elicit things that she did not surveil
24  herself.
25            THE COURT:  Pardon?

11

1            MS. LIEBER:  That she did not surveil herself.  So,
2  for example, this whole issue of the Cadillac, I could not get
3  out through her that she saw the Cadillac or anything like
4  that.
5            THE COURT:  Which Cadillac?
6            MS. LIEBER:  The black Cadillac.
7            MR. BALAREZO:  She just said she saw it.
8            MS. LIEBER:  Because you asked.  So I just want it to
9  be clear these are eliciting hearsay.  And I don't know
10  anything about Gregory Leaks or any of that investigation.
11            THE COURT:  You can ask her whether she spoke to
12  Leaks.  And you can ask her if she learned that he lived there.
13  I don't know what she learned from him.
14            MR. BALAREZO:  Well, Your Honor, then it's not for the
15  truth of the matter, because I want to ask her that to see what
16  steps she then took after she found out that information.
17            THE COURT:  Assuming she found it out.
18            MR. BALAREZO:  It's in her reports that she – I
19  think.  And she has four reports.  I think that they went and
20  further investigated this Leaks person.  And if she says, well,
21  nothing came of it, then nothing came of it.  That's fine.  Why
22  can't I do that?  The government is doing it all along, why
23  can't I do that?
24            THE COURT:  That's not an argument.  If you want to
25  find out whether she came to learn that this guy lived there

*Greg Leaks*

12

1  and did anything about it, I'll let you do it.  It may turn out
2  to come back to haunt you, but that's your – okay.
3            MR. BALAREZO:  We have bigger worries here, Your
4  Honor.
5            THE COURT:  Okay.
6            (Open court)
7            THE COURT:  The objection is overruled.  We are not
8  looking at it for the truth of it.  Go ahead.
9  BY MR. BALAREZO:
10  Q.  You did become aware that this Cadillac registered to
11  Gregory Leaks and his wife frequented the apartment; correct?
12  A.  I was aware that it was at the apartment occasionally.
13  Q.  And occasionally.  What do you mean occasionally?
14            MS. LIEBER:  Objection.  It's hearsay.
15            MR. BALAREZO:  It's not for the truth, Your Honor.
16            THE COURT:  You are right, it's not.  Okay.  Go ahead.
17  What did you learn about how often it was there?
18            THE WITNESS:  What I learned was it was – of the cars
19  that I had inquired about, it was, it most frequented that
20  location.
21  BY MR. BALAREZO:
22  Q.  Okay.  And did you ever interview Gregory Leaks?
23  A.  No.
24  Q.  Okay.  Were you aware that Mr. Leak lived at that apartment
25  during that time?

*[handwritten top: "they wshs Return keys"]*   *[handwritten: "Brandywine - Truck"]*

**Page 13**

1  A.  No.  I don't think anybody lived at the apartment.
2  Q.  I'm not asking what you think.  I'm asking you were you
3  aware that Mr. Leaks lived at that apartment at that time.
4  A.  No.  *[handwritten: Perjury]*
5  Q.  Were you aware that Mr. Leaks and his wife were going
6  through a divorce at that time?
7  A.  No.
8  Q.  Were you aware that that apartment was being rented on
9  behalf of Mr. Leaks because he had bad credit?
10  A.  No.
11        THE COURT:  There is no foundation.  She is not even
12  aware that he rented it or lived there.
13        MR. BALAREZO:  He frequented it most, Your Honor.
14        THE COURT:  I know.
15  BY MR. BALAREZO:
16  Q.  Were you aware that Mr. Leaks returned keys and/or remote
17  control to the rental office of that apartment?
18  A.  Yes.  *[handwritten: very Important]*
19  Q.  Now, the other location – we'll finally move away from
20  Summit Circle.  The other location you talked about or at least
21  one of the other ones was 12221 Brandywine Street; is that
22  correct?  You have to speak up.
23  A.  I'm sorry, the other location that?
24  Q.  That you surveilled or investigated was that address;
25  correct?

**Page 14**

1  A.  Yes.
2  Q.  Did you actually surveil that location?  Let me ask that.
3  A.  Yes.
4  Q.  Was there any video of that location?
5  A.  No.
6  Q.  What you did see at that particular location that I think
7  you mentioned was that there was a white box truck registered
8  to Antoine Jones there; correct?  *[handwritten: Impeacht]*
9  A.  That I saw?
10  Q.  (Nods head.)
11  A.  No.  *[handwritten: Perjury - she authorizes her report]*
12  Q.  Did you yourself ever surveil that location?
13  A.  Yes.
14  Q.  Did you ever see the white box truck there?
15  A.  No.  Me personally, no.  But it was relayed to me that it
16  was at that location.  *[handwritten: Perjury]*
17        THE COURT:  Okay.  I think we are asking what you saw,
18  I realize.
19        And if you want to elicit something that she doesn't
20  have personal knowledge of, let me know and then I can rule.
21  What locations are we now speaking of, Brandywine?
22        MR. BALAREZO:  Brandywine, Your Honor.
23        THE COURT:  All right.  She didn't see the white box
24  truck.
25  BY MR. BALAREZO:

*[handwritten: White Box truck]*

**Page 15**

1  Q.  But it did come – and, Your Honor, this is not for the
2  truth.  It did come to your attention, as you said, that the
3  white box truck was seen there; right?
4  A.  Yes.
5        THE COURT:  Okay.  Can we approach.
6        (bench conference)
7        MR. BALAREZO:  I missed that day in class, Your Honor.
8        THE COURT:  Yes, but I'm tired of it right now.
9  Sorry.  Listen, you got out that the guy returned keys and a
10  remote.  You want to use this for the truth or are you using it
11  to show something about the investigation?  Because you are not
12  going to be able to argue that there is evidence here that this
13  guy leased, used – you can say he frequented it.  That's about
14  the best of your evidence.  *[handwritten: Prejudice]*
15        MR. BALAREZO:  Well, if I bring him in –
16        THE COURT:  You can bring him in anytime you want.
17  What is the relevance now of whether or not she learned that
18  there was a white box truck at Brandywine?  *[handwritten: Impeach]*
19        MR. BALAREZO:  Because, again, in her reporting, Your
20  Honor, it says that the white box truck was surveilled.  It was
21  seen with two –
22        THE COURT:  So what.
23        MR. BALAREZO:  Well, let me finished, Your Honor.  Two
24  unidentified Black males.  They followed it.  They saw this
25  truck.  And the two Black males delivered mattresses to some

*[handwritten bottom: Delivering Furniture]*

*[handwritten top: we had a delivery service]*

**Page 16**

1  other location, which is entirely consistent with the purported
2  business that Mr. Jones had at the warehouse, where the box
3  truck was seen later.
4        THE COURT:  But you can't get it in for the truth
5  unless she knows it.  So I'm going to sustain it.  You want it
6  for the truth.  You're not judging or questioning her
7  credibility.  If you want to call somebody who knows it, put it
8  in.  You can do it through her.  *[handwritten: Gikas put info in report]*
9        MR. BALAREZO:  Well, Your Honor, I don't know who
10  these people are.  The report just says these people were seen.
11  The truck did this.  The people unloaded – let me finish,
12  Rachel.
13        If I don't know who saw it, how can I call anybody?
14  You know, we don't get this information.  I'm just trying to –
15  this is what she wrote as lead agent.  So I'm assuming
16  that she knows something about it.
17        THE COURT:  If you want to dig around about who was
18  working – go right ahead.  But to ask her all this hearsay to
19  put it in for the truth, you can't do it.  That's simple.
20        MR. BALAREZO:  Number one, I don't know whether it's
21  hearsay or not, as I said.
22        THE COURT:  Well, we now know because she said – if
23  you ask her the question, did you see this, and she says, no,
24  but it was told to me, then you know.  And you are introducing
25  it for the truth.  You want to put in all this other stuff

*Deliver mattress*

17

1  about mattresses being delivered by the people.
2        MR. BALAREZO:  I don't know if she didn't see that
3  person. So I'll ask her.
4        THE COURT:  Now we know. She didn't.
5        MR. BALAREZO:  No, she didn't see it at Brandywine.
6        THE COURT:  Your questions are just filled with all
7  these facts, and she burns you. She can't give you the answers
8  without a foundation. You can't keep this up. That's all I'm
9  telling you. She didn't see it. *prejudice*
10       MR. BALAREZO:  At Brandywine. That's all we know
11  right now because that's all I have asked her about, Your
12  Honor.
13       MS. LIEBER:  If I may, just two things. One, any
14  names that I can provide to Mr. Balarezo — and this is what I
15  was going to say. Any names I can get him, any phone numbers I
16  can get him, I will do the best I can to get all that
17  information to Mr. Balarezo to do with what he wants. One.
18       Two, I think this agent did see the mattress thing, I
19  think. I'm not 100 percent sure. I mean, we could obviously
20  ask. But just so everyone knows what I think, that's what I
21  think, and I'm happy to help however I can.
22       THE COURT:  Fine. Then you can ask her if she ever
23  saw the mattress thing.
24            (open court)
25  BY MR. BALAREZO:

18

1  Q.  Special Agent Gikas, at some point during this
2  investigation, did you have the opportunity to observe the
3  white van with two Black males in it making rounds, if you
4  will, at this point?
5        MS. LIEBER:  Objection.
6        THE COURT:  I don't know what making rounds —
7  BY MR. BALAREZO:
8  Q.  Well, did you observe it delivering mattress anywhere?
9  A.  The box truck?
10 Q.  Yes.
11 A.  Yes. On one occasion.
12 Q.  Okay. Can you tell me when that was and where it was,
13 where the mattresses were delivered?
14 A.  Some apartment complex off of Riverdale Road. And I
15 believe that was the Saturday when the black Excursion left
16 Bowie and headed down 95 south.
17 Q.  We are talking about the white box truck now.
18 A.  Yes.
19 Q.  You or any agents, as far as you know, never stopped that
20 truck; correct?
21 A.  Stopped it, no.
22 Q.  It was never searched for drugs or anything of that nature?
23 A.  No.
24 Q.  As far as you know, all they were doing was delivering
25 mattresses?

19

1  A.  I just saw one — yeah, just one occasion where mattresses
2  were delivered.
3  Q.  And you didn't have that particular box truck under
4  surveillance 24, 7 like you had the warehouse; correct?  *Lied*
5  A.  Correct.
6  Q.  So you can't say whether or not they were doing that same
7  thing on other days when you didn't have it under surveillance;
8  correct?
9  A.  Correct.
10 Q.  Now, regarding the box truck, it is accurate that Lawrence
11 Maynard used that almost as if it were his personal vehicle;
12 correct?
13 A.  Yes.
14 Q.  He was the one that you saw driving it mostly?
15 A.  Yes.
16 Q.  You never saw Mr. Jones driving that vehicle?
17 A.  No.
18 Q.  And that is the vehicle that had — that the GPS tracker
19 was placed on; correct?
20 A.  Yes.
21 Q.  And just so we are clear, as far as you know that, that
22 white box truck never went to 9508 Potomac Drive, in Fort
23 Washington by any chance, did it?
24 A.  Quite honestly I'm not sure. I would have to look at the
25 tracker data.

*Delivered mattress*

20

1  Q.  And as you sit here, you can't say that it did, though;
2  right?
3  A.  Right now, no.
4  Q.  Now, let's go to the Myrtle Avenue location that you talked
5  about. You and your agents had that particular location under
6  surveillance for about a week; correct?
7  A.  Yes. From Monday through Saturday.  *24, 7*
8  Q.  And that was 24, 7 basically?  *Myrtle Ave*
9  A.  Yes.
10 Q.  All right. And it was from the Myrtle Street address that
11 you saw the white box truck making that mattress delivery;
12 right?
13       THE COURT:  If you saw it. Do you know where it left
14 from?
15       Is that what you are asking?
16       MR. BALAREZO:  Sure.
17       THE WITNESS:  Yes. I'm just trying to remember if it
18 was the same day — if it was that same Saturday. But, yes, I
19 observed the white box truck go to the Myrtle Street address
20 and leave. Now, I can't remember if I followed it directly
21 from there or if we were on it some other day when it went and
22 delivered the mattresses. The mattresses did not come out of
23 the Myrtle address.
24 BY MR. BALAREZO:
25 Q.  Right. The box truck arrived at Myrtle Street, these

**21**

1 individuals went in, came out and then made the delivery;
2 right?
3 A. That's what I'm not sure of, if that was the same day.
4 Q. Do you remember if you wrote a report or anything regarding
5 that?
6 A. I think I did document the delivery of the mattresses. But
7 if I could look at my report I could –
8 Q. I'm trying to find which – do you recall which report,
9 because you have several? I'm just trying to –
10 A. It would have been the one, identification of stash house
11 or – it's one of the –
12 MR. BALAREZO: If I could just have one second, Your
13 Honor. Let me try to make this quick.
14 THE COURT: Would you have something to refresh her
15 recollection where she discusses mattresses?
16 MR. BALAREZO: I do. It's just that there are
17 several.
18 THE COURT: Show it to her.
19 MR. BALAREZO: I wanted to show her all the reports is
20 what I'm saying.
21 THE COURT: You must have read these reports, so you
22 should know if there is a reference to mattresses, and perhaps
23 that would help her focus.
24 MR. BALAREZO: There is.
25 THE COURT: It would refresh her recollection, that's

**22**

1 all.
2 MR. BALAREZO: I'll mark this document as Jones 28.
3 BY MR. BALAREZO:
4 Q. Show you the front page first. And do you recognize that
5 document?
6 A. Yes, that's the report I wrote.
7 Q. And I'll refer you to page 4 towards the bottom, the
8 highlighted portions. Would that refresh your recollection as
9 to what you observed when this, when you saw the box truck and
10 the mattresses?
11 A. Right. So it was – it was the – it was the Monday. It
12 wasn't the same day that, that the black Excursion left.
13 That's what I wasn't sure about it. It was the Monday, the
14 first day that we started the 24, 7 surveillance on Myrtle
15 Avenue.
16 THE COURT: What Monday is that, I'm sorry?
17 THE WITNESS: The 24th.
18 THE COURT: The 24th of –
19 THE WITNESS: February 24th of 2004.
20 THE COURT: But I think his question was something
21 else.
22 BY MR. BALAREZO:
23 Q. Does it refresh your recollection as to whether or not the
24 box truck went directly from Myrtle Avenue to the location
25 where it delivered the mattresses?

**23**

1 A. Yes. It eventually went to that location. It had gone to
2 some other locations, but there was no loading or unloading of
3 anything.
4 Q. And since you didn't have the box truck under surveillance
5 24, 7, you can't say whether or not the mattresses didn't come
6 from the Hampton Park location; correct?
7 A. Correct.
8 Q. Now, regarding the Myrtle Street address, you indicated at
9 some point when you were working trying to locate Javier that
10 you became aware that his cell phone was pinging in Prince
11 George's County?
12 A. Yes. *Possibly*
13 Q. And then that you kind of narrowed the location down to
14 Myrtle Street or Myrtle Drive; right?
15 A. Yes.
16 Q. You never actually saw the person Javier at that address;
17 is that correct?
18 A. On that day?
19 Q. Well, on that day, yes, when you did that.
20 A. No.
21 Q. Okay. You just narrowed it down to the area and saw that
22 van and got the tags and just made that assumption; correct?
23 THE COURT: Made what assumption?
24 BY MR. BALAREZO:
25 Q. That Javier was in that location.

*Sneak and peek*

**24**

1 A. Yes.
2 Q. Now, the Myrtle Street address was now the third address
3 that you've become aware of during your investigation that
4 was of interest; correct? I'm talking about Summit Place or
5 Summit Circle, Brandywine, and now you have Myrtle Street or
6 Myrtle Drive?
7 A. Yes.
8 Q. So you wanted to find out what was going on inside;
9 correct?
10 A. Yes.
11 Q. So that's why you obtained the warrant to go into Myrtle
12 Street?
13 A. Yes.
14 Q. And, as you said, this was a sneak and peek warrant?
15 A. Yes.
16 Q. And the sneak and peek warrant allowed you to go into the
17 location secretly, in effect; right? You have to speak up.
18 A. Yes.
19 Q. And, of course, you do that when people aren't home; right?
20 A. Ideally, yes.
21 Q. Well, that's what you want to do –
22 A. Yes.
23 Q. – otherwise they would know about it. Because the purpose
24 of the sneak and peek –
25 A. Yes.

**25**

1    Q. -- warrant is not to alert people that you are poking
2    around in their house; is that right?
3    A. Yes.
4    Q. So you did it at a time when there was nobody home; right?
5    A. Yes.
6    Q. And you don't have to leave a copy of the warrant or
7    anything when you do this because the judge said you didn't
8    have to; right?
9    A. Right, for 30 days.
10   Q. For 30 days. So your intention was to go in, take a look
11   around, you weren't going to take anything; right?
12   A. Right.
13   Q. Because that would have tipped them off; right?
14   A. Right.
15   Q. So your intention was to go in, take a look around and then
16   get out?
17   A. Right.
18   Q. So presumably whoever was in that location didn't know that
19   you were coming; is that right?
20   A. Well, except for the broken window.
21   Q. But that was afterwards?
22   A. Right.
23   Q. So you didn't break the window before, you broke it on that
24   day; right?
25   A. Right.

**26**

1    Q. So presumably, whoever was there did not know that you were
2    going to come and search the house?
3    A. Whoever was there?
4    Q. Whoever lived at that location or whoever you were looking
5    for didn't know that you were coming?
6    A. Right.
7    Q. So now, given that you were going to go in secretly, that
8    you were not going to take anything, you wanted to document
9    what the location looked like; correct?
10   A. Yes.
11   Q. All right. And as far as I understand it, you were shown
12   ICE 8 and ICE 9, which are in evidence?
13         THE COURT: Is it on? I'm sorry, Gwen, do you mind
14   turning that screen.
15   BY MR. BALAREZO:
16   Q. Do you see that?
17   A. Yes.
18   Q. Now, this is one of the pictures that was taken while you
19   did this sneak and peek?
20   A. Yes.
21   Q. And the other ICE 9, same thing basically?
22   A. Yes.
23   Q. And these are the only pictures that exist of this search;
24   right?
25   A. Yes. There may have been -- I seem to recall three of

**27**

1    them, but it would have been maybe the same picture.
2         THE COURT: Do you recall any other pictures?
3         THE WITNESS: We only took pictures of the bags and
4    the duffle bags. Im prse it
5    BY MR. BALAREZO:
6    Q. At some point didn't Miss Lieber ask you whether or not
7    those were the only pictures?
8    A. Yes.
9    Q. And did you not go to the photographer that was with you
10   that day and ask?
11   A. Yes.
12   Q. And these are the only pictures you have; correct?
13   A. Yes. But for some reason I thought there were three, but
14   again, of the same, of the bags and the duffle bag. L I C S
15   Q. So at most you are going to have a third picture of this?
16   A. Right.
17   Q. And this is ICE 9 and 8. So you didn't take a picture of
18   the inflatable mattresses; right?
19   A. No.
20   Q. You didn't take a picture of the unfurnished rooms;
21   correct?
22   A. Correct.
23   Q. You didn't take a picture of the heat sealing bags? Well,
24   those are the ones that you are saying are heat sealing bags;
25   right?

**28**

1    A. Right.
2    Q. In another world, perhaps, these could also be used just to
3    store food; right? Food Saver, that's what it says?
4    A. They could, yes.
5    Q. You didn't find a heat sealing machine there, did you?
6    A. No.
7    Q. And you didn't take a picture of one because you didn't
8    find one; right?
9    A. I didn't find one.
10   Q. So you just assumed that it's a heat sealing bag because --
11   A. They are vacuum sealing bags.
12         THE COURT: Vacuum sealing bags.
13         Put it back on the screen a minute.
14         What's the thing in the middle? Oh, duct tape. Is
15   that what it is?
16         THE WITNESS: Yes.
17         THE COURT: Okay.
18         MR. BALAREZO: I think it says duct tape.
19         THE COURT: Sure does.
20   BY MR. BALAREZO:
21   Q. You are done. So no heat sealing machine; right?
22   A. No.
23   Q. All right. You didn't take a picture of the bags of
24   clothes that you said you found?
25   A. No.



Photos from search of 8660 Myrtle Ave. Route
( 2/27/04 )

*[handwritten: WENT TO REMAX to IMPEACH]*

**29**

1  Q. You didn't find, take a picture of the, I think you said
2  the patron saint candles?
3  A. No.
4  Q. You didn't take a picture of the empty refrigerator?
5  A. No.
6  Q. And you didn't take a picture of all these weird coverings
7  on the window or anything like that; right?
8  A. No.
9  Q. And, in fact, you didn't even take a picture of the house
10 that you went into; right?
11 A. Right.
12 Q. Now, you went in there presumably in secret and presumably
13 without anyone knowing you were coming. You didn't find any
14 drugs in that house, did you?
15 A. No.
16 Q. And searched for it, of course?
17 A. Yes.
18 Q. And you didn't find any money in that house?
19 A. No.
20 Q. And you searched for that, too; right?
21 A. Yes.
22 Q. And you weren't interrupted in your search? You had enough
23 time to conduct a search and be satisfied that these things
24 were not there? And by "these things," I mean the drugs and/or
25 the money.

**30**

1  A. Correct.
2  Q. And at no point did you see Antoine Jones in that house;
3  right?
4  A. Correct.
5  Q. And the date that you did the sneak and peek was
6  February 27th, I think, or 28th?
7  A. Twenty-seventh. It was a Friday night.
8  Q. Okay. And you, as I said, you had sufficient time to
9  do your search that day with the sneak and peek.
10 A. Yes.
11 Q. Yet you, in fact, went back to the location; correct?
12 A. Yes.
13 Q. And this time you went to the management office and you had
14 them let you in? *[handwritten: IMPEACH]*
15 A. Yes.
16 Q. And you went in and did the same thing again?
17 A. Yes.
18 Q. You searched and nothing was found; right?
19    THE COURT: Was she there? I'm sorry. I just want to
20 make sure I understand.
21    Did you go back and go in with the management?
22    THE WITNESS: Yes.
23    THE COURT: Okay. *[handwritten: Very Important]*
24 BY MR. BALAREZO:
25 Q. So even –

*[handwritten: Perjury if she didn't go in without ReMAX Agent, Mr Kelly]*

**31**

*[handwritten: Illegal search PREJUDICE]*

1     THE COURT: This was later, though; right?
2     THE WITNESS: This was after the Excursion group had
3  gone back into the house.
4  BY MR. BALAREZO:
5  Q. And how many days later was that, do you think?
6  A. It was the next day.
7  Q. Okay. So you did the sneak and peek search, didn't find
8  anything, and then you had to go back the next day; right?
9  A. Yes.
10 Q. And you went to the rental office, you didn't get another
11 warrant; right?
12 A. Right.
13 Q. So you went to the rental office, they let you in, and once
14 again you searched and you didn't find drugs or money?
15 A. The second day we literally walked through with the rental
16 agent.
17 Q. This was just to see in case you missed something the first
18 time or what?
19 A. To see if the individuals who had been in the house that
20 morning had brought anything or left anything.
21 Q. And you didn't find anything, did you?
22 A. No.
23 Q. No drugs, no money?
24 A. No.
25 Q. Now, with respect to the, the warehouse at 400 Hampton

*[handwritten: Illegal warrant]*

**32**

1  Place, you have had 24-hour-day, 7-day-a-week surveillance of
2  that place for about 35 days or something like that?
3  A. Yes.
4  Q. Couple of weeks?
5     And you have testified that you didn't see a lot of
6  commercial activity, I think is your words?
7  A. Correct.
8  Q. Now, you yourself were not posted in front of that building
9  24, 7; right?
10 A. No.
11 Q. And all you did was see the videotapes?
12 A. No, I was there in person for some, like a couple hours on
13 several days but not 24, 7.
14 Q. Did you see every hour, every minute of those videotapes?
15 A. Yes.
16 Q. And you are saying that there was not a lot of commercial
17 activity; right?
18 A. Yes.
19 Q. Were you aware that the location, at least the purpose that
20 Mr. Jones rented that was for a moving service? Were you aware
21 of that?
22 A. I had found out that he, that it was a delivery service
23 that he was, was running out of there, yes.
24 Q. And the white box truck that you saw deliver those
25 mattresses was seen at that location on several occasions;

*Handwritten top margin: "Perjury / Testified she better gave key"*

## Page 32

1   correct?

2   A. Yes.

3   Q. Now, you, you never got a search warrant for that location;

4   correct, for the warehouse?

5   A. Correct.

6   Q. During these 35 days when you didn't see commercial

7   activity, when you saw Lawrence Maynard go there, and you saw

8   Mr. Jones there a few times, too; right?

9   A. Yes.

10   Q. You never got a warrant?

11   A. Correct.

12   Q. You waited until, at least according to your testimony,

13   until Mr. Jones left and then you went to Andy Schaefer; is

14   that correct?

15   A. Yes.

16   Q. You went to Andy Schaefer and had him let you into the

17   location, is that what you are saying?

18   A. I asked for consent to, to go into the property and he gave

19   me the key. *IMPEACH*

20   Q. So the answer is yes, Mr. Schaefer let you in? You went to

21   him to let you in and he let you in?

22   A. He gave me the key. He didn't -- when you say let me in,

23   it sounds like he opened the door. He gave me the key.

24   Q. He gave you have access to the location?

25   A. Yes.    *IMPEACH - LIES*

*Left margin handwritten: "IMPEACH"*

## Page 34

1   Q. So if Mr. Schaefer had indicated that he didn't remember

2   that --

3       MS. LIEBER: Objection.

4       THE COURT: Sustained.

5   BY MR. BALAREZO:

6   Q. And, when you went into that location, this was supposedly

7   after Mr. Jones had cleared out; correct?

8   A. Yes.

9   Q. This is No. ICE 22, which has already been admitted. This

10   is one of the pictures that you indicated showed the warehouse

11   space at the time that you went in with Mr. Schaefer's consent;

12   right?

13   A. Yes.

14   Q. And you indicated all these things were left there. For

15   example, ICE 25, there was -- going the wrong way -- there was

16   some sort of work clothing that was left; right?

17   A. Yes.

18   Q. As you can see right next door there was a whole box of

19   what appear to be valentines type material. Do you see that?

20   I think you can see the hearts on it. Stuffed animals of some

21   kind, do you remember that?

22   A. Yes.

23   Q. You saw that; right?

24   ICE 26. There was a whole pack of these moving blankets;

25   right? *I would never leave this much property behind. (Perjury)*

## Page 36 (left)

1   A. Yes.

2   Q. That's one -- are these the same packs? This is ICE 27.

3   It looks a little bit different. Can you recall if it's two

4   separate packs?

5   A. I don't know if it's a different angle or two separate

6   packs.

7   Q. Okay. Or at least one pack; right? You said that you

8   found an inflatable mattress with batteries in it, it still

9   seems?    *new batteries*

10   A. Yes.    *why would I leave new batteries*

11   Q. Right here are the batteries. And you also indicated that

12   you found a box of what you characterized as shrink wrapping?

13   A. Right.

14   Q. Or, in fact, this is just that plastic film that movers

15   wrap furniture with; right, and boxes and that kind of thing?

16   A. I suppose so.

17   Q. So when you say that it was shrink wrapping, that's just

18   your characterization; right, because you don't know what that

19   was used for?

20   A. Correct.

21   Q. And here is another picture of that same thing. And you

22   also mentioned a couple of times something about the window

23   having been covered. And I believe at one point you said he,

24   meaning Mr. Jones, had done this; right?

25   A. I think I said they and someone, yeah. I don't know who.

## Page 36 (right)

1   Q. They meaning Mr. Jones; right?

2       THE COURT: She said they.

3   BY MR. BALAREZO:

4   Q. Well, you have no idea who put that cover on it; right?

5   A. Correct. I would presume the current renters, but I don't

6   know for sure.

7   Q. Can I just show her what I have marked as No. 29. Can you

8   see that?

9       THE COURT: It's not on the screen.

10       MR. BALAREZO: It's just for her.

11       THE COURT: All right.

12       THE WITNESS: It's upside down.

13   BY MR. BALAREZO:

14   Q. Is it? What is this a picture of? Can you see it? Is

15   there a light -- well, can you make out what it is?

16   A. It looks like another garage window covered with that same

17   stuff that the other window was covered with.

18   Q. Look at it closely. Actually it's right there. Look at it

19   closely. Can you see both of them?

20   A. Is it the same one? I'm not sure.

21   Q. Look at them. You tell me, does it appear to be the same

22   one? Why don't I do this so you can --

23   A. Yeah.

24   Q. I'll show you ICE 23 and Jones 29.

25   A. It looks like the same one.

37

1  Q.  I'm sorry?
2  A.  It looks like the same one.
3  Q.  And when these, at least --
4        THE COURT:  You want to put it into evidence so we
5  know what are you talking about?
6        MR. BALAREZO:  Sure.
7        THE COURT:  Okay.
8        MR. BALAREZO:  Then I move No. 29 into evidence.
9        THE COURT:  Do you have any objection?
10       MS. LIEBER:  Yes.  I don't have any idea where it came
11 from.
12       THE COURT:  I assume it came from you, the government.
13       MR. BALAREZO:  Subject to connection later, I have no
14 problems with that, Your Honor.
15       THE COURT:  I'm sorry.  I thought it was government
16 produced.  Sorry, no.  Okay.
17 BY MR. BALAREZO:
18 Q.  It appears to be the --
19       THE COURT:  We will have to wait.
20 BY MR. BALAREZO:
21 Q.  It appears to be the same; correct?
22 A.  It appears to be, yes.
23 Q.  Now, your pictures were taken in 2004 when you went into
24 the warehouse?
25 A.  Yes.

38

1  Q.  All right.  Looking at No. 29 that I showed you, would it
2  surprise you --
3        THE COURT:  No, no, no.  It's not in evidence.  Sorry.
4        MR. BALAREZO:  Well, I can ask her, Your Honor.  I'm
5  not showing it to the jury.
6        THE COURT:  Would it surprise you, if she didn't take
7  it and doesn't know when it was taken, then you can't ask her.
8        MR. BALAREZO:  Very well.
9        THE COURT:  You can put it in later.
10       MR. BALAREZO:  I may be done, Your Honor, if I can
11 have one second.
12 BY MR. BALAREZO:
13 Q.  As far as you know, are all these pictures that we have of
14 the warehouse, are these the extent of all the pictures?
15 A.  Yes.
16 Q.  Okay.  And you indicated that there was an office, which --
17 and this is ICE 20, which is in evidence.  Right?
18 A.  Yes.
19 Q.  You have indicated there was an office over here in this
20 little location where it says office?
21 A.  Yes.
22 Q.  All right.  You didn't take any pictures of the inside of
23 that office?
24 A.  No.
25 Q.  Do you recall that there was furniture stored in that

39

1  office when you went in?
2  A.  No, I don't remember.
3  Q.  Did you go into the office to look at it?
4  A.  I looked at -- yes.
5  Q.  But no pictures were taken of that office?
6  A.  No.
7        MR. BALAREZO:  If I can have just one second, Your
8  Honor.
9  BY MR. BALAREZO:
10 Q.  Agent, what time did you go into the warehouse, do you
11 recall?
12 A.  I remember it being dark.
13 Q.  Was it about 11:00 o'clock at night?
14 A.  I don't recall the exact time, but in the evening sometime.
15       MR. BALAREZO:  Your Honor, I believe that's all I have
16 for the agent.
17       THE COURT:  Mr. Norris.
18       MR. NORRIS:  No questions.
19       THE COURT:  Mr. McDaniel.
20       MR. McDANIEL:  No, Your Honor.
21       THE COURT:  Thank you.  Let's finish up, then.  Maybe
22 the agent would like to do something else.
23       MS. LIEBER:  Your Honor, just a few questions.  Before
24 I do, so as to speed this along, if we can approach about one
25 question I'm going to ask.  But before I do it, I want to clear

*Judge Angry At Government*

40

1  it.
2        THE COURT:  Fine.  I understand.  Come on.
3        Excuse us, ladies and gentlemen.  Take a stretch.  It
4  won't take us long.
5        (Bench conference.)
6        MR. BALAREZO:  What door did I open up now?
7        THE COURT:  I don't know.  We will find out.
8  I have advice for the government at the end of this
9  trial.  Okay.  *THE JUDGE IS ANGRY AT THE GOVERN...*
10       MS. LIEBER:  The question is the last set of questions
11 about you didn't take any pictures of the office.  I'm going to
12 ask her why did you take pictures of the, some of this other
13 stuff, the coveralls and that sort of thing.
14       THE COURT:  Sure.
15       MS. LIEBER:  The answer to which is because the drug
16 dog came in and alerted on them.  And so I just wanted to clear
17 that now.
18       MR. BALAREZO:  How does that get --
19       THE COURT:  -- when the drug dogs -- you know, drug
20 dogs hit on a lot of things.  If there is any kind of cocaine,
21 even on money that passes hands in lots of places, so --
22       MS. LIEBER:  I didn't know that.
23       THE COURT:  But that doesn't explain why they took
24 pictures of some things and not others.  I don't know what
25 difference it makes whether she took pictures of all these

41

1  things. That's why I just wonder what we are doing.
2      MS. LIEBER:  Why would you take pictures of overalls.
3  The only reason they took pictures of the overalls as opposed
4  to – I mean, the air mattresses make sense, the shrink
5  wrapping makes sense. The overalls –
6      THE COURT:  Did they examine them or take anything out
7  of them?
8      MS. LIEBER:  There was no cocaine found. And I would,
9  of course, ask that – obviously, I would ask that follow-up
10  question.
11      MR. BALAREZO:  Your Honor, first of all, was she there
12  when the dog –
13      MS. LIEBER:  Yes.
14      MR. BALAREZO:  – did it?
15      What's her experience with the dog? How does she know
16  what the dog does? Did somebody tell her or did the handler
17  tell her the dog came up positive?
18      I don't know what the dog does when – does he wag his
19  tail? Does he point? I don't know.
20      THE COURT:  I believe he barks. But we can ask those
21  questions, if you want. That's fine. She can say what –
22      MS. LIEBER:  What she saw.
23      MR. NORRIS:  Isn't that expert testimony whether a dog
24  is alerting or just something that dogs do?
25      THE COURT:  But we are not offering it for the truth

42

1  of it. It only being offered to show why they took these silly
2  pictures of some things and not others. Then you wanted to
3  make a point about why they didn't take pictures of the office.
4  Here's the reason why they took a picture. It's not for the
5  truth at all. The fact the thing was – it might have alerted
6  or they thought it alerted. It doesn't matter if there was
7  coke there or not. That's irrelevant. So, we're not offering
8  to show that –
9      MR. NORRIS:  It could have meant Timmy was stuck in
10  the well.
11      THE COURT:  Seems to me there is some insinuation they
12  didn't do some arbitrary thing about taking pictures. And
13  that's why she's doing it.
14      MR. BALAREZO:  She took pictures of everything else
15  except the office. I mean, I was just wondering why she didn't
16  take a picture. And I guess she's going to ask.
17      THE COURT:  She can ask also why you didn't take
18  pictures of the office. I'm going to allow it. But we will
19  tell the jury that there is no evidence of cocaine found.
20  Okay. Go ahead.
21      (open court)
22      THE COURT:  Sorry. Come on back.
23      REDIRECT EXAMINATION
24  BY MS. LIEBER:
25  Q.  Just a very few questions, Special Agent Gikas.

43

1  Mr. Balarezo just asked you whether or not you took pictures of
2  the office inside that warehouse.
3  A.  Yes.
4  Q.  And you said you did not. Why didn't you take pictures of
5  the office?
6  A.  Well, pretty much took pictures of things that were
7  relevant to the investigation. Bull CRAP
8  Q.  Okay. I'm going to show you Government's ICE 25, which is
9  in evidence. What was it about the, I guess, coveralls and
10  jacket there that made you take a picture?
11      MR. BALAREZO:  Objection.
12      THE COURT:  Overruled. Ladies and gentlemen, the –
13  go ahead. Answer the question first before I start instructing
14  away.
15      THE WITNESS:  That evening when we entered the
16  warehouse, we had a drug dog run through. And the drug dog hit
17  on those coveralls. THESE WAS NOT MAN
18  BY MS. LIEBER:  ONLY OVERALLS
19  Q.  And did you actually observe that?
20  A.  No. The dog handler – I observed the dog going in, but
21  the dog works better when –
22      MR. BALAREZO:  Objection, Your Honor.
23      THE COURT:  It's not being offered for the truth. We
24  are not offering it to show for any reason that there was
25  cocaine found or that the dog was right or wrong. We don't

44

1  care if the dog was right or wrong.
2      Go ahead. So why did you take the picture of the
3  jackets?
4      THE WITNESS:  Because the dog handler indicated that's
5  where the dog hit.
6      THE COURT:  Ladies and gentlemen, this answer was
7  admitted solely for you to understand why this particular
8  picture was taken, not to even think about whether the dog was
9  reliable or not or whether there was – in fact, there was no
10  cocaine found.
11      Isn't that right?
12      THE WITNESS:  Correct.
13      THE COURT:  Okay.
14  BY MS. LIEBER:
15  Q.  And you actually looked and didn't find any?
16  A.  Correct.
17  Q.  Mr. Balarezo asked you about these deliveries of
18  mattresses. Did you ever see, in terms of your personal
19  surveillance, did you ever see any other deliveries aside from
20  that one day?
21  A.  No.
22  Q.  And in your review of the 35 days of 24, 7 video
23  surveillance of the warehouse, did you see any other mattress
24  deliveries or moving type deliveries? Emperich
25  A.  No.

101

```
 1        THE COURT:  Well, you did.  Thank you.
 2    MR. BALAREZO:  Am I done?
 3        THE COURT:  I hope so.
 4    Anybody else?
 5        MR. BALAREZO:  I may have had one more, but I'll defer
 6    to the --
 7        MR. NORRIS:  I'll defer to Mr. Balarezo.
 8        THE COURT:  Do you want to give him your one question,
 9    that will be fine.  Go ahead.
10        MR. BALAREZO:  I'll turn it into three.
11        THE COURT:  Okay, Mr. Norris.
12        MR. NORRIS:  Thank you.
13                    CROSS-EXAMINATION
14    BY MR. NORRIS:
15    Q.  Good afternoon, Mr. Schaeffer.
16    A.  Good afternoon.
17    Q.  I believe you've mentioned three names in connection with
18    this lease, Mr. Antoine Jones, his wife, I believe you said was
19    Denise Jones, and someone named Lawrence; is that correct?
20    A.  Yes.
21    Q.  Okay.  And Lawrence, would that be Lawrence Maynard?
22    A.  It would be.
23    Q.  Okay.  And the name Adrian Jackson is not anything that
24    you're familiar with in connection with the rental of this
25    unit; is that correct?
```

102

```
 1    A.  No.
 2    Q.  And that's not one that you've met --
 3        THE COURT:  Wait, no.  Is that correct meaning yes?
 4    Correct, you're agreeing with him?
 5        The name Adrian Jackson is meaningless to you?
 6        THE WITNESS:  Yes, I have no knowledge of him.
 7    BY MR. NORRIS:
 8    Q.  No knowledge of Adrian Jackson?
 9    A.  Correct.
10    Q.  Okay.
11        MR. NORRIS:  Nothing further.
12        MR. McDANIEL:  No thank you, Your Honor.
13        MR. ACREE:  No, Your Honor.
14
15                    REDIRECT
16    BY MS. LIEBER:
17    Q.  Mr. Schaeffer, very briefly, I'm going to show you -- I'll
18    just put them on the monitor here.
19        THE COURT:  They're not in evidence?
20        MS. LIEBER:  They're not in evidence yet.
21    BY MS. LIEBER:
22    Q.  Photo 61, do you see that?
23    A.  Yes.
24    Q.  And what is Photo 61?
25    A.  It's a driver's license of Lawrence Maynard.
```

103

```
 1    Q.  Is it a photocopy of that driver's license?
 2    A.  It is.
 3    Q.  Okay.  Now I'm going to show you Photo 62; do you see that?
 4    A.  I do.
 5    Q.  And what is that?
 6    A.  That's a photocopy of a driver's license of Mrs. Jones.
 7    Q.  Now, Mr. Schaeffer, were these also kept in your rental
 8    file in the ordinary course of business?
 9    A.  It was.
10    Q.  Okay.  Were these actual photocopies that you or someone
11    like you made of the driver's licenses presented by Mrs. Jones
12    and Mr. Maynard?
13    A.  It was.
14    Q.  Okay.
15        MS. LIEBER:  Your Honor, at this time I would move
16    Photos 61 and 62 into evidence.
17        THE COURT:  Are these copies from your files?
18        THE WITNESS:  They are, Your Honor.
19        THE COURT:  Any objection?
20        MR. BALAREZO:  No.
21        THE COURT:  Photo 61 and -2 are in.
22        (Government's Exhibits Photo 61 and Photo 62 were
23        received into evidence.)
24    BY MS. LIEBER:
25    Q.  And finally, Mr. Schaeffer --
```

104

```
 1        THE COURT:  Are you going to put them on the screen
 2    though?
 3        MS. LIEBER:  I'm sorry.
 4    BY MS. LIEBER:
 5    Q.  Here's Photo 62; is that right?
 6    A.  Yes, it is.
 7    Q.  Okay.  And that's Denise Jones?
 8    A.  Yes, it is.
 9    Q.  Now Photo 61?
10    A.  That's Lawrence.
11    Q.  Okay.  Thank you.
12        Did you actually see Lawrence around that property from
13    time to time?
14    A.  I did.
15    Q.  Finally, Mr. Schaeffer, when Mr. Jones was the renter of
16    that space, so we're talking now the winter of 2004, did you
17    have a key to that overhead door?
18    A.  I did not.
19    Q.  How did you get the key when he vacated the premises?
20    A.  He took the locks off the door when he left.
21    Q.  Okay.  And it was at that time that you had access to it?
22    A.  It was.
23    Q.  Okay.  Thank you.
24        MS. LIEBER:  Nothing else.
25        THE COURT:  Thank you, you may step down.
```

End of Mr Schaeffer

**97**

1   A.  That and this is the only building I own in Hampton Park.

2   Q.  I understand.

3       MR. BALAREZO:  And, Your Honor, actually, can we

4  approach before I continue, just so – I know it's late.

5       THE COURT:  Just finish it up please.

6       Go ahead.

7  BY MR. BALAREZO:

8   Q.  This person, Katerina, did there come a time when she –

9  when you allowed her to enter the premises at 400 Hampton Park?

10  A.  I may have.

11  Q.  As best as you can, did you, or did you not?

12  A.  I didn't have a key when the tenant was in. After the

13  tenant left, if she asked me for the key, I would have given

14  her the key.

15  Q.  Well, but my question is – I'm not asking you to speculate

16  as to whether you did or not.

17       To the best of your recollection, did she ask you to –

18  whether –

19  A.  I do not remember.

20  Q.  All right. Do you remember speaking to an individual by

21  the name of Mark Glick?

22  A.  Yes.

23  Q.  About a month ago?

24  A.  Yes.

25  Q.  And you're aware that Mr. Glick is my investigator?

**98**

1   A.  I am.

2  Q.  Okay. And do you recall Mr. Glick asking you questions to

3  that effect, whether or not you allowed agent Katerina – Gikas

4  is her last name – to enter the premises?

5  A.  I do.

6  Q.  And do you remember that you told Mr. Glick that you did

7  not give Agent Gikas authority to enter the premises?

8  A.  No. I said I did not remember.

9  Q.  Now, the – the inside of 400, it just wasn't one big open

10  space; correct?

11       There was an office –

12  A.  There was an office in the front part, yes.

13  Q.  And that office had doors – well, the office is what

14  fronted the glass partition at the front; correct?

15  A.  Yes.

16  Q.  All right. Now, were you aware that Mr. Jones kept

17  furniture in the office?

18  A.  No.

19  Q.  So you had no inspections of the premises while he had the

20  lease?

21  A.  He was there a very short time. I don't remember going out

22  while he was a tenant.

23       THE COURT:  When did he leave? When was the tenancy

24  over?

25       THE WITNESS:  April 30th. I think he was there for

**99**

1  about five months.

2       THE COURT:  April 30, '04?

3       THE WITNESS:  '04.

4  BY MR. BALAREZO:

5  Q.  And did you, yourself, enter the premises upon his

6  departure?

7  A.  I don't remember, but it's customary for me to go out and

8  inspect the premises, so he could get his security deposit

9  back.

10  Q.  And did you give Mr. Jones his –

11  A.  I did.

12  Q.  And part of the reason you gave the security deposit back

13  was because there was no damage to the property; right?

14  A.  Correct.

15  Q.  And when Mr. Jones left the property, he cleared it out; is

16  that correct?

17  A.  I don't – I don't remember.

18  Q.  Well, if Mr. Jones had left garbage and equipment and all

19  kinds of items in the – in the location, would you have

20  considered that basically completing his lease and given him

21  all his money back, or would you have taken money for cleanup,

22  let's say?

23  A.  Yes. Normally, if there's a small amount of debris or

24  stuff left, I still return the security deposit.

25  Q.  Let me ask you this, do you recall whether or not once

**100**

1  Mr. Jones left the premises, whether there was a – any

2  clothing, any uniforms, anything of that nature?

3  A.  I do not know.

4  Q.  Don't know or don't recall?

5  A.  I guess I would say I don't recall. I don't remember

6  anything like that.

7  Q.  Do you remember whether or not when Mr. Jones left the

8  premises, if there were any sort of inflatable mattresses or

9  any sort of equipment like that?

10  A.  I don't recall.

11  Q.  Do you know whether or not when Mr. Jones left the

12  premises, if there were any bags, duffle bags, suitcases,

13  anything of that nature?

14  A.  No, I don't know.

15  Q.  And do you know when Mr. Jones left the premises, if there

16  were any heat-sealing equipment, any wrapping materials,

17  anything of that nature?

18  A.  I do not know.

19  Q.  And when Mr. Jones left the premises do you know if there

20  was –

21       THE COURT:  Can we ask you, do you have any idea what

22  was in it when he left?

23       THE WITNESS:  I have no idea, Your Honor.

24       MR. BALAREZO:  Well, Your Honor, I have to ask those

25  specific ones.

---

**93**

1  right?
2  A.  Yes.
3  Q.  There's not a lot of people coming and going; correct?
4  A.  The tenant next to him sometimes stays open until 7:00 or
5  8:00, yeah, 404 and 408.
6  Q.  And that's the --
7  A.  Snack food --
8  Q.  And that's the Snack Shack; is that right?
9  A.  Yes.
10  Q.  And the Snack Shack is still there?
11  A.  It is.
12  Q.  Now, you are aware, since you're the owner and you deal
13  with these people, that the snack shack, in the past -- I'm not
14  asking about right now -- but in the past, had a lot of
15  break-ins; correct?
16  A.  I don't recall that.  I remember when there was a bicycle
17  shop in unit -- I think it was 412 or 418, they were broken
18  into.  I don't remember the snack shack being broken into, but
19  I remember at least one break in.
20  Q.  And most of these -- most, if not all of those spaces,
21  again, each of these spaces is an individual warehouse; right?
22  A.  Some of them are combined units like 404 and 408, there
23  would be no wall in-between, it would be just open space.
24  Q.  But the front of these were all the same, basically that
25  plate grass that you were talking about; right?

---

**94**

1  A.  Right.
2  Q.  Okay.  So, for example, when the bicycle shop was broken
3  into, somebody broke the plate glass and got in; correct?
4  A.  Yes.
5  Q.  Now, you indicated that Mr. Jones told you that he was
6  going to use this as -- what was it, a furniture --
7  A.  I thought he said moving and storage.
8  Q.  A moving and storage company.
9     Did you ever go into the space at the time that Mr. Jones
10  had the lease?
11  A.  Not that I remember, no.
12  Q.  Can you tell this jury that Mr. Jones never had any
13  furniture in that -- in that particular space, Number 400?
14  A.  No, I couldn't say that.
15  Q.  Now, if Mr. Jones was conducting this business, this
16  furniture moving business, and considering that you've had
17  break-ins into your other warehouse spaces, it's not really
18  unusual for him to want to secure his space, is it?
19     MS. LIEBER:   Objection.
20     THE COURT:  Sustained.  Sustained.
21  BY MR. BALAREZO:
22  Q.  Now, you indicated that you, yourself, had some of these
23  overhead doors installed.
24     Were they installed in these other spaces?
25  A.  They were not installed in this building, no.

---

**96**

1  Q.  Why did you have those installed?
2  A.  For security.
3  Q.  To prevent break-ins; correct?
4  A.  Yes.
5  Q.  Now, you indicated that you gave the documents that Miss
6  Lieber showed you, the lease and the brochures, you gave them
7  to somebody named Katerina?
8  A.  Yes.
9  Q.  Do you recall when you gave her those documents?
10  A.  No.
11  Q.  Was it within the last month, or was it within the last
12  year, do you recall?
13  A.  It certainly wasn't within the last year.
14  Q.  Was it before last year, let's say?
15  A.  It was.
16  Q.  Okay.  And that was in response to a subpoena; is that
17  correct?
18  A.  It was.
19  Q.  All right.  And is it not true that you also agreed to
20  allow her agency, the Immigration and Customs Enforcement
21  Agency, to use another location to conduct surveillance?
22  A.  I never did that, no.
23  Q.  Are you -- you're the owner of this location; right?
24  A.  I'm the owner of this building, yes.
25     MR. BALAREZO:   If I could just have one second.

---

**96**

1  BY MR. BALAREZO:
2  Q.  Do you know who someone by the name of Larry Gasner
3  (phonetic) is?
4  A.  No.
5  Q.  Do you know what Crystal Management, LLC is?
6  A.  No.
7  Q.  How about Hampton Park Center, LLC?
8  A.  No.
9  Q.  What is the name of your particular company?
10  A.  9000 Hampton Park Limited Partnership.
11  Q.  And do you know what the building at 401 Hampton Park
12  Boulevard is -- where that is?
13     MS. LIEBER:   Objection.  Beyond the scope.
14     THE COURT:  It is.
15     If you know, you can answer this.
16     THE WITNESS:   I assume it's across the street.  You
17  know, without going out there, I don't know.  I assume 401
18  would be across from 400, I assume.
19     THE COURT:  But you don't have any interest?
20     THE WITNESS:  No.
21     THE COURT:  Okay.  Go ahead.
22  BY MR. BALAREZO:
23  Q.  No interest, just to clarify that -- because I anticipate
24  the following witness.
25     You have no interest as in you have no ownership interest?

89

```
1    A.  Mrs. Jones.
2    Q.  Did she actually come there in person, herself?
3    A.  She came at least once.  I don't know if he brought it
4    signed or if she came.
5    Q.  Okay.  But you actually -- she came at least one time?
6    A.  Yes.
7    Q.  Okay.  And finally, sir, with respect to the overhead door,
8    how much do those cost, do you know?
9         MR. BALAREZO:  Objection.
10        THE COURT:  And how would he know?
11        MS. LIEBER:  Well --
12        THE COURT:  Do you know?
13   BY MS. LIEBER:
14   Q.  Do you have firsthand knowledge of how much an overhead
15   door like that costs?
16   A.  Approximately, yes.
17        MR. BALAREZO:  Objection.
18   BY MS. LIEBER:
19   Q.  And how do you know?
20   A.  I've had other doors like that installed.
21        THE COURT:  Did you pay for them or see the bill?
22        THE WITNESS:  I paid for them.
23        THE COURT:  Okay.  Overruled.
24   BY MS. LIEBER:
25   Q.  And how much does an overhead door like that cost?
```

90

```
1    A.  Between 3,000 and $3,500.
2    Q.  Okay.  Thank you very much, sir.
3         THE COURT:  Go ahead.
4         MS. LIEBER:  Oh, I'm sorry.  I said "Thank you very
5    much."  I meant that's all I had.
6         Thank you very much.
7         THE COURT:  That's why she sat down.
8         Okay.
9                          CROSS-EXAMINATION
10   BY MR. BALAREZO:
11   Q.  Good afternoon, Mr. Schaeffer.  How are you?
12        My name is Eduardo Balarezo.  I think you might recall, you
13   and I spoke a few times over the phone?
14   A.  Yes.
15   Q.  How are you?
16   A.  Fine, thank you.
17   Q.  Mr. Schaeffer, what was the date of this lease that we were
18   talking about?
19   A.  November 17, 2003.
20   Q.  So that was approximately three years ago?
21   A.  Approximately, yes.
22   Q.  Did you, yourself, accept the lease from this Mr. Jones?
23   A.  I did.
24   Q.  Okay.  And you've identified an individual here that is Mr.
25   Jones; right?
```

Strano

91

```
1    A.  I did.
2    Q.  Okay.  Now, you've also talked about Mrs. Jones.
3         Did you do anything to confirm that the person you are
4    calling Mrs. Jones was, in fact, Mrs. Jones?
5    A.  When they first came in, they came in together.  They
6    were -- I believe there were three people.  There was
7    Mr. Jones, Mrs. Jones, and Lawrence.
8         And I asked for their driver's licenses at that time.  And
9    then I ran a credit check.  And they came back later once the
10   process had been completed, but I'm not sure if Mrs. Jones came
11   back.
12   Q.  Right.
13        But my question -- and I'll try to make it very specific,
14   is, did you do anything to confirm that Mr. Jones and
15   Mrs. Jones were, in fact, married, besides check their
16   licenses?
17   A.  No, that's all I did, yes.
18   Q.  Okay.  So --
19   A.  I mean, and I did run a credit report, but I -- I -- that's
20   all I did, yes.
21   Q.  And the -- the warehouse that you own over in Hampton Park,
22   that is a large -- well, a fairly large --
23        THE COURT:  What town is it in again?
24        THE WITNESS:  Capitol Heights.
25   BY MR. BALAREZO:
```

92

```
1    Q.  Let me show you or put up on the Elmo, ICE-19.  I think
2    it's already been admitted.
3         Okay.  Do you see that, sir?
4    A.  I do.
5    Q.  Exhibit 19?
6         Now, is this the -- would this diagram, would that
7    represent the entirety of the warehouse that you own in Hampton
8    Park?
9    A.  It does.
10   Q.  And the one that -- the space that we've been talking about
11   is Number 400; right?
12   A.  It is.
13   Q.  As that's -- as we can see, that's at the end of the
14   warehouse?
15   A.  It is.
16   Q.  Okay.  What's -- what's on this side over here?
17   A.  There's a fence.
18   Q.  Okay.
19   A.  And then there's a parking lot.  And then there's a --
20   another industrial building.  I believe it's Con Paper
21   Products.
22   Q.  All right.  Now, the -- the area, it's basically -- let's
23   say after hours, it's pretty desolate, is it not?
24   A.  I would say yes.
25   Q.  It's a parking lot and some other industrial complex;
```

85

```
1         MR. NORRIS:   I can work on that.
2         MS. LIEBER:   Your Honor, that's why I didn't say for
3    the record he identified -- because I didn't want to tip him
4    off.
5         THE COURT:   Right.  Okay.  I've had enough.
6         MR. BALAREZO:   I'm sorry, Your Honor.
7         THE COURT:   Thank you.
8         MS. LIEBER:   She has enough of a recollection of the
9    rules of evidence.  Thank you.
10             (Open court.)
11        THE COURT:   Thank you, sir.  Would you retake the
12   stand?
13        You notice our bench conferences, ladies and
14   gentlemen, get longer as the day gets later.  It's harder to
15   think fast enough.
16        Okay.  Go ahead.  Sorry.
17        MS. LIEBER:   Mr. Norris gets funnier.
18   BY MS. LIEBER:
19   Q.  Let me ask this, Mr. Schaeffer, the item that I identified
20   for you as Photo 60 and brought up there that you looked at --
21        THE COURT:   This is ICE-60, Gwen.
22        MS. LIEBER:   I'm sorry, it's Photo 60.
23        THE COURT:   Photo 60.  Okay, Photo 60.
24   BY MS. LIEBER:
25   Q.  Is that photocopy a document that you also kept in the
```

86

```
1    ordinary course of business?
2    A.  It is.
3    Q.  Okay.
4         MS. LIEBER:   At this time, Your Honor, I would move
5    Photo 60 into evidence.
6         THE COURT:   Do you know whether that came from your
7    files, or?
8         THE WITNESS:   It did, Your Honor.
9         THE COURT:   Any objection?
10        MR. BALAREZO:   No, Your Honor.
11        THE COURT:   That means Photo 60 is in evidence, and it
12   can be shown.
13
14   (Government's Exhibit Photo 60 was received into evidence.)
15        MR. NORRIS:   Your Honor, no objection, but just for
16   the record, can we say that that appeared to be a photocopy of
17   a driver's license that's been enlarged several times.
18        THE COURT:   Okay.  I think we can agree that that's
19   probably a correct photocopy of an enlarged driver's license.
20   BY MS. LIEBER:
21   Q.  Mr. Schaeffer, I have been asking a lot of questions about
22   the person who rented the location and the person who installed
23   this overhead door.
24        The person who did all of those things, did he also give
25   you this driver's license?
```

87

```
1    A.  He did.
2    Q.  As part of his identification?
3    A.  He did.
4    Q.  Okay.  Thank you.
5         THE COURT:   Is that the person you talked to?
6         THE WITNESS:   Yes, it is.
7    BY MS. LIEBER:
8    Q.  And did he say his name was Antoine Jones?
9    A.  Yes, he did.
10   Q.  Okay, thank you.
11        Back to the overhead door.
12        When you had a conversation with Mr. Jones, what did he
13   tell you about why he wanted to install this overhead door?
14   A.  He said that he was in the moving and storage business, and
15   he felt that the glass door front was not secure enough.
16   Q.  And tell the jury, what was the glass door?  What did it
17   look like?
18   A.  It was a glass door front, and then it had a personnel door
19   to go in and out of.
20   Q.  When you say personnel door --
21   A.  Or a people door.
22   Q.  Like the one behind you, for instance?
23   A.  Yes.  And then -- yes.
24   Q.  And for the record, I'm talking about the door to the jury
25   room.
```

88

```
1         And when you say a glass front, what kind of grass --
2    A.  It was tempered glass.
3    Q.  Okay.  And when he said that he wanted to do that, did you
4    grant him permission to do that?
5    A.  I did.
6    Q.  Okay.  Did you give him any sort of instructions about what
7    would have to happen to that door come time that he ended his
8    lease?
9    A.  I told him that it became affixed to the building, that
10   when he terminated his lease, that it would stay.  And he
11   agreed.
12   Q.  Okay.
13        MS. LIEBER:   Court's indulgence.
14        THE COURT:   What was the day the lease was signed?  D
15   you have the documents in front of you?
16   BY MS. LIEBER:
17   Q.  And this part of the --
18        THE COURT:   I just asked him the date the lease was
19   signed.
20        MS. LIEBER:   Oh, I'm sorry.
21   BY MS. LIEBER:
22   Q.  I was going to show you this anyway.
23        Looking at this, when was the lease signed, sir?
24   A.  The lease was signed November 17, 2003.
25   Q.  And was it signed by Mr. Jones, and anybody else?
```

81

1  evidence.)
2      MR. BALAREZO:  But I still object to it, for the
3  record.
4      THE COURT:   Okay.  Overruled.
5      Go ahead.
6  BY MS. LIEBER:
7  Q.  Mr. Schaeffer, did you actually have a conversation with
8  Mr. Jones about why he wanted to install that particular
9  overhead door?
10  A.  He did ask if he could have permission to install it, and I
11  said, yes.
12  Q.  Okay.  And why -- did he tell you why he wanted to install
13  an overhead door on the front of that warehouse facility?
14  A.  He said that --
15      MR. BALAREZO:   Objection, Your Honor.
16      THE COURT:   You want to approach, on what basis?
17      MR. BALAREZO:   Let me think of one.
18      THE COURT:   Huh?
19      MR. BALAREZO:   Yes.
20      THE COURT:   Have we talked about it before?  I've
21  overruled that.
22      MR. BALAREZO:   Well --
23      THE COURT:   When you were talking with this person,
24  the person who entered into the lease, is this the same person
25  you talked to?

82

1      THE WITNESS:  Yes, Your Honor.
2      THE COURT:   Okay.  And did the person who you were
3  talking to give you a name?
4      THE WITNESS:  He did.
5      THE COURT:   What did he tell you his name was?
6      THE WITNESS:  Mr. Jones.
7      THE COURT:   Okay.  You want to approach?
8      MR. BALAREZO:  Yes.
9      THE COURT:   All right.  Sorry.
10      (Bench conference.)
11      THE COURT:   The fact that he can't make an -- can you
12  stand over there, please?  Sorry to make you do that.  Just
13  stand over there.
14      Let me -- okay.  Never mind.  Go ahead -- 21 is
15  admitted.  Go ahead.
16      MR. BALAREZO:  Where is it?
17      THE COURT:   What are you looking for?
18      MR. BALAREZO:  Well -- sorry.
19      THE COURT:   He can't make and in-court identification.
20      MR. BALAREZO:  Right.  No, I understand.
21      THE COURT:   Where is the photo I.D.?
22      MS. LIEBER:   Your Honor, if I may, I'm going to ask
23  him was that also kept in his file in the ordinary course of
24  business.  He's going to say yes, and I'm going to put it in.
25      THE COURT:   Did this come from his file?

83

1      MS. LIEBER:   It did.  I took it out of his file and
2  put a sticker on it.
3      THE COURT:   What -- what is the problem?  This is the
4  guy I talked to, this is the guy that signed the lease, this is
5  the guy --
6      MR. BALAREZO:  Well, he hasn't said that.
7      THE COURT:   He's about to.  I mean, that's the point.
8  That's where we're going.
9      And what's the answer, though?  What is the person
10  saying?
11      MS. LIEBER:   He says that he wanted more secure -- he
12  wanted to secure it with an overhead door because he ran a
13  moving and storage business.
14      THE COURT:   We're fighting over this?
15      MR. BALAREZO:  Well, Your Honor, because -- no.
16  Because the implication is --
17      THE COURT:   I'm working so hard that my brain cells
18  are gone.
19      MR. BALAREZO:  Mine are gone.
20      But the implication, I think, is that the warehouse
21  had a glass front at some point, and Mr. Jones put that in so
22  he could secure his drugs.
23      THE COURT:   The implication, but the more you bring it
24  out -- we didn't know anything about glass doors, I'll tell you
25  that.

84

1      MR. BALAREZO:  Well, I don't particularly want to get
2  into it.  The thing is, it's --
3      THE COURT:   But in any case, it's not fatal to her
4  being able to elicit this.  When a person who looks like this
5  who says, "My name's Jones and signs the lease," says the
6  following.  It's an admission of the party opponent.
7      MR. BALAREZO:  That's what I'm reading right now.  I
8  thought there was one of the subsections there that I could
9  throw at the government, but --
10      MR. GEISE:  I think it's 801(d)(2)-1.
11      MR. BALAREZO:  I have it, yeah.
12      MR. NORRIS:  While Mr. Balarezo is looking at that,
13  how do we deal with the issue of the false identification of my
14  client as Mr. Jones, with the jury?
15      THE COURT:  I think that they have to be told that he
16  has done that.  We can stipulate after he leaves.
17      MR. NORRIS:  Very well.
18      THE COURT:  I don't think we ought to clue him in, so
19  that he goes back --
20      MR. NORRIS:  No, no.  I don't want to do it in front
21  of the witness.
22      THE COURT:  But for the record, it's been done as
23  identified as your client, and we can certainly say that, you
24  know, it wasn't -- there was no suggestion that it was your
25  client that was renting this.

77

```
 1        MS. LIEBER:  He is going to test -- I'm going to ask
 2   him --
 3        THE COURT:  He can testify to what Adam -- what Jones
 4   told him, not his wife though.
 5        MS. LIEBER:  Right.  And he's only going to -- I'm
 6   sorry.  He's going to testify about a conversation he had with
 7   Mr. Jones about putting up the door, why Mr. Jones wanted to
 8   put up the door.
 9        THE COURT:  It's all staying in.
10        MS. LIEBER:  -- and the fact that the door has to stay
11   because it's permanent.
12        THE COURT:  Okay.  Thank you.
13        (Open court.)
14
15   BY MS. LIEBER:
16   Q.  Mr. Schaeffer, before I get to the picture that we have
17   been talking about, in the course of your duties as the manager
18   of that property, did you have occasion to have a conversation
19   or a number of conversations with Antoine Jones?
20   A.  I had one or two.
21   Q.  Okay.  And do you actually have a photograph of Antoine
22   Jones in your file?
23   A.  I have a copy of his driver's license.
24   Q.  Okay.  Would you -- if you saw Mr. Jones again, would you
25   be able to recognize Mr. Jones?
```

78

```
 1   A.  Maybe.
 2   Q.  Okay.  Would seeing that picture that you have in your file
 3   refresh your memory as to what Mr. Jones looked like?
 4        MR. BALAREZO:  Objection, Your Honor.  He didn't
 5   indicate that he couldn't.
 6        THE COURT:  No, he didn't.
 7        The first question is:  Can you identify anybody in
 8   this courtroom as Mr. Jones?
 9        THE WITNESS:  Without looking at the driver's license,
10   I would say no.
11   BY MS. LIEBER:
12   Q.  Would taking a look at that driver's license picture
13   refresh your memory as to the person who calls himself
14   Mr. Jones, who rented this facility?
15   A.  It would.
16        MS. LIEBER:  I'm showing to Mr. Balarezo, Photo 60,
17   just for identification.
18        If I may approach Your Honor, may I approach?
19        THE COURT:  Yes.
20   BY MS. LIEBER:
21   Q.  Mr. Schaeffer, I'm showing you Government's Exhibit Photo
22   60.  Taking a look at that photograph, does that refresh your
23   memory as to the person who identified himself as Antoine Jones
24   who rented the storage facility we're talking about?
25   A.  Yes.
```

79

```
 1   Q.  Okay.  Now, having taken a look at that photograph, if you
 2   look around the courtroom, do you see the person who you spoke
 3   with who represented himself to be Antoine Jones who rep -- who
 4   rented this facility?
 5   A.  I think he's sitting at that table over there.
 6   Q.  Okay.  Can you be -- I'm sorry.  Can you be a little more
 7   specific?  There are several people sitting at that table.
 8        You can stand up and look, if it helps.
 9   A.  I would say the man in the brown suit, but I'm not sure.
10   Q.  Thank you.
11        THE COURT:  You mean that gentleman that's standing?
12        THE WITNESS:  Yes.
13        MR. BALAREZO:  For the record, Mr. Norris' client
14   stood up.
15        MR. NORRIS:  Thank you.
16        THE COURT:  All right.  True, for the record.
17        All right.  Go ahead.
18   BY MS. LIEBER:
19   Q.  Now, Mr. Schaeffer, I want to show you now what I've marked
20   as Government's Exhibit, again, ICE-21.  It's not in evidence.
21   At the time that Mr. Jones rented the storage facility in --
22   I'll put this on the machine, which was on November 17th, 2003,
23   did the storage Unit, 400 Hampton Park Boulevard, actually have
24   that door on it?
25   A.  No.
```

80

```
 1   Q.  Is that the standard door that is in front of the various
 2   warehouse units at your company?
 3   A.  No.
 4   Q.  Okay.  Did there come a point in time during the course of
 5   Mr. Jones' rental of that particular space that he installed
 6   this overhead door?
 7   A.  He did.
 8   Q.  Okay.  Does this picture fairly an accurately represent the
 9   storage facility unit after he had that door installed?
10   A.  It does.
11        MS. LIEBER:  Your Honor, at this time I would move
12   ICE-21 into evidence.
13        MR. BALAREZO:  Your Honor, I object, subject to the
14   objection I made at the bench.
15        THE COURT:  Who --
16        MS. LIEBER:  Your Honor, I --
17        THE COURT:  Fairly and accurately represents the
18   facility after the door was added, but the door wasn't there
19   originally; right?
20        THE WITNESS:  Correct.
21        THE COURT:  Okay.  I don't understand the objection to
22   the admission of the paper.
23        MR. BALAREZO:  I'll deal with it on cross.
24        THE COURT:  All right.  Then 21 is admitted.
25        (Government's Exhibit ICE-21 was received into
```

73

1  Q.  Mr. Schaeffer, before we go on to ICE-21, let me ask you,
2  who is the person who leased -- and I'll put this on the Elmo
3  for you, if you look at that little screen.
4      Who is the person who leased this Hampton Park warehouse
5  storage facility?
6  A.  Mr. Jones and Mrs. Jones.
7  Q.  Okay.  And is it Antoine and Denise Jones?
8  A.  Yes.
9  Q.  And did you, yourself, actually make copies of these
10 documents and give them to anybody a while back?
11 A.  Yes.
12 Q.  Okay.  And who did you give them to, if you remember?
13 A.  I received a subpoena, and I gave them -- I only remember
14 the first person, Katerina, I believe her name was.
15 Q.  Okay.  And in reviewing them again today are these the same
16 documents?
17 A.  They are.
18 Q.  Okay.  Now, let me ask you, finally, Mr. Schaeffer about
19 ICE-21.
20     Do you recognize that picture?
21 A.  I do.
22 Q.  What is that -- that's actually not in evidence.
23 A.  That is the front of 400 Hampton Park Boulevard.
24 Q.  Okay.  And does that picture fairly and accurately
25 represent the front of a particular storage unit at Hampton

74

1  Park?
2  A.  It does.
3  Q.  Okay.  Which unit was that?
4  A.  400.
5  Q.  Okay.  And is 400 the unit that we've been talking about?
6  A.  It is.
7  Q.  Okay.  And does that picture fairly and accurately
8  represent how the front of Unit 400 look at the time that it
9  was being leased by Mr. Jones?
10 A.  It does.
11     MS. LIEBER:  Your Honor, at this time I would move
12 Government's ICE-21 into evidence.
13     MR. BALAREZO:  At what time?
14     THE COURT:  What's the date of the lease, please?
15 BY MS. LIEBER:
16 Q.  Well, let me ask this, actually, Mr. Schaeffer, at the time
17 that Mr. Jones entered into the lease agreement with your
18 company for 400 Hampton Park Storage, did the front door to
19 that unit look like this?
20 A.  No.
21 Q.  What did the front door of that unit look like when you
22 first rented that space to Antoine Jones?
23     MR. BALAREZO:  Objection, Your Honor.
24     Can we approach one second?
25     THE COURT:  No.  Does he know?

75

1      MR. BALAREZO:  It's not about -- it's about something
2  else, Your Honor, please.
3      THE COURT:  All right.
4      (Bench conference.)
5      MR. BALAREZO:  Your Honor, this may be a minor point
6  in the universe, but, number one, there's been no
7  identification of my client yet.
8      Number two, I don't know if this witness can identify
9  my client.
10     Number three, I object to Miss Lieber saying something
11 about Mr. Jones and then pointing to my client.
12     MS. LIEBER:  I'm sorry.  I -- I didn't think about it,
13 and you're right.
14     THE COURT:  I don't know.  That's all well-taken.  I
15 don't know if he can or he can't.
16     He can identify dates.  Can he identify him?
17     MS. LIEBER:  He can.  He has a picture in his file, a
18 driver's license picture.
19     THE COURT:  Oh, all right.  Well then, you'd better
20 establish that.
21     MS. LIEBER:  Okay.  And I'm sorry.  I didn't think
22 about it.
23     THE COURT:  I don't know how we're using this
24 custodian of records -- very good.
25     MR. BALAREZO:  Well, I didn't object, but he's the

76

1  president of the company.  That doesn't necessarily mean he was
2  the custodian.  That's one of the things I was objecting to
3  before the Court laid that foundation as it did.
4      And that was really my concern, does he know what
5  these documents are, does he deal with them, I don't know.
6      MS. LIEBER:  He personally made the copies from the
7  file, so he does know.
8      THE COURT:  No, that's not the point.  Now the problem
9  is whether he has firsthand knowledge about who is the lessee,
10 and what did he lease, and what did the door look like.
11     So you have to lay that foundation.
12     MS. LIEBER:  Sure.  Thank you.
13     THE COURT:  Thank you.
14     MR. BALAREZO:  Before we go, I think there is an issue
15 where he may testify about Mr. Jones putting up a door that
16 cost thousands of dollars.  I don't think this guy knows who
17 ordered that door put in there, how much it costs, I mean, so I
18 don't want to get into -- it's hearsay.
19     MS. LIEBER:  Since we're here -- he is going to --
20     THE COURT:  Well, it's not hearsay to say the door
21 went up.
22     MR. BALAREZO:  No, no, but --
23     THE COURT:  He saw it.
24     MR. BALAREZO:  -- but there are other things that I
25 think would be hearsay, related to the door.

69

1  to the jury and spell your first and last names for the court
2  reporter?
3  A.  My name is Andrew Schaeffer, S-C-H-A-E-F-F-E-R.
4  Q.  Sir, how are you employed?
5  A.  I'm the president of Metropolitan Investment Company.
6  Q.  And what is Metropolitan Investment Company?
7  A.  It a property management company for commercial buildings.
8       THE COURT:  Sorry.  You'll have to speak up a little
9  bit.  It moves your -- if you want to move it closer.
10 BY MS. LIEBER:
11 Q.  Mr. Schaeffer, is one of the properties that your company
12 manages the Hampton Park Storage Facility located at 400
13 Hampton Park Boulevard in Capitol Heights, Maryland?
14 A.  It is.
15 Q.  Okay.  And sir, I'm going to show you what I've marked as
16 Government's Exhibits ICE-15, -16, -17, -18 and -19.
17      MS. LIEBER:  First, I'm going to show this to the
18 defense, Your Honor, which they've seen before.  And actually,
19 I'll add in ICE 21, while we're at it.
20      MR. BALAREZO:  Before we show this, can we lay a
21 proper foundation about --
22      THE COURT:  No.  The way you lay it is to show it to
23 him and ask him if he recognizes them.  They're not in evidence
24 yet.  That's what she's doing.
25      MR. BALAREZO:  I understand, Your Honor.

70

1       THE COURT:  All right.  Go ahead.  You can -- has
2  everybody seen them?  I'm sure you've seen them before.
3       What page of the list, Gwen, do you know?
4       THE DEPUTY CLERK:  It's page 18.
5       THE COURT:  18, thank you.
6       MS. LIEBER:  Your Honor, if I may approach the
7  witness.
8       THE COURT:  Yes.
9  BY MS. LIEBER:
10 Q.  Mr. Schaeffer I'm showing you Government Exhibits ICE-15,
11 -16, -17, -18, -19 and -21.
12      I'm just going to ask you to take a look at those documents
13 and see if you recognize those documents.
14 A.  I do.
15 Q.  Have you seen those documents today, as a matter of fact?
16 A.  Yes.
17 Q.  Okay.  What are those documents?
18 A.  The first one is the front page and the last page of a
19 lease for 400 Hampton Park Boulevard.  Exhibit 16 is a credit
20 application, business application, and 17 is a termination
21 letter.  18 is a brochure of the building.  And 19 is a plan of
22 the building.
23 Q.  Okay.  And I'm going to stop you there for a minute.
24      Just that first -- not the picture, but that first set of
25 documents, are those -- those documents, those lease documents

71

1  that you have before you, are those records that you -- well,
2  first of all, do those pertain to a particular lease at the 400
3  Hampton Park Boulevard storage facility?
4       MR. BALAREZO:  Objection, Your Honor.
5       THE COURT:  Why?
6       MR. BALAREZO:  I think it's getting a little bit ahead
7  of itself before the proper foundation is laid, if it gets into
8  specifics of --
9       THE COURT:  You recognize these?
10      THE WITNESS:  I do, Your Honor.
11      THE COURT:  Did a copy of these come from your files,
12 from your company's files?
13      THE WITNESS:  They did.
14      THE COURT:  And are these documents kept in the
15 regular course of business.
16      THE WITNESS:  They are.
17      THE COURT:  And is it in the regular course of
18 business for your company to maintain tease type of documents?
19      THE WITNESS:  It is.
20      THE COURT:  What's your objection?
21      MR. BALAREZO:  Well, none in that -- with that direct.
22      THE COURT:  Anything else?
23      MS. LIEBER:  For the record, those were my next four
24 questions.
25      THE COURT:  You said it was going to be a short

72

1  witness.  I'm determined to have it be a short witness.
2       Anything else for anybody?
3       MR. BALAREZO:  You want to do my cross?
4       MS. LIEBER:  Your Honor, at this time, I seek
5  admission of ICE-15 through -19.
6       THE COURT:  And what about 21, I'm sorry -- okay.
7  Any objection to my laying that foundation?
8       MR. BALAREZO:  No, Your Honor.
9       THE COURT:  Mr. Norris?
10      MR. NORRIS:  No.
11      THE COURT:  18 -- 15, 16, 17, 18, 19 are admitted.
12 Thank you.
13
14 (Government's Exhibits ICE-15, ICE-16, ICE-17, ICE-18,
15 and ICE-19 were received into evidence.)
16 BY MS. LIEBER:
17 Q.  Mr. Schaeffer, I'm also now going to put on this Elmo, just
18 for your purposes at this point, it's in the in evidence,
19 ICE-21 --
20      THE COURT:  Do you want the jury to see the ones that
21 just went in?  I didn't do that.
22      I think you just at least could have him identify the
23 ones that just went into evidence, please, for the purpose of
24 the jury.
25 BY MS. LIEBER:

*MR SCHROEFFER — Hampden Blvd Wire House Leasing Agent*

**66**

1  A.  Yes.
2  Q.  Did you participate in the decision about whether or not to
3  actually formally charge her in connection with those items?
4  A.  Yes, I did.
5  Q.  And when was that decision made?
6  A.  It was actually made on the 24th, once the search warrants
7  had been competed.
8  Q.  And what was that decision?
9  A.  The decision was to not formally charge her.
10  Q.  Okay.  And when was she released from custody?
11  A.  I believe she was actually released the next day.
12  Q.  All right.  Why -- who was the focus of the investigation
13  that you were working on?
14  A.  The investigation was focused on Antoine Jones and the
15  conspiracies surrounding.
16       MR. BALAREZO:  Objection.  Calls for legal conclusion.
17  Move to strike.
18       THE COURT:  Well, sustained.  The focus was Antoine
19  Jones.  After that, I don't see that the rest of the answer is
20  particularly responsive.  So it will be stricken.
21       MS. LIEBER:  Thank, Your Honor.
22  BY MS. LIEBER:
23  Q.  And Special Agent Yanta, finally, was John Adams'
24  willingness to cooperate with the government, did that factor
25  in at all to your decision to cut Mrs. Adams loose?

**66**

1  A.  No, it did not.
2  Q.  How do you know that?
3  A.  Because at that point in time, no one had expressed a
4  willingness to cooperate with the government.
5  Q.  Thank you.
6       MS. LIEBER:  I don't have anything else.
7       THE COURT:  I can't believe we have any questions on
8  that particular point.
9       MR. BALAREZO:  Believe it, Your Honor.  I have a few.
10  Or don't believe it.
11
12  BY MR. BALAREZO:
13  Q.  Good afternoon, Special Agent Yanta, how are you?
14  A.  Good afternoon, sir.
15  Q.  You were aware at the time you made this decision to
16  release Mrs. Adams, that a weapon had been found in the closet
17  of her shoes -- or in -- with a box of her shoes; right?
18  A.  Yes, sir.
19  Q.  And you were aware that a large amount of money, about
20  $9,700, was found in a closet and in a shoe box containing her
21  shoes; right?
22  A.  Yes.
23  Q.  All right.  And you were aware that her husband, Mr. Adams,
24  had also -- or you were aware that drugs were also found in her
25  house; correct?

CROSS-EXAMINATION

**67**

1  A.  Absolutely.
2  Q.  Now, you've -- normally, possession of drugs and weapons
3  are offenses in certain -- certain cases; right?
4  A.  I believe it's an offense all the time.
5  Q.  All the time.  Very good.
6       Now, you indicated that she was not the focus of a -- of
7  the investigation; right?
8  A.  Yes.
9  Q.  That's what you just said?
10  A.  That's correct.
11  Q.  So are you telling us that because she was not a focus of
12  the investigation, you're willing to overlook a crime that may
13  have been committed by her?
14  A.  No, sir.
15  Q.  Okay.  Did -- you just decided not to pursue the charges;
16  right?
17  A.  That's correct.
18  Q.  Now, you didn't make that decision all on your own?
19  A.  No, sir, I did not.
20  Q.  You had conversations with the prosecutors; correct?
21  A.  Yes, sir.
22  Q.  And basically they directed you to release her and not
23  press charges against her; correct?
24  A.  It was a collaborative decision, sir.
25  Q.  But ultimately, it was their decision; right?

**68**

1  A.  I don't know who ultimately made the decision.
2  Q.  Well, you don't make a decision to prosecute or not, do
3  you?
4  A.  That's correct, I do not.
5  Q.  They make that decision?
6  A.  They are the prosecutors, yes, sir.
7  Q.  Right.
8       So they make the decision?
9  A.  They are the prosecutors.
10       MR. BALAREZO:  I have nothing else, Your Honor.
11       MR. NORRIS:  No questions, Your Honor.
12       MR. McDANIEL:  No questions.
13       MR. ACREE:  No questions.
14       THE COURT:  Nothing else?
15       MS. LIEBER:  Nothing.  Thank you.
16       THE COURT:  Okay.  Call your next witness.
17       MS. LIEBER:  Your Honor, the government calls Andrew
18  Schaeffer.
19       THE COURT:  Right up here, sir, please.
20       (Witness sworn by the clerk at 3:31 p.m.)
21       DIRECT EXAMINATION
22  BY MS. LIEBER:
23  Q.  Good afternoon, sir.
24  A.  Good day.
25  Q.  In a nice, clear voice, can you please introduce yourself

*Start Schroeffer*










**33**

1  A  Yes, ma'am.

2  Q  How long have you been incarcerated?

3  A  About 31 months now.

4  Q  When were you first locked up?

5  A  '04, May 11th.

6  Q  When you were arrested, tell the jury why were you

7  arrested?

8  A  When I was arrested, I was carrying 600 grams of crack

9  cocaine. I was arrested for that.

10  Q  When you say you were carrying it, did you intend to

11  actually sell that crack cocaine?

12  A  Yes.

13  Q  Because you had close to 500 grams of crack cocaine,

14  were you indicted for that offense?

15  A  Yes.

16  Q  After you were indicted for that offense, were you

17  indicted for possession with intent to distribute 50 grams or

18  more of cocaine base?

19  A  Yes.

20  Q  Is cocaine base known as crack on the street?

21  A  Yes.

22  Q  Were you indicted for that offense?

23  A  Yes, I was.

24  Q  Did you ultimately make a decision about what to do

25  about that indictment?

**34**

1  A  Yes.

2  Q  What was your decision?

3  A  To cooperate with the Government as far as the case, as

4  far as my case was.

5  Q  When you say "cooperate with the Government," did you

6  actually enter a plea of guilty to the indictment?

7  A  Yes.

8  MS. LIEBER: Your Honor, at this time I'm going to

9  show Mr. Balarezo, all counsel, what I've marked, going to

10  mark as Miscellaneous 12.

11  THE DEPUTY CLERK: Miscellaneous 11 was a

12  stipulation.

13  MS. LIEBER: Your Honor, if we can just approach on

14  one matter. I'm sorry about that.

15  (Bench conference.)

16  THE COURT: We have something that needs to come

17  out?

18  MS. LIEBER: I'll do that too. Your Honor, with

19  respect to this, I asked my secretary to pull a signed copy

20  of his plea letter, which this is not a signed copy. She is

21  out this morning. So I couldn't actually get that from her.

22  I'm going to use this with Mr. Givens because it is

23  identical. It's just not signed. So I'm just going to

24  substitute, Mr. Balarezo has already given me permission to

25  substitute a signed copy when it goes back.

**35**

1  MR. BALAREZO: I just don't want to have any issue

2  when I'm crossing saying I have not signed it.

3  MS. LIEBER: I am going to actually say to him this

4  is an unsigned version of your plea agreement.

5  THE COURT: Fine, for the record, we'll substitute

6  it, this one for the other one. Any problems?

7  MR. BALAREZO: No.

8  THE COURT: Okay. Go ahead.

9  (Open Court.)

10  THE COURT: Any objection to its admission,

11  Miscellaneous 12?

12  MR. BALAREZO: No, subject to our discussion, Your

13  Honor.

14  THE COURT: Let's make it clear, this is an

15  unsigned copy, and we'll just put in the signed copy as soon

16  as it's available, when your secretary gets back.

17  MS. LIEBER: Thank you.

18  (Government Exhibit No. Miscellaneous 12

19  was admitted into evidence.)

20  BY MS. LIEBER:

21  Q  Mr. Givens, I'm going to show you what I've marked at

22  the bottom as Miscellaneous 12 here, and I want you to

23  take a look at this. First of all, is this, just so

24  everybody knows, is this an unsigned copy of your plea

25  letter?

**36**

1  A  Yes.

2  Q  Actually, why don't I have you take a look at it?

3  Mr. Givens, if you would take a look at that and

4  see if you recognize what that document is.

5  A  This is my plea letter.

6  Q  Except for the fact that this actual copy doesn't have

7  your signature on it, is this the plea letter that you agreed

8  to when you pled guilty?

9  A  Yes.

10  Q  Okay. And I'm going to just spend a few minutes talking

11  about the letter itself. In this plea letter, first of all,

12  who is Pleasant Broadnax?

13  A  That's my lawyer.

14  Q  In this plea letter, what have you agreed to plead

15  guilty to here in Paragraph 1?

16  A  I agreed to plead to 21 USC 841, dash (a)(1).

17  Q  Now, do you know about 21 USC 841(a)(1). In other

18  words, are you familiar with the U.S. Code?

19  A  No, I'm not familiar with the U.S. Code. But I'm quite

20  sure it's distributing crack cocaine above 50 grams.

21  Q  In fact, is it, above here, possession with intent to

22  distribute 50 grams or more of cocaine base?

23  A  Yes.

24  Q  How much time, are you aware that you're facing a

25  mandatory minimum amount of time?

Received
Mail Room

MAY 15 2007

Nancy Mayer Whittington, Clerk
U.S. District Court, District of Columbia

29

```
 1   vacated, too, so I get the dates correct?  When was the
 2   tenant vacated?
 3           MS. LIEBER:  Your Honor, if I may, I can actually
 4   put on information that's in evidence, put ICE 13 onto the
 5   machine.
 6   BY MS. LIEBER:
 7   Q   Mr. Kelly, does this -- there is no date on it.
 8           Do you see though, first of all, the Dear Mr. Kelly
 9   letter?
10   A   Yes.
11   Q   Is that you?
12   A   It is me.
13   Q   And the termination of his lease would be as of what
14   date, do you see that?
15   A   March 1, '04.
16   Q   Okay.  So, the lease ran from June 10th to --
17           THE COURT:  January, January.
18   BY MS. LIEBER:
19   Q   I'm sorry.  January 10th to March 1st of 2004; is that
20   right?
21   A   That's right.  It was a year lease, but he asked to be
22   let out early and the landlord conceded to his request.
23   Q   So you had to check with the landlord?
24   A   Yes.
25   Q   When, within that timeframe, did you actually go into
```

30

```
 1   that house?
 2   A   It was before that date, but I'm not certain what the
 3   date of that was, but I did go into the house.
 4   Q   Was this before he had vacated or after?  Do you know?
 5   A   Before.
 6   Q   Any sense of when within that timeframe?
 7   A   It was about a month before, maybe less.
 8           MS. LIEBER:  Thank you.
 9           THE COURT:  Thank you.
10           (Witness excused.)
11           THE COURT:  Should we take a short break?
12           MS. LIEBER:  Yes.
13           THE COURT:  All right.  Ladies and gentlemen.  I am
14   going to excuse you for five minutes.  It won't be long,
15   promise.
16           (Jury Out.)
17           MS. LIEBER:  Your Honor, if I may, just as they're
18   bringing the witness in, I need to have one brief word with
19   him  I'm happy to have any defense counsel that wants to be
20   there with me come with me.  Mr. McDaniel and I had discussed
21   an issue that I wanted to clarify with the witness.
22           THE COURT:  Mr. McDaniel will come with you then,
23   that's fine.  I don't know what that means but at a minimum
24           Can we bring him in?
25           MS. LIEBER:  Sure, yes.
```

31

```
 1           (There was a pause in the proceedings.)
 2           THE COURT:  Are we ready to proceed?
 3           MS. LIEBER:  We are.
 4           (Jury Present.)
 5           THE COURT:  All right.  Ladies and gentlemen, we're
 6   ready to proceed.
 7           ANTHONY GIVENS, GOVERNMENT WITNESS, SWORN
 8                      DIRECT EXAMINATION
 9   BY MS. LIEBER:
10   Q   Good morning, sir.  In a nice, clear voice, can you
11   please introduce yourself to our jury.
12   A   My name is Anthony Givens.
13   Q   How do you spell Givens?
14   A   G-I-V-E-N-S.
15   Q   Sir, do you have a nickname?
16   A   Pig, P-I-G.
17   Q   How did you get that nickname?
18   A   My grandmother.
19   Q   Your grandmother?
20   A   Yes, ma'am
21   Q   How old are you?
22   A   Thirty-four.
23   Q   And are you presently incarcerated?
24   A   Yes.
25   Q   Where are you currently incarcerated?
```

32

```
 1   A   CTF or CTA.
 2   Q   And what is CTF or CTA?
 3   A   D.C. Jail.
 4   Q   It's sort of a component of the D.C. Jail?
 5   A   Yes, ma'am
 6           THE COURT:  You're going to have to speak up a bit
 7   so everybody all the way down can hear you.  All right, sir?
 8           THE WITNESS:  Okay.
 9   BY MS. LIEBER:
10   Q   Mr. Givens, prior to your time that you're spending now
11   incarcerated, where did you live generally?
12   A   In Northeast, Washington, D.C.
13   Q   Where were you born and raised?
14   A   In the Capitol Hill, Eastern High School area.
15   Q   Is that in Northeast here in Washington?
16   A   That's Southeast, just a bit over.
17   Q   Okay.  Where did you go to elementary school?
18   A   I went to Payne Elementary.
19   Q   Is that Payne, P-A-Y-N-E?
20   A   Yes, ma'am
21   Q   Where did you go to school beyond that?
22   A   I went to Elliott and then I went to McKinley.
23   Q   Elliott Jr. High School?
24   A   Yes, ma'am
25   Q   And McKinley Tech High School?
```

**25**

1  Q  Kind of tall, slender female, looks like Joe Hennessy
2  from what I've been told?
3  A  Okay.
4  Q  Does that ring a bell?
5  A  Yes.
6  Q  Are you aware that there was a search warrant executed
7  at the 8550 Myrtle street address?
8  MS. LIEBER:  Objection, beyond the scope.
9  THE COURT:  I think so.
10  MR. BALAREZO:  Then, Your Honor, I'm just trying to
11  save time.  Then I ask that he be put on call.
12  THE COURT:  Let's approach please.
13  (Bench conference.)
14  THE COURT:  First of all, was there one?
15  MR. BALAREZO:  All I want to ask him is if he let
16  in Agent Gikas after the search warrant is all I want to ask.
17  If he testified, she testified after the sneak and peek was
18  done, that the rental office let the agents into the property
19  once again.  I could call this guy back for that question or
20  I could do it now.
21  THE COURT:  I don't want to inconvenience him and
22  have him back in even though I don't know what difference
23  does it make.
24  MS. LIEBER:  That's my next question.  What
25  difference does it make that he let him in?

**26**

1  THE COURT:  We continually spend a lot of time on
2  these things.  There was nothing seized and introduced here.
3  MS. LIEBER:  That is correct.  And nobody in this
4  courtroom would have standing to object to any search.
5  MR. BALAREZO:  Your Honor, there was testimony
6  about the candles and that kind of thing at that house.  I
7  just want to know, if he went in the house, did he see any.
8  THE COURT:  You can ask him if he ever went in the
9  house after it was vacated, if that's what your purpose is.
10  MR. BALAREZO:  I can't ask whether or not he let
11  the agent in?
12  THE COURT:  I thought your reason was you wanted to
13  know whether or not he saw anything.  So you can ask him.
14  She didn't identify this gentleman by name.  So if your point
15  is you want to know what he saw is there after it was
16  vacated, you can do that.  PREJUDICE
17  MR. BALAREZO:  I also want to know whether or not
18  he let the agents in.  Agent Gikas testified after the search
19  warrant, the sneak and peek, they were let in by somebody
20  from the rental office.  But Your Honor, the reason it
21  matters is because she already indicated that she did a
22  warrantless search, if you will, of the apartment at Summit
23  Circle.
24  THE COURT:  Yeah, but you are misstating the
25  transcript dramatically.  She wasn't there for any

**27**

PREJUDICE
Side WACHWAR

1  warrantless search so to speak.
2  MR. BALAREZO:  But she knows that it happened.  The
3  Government is prosecuting my client.  I need to establish
4  whether or not there is a pattern of the Government doing,
5  perhaps, things that they shouldn't be doing.
6  THE COURT:  Never mind, Ms. Lieber.
7  We already had an exploration of that.  I will let
8  you ask your questions but I think the Government is right.
9  Go ahead, ask your questions.  Let's get it over
10  with.
11  (Open Court.)
12  BY MR. BALAREZO:
13  Q  Have you ever been inside of 8550 Myrtle Avenue?
14  A  Many times.
15  Q  Were you there inside the location at around the time
16  February or so of 2004?
17  A  Yes.
18  Q  Do you know who was living there at the time?
19  A  Yes.
20  Q  Who was that?
21  A  The tenant, Lawrence Maynard.
22  Q  Lawrence Maynard.  And do you know whether or not
23  Mr. Maynard kept any candles, any of those religious-type
24  candles in that, did you ever notice any of those?
25  A  No, I didn't.

**28**

1  Q  Did you ever notice any inflatable mattresses?
2  A  Not that I recall.
3  Q  Did you notice whether or not the windows were covered
4  up, each and every window was covered up in some fashion?
5  A  I'm not sure.  I think it was, but I can't be certain
6  that every one was.
7  Q  Well, the windows did have window coverings, right,
8  shades, blinds, that kind of thing?
9  A  I believe they have mini blinds.
10  Q  Do you remember any aluminum foil covering any windows?
11  A  Not specifically, no.
12  Q  Do you remember seeing any narcotics in that house?
13  A  No.
14  Q  Do you remember seeing any large amounts of money in
15  that house?
16  A  No.
17  MR. BALAREZO:  I have nothing else.
18  THE COURT:  Anything else?
19  MR. NORRIS:  No questions, Your Honor.
20  MR. McDANIEL:  No questions.
21  MS. LIEBER:  Your Honor, just for clarification.
22  RE-DIRECT EXAMINATION
23  BY MS. LIEBER:
24  Q  Mr. Kelly, when exactly did you go into that house?
25  THE COURT:  Can you remind me when the house was

**21**

```
1    A   Good morning.
2    Q   In a nice, clear voice will you please introduce
3    yourself to our jury?
4    A   My name is William Kelly. I'm a rental manager and
5    leasing agent for Remax 2000 real estate company in Silver
6    Spring, Maryland.
7    Q   Sir, how long have you been an agent with Remax 2000?
8    A   About ten years.
9    Q   Mr. Kelly, I want to direct your attention specifically
10   to some documents pertaining to a lease of 8550 Myrtle Avenue
11   in Bowie, Maryland, these documents from January of 2004.
12       MS. LIEBER: And, Your Honor, if I may approach the
13   witness, I'm going to approach with documents labeled ICE 10
14   through ICE 14.
15       THE COURT: Okay. Go ahead.
16       MS. LIEBER: Counsel has seen these but I will show
17   him again.
18   BY MS. LIEBER:
19   Q   Mr. Kelly, I'm showing you what I've marked as
20   Government's Exhibit ICE 10 through ICE 14. I'm going to ask
21   you to take a look at those documents.
22   A   Okay.
23   Q   Are these lease documents pertaining to 8550 Myrtle
24   Avenue in Bowie, Maryland?
25   A   Yes, they are.
```

**22**

```
1    Q   Who is the applicant for that lease?
2    A   Lawrence Maynard.
3    Q   Okay. Mr. Kelly, having reviewed those documents here
4    this morning, are those documents items that you keep in the
5    ordinary course of your business as a rental manager at Remax
6    2000?
7    A   Yes.
8        MS. LIEBER: And, Your Honor, at this time, some of
9    those are actually in evidence but I wanted to put them all
10   together. At this time I would move ICE 10 through 14 into
11   evidence.
12       THE COURT: Well, 12, 13 and 14 are in evidence I
13   think. Were these all kept in the ordinary course of
14   business in your files?
15       THE WITNESS: Yes, Ma'am.
16       THE COURT: It's your ordinary business to keep
17   these kinds of records?
18       THE WITNESS: Yes. We're supposed to keep these
19   records on file for at least three years.
20       THE COURT: Any objection?
21       MR. BALAREZO: No, Your Honor.
22       THE COURT: Then 10 through, 10 and 11 are in. The
23   others are already in.
24       (Government Exhibit Nos. ICE 10 and ICE 11
25        were admitted into evidence.)
```

**23**

```
1        MS. LIEBER: Thank you. I have nothing else, sir.
2    Thank you.
3        THE COURT: Any questions for Mr. Kelly?
4        MR. BALAREZO: May I speak with Ms. Lieber for one
5    second?
6        THE COURT: Are we going to put them on the screen
7    so we know what's in evidence at least briefly?
8        MS. LIEBER: Sure.
9        THE COURT: Okay. Let's put them on the Elmo so
10   everybody can see them
11       MS. LIEBER: Since it's just 10 and 11, thank you,
12   Your Honor. And just for everyone's information, this is ICE
13   10.
14   BY MS. LIEBER:
15   Q   Sir, is that a copy of the rental application for 8550
16   Myrtle Avenue filled out by Lawrence Maynard? Do you see
17   that up here, Mr. Kelly?
18   A   Yes.
19   Q   Just so we're clear, this is a copy of the rental
20   application for Mr. Maynard?
21   A   Yes, it is.
22       THE COURT: What is the date of the rental
23   application please?
24       MS. LIEBER: Court's indulgence. There does not
25   appear to be a date on the actual application. The date on
```

**24**

```
1    the lease is January 10th.
2        THE WITNESS: There may be a fax date on the top of
3    it though. I'm not sure.
4        THE COURT: January 6th or 8th? I can't tell.
5        MS. LIEBER: The first fax line is January 7th of
6    '04, I'm sorry, the top, January 6th of '04. And the actual
7    lease, ICE 12, that lease is to commence January 10, 2004.
8    BY MS. LIEBER:
9    Q   Sir, if I might, ICE 11, this document here, are these
10   earnings statements that Mr. Maynard submitted to you all?
11   A   Yes, this is proof of income.
12       MS. LIEBER: Thank you.
13       THE COURT: Okay. Mr. Balarezo?
14       MR. BALAREZO: Good morning, ladies and gentlemen.
15                  CROSS EXAMINATION
16   BY MR. BALAREZO:
17   Q   Mr. Kelly, how long have you been with Remax?
18   A   About ten years.
19   Q   Were you, then does that mean that you were working
20   there back in February of 2004?
21   A   Yes.
22   Q   The documents that Ms. Lieber just asked you about, did
23   you provide those to an agent by the name of Katerina Gikas?
24   A   I did provide to an agent. I can't recall what her name
25   was.
```