UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

APR 2 4 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Antoine Jones
DC# 241-912
1901 D Street, SE
Washington, DC  20003
    Plaintif

Jury Trial

-V-

Civil Action No. 07-1068  RJL

Defendants
Agent Katerina Gikas, DHS, ICE
  And Un-named ICE Agents

Motion to Supplement Original Complaint Filed *pro se* by Plaintiff

Plaintiff, Antoine Jones, comes before this court to request the Courts to allow this supplemental to attach to the original complaint.

Plaintiff Antoine Jones is currently housed at the District of Columbia Jail in Washington, DC.  Plaintiff Jones has not received any response from the Court or the defendant (or counsel) regarding the matter of Antoine Jones v Katerina Gikas and Unknown ICE Agents.

Plaintiff is suing the defendants for invading the plaintiff's privacy in the illegal entry of Summit Circle apartment, and breaking and entering the Hampton Blvd warehouse, and perjury committed during the Grand Jury trial and the first and second trials of *US v Jones, et al, CR-05-0386*.  Plaintiff is suing Special Agent Katerina Gikas and all *unknown* ICE agents who entered Summit Circle apartment and who entered the Hampton Blvd warehouse, all in their individual capacity and their employer.

As noted in Plaintiff's original filing, the current mailing address for Plaintiff Antoine Jones is:

Antoine Jones
DCDC #241-912
1901 D Street, SE
Washington, DC  20003

Plaintiff requests the Defendant's and/or their counsel make the correct mailing address notation and respond to plaintiff at this address unless notified otherwise by plaintiff.

Mr. Antoine Jones comes before this court, *pro se* to request the Court's acceptance of this Supplement to the civil action. Reasons for this supplemental Motion are stated herein.

Contained herein are cumulative facts and evidence, highlighted instances of perjury and ethics violations, and misconduct committed by Katerina Gikas, Rachel Lieber and others during Mr. Jones' first and second criminal trials, (CR-05-0386 United States v Antoine Jones and *et al*).

Mr. Jones would like to call the court's attention to trial transcript dated November 19, 2007 at 1:40 p.m., day 5.

<u>Andrew Shaeffer</u> – November 19, 2007 1:40p.m. Day 5

Mr. Andrew Shaeffer perjured himself when he testified under oath. Mr. Shaeffer testified that he let the ICE agents into the Hampton Boulevard warehouse on April 30, 2004. I call to the court's attention the trial transcript of November 19, 2007 at 1:40p.m. <u>Page 28 line 3</u>: Mr. Balarezo asked the question, *all right, and do you recall whether or not she contacted you to gain access into the warehouse? Just yes or no for right now.* <u>Page 28 line 6</u>: Mr. Shaeffer responded, *yes.*

<u>Page 28 line 14</u>: Balarezo: *How did you give her access to the warehouse?*

<u>Page 28 line 17</u>: Shaeffer: *Then she asked me to gain access and I told her that it was not possible until the space was vacant.*

<u>Page 28 line 19</u>: Balarezo: *Okay, and as you sit here today you are certain that you gave her access?*

<u>Page 28 line 21</u>: Shaeffer: *"yes"*

<u>Page 29 line 12</u>: Balarezo: *So, back on November 15, 2006, you have testified under oath in front of a Jury and you told them that you may have and you weren't sure if you let her in, correct?*

<u>Page 29 line 15</u>: Shaeffer: *"yes"*

<u>Page 29 line 16</u>:  Balarezo: *But you are telling these people here today "<u>that you did in</u>* <u>*fact let her in?"*</u>

<u>Page 29 line 18</u>:  Shaeffer: *"yes"*

[Page 29 line 18] is clearly perjury and it contradicts Agent Katerina Gikas-Karaousos grand jury testimony, Report Number 005, and both of Agent Karousos trial transcripts.

Also on Monday November 19, 2007, Day 5, Assistant United States Attorney Rachel Lieber-Carson coerced Mr. Shaeffer to alter his testimony when he had sworn to tell the truth. Mr. Shaeffer followed Ms. Lieber's coercing and lied under oath. I refer the court to:

<u>Page 56 line 25</u>:  Ms. Lieber asks Mr. Shaeffer: *you also testified in the prior trial, you* *said that you may have granted access to the ICE agents to go through that warehouse* *facility, "<u>and today you recall actually letting them in that night</u>"?*

<u>Page 57 line 4</u>:  Mr. Shaeffer: *yes*

Again, this is clearly prosecutorial misconduct. Ms. Lieber demonstrated her desperation and her determination to ignore the Code of Ethics, and the Code of Professional Conduct. The prosecutor displayed in Federal court a desperate attempt to coerce Mr. Shaeffer to lie and perjure himself, deceive the courts and prejudice then defendant(s), Jones and Maynard.

Mr. Shaeffer gave sworn testimony in the first trial when asked the following question, <u>Page 97 line 8</u>, *this person Katerina, did there come a time when she; when you* *allowed her to enter the premises at Hampton Park?*

<u>Page 97 line 10</u>: Shaeffer: *I may have*

<u>Page 97 line 11</u>: *as best as you can, did you, or did you not?*

<u>Page 97 line 12</u>:  Shaeffer: *I didn't have a key when the tenant was in. After the tenant* *left, if she asked me for the key, "<u>I would have given her the key</u>".*

<u>Agent Gikas-Karaousos</u>, ICE Report 005 specifically shows and proves Mr. Shaeffer perjured himself and Ms. Lieber coerced him. Agent Gikas-Karousos reported

"on April 30, 2004, after Jones et al had vacated, your writer obtained permission and keys from the landlord to enter and search the warehouse (page 3). On page 4, Agent Gikas-Karausos concluded – <u>agents and officers departed the warehouse without incident and your writer returned the key to the landlord the next business day on May 3, 2004.</u>

I also want to call the court's attention to Agent Gikas-Kakaousos sworn Grand Jury testimony. Page 41 line 18, Mr. Geise asked Agent Gikas a question: *Okay. And by the way, did there come a time that Mr. Jones broke the lease early on that Hampton Park Boulevard warehouse facility and you actually got consent to search it?*
<u>Page 41 lines 21-25</u>: Agent Gikas responded: *Yes. He, in writing, notified the landlord that he was vacating by April 30th. And on that same day, when he turned the keys in to the landlord, the landlord - - so he had vacated the premises. "The Landlord allowed us, allowed me, He gave me the key" and allowed me to go in with a few others.*

During the first trial, Thursday November 16, 2006, 2:12p.m., Agent Gikas-Karausos testified and contradicted Mr. Shaeffer's testimony.
<u>Page 33 line 3</u>: Mr. Balarezo questioned Agent Gikas: *Now you never got a search warrant for that location correct, for the warehouse?*
<u>Page 33 line 4</u>: Agent Gikas: *Correct.*
<u>Page 33 line 12</u>: Mr. Balarezo: *You waited until at least according to your testimony, Mr. Jones left, then you went to Andy Shaeffer, is that correct?*
<u>Page 33 line 15</u>: Agent Gikas: *"yes"*
<u>Page 33 line 17</u>: Agent Gikas: *I asked for consent to go into the property and he gave "me the key".*
<u>Page 33 line 20</u>: Mr. Balarezo: *You went to Andy Shaeffer and had him let you into the location, is that what you are saying?*
<u>Page 33 line 22</u>: Agent Gikas: *He gave me the key, he didn't – when you say let me in it sounds like he opened the door, "He gave me the key."*
<u>Page 33 line 24</u>: Mr. Balarezo: *He gave you access to the location?*
<u>Page 25</u>: Agent Gikas: *"yes"*

Also on Monday, November 19, 2007, 1:40 p.m. trial transcript Day 5: Agent Gikas-Karaousos testified: *Mr. Shaeffer gave her the key for Hampton Boulevard warehouse.*

Page 63 line 8-9: Mr. Balarezo: *Okay, so on April 30th of 2004, did you actually go into that warehouse facility once Mr. Jones vacated?*

Page 63 line 10: Agent Gikas: *"yes"*

Page 63 line 11: Mr. Balarezo: *How did you get in?*

Page 63 line 12-14: Agent Gikas: *I can't remember if it was earlier in the day, it must have been earlier in the day. I obtained, "I went into Mr. Shaeffer's office and obtained the key."*

Mr. Jones challenges the government's unlawful search, perjury and prosecutorial misconduct. During the second trial, the defense presented evidence that exposed the ICE agents' outrageous conduct, unlawful search, perjury throughout the grand jury testimony and throughout sworn testimonies delivered during both the first and second trials. Mr. also challenges the prosecutorial misconduct displayed.

I call to the court's attention the sworn trial testimony of <u>Howard Scott Peacock</u>, <u>Page 101-103</u>. Mr. Peacock testified that there was a pegboard when he moved into the warehouse space at 400 Hampton Park Boulevard, 30 days after Mr. Jones broke his lease.

Page 101 line 23: Mr. Balarezo: *And was that pegboard there when you moved in?*

Page 101 line 24: Mr. Peacock: *Yes,*

Page 102 line 15: Mr. Balarezo: *Was the pegboard there when you moved in, first of all?*
Mr. Peacock further responded: *Yes, it was there when I moved in.*

Page 101 lines 3-10: Mr. Balarezo asks on <u>Line 5</u>: *When did you move into 400?* <u>Line 6</u>: Mr. Peacock: *Approximately June of that year, the year in question.*

Line 8: Mr. Balarezo: *When you moved in to 400, were all of these items that are shown in the picture in 400?*

Line 10: Mr. Peacock: *No, these items weren't here.*

<u>Page 101 line 11</u>: Mr. Balarezo: *"Zoom in on the wall in question.* On <u>line 15</u>, Mr. Peacock: *"Yeah, there's like pegboard that cover like right in that area".* Here Mr. Peacock specifically points out the white area wall where the pegboard is located but it is absent in the photo Mr. Balarezo is showing him.

I call the court's attention to the sworn trial testimony of Gregory Wills. Mr. Wills testified that he placed the pegboard there in the warehouse when it was cold outside, sometime late February 2004. This was the time when he was employed to do handyman work at the warehouse a couple of months after he started doing handyman work at Club Levels; which is how he recalls the February 2004 date.

<u>Gregory Wills</u> trial testimony Thursday, December 20, 2007 9:45 a.m. (Pages 13-46). Mr. Lyons is questioning the witness:
<u>Page 17 lines 11-12</u>: Mr. Lyons: *Do you remember the specific date you put the pegboard up?*
<u>Page 17 line 13</u>: Mr. Wills: *No, I know it was cold, it was really cold.*

I call the court's attention to the extensive and excellent cross examination of Mr. Wills by the Honorable Judge Huvelle. <u>Page 19 line 20-21</u>: Judge Huvelle questions: *was, you know it was cold, but can you give us any better date by month or what have you?*
<u>Page 19 line 23</u>: Mr. Wills: *January or February, somewhere in February.* Judge Huvelle asks: *'04?* The witness responded: *'04.*
Mr. Lyons asks the witness – <u>line 3</u>: *it was prior to you starting doing work for Levels?* The witness (Wills) responded: *About a month or two after that.*
<u>Line 9</u>: The witness (Wills) also responded, *In February I know I stopped working a little bit after February.*
<u>Line 13</u>: Judge Huvelle asked the witness, Mr. Wills, *What happened in February?*
<u>Line 14</u>: Mr. Wills: *I was working about the end of February.*

Even with both Mr. Shaeffer's sworn trial transcript, he testified that none of those items seen in the ICE Hampton Park Boulevard photo were left there. He testified that he did not recall those items being there during the April 30th walk-through when Jones moved out.

I call the court's attention to Mr. Shaeffer's trial testimony during the first trial. Mr. Balarezo asked Mr. Shaeffer, Page 99 line 5: *And did you, yourself enter the premises upon his departure?* Mr. Shaeffer responded, Line 7: *I don't remember but it is customary for me to go out and inspect the premises, so "he could get his security deposit back."*

Line 10: Mr. Balarezo: *And did you give Mr. Jones his...*

Line 11: Mr. Shaeffer: *"I did."*

Lines 12-13: Mr. Balarezo: *And part of the reason you gave the ...*

Line 14: Mr. Shaeffer: *Correct.*

Line 18-22: Mr. Balarezo: *Well, if Mr. Jones had left garbage, and equipment and all kind of items in the – in the location, would you have considered that basically completing his lease and given him all his money back, or would you have taken money for clean up lets say?*

Lines 23-24: Mr. Shaeffer: *Yes, normally, if there's a small amount of debris, or stuff left, I still return the security deposit.*

Line 25: Mr. Balarezo asked Mr. Shaeffer if he recalls, any clothing, any uniform, anything of that nature.

Page 101 line 3: Mr. Shaeffer: *I don't know.*

Page 101 line 5: Mr. Shaeffer: *I guess I would say I don't recall.*

Line 10: Mr. Shaeffer did not recall any inflatable mattress or any sort of equipment.

Line14: Mr. Shaeffer did not recall, or know if, any bags, duffle bags, suitcases, anything of that nature. The bottom line is Mr. Shaeffer's testimony is that he did not recall, or didn't remember if Mr. Jones left the following items in the warehouse after he vacated: buckets of brand new 5 gallon joint compound, numerous boxes of shrink wrap, a pair of brown coveralls, a blue shirt and a green jacket hanging on the wall, a brand new glass top desk purchased from Staples, bundles of blue furniture pads, some pads still brand

new in the plastic, boxes of stuffed animals and valentine's gift baskets (which were sold by Mr. Maynard –before and during the Valentine's day holiday), inflatable mattresses with battery pack attached, boxes of C-cell and D-cell batteries, an electric heater, a small 1-gallon drywall compound, overhead light fixtures, a radio still plugged in on a small chair, a large rollaway cart, business cards from Club Levels, a couple of Rolodex cards, two trash cans full of trash and debris, an office chair, a microwave, etc. There were over 32 items in the ICE photograph taken when the ICE agents entered the warehouse. Mr. Shaeffer's testimony however, is that he does not remember or can't recall if these items were left there when Mr. Jones vacated the warehouse.

During the April 30, 2004 walkthrough, Mr. Shaeffer again stated he doesn't remember or can't recall these items. Mr. Jones calls the court's attention to Thursday, December 20, 2007, 9:45 a.m. trial transcript, <u>Page 40 line 20</u>: Honorable Judge Huvelle stated, Mr. Peacock was asked about the pictures. <u>*"He said he didn't see the pegboard."*</u> Mr. Lyons responded, on <u>line 22</u>, *That's the point.* <u>Line 23</u>: Honorable Judge Huvelle stated: *The pictures speaks for itself.*

The photos taken by the ICE agents when they entered the warehouse clearly show the white wall is absent of any objects, including the pegboard. Mr. Peacock took over the space 30 days after Mr. Jones broke his lease. Mr. Wills testified that he placed the pegboard there when it was cold, sometime in February 2004 (supported by the Valentine's Day items in the ICE photos). Mr. Shaeffer testified in both trials that he didn't remember or recall the items in the ICE Hampton Park Boulevard photos. Mr. Peacock testified on <u>Page 101</u> that none of the items in the ICE Hampton Park Boulevard photos were present when he moved into the warehouse space at 400 Hampton Park Boulevard, approximately June 2004.

Jones hereby asserts that the ICE agents unlawfully entered the warehouse while Mr. Antoine Jones and Mrs. Deniece Jones were still tenants of the space. This clearly is a violation of the Jones' Rule 41, Fourth Amendment Rights. This also demonstrates perjury by the ICE agent (Katerina Gikas).

- ICE agents enter warehouse and take photos. Photos show approximately 32 items in the warehouse but no pegboard partition on the wall.
- February 2004 Mr. Maynard puts together Valentine's Day gift baskets and sells them.
- February 2004 Mr. Wills puts up pegboard in warehouse sometime in February and pegboard still present in June 2004.
- April 2004 Mr. Jones gives notice he will break lease
- April 2004 Mr. Jones and Mr. Shaeffer conduct walkthrough. Mr. Shaeffer does not recall items in ICE photos left in warehouse.
- Jones receives deposit after vacating warehouse.
- Mr. Peacock moves into warehouse. Mr. Peacock recalls pegboard but does not recall 32 items pictured in ICE photo.

These acts of perjury, violations of the Professional Conduct Standard, violations of the Professional Code of Ethics, outrageous gross misconduct on behalf of the ICE agents and the Assistant US Attorneys severely prejudiced Mr. Jones during the criminal trial. Mr. Jones is calling for the entire testimonies to be stricken, the witnesses impeached and the detectives and Prosecutors reprimanded for gross misconduct and prosecutorial misconduct. Mr. Jones further supplements these items along with the civil action filed against Katerina Gikas and un-named ICE agents.

Respectfully Submitted, *pro se*
Antoine Jones

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

                       :

    v.               :      Criminal No. 05-386(1) (ESH)

                       :

ANTOINE JONES          :

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
## RELATED TO SEARCH OF 400 HAMPTON PARK BOULEVARD WAREHOUSE

      Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby respectfully moves to suppress evidence relating to the search of the 400 Hampton Park Boulevard warehouse by federal agents. In support of this Motion, Jones states as follows:

### FACTS

      In February 2004, ICE began an investigation into alleged narcotics trafficking by several Hispanic individuals in Maryland. From this investigation, the government allegedly learned Antoine Jones had rented a warehouse located at 400 Hampton Park Boulevard, _____, Maryland, purportedly for the purposes of conducting narcotics related activity.

      ICE Agent Katarina Korousos testified at trial that she and other agents entered the warehouse late on the evening of April 30, 2004, after having obtained the key from the landlord (Andrew Schaeffer) and purportedly after Jones vacated the premises. Korousos further testified that upon entering the premises, she observed inflatable mattresses and wrapping, purportedly typical to a cocaine distribution operation.

      Defense witness Gregory Wills testified that he installed a "peg board" inside the warehouse for Jones sometime *prior* to Jones vacating the premises. Defense witness Scott

Peacock testified that when he moved into the premises approximately a month after Jones left, the "peg board" was still installed on the wall of the warehouse.

Photographs introduced into evidence by the government (exh. ___), purportedly taken during the ICE search of April 30, 2004, *after* Jones vacated the premises, clearly show that the "peg board" is not located on the wall where Wills testified he installed it prior to Jones' departure and where Peacock testified it was when he moved in. The clear implication is that the photographs were taken by the ICE agents sometime prior to the installation of the "peg board" and thus, sometime prior to Jones' vacating the premises. Thus, the ICE agents entered and searched the premises without a warrant.

Because the ICE agents conducted a warrantless search and there were no exceptions to the warrant requirement, any tangible evidence seized or testimony derived from their illegal entry must be suppressed as the fruit of the poisonous tree.

## ARGUMENT

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized ..." U.S. Const. amend. IV. The Supreme Court has consistently held that the Fourth Amendment only prohibits *unreasonable* searches and seizures. *See Maryland v. Buie,* 494 U.S. 325 (1990); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602 (1989).

In evaluating the reasonableness of a challenged governmental action, it is necessary to balance the intrusion on the individual's Fourth Amendment interests against its

2

promotion of legitimate governmental interests. *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983); *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). A search of a house, apartment, or office is generally unreasonable without a warrant issued on probable cause. The Court has consistently expressed a preference for the use of search warrants. *See United States v. Ventresca*, 380 U.S. 102 (1965). "Resort to the warrant process, the Court has declared, is to be preferred because it 'interposes an orderly procedure' involving 'judicial impartiality' whereby 'a neutral and detached magistrate' can make 'informed and deliberate determinations' on the issue of probable cause." 1 LaFave, Search & Seizure, § 3.1(b), 548-49 (1987) (citations omitted).

In this case, the testimony from Karousos, Wills and Peacock, along with the photographic evidence, support the argument that the ICE agents entered Jones' warehouse prior to Jones' vacating the premises. In fact, Schaeffer testified that Carouses tried to gain access to the warehouse prior to Jones' departure:

> 14 Q. Without telling me what you said or what she said, just
> 13 tell us how exactly that came about? How did you give her
> 14 access to the warehouse?
> 15 A. She had contacted me, she wanted some information about
> 16 the tenant. I told her that she would have to subpoena the
> 17 information which she did. Then she asked to gain access and I
> 18 told her that it was not possible until the space was vacant.

(Testimony of Andrew Schaeffer, Nov. 19, 2007, afternoon session, at 28). Considering that the ICE investigation exhibited a pattern of warrantless entries into private locations (*i.e.*, Summit Circle apartment 3B and 8550 Myrtle Avenue), it is not inconceivable that the ICE agents entered the 400 Hampton Park prior to Jones' departure – in fact, it is clear that they were seeking entry into the warehouse at that time.

WHEREFORE for the foregoing reasons, and any others that may appear to the Court. Mr. Jones respectfully requests that this Motion be **GRANTED** and that the Court strike any testimony derived from the search of the warehouse located at 400 Hampton Park Boulevard.

Dated: Washington. DC
          January 1, 2008

Respectfully submitted.

### LAW OFFICE OF A. EDUARDO BALAREZO

/s/

By: _____

A. Eduardo Balarezo (Bar # 462659)
400 Fifth Street, NW
Suite 300
Washington, DC 20001
(202) 639-0999

*Attorney for Defendant Antoine Jones*

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of January 2008, I caused a true and correct copy of the foregoing  Defendant Jones' Motion to Suppress Tangible Evidence Related to Search of 400 Hampton Park Boulevard to be delivered to the parties in this matter via Electronic Case Filing (ECF).

_____

A. Eduardo Balarezo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA

v.

ANTOINE JONES, et al,

Defendants.

Criminal Case No. 05-386

Washington, D.C.

Tuesday, December 18, 2007
2:10 p.m.
Day 16

PM SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:
JACK GEISE, Esquire
RACHEL LIEBER, Esquire
Assistant United States Attorneys
555 4th Street, NW
Washington, DC 20530
(202) 616-9156

For Defendant Jones:
A. EDUARDO BALAREZO, Esquire
400 Fifth Street, NW
Suite 300 A
Washington, DC 20001
(202) 639-0999

For Defendant Maynard:
JAMES L. LYONS, Esquire
Kellogg, Williams & Lyons
1350 Connecticut Avenue, NW
Suite 600
Washington, DC 20036
(202) 496-0722

Appearances Cont'd

Court Reporter:
Crystal M. Pilgrim, RPR
United States District Court
District of Columbia
333 Constitution Avenue, NW
Room 4704
Washington, DC 20001
(202) 354-3127

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

---

3

```
 1                          -oOo-
 2                    AFTERNOON SESSION
 3          THE COURT:  Mr. Norris.
 4          MR. NORRIS:  Yes, Your Honor.
 5          THE COURT:  One second.  Can we introduce Mr. Norris
 6  and his client?
 7          Mr. Norris, I take it Adrian Jackson is here with you?
 8          MR. NORRIS:  Yes.  Can he come forward, Your Honor?
 9          THE COURT:  The defendant has indicated he would like
10  to call Mr. Jackson in his case.  And that we wanted you to
11  advise -- good afternoon, Mr. Jackson -- Mr. Jackson whether or
12  not he wants to invoke his Fifth Amendment privilege regarding
13  his testimony.
14          I assume you've had a chance to talk to him by now?
15          MR. NORRIS:  We've had a chance to talk.  Thank you
16  for accommodating my schedule today, it got a little bit out of
17  control.
18          THE COURT:  It's all right.
19          Have you advised him on his Fifth Amendment rights?
20          MR. NORRIS:  I have.  And my advice to Mr. Jackson is
21  that he does have a valid Fifth Amendment privilege in this
22  case based on numerous factors which I can go into if the Court
23  would like.
24          THE COURT:  Well, I don't know.  Let me, I don't want
25  to have any disclosure of attorney client communications.  I
```

---

4

```
 1  want him to understand if he were to testify and the government
 2  thought he was lying under oath, he could be prosecuted for
 3  perjury or false statements and that given, I don't know
 4  whether he was acquitted of any substantive counts, I don't
 5  recall now.
 6          MS. LIEBER:  Your Honor, he was.
 7          THE COURT:  Excuse me one second, sir.
 8          MS. LIEBER:  He, it's sort of the most focused
 9  liability is for a felon in possession charge in, out of Prince
10  George's County because at the time of the arrest some evidence
11  was that Mr. Jackson was in possession of a handgun that was in
12  a --
13          THE COURT:  In a house.
14          MS. LIEBER:  -- in a house in Maryland.
15          THE COURT:  Was that the one on the --
16          MR. NORRIS:  The window.  He was seen at a window
17  apparently by an officer outside.
18          THE COURT:  Was he charged in this prior case with
19  any substantive offenses?  I just don't recall.
20          MS. LIEBER:  It was a substantive --
21          THE COURT:  Drug?
22          MS. LIEBER:  No, possession of a firearm during the
23  course of a drug trafficking offense which was the conspiracy.
24          There would be a substantive offense of a felon in
25  possession and possibly related offenses in Maryland that is
```

RECROSS EXAMINATION

BY MS. LIEBER:

Q.   Sir, you were shown a number of flyers and tickets and passes and things that.  And just so we're clear, a lot of different bands play at Levels; is that right?

A.   Yes.

Q.   We talked for a while about Lissen, the group?

A.   Um-hum.

Q.   Is that yes?

A.   Yes, it is.

Q.   So Lissen played at Levels every once in a while; is that right?

A.   Yes, they did.

Q.   But they also played -- you printed up flyers and tickets and promotional materials for Lissen, who -- they played all over the area; is that right?

A.   Correct.

Q.   So not --

A.   Not just at one venue.

Q.   And not always at Levels?

A.   No.

Q.   By any stretch?

A.   No.

THE COURT:  Okay.  Thank you, you may step down.

---

minutes recess?  Thank you.

Can I see counsel?  We have one more, at most.

(Jury excused.)

(Afternoon recess, 4:00 p.m.)

(Proceedings resumed.)

(Jury present.)

THE COURT:  Okay, ladies and gentlemen, we are going to slip in one more quick witness only because we don't want to inconvenience the person.  And we will complete the testimony, I think, tomorrow.  So at that point, we're going to give you a long holiday, so that we can all work on the legal things and get the closing arguments ready for you after the 1st.  Okay.  We'll discuss schedule some more tomorrow.

Come on up, sir.

MR. BALAREZO:  Scott Peacock.

THE COURT:  Okay.  I'll get more specific tomorrow, but that's basically the case.  The testimony will be complete tomorrow.

DEFENDANT JONES' WITNESS SCOTT PEACOCK SWORN

DIRECT EXAMINATION

BY MR. BALAREZO:

Q.   Sir, could you please state your name and spell your last name for us?

A.   Howard Scott Peacock, P-E-A-C-O-C-K.

---

91

Q.   How old are you, sir?

A.   Forty-nine.

Q.   Are you currently employed?

A.   Yes.

Q.   How are you employed?

A.   I'm employed by the Snack Shack which is my business.

Q.   What is the Snack Shack?

A.   It's a convenience store that sells snacks.

Q.   Can you repeat that?

A.   A convenience store that sells snacks.

Q.   Are you a retailer or a distributor?

A.   I'm a retailer.

Q.   Where is your business located?

A.   404 Hampton Park Boulevard, Capital Heights, Maryland 20743.

Q.   And 404 Hampton Park Boulevard, where in relation to 400 Hampton Park Boulevard is that?

A.   Next door.

MR. BALAREZO:  Your Honor, I have a CD which has been marked as Jones Exhibit 59?

MS. LIEBER:  No objection.

MR. BALAREZO:  I'm just going play it from my laptop, for ease.

THE COURT:  All right.  What's it numbered again?

MR. BALAREZO:  Jones 59.

---

92

THE COURT:  Fifty-nine, it's admitted.

(Defense Exhibit No. Jones 59 received in evidence.)

BY MR. BALAREZO:

Q.   Sir, have you and I met before today?

A.   Yes.

Q.   When did we last speak?

A.   Just last week.

Q.   Where did I visit you?

A.   At my place of business, 404 Hampton Park Boulevard.

Q.   Was I with anyone else?

A.   Yes, Private Investigator Glich.

Q.   Glich?

A.   Yes.

Q.   When we were there, did you notice if we were able to take any photographs or anything of that nature?

A.   Yes.

THE COURT:  Okay.  It's in, right?

MR. BALAREZO:  It is.  Thank you.

THE COURT:  Go ahead.

BY MR. BALAREZO:

Q.   Sir, I'm going to ask you to take a look at the screen.  Can you see that?

A.   Um-hum.

Q.   Just to start us off, what does this show?

A.   This is the parking lot of my business.

1  Q.  And then, too, when you're saying
2  what --
3  A.  Okay, you're coming from my storefront. My vehicle.
4  Q.  Now, the sign right there says Snack Shack. Is that your
5  business?
6  A.  Yes.
7  Q.  What is the structure in front of the sign? It looks like
8  a porch of some kind?
9  A.  An awning.
10 Q.  Let's keep going.
11     Now, the Snack Shack, where you saw that sign, what was
12 that address?
13 A.  Mine, that's 404.
14 Q.  Okay.
15 A.  That right there is 400.
16 Q.  Do you have anything to do with 400?
17 A.  Well, I now rent that space as well as the other space, as
18 storage.
19 Q.  All of these items that are shown in that open bay area,
20 are those your products?
21 A.  Yes.
22 Q.  Now, what view is this now?
23 A.  That's just the neighboring warehouses. You see there's a
24 fence there that separates.
25 Q.  Let me hit play again. And there seems to be a road

---

1  A.  That's Hampton Park Boulevard.
2  Q.  Now, this view with respect to 400 Hampton Park, what is
3  A.  this view? Is it the side --
4  Q.
5  A.  This is a view of three trucks, and right in front of 400.
6  Q.  On any normal day, are there trucks parked there?
7  A.  Yes, always.
8  Q.  So would it be accurate to say this is basically a 360
9  degree view?
10 A.  Oh, yeah, that's a complete.
11 Q.  Okay. Now, do you know anyone by the name of Antoine
12 Jones?
13 A.  Antoine Jones, I've never met.
14 Q.  Let me -- do you see this particular view right now?
15 A.  Yes, the overhead door. Right.
16 Q.  Let me draw your attention to the red portion that's
17 described. What is that in the building? It's hard to see,
18 but --
19 A.  Well, that's the remnants of a pass tenant's sign, which
20 was Central Auto Upholstery.
21 Q.  And if I could just approach, why don't you take a look at
22 this right here?
23 A.  This is the same things I'm seeing here?
24 Q.  Yes, it is.
25     Do you see these kind of dots? Look over here. See these

---

95

1  kind of dots right here?
2  A.  Yeah.
3  Q.  What are those?
4  A.  Those are just the remnants of the sign, when they pulled
5  it down.
6  Q.  Can you kind of see the --
7  A.  Well, you can't see it very well there, but if you were on
8  location, you could definitely make out Central Auto
9  Upholstery.
10 Q.  What kind of business was that?
11 A.  That was an auto upholstery renovator.
12 Q.  Was that business there before you moved into 400 Hampton
13 Park?
14 A.  Before I moved into 400?
15 Q.  Yes.
16 A.  Yes.
17 Q.  Now, you said you don't know someone by the name of
18 Antoine Jones?
19 A.  No, other than from the court things.
20 Q.  Do you know someone by the name of Lawrence Maynard?
21 A.  Yes.
22 Q.  Do you see him anywhere in the room?
23 A.  Yes, I see Lawrence right over there.
24 Q.  The gentlemen who just stood up?
25 A.  Yes.

---

96

1  Q.  How do you know Mr. Maynard?
2  A.  Just from him moving into the 400 location, and just
3  becoming neighbors.
4  Q.  Do you know whether or not he conducted any business in
5  that location, 400 Hampton Park?
6  A.  My understanding, it was a moving company.
7        MS. LIEBER:  Objection to his understanding.
8        THE COURT:  Well, let's find out. Lay a foundation.
9  BY MR. BALAREZO:
10 Q.  Well, did you ever see Mr. Maynard at that location?
11 A.  Yes.
12 Q.  Were you at your current location at 404, when Mr. Maynard
13 moved into that location?
14 A.  Yes.
15 Q.  Did you ever see Mr. Maynard conducting any business at
16 the location, 400 Hampton Park?
17 A.  I've seen trucks there, yes.
18 Q.  What kinds of trucks?
19 A.  Trucks similar to what are parked out there now.
20 Q.  The white ones that we saw in the video?
21 A.  Right.
22 Q.  Let me just finish watching the video so we see the whole
23 thing. It's just a couple seconds long.
24     Let me ask you, how long was Mr. Maynard at that location,
25 that you're aware of?

1  A.  Oh, probably.
2  Q.  During those six months, did you conduct business at 404
3  on a daily basis?
4  A.  Yes.
5  Q.  Are you there on a daily basis?
6  A.  Absolutely.
7  Q.  During the time that Mr. Maynard was there, were you there
8  on a daily basis?
9  A.  Yes. Oh, yeah.
10  Q.  On a daily basis when you were there, did you ever recall
11  seeing any Hispanic males coming in or out of 400 Hampton Park?
12  A.  No.
13  Q.  Do you ever recall any Hispanic males hanging around that
14  particular area?
15  A.  No.
16  Q.  Do you ever recall any 18-wheelers coming in, into that
17  particular location at odd hours of the night or day?
18  A.  No, no.
19  Q.  Did you ever see any, what you would consider suspicious
20  activity?
21  A.  No, I didn't.
22  Q.  Did you see any activity that was not consistent with the
23  running of a storage or a furniture company?
24  A.  No.
25  Q.  Now, let me --

---

1  know how much longer you expect. You're taking -- it is --
2  know how much longer you expect. You're taking -- it is --
3       MR. BALAREZO:  I think five minutes, Your Honor.
4       THE COURT:  That's what you said. It's been more
5  than five. Government gets time too.
6  BY MR. BALAREZO:
7  Q.  Let me show you what's already in evidence as Jones --
8  excuse me, Government 13 and 14.
9       THE DEPUTY CLERK:  Government's?
10       MR. BALAREZO:  Government ICE 13 and ICE 14.
11       THE DEPUTY CLERK:  Okay.
12  BY MR. BALAREZO:
13  Q.  Do you see that, sir?
14  A.  Yes.
15  Q.  Do you recognize that?
16  A.  Yes.
17  Q.  What is that?
18  A.  That is a flap over the bay door opening.
19  Q.  And ICE -- Government ICE Number 14, do you recognize
20  that?
21  A.  Yes, it's the same thing.
22  Q.  Now, you've moved into the 400 address; is that correct?
23  A.  Yes.
24  Q.  When you moved into that address, was that particular flap
25  on that window?

---

99

1  A.  Yes, it was.
2  Q.  Now, from the time that Mr. Maynard was at that location,
3  when was it that the upholstery place was at that location?
4  Was it before or was it after?
5  A.  It was before he moved in.
6  Q.  And to your knowledge, was this particular flap covering
7  that window, was it there before Mr. Maynard moved in?
8  A.  Yes, I would assume, because when I moved in there, it's
9  upholstery .
10       MS. LIEBER:  Objection.
11       THE COURT:  What do you mean you assume? You don't
12  know? You weren't there?
13       THE WITNESS:  Well, I was never in their business,
14  inside.
15       THE COURT:  But can you say whether that was there,
16  preceded -- or Mr. Maynard?
17       THE WITNESS:  Preceded him moving in? Yes, it was.
18  BY MR. BALAREZO:
19  Q.  What is the material, what is that made of?
20  A.  It looks like car upholstery.
21  Q.  Like vinyl?
22  A.  Yeah, vinyl, upholstery that you would use to renovate a
23  car seat.
24       MR. BALAREZO:  Moving along, Your Honor.
25  BY MR. BALAREZO:

---

100

1  Q.  ICE Number 11, I believe that's in evidence.
2       THE DEPUTY CLERK:  Yes.
3  BY MR. BALAREZO:
4  Q.  Do you recognize this?
5  A.  Yes, it's an overhead door.
6  Q.  This particular door?
7  A.  Yeah, it covers the entrance to 400.
8  Q.  Do you have such a door at your location at 404?
9  A.  I would if I could, but I don't.
10  Q.  What do you mean you would if you could?
11  A.  I would because of the break-ins there in that area, but
12  because of that awning, I've been told I haven't been able to
13  have that kind of a pull-down door.
14  Q.  You're talking about that porch -- that thing that I
15  described as a porch?
16  A.  Right. Right.
17  Q.  So why is exactly that you can't put --
18  A.  The space. That's what they told me.
19  Q.  Regarding the break-ins, just describe for us what are you
20  talking about?
21  A.  Well, typically, they are just what they call crash and
22  run. They break the window, grab what they can, and run.
23  Q.  And you have had those?
24  A.  Oh, absolutely.
25  Q.  Now, let me show you what's already in evidence as ICE

**[Page 101]**

1  Number 12. Do you see that?
2  A.  Yes, sir.
3  Q.  What do you recognize that to be?
4  A.  That's the inside of 400.
5  Q.  When did you move into 400?
6  A.  Approximately June of that year, you know, the year in
7  question.
8  Q.  When you moved into 400, were all of these items that
9  shown in the picture in 400?
10  A.  No, these items weren't here.
11  Q.  Let me ask you know, I'm going to zoom in really quickly
12  to this particular area in this corner.  In your facility right
13  now, is there some sort of structure there that is not shown in
14  this picture?
15  A.  Yeah, there's like pegboard that covers like right in that
16  white area.
17  Q.  This one or this one?
18  A.  That white area where your finger is now, yeah.
19  Q.  What do you mean, pegboard?
20  A.  You know, what you would typically hang tools from.
21  Q.  Did you put that pegboard there?
22  A.  No.
23  Q.  And was that pegboard there when you moved in?
24  A.  Yes.
25  Q.  Do you now if that pegboard was placed in that location

**[Page 102]**

1  before Mr. Jones -- well, excuse me, Mr. Maynard, vacated the
2  premises?
3  A.  Say that again.
4  Q.  Are you aware of whether or not that pegboard was on that
5  wall at the time that Mr. Maynard vacated the premises?
6  A.  I'm not aware of that because I was never in that facility
7  when he was there.
8  Q.  Well, a few -- maybe an hour or so ago we spoke outside?
9  A.  Right.
10  Q.  And I asked you that same question?
11  A.  Okay.  Maybe I missed --
12  Q.  The pegboard that you say is on this particular wall now?
13  A.  Right.
14  Q.  Was that pegboard there when you moved in, first of all?
15  A.  Yes, it was there when I moved in.
16  Q.  All right.
17        THE COURT:  But there was some break between when you
18  moved in and when Mr. Maynard was there, is what he's saying,
19  right?
20        THE WITNESS:  Yeah.
21        THE COURT:  You didn't follow directly?
22        THE WITNESS:  No, there was a break.  Yes.
23  BY MR. BALAREZO:
24  Q.  Do you recall mentioning something about a handyman?
25  A.  Yeah, I think Lawrence had a handyman that worked in

**[Page 103]**

1  there.
2  Q.  Do you recall informing me that the handyman had placed
3  the pegboard there before Maynard left the premises?
4  A.  Yeah.
5  Q.  You did mention that earlier?
6  A.  I don't know what you're asking me really because what I
7  saw, when I moved in, there was pegboard there.  I don't know
8  when this picture was taken.
9  Q.  Okay.
10  A.  Okay.  So when I moved in, it was pegboard.  If it was a
11  six-month time, I find it highly unlikely for someone to bring
12  pegboard in.  Usual they take stuff out.
13        THE COURT:  You don't know how the pegboard got
14  there, is what --
15        THE WITNESS:  Right.  I don't know.
16        THE COURT:  Move on.
17        THE WITNESS:  I would assume that the handyman would
18  have --
19        THE COURT:  You assume, but you don't know.
20        MR. BALAREZO:  That's fine, Your Honor.  I may done.
21        THE COURT:  Does the government have anything for
22  this witness?
23        MS. LIEBER:  Two questions.
24        THE COURT:  Fine.
25        Mr. Lyons, do you have questions?

**[Page 104]**

1        MR. LYONS:  No, Your Honor.
2        MR. BALAREZO:  That's all I have, Your Honor.
3        THE COURT:  Thank you.
4              CROSS EXAMINATION
5  BY MS. LIEBER:
6  Q.  Good afternoon, sir.
7  A.  Hi.
8  Q.  I'll be quick.
9      Sir, just so we're clear, you never set foot inside that
10  warehouse space when Mr. Maynard had his business there; is
11  that right?
12  A.  No.
13  Q.  Okay.  So basically, you just saw a truck come and go
14  every once and a while; is that right?
15  A.  Yes.
16        MS. LIEBER:  That's all I have.
17        THE COURT:  Anything else?
18        MR. BALAREZO:  No.
19        THE COURT:  All right.  Thank you, sir, you may step
20  down.
21      (Witness excused.)
22        THE COURT:  Ladies and gentlemen, tomorrow we'll
23  start at -- will we be ready at 9:30?  Okay.  Good.  And I'll
24  have more specific instructions then.
25      Thank you, have a good evening.  Do not discuss the

case. Leave everything. Break is over. 9:30 --

THE DEPUTY CLERK: 9:00.

THE COURT: 9:30 we'll start. Thank you. All right. Thank you.

(Jury excused, 4:25 p.m.)

-oOo-

---

I-N-D-E-X

| On behalf of Defendant Jones: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Barbara Goodwin | | | | |
| By Mr. Balarezo | 11 | | 24 | |
| By Mr. Geise | | 18 | | |
| Don Paul | | | | |
| By Mr. Balarezo | 26 | | | |
| By Mr. Geise | | 37 | | |
| Christopher Burch | | | | |
| By Mr. Balarezo | 39 | | | |
| By Ms. Lieber | | 58 | | |
| Scott Peacock | | | | |
| By Mr. Balarezo | 90 | | | |
| By Ms. Lieber | | 104 | | |

E-X-H-I-B-I-T-S

| | Received |
|---|---|
| On behalf of the Government: | |
| Exhibit No. Miscellaneous 27 | 59 |
| Exhibit No. Misc. 28 and 29 | 64 |
| Exhibit No. Misc. 30 | 67 |
| Exhibit No. Misc. 32 | 73 |
| On behalf of Defendant Jones: | |
| Exhibit No. 65 | 15 |
| Exhibit No. 65, 66, and 67 | 30 |
| Exhibit No. 80 | 44 |
| Exhibit No. 81 | 56 |
| Exhibit No. 25 | 81 |
| Exhibit No. 28 | 86 |
| Exhibit No. 59 | 95 |

---

107

CERTIFICATE

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the stenographic notes provided to me by the United States District Court, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

Crystal M. Pilgrim, RPR                    Date

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3      -------------------------------X

 4   THE UNITED STATES OF AMERICA      Criminal Case No. 05-???

 5                   v.                VOLUME 21 - A.M. SESSION

 6   ANTOINE JONES, et al,

 7                Defendants,

 8      -------------------------------X   Washington, D.C.
                                           Thursday, December 20, 2007
 9                                         9:45 A.M.

10                       TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11          UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Government:            JACK GEISE, ESQUIRE
                                    RACHEL LIEBER, ESQUIRE
14                                  Office of the U.S. Attorney
                                    555 4TH Street, N.W.
15                                  Washington, D.C.  20560
                                    (202) 616-9156
16

17   For Defendant Jones:          EDUARDO BALAREZO, ESQUIRE
                                    400 Fifth Street, N.W.
18                                  Suite 500
                                    Washington, D.C.  20001
19                                  (202) 639-0999

20

21   Court Reporter:               Lisa Walker Griffith, RPR
                                    U.S. District Courthouse
22                                  Room 6507
                                    Washington, D.C.  20001
23                                  (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.
```

13

1    regarding this matter, whether in the halls, outside the

2    elevators.  Has anyone had any contact with anybody related in

3    any way with this case?

4                    THE JURORS:  No.

5                    THE COURT:  If you do, would you raise your hands

6    please?  I see no hands.  So I think I just want to double

7    check because you never know what happens in the court house or

8    in the surrounding areas.  Thank you.

9                    Also I do, we are going to break obviously.  It's a

10   long break because of Christmas and New Years.  It's very

11   important that you do not, I haven't seen myself in any press.

12   But please remember all the admonitions about not talking about

13   the case, about not looking up anything on the Internet.  The

14   Internet is a great thing.  It has caused more trouble in the

15   courts than you can imagine.

16                    So it's very, very important that you keep these

17   instructions in mind.  That you don't start searching sites or

18   inquire of other people about information.  You have to rely on

19   the lawyers and what evidence they present here.

20                    Mr. Lyons, I'm sorry, go ahead.

21                    MR. LYONS:  On behalf of Mr. Maynard, we're going to

22.  call to the stand Mr. Gregory Wills.

23       GREGORY WILLS, WITNESS FOR THE DEFENDANT MAYNARD, SWORN

24                            DIRECT EXAMINATION

25   BY MR. LYONS:

14

1    Q. Good morning.

2    A. Good morning.

3    Q. Sir, in a loud, clear voice, would you please state your

4    name and spell it for the court reporter?

5    A. Gregory Kenneth Wills, G-R-E-G-O-R-Y, K-E-N-N-E-T-H, last

6    name W-I-L-L-S.

7    Q. Where do you live, Mr. Wills?

8    A. 1731 S Street, Northwest.

9    Q. How long have you been in the Washington, D.C. area?

10    A. Off and on about 20 years.

11    Q. What is your trade or your occupation?

12    A. Home improvement, handy man.

13    Q. Would you explain to the ladies and gentlemen of the jury,

14    as a handy man, what are you good at as a handy man?

15    A. Just about everything as far drywall.

16    Q. Explain a little bit.

17    A. Drywall, reset lights, ceiling fans, hardwood floors.

18              THE COURT:  How about heat?

19              THE WITNESS:  Heat, too.  Everything except heavy up.

20    I don't do heavy up.  But I can do just about everything else

21    with my hands pertaining to a house or a commercial building.

22    That's basically it.

23    BY MR. LYONS:

24    Q. How long have you been a handy man?

25    A. Since I was 12, since I fixed my mother's toaster, twelve

15

1    years old.  A broken toaster, I fixed that.  I found out I was

2    good with my hands.  It's what I like doing.

3        Q. Are other members in your family, are they in the handy

4    man business so to speak?

5        A. Yes, I have a brother.  He's a carpenter.

6        Q. Do you work for yourself or for a company?

7        A. Now, I work for myself.

8        Q. What's your primary source of business?  How do you get

9    customers?

10        A. A lot by word of mouth, by doing good work.

11        Q. A satisfied customer is the best referral?

12        A. Yes.

13        Q. All right.  Now, do you know Mr. Antoine Jones?

14        A. Yes, I do.

15        Q. Is that the gentleman seated at the defense table?

16        A. Yes.

17        Q. How about Mr. Lawrence Maynard?

18        A. Yes, I do.

19        Q. When did you first meet Mr. Jones and how did you meet

20    him?

21        A. I met him through a friend, did some hardwood flooring

22    work for him and some other little things like, you know, a

23    little deck work.

24        Q. All right.  Was that at his house?

25        A. Yes.

1    Q. Are you familiar with Club Levels?

2    A. Yes, I am.

3    Q. Directing your attention in 2004, 2005, did you ever do

4    any handy man work at Club Levels?

5    A. Yes, I did.

6    Q. Who hired you to do that work?

7    A. Antoine.

8    Q. Was the Club opened for business when you first started

9    doing some work at Levels?

10    A. No.

11    Q. Describe generally what type of work you did there?

12    A. Punch out work, demolition. And then I built a room, a

13    VIP room and kind of a lot of little things. I put in toilets.

14    I put in light switches.

15    Q. Now, before you started doing some work at Club Levels,

16    did you do, in 2004, did you do any handy man work for

17    Mr. Jones and Mr. Maynard at another commercial premises,

18    specifically 400 Hampton Park Boulevard?

19    A. Yes, I did.

20    Q. What type of work did you do at the 400 Hampton Park?

21    Explain that to the jury.

22    A. I replaced drywall, put in a toilet tank. I put in a

23    small window, replaced some, mainly drywall. I built a stand.

24    I put up a picket board to hang tools on. And I installed the

25    floors, just general things after that.

1    Q. Now, I want to focus on the peg board that you just

2    mentioned.  Do you recall where did you get that peg board to

3    put up?

4    A. I bought it from Home Depot.

5    Q. Home Depot?

6    A. Yes.

7    Q. And was there a Home Depot --

8    A. Right down the street from the building.

9    Q. What was the peg board for?

10   A. To hang tools on.

11   Q. Do you remember the specific date that you put the peg

12   board up?

13   A. No, I know it was cold.  It was really cold.

14   Q. Was it a time when Mr. Maynard and Mr. Jones were using --

15   A. Yes, yes.

16   Q. At the warehouse?

17   A. Yes.

18   Q. Now, I'm going to show you a photograph.  Have this marked

19   as Maynard's Number 9 for identification.

20        THE COURT:  Has the government seen it?

21        MR. GEISE:  No objection.

22        THE COURT:  No objection.  It will be admitted then.

23   We can put it on the screen.

24        (Defendant Maynard Exhibit Number 9 was

25        admitted into evidence.)

1   BY MR. LYONS:

2       Q. Mr. Wills, can you identify that photograph?

3       A. Yes, I can.

4       Q. What is that photograph?

5       A. It's a picture of the warehouse.

6       Q. All right.  Now, I'm going to take Maynard's Number 9, and

7   I'm going to ask you, with this pencil -- first of all, let me

8   ask you this question.  Does that photograph depict the area

9   that you put the peg board up on?

10      A. Yes.

11      Q. And would you take the red pencil and outline where it was

12   that you put the peg board on?

13      A. (Complying.)

14              THE COURT:  It's red?  He did it in red ink?

15              MR. LYONS:  Yes..

16   BY MR. LYONS:

17      Q. And that outline in the red ink, that is the area that you

18   put the peg board on, on that wall?

19      A. Yes, that's the area I put the peg board on?

20              THE COURT:  It's like a square?  Is that fair for the

21   record, the red ink?

22              MR. LYONS:  Well, Your Honor, this is going to be

23   introduced as an exhibit.

24              THE COURT:  I'm describing it for the record though,

25   what he has done is drawn a square shape in red ink to

1    represent the peg board.  Is that fair?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.

4    BY MR. LYONS:

5.   Q. Just for clarity, would you point, draw an arrow to

6    exactly where it was that you placed the peg board?

7    A. (Complying.)

8    Q. Now, I'm going to show you what has been marked as

9    Government Exhibit Number ICE Number 12.  Can you identify

10   that, sir?

11   A. Yes.

12   Q. Is that the same --

13   A. That's the same.

14   Q. Same photograph?

15   A. Right.

16   Q. I'm going to point to the area that you outlined in red, a

17   square area of that white wall.  Is that where you put the peg

18   board up?

19   A. Yes, it is.

20   Q. Now, after you put the peg board up --

21             THE COURT:  You know it was cold.  But can you give

22   us any better date by month or what have you?

23             THE WITNESS:  January or February, somewhere in

24   February.

25             THE COURT:  '04?

20061115 PM.txt

<pre>
1                    1
1              UNITED STATES DISTRICT COURT
1              FOR THE DISTRICT OF COLUMBIA
2
2       ----------------------------X
3                                   x
3       THE UNITED STATES OF AMERICA  x    Docket No. CR-05386
4                                   x
4          vs.                      x        Washington, D.C.
5                                   x    Wednesday, November 15, 2006
5       ANTOINE JONES,             x           1.42 p.m.
6       ADRIAN JACKSON,            x
6       MICHAEL HUGGINS,           x          (Day 15)
7       KEVIN HOLLAND,             x
7                                   x     (AFTERNOON SESSION)
8       Defendants.               x
8       ----------------------------X
9
10
11                    TRANSCRIPT OF TRIAL
11        BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
12        UNITED STATES DISTRICT JUDGE, AND A JURY
13
14      APPEARANCES:
15      For the Government:            JACK GEISE, ESQUIRE
15                                     RACHEL LIEBER, ESQUIRE
16                                     Office of the U.S. Attorney
16                                     555 Fourth Street, N.W.
17                                     Washington, D.C.  20560
17                                     (202) 616-9156
18
18      For the Defendant Jones:       EDUARDO BALAREZO, ESQUIRE
19                                     400 Fifth Street, N.W.
19                                     Suite 300
20                                     Washington, D.C.  20001
20                                     lawoffice@balarezo.net
21
22
23
24
25
</pre>

<pre>
                                                             2
1       APPEARANCES:   (Con't.)
2       For Defendant Jackson:         JON NORRIS, ESQUIRE
2                                      641 Indiana Avenue, N.W.
3                                      2nd Floor
3                                      Washington, D.C.   20001
4                                      (202) 842-2695
4
5
5       For Defendant Jackson:         RUDOLPH ACREE, ESQUIRE
6                                      1211 Connecticut Avenue, N.W.
6                                      Suite 303
7                                      Washington, D.C.  20036
7                                      (202) 331-0739
8
8
9       For Defendant Holland:         BRIAN MCDANIEL, ESQUIRE
9                                      1221 Connecticut Avenue, N.W.
10                                     Suite 506
10                                     Washington, D.C.  20036
11                                     (202) 331-0739
11
</pre>

20061115 PM.txt

```
18   Q.  Now, you didn't make that decision all on your own?
19   A.  No, sir, I did not.
20   Q.  You had conversations with the prosecutors; correct?
21   A.  Yes, sir.
22   Q.  And basically they directed you to release her and not
23   press charges against her; correct?
24   A.  It was a collaborative decision, sir.
25   Q.  But ultimately, it was their decision; right?
```

68

```
1    A.  I don't know who ultimately made the decision.
2    Q.  Well, you don't make a decision to prosecute or not, do
3    you?
4    A.  That's correct, I do not.
5    Q.  They make that decision?
6    A.  They are the prosecutors, yes, sir.
7    Q.  Right.
8        So they make the decision?
9    A.  They are the prosecutors.
10              MR. BALAREZO:  I have nothing else, Your Honor.
11              MR. NORRIS:  No questions, Your Honor.
12              MR. MCDANIEL:  No questions.
13              MR. ACREE:  No questions.
14              THE COURT:  Nothing else?
15              MS. LIEBER:  Nothing.  Thank you.
16              THE COURT:  Okay.  Call your next witness.
17              MS. LIEBER:  Your Honor, the government calls Andrew
18   Schaeffer.
19              THE COURT:  Right up here, sir, please.
20              (Witness sworn by the clerk at 3:31 p.m.)
21                        DIRECT EXAMINATION
22   BY MS. LIEBER:
23   Q.  Good afternoon, sir.
24   A.  Good day.
25   Q.  In a nice, clear voice, can you please introduce yourself
```

69

```
1    to the jury and spell your first and last names for the court
2    reporter?
3    A.  My name is Andrew Schaeffer, S-C-H-A-E-F-F-E-R.
4    Q.  Sir, how are you employed?
5    A.  I'm the president of Metropolitan Investment Company.
6    Q.  And what is Metropolitan Investment Company?
7    A.  It a property management company for commercial buildings.
8              THE COURT:  Sorry.  You'll have to speak up a little
9    bit.  It moves your -- if you want to move it closer.
10   BY MS. LIEBER:
11   Q.  Mr. Schaeffer, is one of the properties that your company
12   manages the Hampton Park Storage Facility located at 400
13   Hampton Park Boulevard in Capitol Heights, Maryland?
14   A.  It is.
15   Q.  Okay.  And sir, I'm going to show you what I've marked as
16   Government's Exhibits ICE-15, -16, -17, -18 and -19.
17              MS. LIEBER:  First, I'm going to show this to the
18   defense, Your Honor, which they've seen before.  And actually,
19   I'll add in ICE 21, while we're at it.
20              MR. BALAREZO:  Before we show this, can we lay a
21   proper foundation about --
22              THE COURT:  No.  The way you lay it is to show it to
23   him and ask him if he recognizes them.  They're not in evidence
24   yet.  That's what she's doing.
25              MR. BALAREZO:  I understand, Your Honor.
```

70

```
1              THE COURT:  All right.  Go ahead.  You can -- has
2    everybody seen them?  I'm sure you've seen them before.
```

Page 29

```
                          20061115 PM.txt
  3              What page of the list, Gwen, do you know?
  4              THE DEPUTY CLERK:  It's page 18.
  5              THE COURT:  18, thank you.
  6              MS. LIEBER:  Your Honor, if I may approach the
  7     witness.
  8              THE COURT:  Yes.
  9     BY MS. LIEBER:
 10     Q.  Mr. Schaeffer I'm showing you Government Exhibits ICE-15,
 11     -16, -17, -18, -19 and -21.
 12         I'm just going to ask you to take a look at those documents
 13     and see if you recognize those documents.
 14     A.  I do.
 15     Q.  Have you seen those documents today, as a matter of fact?
 16     A.  Yes.
 17     Q.  Okay.  What are those documents?
 18     A.  The first one is the front page and the last page of a
 19     lease for 400 Hampton Park Boulevard.  Exhibit 16 is a credit
 20     application, business application, and 17 is a termination
 21     letter.  18 is a brochure of the building.  And 19 is a plan of
 22     the building.
 23     Q.  Okay.  And I'm going to stop you there for a minute.
 24         Just that first -- not the picture, but that first set of
 25     documents, are those -- those documents, those lease documents    '71
```

```
  1     that you have before you, are those records that you -- well,
  2     first of all, do those pertain to a particular lease at the 400
  3     Hampton Park Boulevard storage facility?
  4              MR. BALAREZO:  Objection, Your Honor.
  5              THE COURT:  Why?
  6              MR. BALAREZO:  I think it's getting a little bit ahead
  7     of itself before the proper foundation is laid, if it gets into
  8     specifics of --
  9              THE COURT:  You recognize these?
 10              THE WITNESS:  I do, Your Honor.
 11              THE COURT:  Did a copy of these come from your files,
 12     from your company's files?
 13              THE WITNESS:  They did.
 14              THE COURT:  And are these documents kept in the
 15     regular course of business.
 16              THE WITNESS:  They are.
 17              THE COURT:  And is it in the regular course of
 18     business for your company to maintain tease type of documents?
 19              THE WITNESS:  It is.
 20              THE COURT:  What's your objection?
 21              MR. BALAREZO:  Well, none in that -- with that direct.
 22              THE COURT:  Anything else?
 23              MS. LIEBER:  For the record, those were my next four
 24     questions.
 25              THE COURT:  You said it was going to be a short
                                                                       72
```

```
  1     witness.  I'm determined to have it be a short witness.
  2              Anything else for anybody?
  3              MR. BALAREZO:  You want to do my cross?
  4              MS. LIEBER:  Your Honor, at this time, I seek
  5     admission of ICE-15 through -19.
  6              THE COURT:  And what about 21, I'm sorry -- okay.
  7              Any objection to my laying that foundation?
  8              MR. BALAREZO:  No, Your Honor.
  9              THE COURT:  Mr. Norris?
 10              MR. NORRIS:  No.
 11              THE COURT:  18 -- 15, 16, 17, 18, 19 are admitted.
 12              Thank you.
 13
```

20061115 PM.txt

14          (Government's Exhibits ICE-15, ICE-16, ICE-17, ICE-18,
15           and ICE-19 were received into evidence.)
16  BY MS. LIEBER:
17  Q.  Mr. Schaeffer, I'm also now going to put on this Elmo, just
18  for your purposes at this point, it's in the in evidence,
19  ICE-21 --
20          THE COURT:  Do you want the jury to see the ones that
21  just went in?  I didn't do that.
22          I think you just at least could have him identify the
23  ones that just went into evidence, please, for the purpose of
24  the jury.
25  BY MS. LIEBER:

                                                                    73

1   Q.  Mr. Schaeffer, before we go on to ICE-21, let me ask you,
2   who is the person who leased -- and I'll put this on the Elmo
3   for you, if you look at that little screen.
4           Who is the person who leased this Hampton Park warehouse
5   storage facility?
6   A.  Mr. Jones and Mrs. Jones.                    Civil Suit
7   Q.  Okay.  And is it Antoine and Denise Jones?
8   A.  Yes.
9   Q.  And did you, yourself, actually make copies of these
10  documents and give them to anybody a while back?
11  A.  Yes.
12  Q.  Okay.  And who did you give them to, if you remember?
13  A.  I received a subpoena, and I gave them -- I only remember
14  the first person, Katerina, I believe her name was.
15  Q.  Okay.  And in reviewing them again today are these the same
16  documents?
17  A.  They are.
18  Q.  Okay.  Now, let me ask you, finally, Mr. Schaeffer about
19  ICE-21.
20          Do you recognize that picture?
21  A.  I do.
22  Q.  What is that -- that's actually not in evidence.
23  A.  That is the front of 400 Hampton Park Boulevard.
24  Q.  Okay.  And does that picture fairly and accurately
25  represent the front of a particular storage unit at Hampton

                                                                    74

1   Park?
2   A.  It does.
3   Q.  Okay.  Which unit was that?
4   A.  400.
5   Q.  Okay.  And is 400 the unit that we've been talking about?
6   A.  It is.
7   Q.  Okay.  And does that picture fairly and accurately
8   represent how the front of Unit 400 look at the time that it
9   was being leased by Mr. Jones?
10  A.  It does.
11          MS. LIEBER:  Your Honor, at this time I would move
12  Government's ICE-21 into evidence.
13          MR. BALAREZO:  At what time?
14          THE COURT:  What's the date of the lease, please?
15  BY MS. LIEBER:
16  Q.  Well, let me ask this, actually, Mr. Schaeffer, at the time
17  that Mr. Jones entered into the lease agreement with your
18  company for 400 Hampton Park Storage, did the front door to
19  that unit look like this?
20  A.  No.
21  Q.  what did the front door of that unit look like when you
22  first rented that space to Antoine Jones?
23          MR. BALAREZO:  Objection, Your Honor.
24          Can we approach one second?
                            Page 31

20061115 PM.txt

```
25              THE COURT:  No.  Does he know?
                                                                    75
 1              MR. BALAREZO:  It's not about -- it's about something
 2  else, Your Honor, please.
 3              THE COURT:  All right.
 4              (Bench conference.)
 5              MR. BALAREZO:  Your Honor, this may be a minor point
 6  in the universe, but, number one, there's been no
 7  identification of my client yet.
 8              Number two, I don't know if this witness can identify
 9  my client.
10              Number three, I object to Miss Lieber saying something
11  about Mr. Jones and then pointing to my client.
12              MS. LIEBER:  I'm sorry.  I -- I didn't think about it,
13  and you're right.
14              THE COURT:  I don't know.  That's all well-taken.  I
15  don't know if he can or he can't.
16              He can identify dates.  Can he identify him?
17              MS. LIEBER:  He can.  He has a picture in his file, a
18  driver's license picture.
19              THE COURT:  Oh, all right.  Well then, you'd better
20  establish that.
21              MS. LIEBER:  Okay.  And I'm sorry.  I didn't think
22  about it.
23              THE COURT:  I don't know how we're using this
24  custodian of records -- very good.
25              MR. BALAREZO:  Well, I didn't object, but he's the
                                                                    76
 1  president of the company.  That doesn't necessarily mean he was
 2  the custodian.  That's one of the things I was objecting to
 3  before the Court laid that foundation as it did.
 4              And that was really my concern, does he know what
 5  these documents are, does he deal with them, I don't know.
 6              MS. LIEBER:  He personally made the copies from the
 7  file, so he does know.
 8              THE COURT:  No, that's not the point.  Now the problem
 9  is whether he has firsthand knowledge about who is the lessee,
10  and what did he lease, and what did the door look like.
11              So you have to lay that foundation.
12              MS. LIEBER:  Sure.  Thank you.
13              THE COURT:  Thank you.
14              MR. BALAREZO:  Before we go, I think there is an issue
15  where he may testify about Mr. Jones putting up a door that
16  cost thousands of dollars.  I don't think this guy knows who
17  ordered that door put in there, how much it costs, I mean, so I
18  don't want to get into -- it's hearsay.
19              MS. LIEBER:  Since we're here -- he is going to --
20              THE COURT:  Well, it's not hearsay to say the door
21  went up.
22              MR. BALAREZO:  No, no, but --
23              THE COURT:  He saw it.
24              MR. BALAREZO:  -- but there are other things that I
25  think would be hearsay, related to the door.
                                                                    77
 1              MS. LIEBER:  He is going to test -- I'm going to ask
 2  him --
 3              THE COURT:  He can testify to what Adam -- what Jones
 4  told him, not his wife though.
 5              MS. LIEBER:  Right.  And he's only going to -- I'm
 6  sorry.  He's going to testify about a conversation he had with
 7  Mr. Jones about putting up the door, why Mr. Jones wanted to
 8  put up the door.
 9              THE COURT:  It's all staying in.
                        Page 32
```

20061115 PM.txt

```
10          MS. LIEBER:  -- and the fact that the door has to stay
11   because it's permanent.
12          THE COURT:  Okay.  Thank you.
13          (Open court.)
14
15   BY MS. LIEBER:
16   Q.  Mr. Schaeffer, before I get to the picture that we have
17   been talking about, in the course of your duties as the manager
18   of that property, did you have occasion to have a conversation
19   or a number of conversations with Antoine Jones?
20   A.  I had one or two.
21   Q.  Okay.  And do you actually have a photograph of Antoine
22   Jones in your file?
23   A.  I have a copy of his driver's license.
24   Q.  Okay.  Would you -- if you saw Mr. Jones again, would you
25   be able to recognize Mr. Jones?
                                                                    78
1    A.  Maybe.
2    Q.  Okay.  Would seeing that picture that you have in your file
3    refresh your memory as to what Mr. Jones looked like?
4           MR. BALAREZO:  Objection, Your Honor.  He didn't
5    indicate that he couldn't.
6           THE COURT:  No, he didn't.
7           The first question is:  Can you identify anybody in
8    this courtroom as Mr. Jones?
9           THE WITNESS:  Without looking at the driver's license,
10   I would say no.
11   BY MS. LIEBER:
12   Q.  Would taking a look at that driver's license picture
13   refresh your memory as to the person who calls himself
14   Mr. Jones, who rented this facility?
15   A.  It would.
16          MS. LIEBER:  I'm showing to Mr. Balarezo, Photo 60,
17   just for identification.
18          If I may approach Your Honor, may I approach?
19          THE COURT:  Yes.
20   BY MS. LIEBER:
21   Q.  Mr. Schaeffer, I'm showing you Government's Exhibit Photo
22   60.  Taking a look at that photograph, does that refresh your
23   memory as to the person who identified himself as Antoine Jones
24   who rented the storage facility we're talking about?
25   A.  Yes.
                                                                    79
1    Q.  Okay.  Now, having taken a look at that photograph, if you
2    look around the courtroom, do you see the person who you spoke
3    with who represented himself to be Antoine Jones who rep -- who
4    rented this facility?
5    A.  I think he's sitting at that table over there.
6    Q.  Okay.  Can you be -- I'm sorry.  Can you be a little more
7    specific?  There are several people sitting at that table.
8           You can stand up and look, if it helps.
9    A.  I would say the man in the brown suit, but I'm not sure.
10   Q.  Thank you.
11          THE COURT:  You mean that gentleman that's standing?
12          THE WITNESS:  Yes.
13          MR. BALAREZO:  For the record, Mr. Norris' client
14   stood up.
15          MR. NORRIS:  Thank you.
16          THE COURT:  All right.  True, for the record.
17          All right.  Go ahead.
18   BY MS. LIEBER:
19   Q.  Now, Mr. Schaeffer, I want to show you now what I've marked
20   as Government's Exhibit, again, ICE-21.  It's not in evidence.
```

20061115 PM.txt

21  At the time that Mr. Jones rented the storage facility in --
22  I'll put this on the machine, which was on November 17th, 2003,
23  did the storage unit, 400 Hampton Park Boulevard, actually have
24  that door on it?
25  A.  No.

80

1   Q.  Is that the standard door that is in front of the various
2   warehouse units at your company?
3   A.  No.
4   Q.  Okay.  Did there come a point in time during the course of
5   Mr. Jones' rental of that particular space that he installed
6   this overhead door?
7   A.  He did.
8   Q.  Okay.  Does this picture fairly an accurately represent the
9   storage facility unit after he had that door installed?
10  A.  It does.
11          MS. LIEBER:  Your Honor, at this time I would move
12  ICE-21 into evidence.
13          MR. BALAREZO:  Your Honor, I object, subject to the
14  objection I made at the bench.
15          THE COURT:  Who --
16          MS. LIEBER:  Your Honor, I --
17          THE COURT:  Fairly and accurately represents the
18  facility after the door was added, but the door wasn't there
19  originally; right?
20          THE WITNESS:  Correct.
21          THE COURT:  Okay.  I don't understand the objection to
22  the admission of the paper.
23          MR. BALAREZO:  I'll deal with it on cross.
24          THE COURT:  All right.  Then 21 is admitted.
25          (Government's Exhibit ICE-21 was received into

81

1           evidence.)
2           MR. BALAREZO:  But I still object to it, for the
3   record.
4           THE COURT:  Okay.  Overruled.
5           Go ahead.
6   BY MS. LIEBER:
7   Q.  Mr. Schaeffer, did you actually have a conversation with
8   Mr. Jones about why he wanted to install that particular
9   overhead door?
10  A.  He did ask if he could have permission to install it, and I
11  said, yes.
12  Q.  Okay.  And why -- did he tell you why he wanted to install
13  an overhead door on the front of that warehouse facility?
14  A.  He said that --
15          MR. BALAREZO:  Objection, Your Honor.
16          THE COURT:  You want to approach, on what basis?
17          MR. BALAREZO:  Let me think of one.
18          THE COURT:  Huh?
19          MR. BALAREZO:  Yes.
20          THE COURT:  Have we talked about it before?  I've
21  overruled that.
22          MR. BALAREZO:  Well --
23          THE COURT:  When you were talking with this person,
24  the person who entered into the lease, is this the same person
25  you talked to?

82

1           THE WITNESS:  Yes, Your Honor.
2           THE COURT:  Okay.  And did the person who you were
3   talking to give you a name?
4           THE WITNESS:  He did.
5           THE COURT:  What did he tell you his name was?
Page 34

20061115 PM.txt

```
 6              THE WITNESS:  Mr. Jones.
 7              THE COURT:  Okay.  You want to approach?
 8              MR. BALAREZO:  Yes.
 9              THE COURT:  All right.  Sorry.
10              (Bench conference.)
11              THE COURT:  The fact that he can't make an -- can you
12    stand over there, please?  Sorry to make you do that.  Just
13    stand over there.
14              Let me -- okay.  Never mind.  Go ahead -- 21 is
15    admitted.  Go ahead.
16              MR. BALAREZO:  Where is it?
17              THE COURT:  What are you looking for?
18              MR. BALAREZO:  Well -- sorry.
19              THE COURT:  He can't make and in-court identification.
20              MR. BALAREZO:  Right.  No, I understand.
21              THE COURT:  Where is the photo I.D.?
22              MS. LIEBER:  Your Honor, if I may, I'm going to ask
23    him was that also kept in his file in the ordinary course of
24    business.  He's going to say yes, and I'm going to put it in.
25              THE COURT:  Did this come from his file?
```
                                                                    83
```
 1              MS. LIEBER:  It did.  I took it out of his file and
 2    put a sticker on it.
 3              THE COURT:  What -- what is the problem?  This is the
 4    guy I talked to, this is the guy that signed the lease, this is
 5    the guy --
 6              MR. BALAREZO:  Well, he hasn't said that.
 7              THE COURT:  He's about to.  I mean, that's the point.
 8    That's where we're going.
 9              And what's the answer, though?  What is the person
10    saying?
11              MS. LIEBER:  He says that he wanted more secure -- he
12    wanted to secure it with an overhead door because he ran a
13    moving and storage business.
14              THE COURT:  We're fighting over this?
15              MR. BALAREZO:  Well, Your Honor, because -- no.
16    Because the implication is --
17              THE COURT:  I'm working so hard that my brain cells
18    are gone.
19              MR. BALAREZO:  Mine are gone.
20              But the implication, I think, is that the warehouse
21    had a glass front at some point, and Mr. Jones put that in so
22    he could secure his drugs.
23              THE COURT:  The implication, but the more you bring it
24    out -- we didn't know anything about glass doors, I'll tell you
25    that.
```
                                                                    84
```
 1              MR. BALAREZO:  Well, I don't particularly want to get
 2    into it.  The thing is, it's --
 3              THE COURT:  But in any case, it's not fatal to her
 4    being able to elicit this.  When a person who looks like this
 5    who says, "My name's Jones and signs the lease," says the
 6    following.  It's an admission of the party opponent.
 7              MR. BALAREZO:  That's what I'm reading right now.  I
 8    thought there was one of the subsections there that I could
 9    throw at the government, but --
10              MR. GEISE:  I think it's 801(d)(2)-1.
11              MR. BALAREZO:  I have it, yeah.
12              MR. NORRIS:  While Mr. Balarezo is looking at that,
13    how do we deal with the issue of the false identification of my
14    client as Mr. Jones, with the jury?
15              THE COURT:  I think that they have to be told that he
16    has done that.  We can stipulate after he leaves.
```

20061115 PM.txt
```
17          MR. NORRIS: Very well.
18          THE COURT: I don't think we ought to clue him in, so
19 that he goes back --
20          MR. NORRIS: No, no. I don't want to do it in front
21 of the witness.
22          THE COURT: But for the record, it's been done as
23 identified as your client, and we can certainly say that, you
24 know, it wasn't -- there was no suggestion that it was your
25 client that was renting this.                                    85

1          MR. NORRIS: I can work on that.
2          MS. LIEBER: Your Honor, that's why I didn't say for
3 the record he identified -- because I didn't want to tip him
4 off.
5          THE COURT: Right. Okay. I've had enough.
6          MR. BALAREZO: I'm sorry, Your Honor.
7          THE COURT: Thank you.
8          MS. LIEBER: She has enough of a recollection of the
9 rules of evidence. Thank you.
10          (Open court.)
11          THE COURT: Thank you, sir. Would you retake the
12 stand?
13          You notice our bench conferences, ladies and
14 gentlemen, get longer as the day gets later. It's harder to
15 think fast enough.
16          Okay. Go ahead. Sorry.
17          MS. LIEBER: Mr. Norris gets funnier.
18 BY MS. LIEBER:
19 Q. Let me ask this, Mr. Schaeffer, the item that I identified
20 for you as Photo 60 and brought up there that you looked at --
21          THE COURT: This is ICE-60, Gwen.
22          MS. LIEBER: I'm sorry, it's Photo 60.
23          THE COURT: Photo 60. Okay, Photo 60.
24 BY MS. LIEBER:
25 Q. Is that photocopy a document that you also kept in the      86

1 ordinary course of business?
2 A. It is.
3 Q. Okay.
4          MS. LIEBER: At this time, Your Honor, I would move
5 Photo 60 into evidence.
6          THE COURT: Do you know whether that came from your
7 files, sir?
8          THE WITNESS: It did, Your Honor.
9          THE COURT: Any objection?
10          MR. BALAREZO: No, Your Honor.
11          THE COURT: That means Photo 60 is in evidence, and it
12 can be shown.
13
14 (Government's Exhibit Photo 60 was received into evidence.)
15          MR. NORRIS: Your Honor, no objection, but just for
16 the record, can we say that that appeared to be a photocopy of
17 a driver's license that's been enlarged several times.
18          THE COURT: Okay. I think we can agree that that's
19 probably a correct photocopy of an enlarged driver's license.
20 BY MS. LIEBER:
21 Q. Mr. Schaeffer, I have been asking a lot of questions about
22 the person who rented the location and the person who installed
23 this overhead door.
24     The person who did all of those things, did he also give
25 you this driver's license?                                       87

1 A. He did.
```
                              Page 36

20061115 PM.txt

```
 2   Q.  As part of his identification?
 3   A.  He did.
 4   Q.  Okay.  Thank you.
 5            THE COURT:  Is that the person you talked to?
 6            THE WITNESS:  Yes, it is.
 7   BY MS. LIEBER:
 8   Q.  And did he say his name was Antoine Jones?
 9   A.  Yes, he did.
10   Q.  Okay, thank you.
11        Back to the overhead door.
12        When you had a conversation with Mr. Jones, what did he
13   tell you about why he wanted to install this overhead door?
14   A.  He said that he was in the moving and storage business, and
15   he felt that the glass door front was not secure enough.
16   Q.  And tell the jury, what was the glass door?  What did it
17   look like?
18   A.  It was a glass door front, and then it had a personnel door
19   to go in and out of.
20   Q.  When you say personnel door --
21   A.  Or a people door.
22   Q.  Like the one behind you, for instance?
23   A.  Yes.  And then -- yes.
24   Q.  And for the record, I'm talking about the door to the jury
25   room.
```
                                                                    88
```
 1        And when you say a glass front, what kind of grass?
 2   A.  It was tempered glass.
 3   Q.  Okay.  And when he said that he wanted to do that, did you
 4   grant him permission to do that?
 5   A.  I did.
 6   Q.  Okay.  Did you give him any sort of instructions about what
 7   would have to happen to that door come time that he ended his
 8   lease?
 9   A.  I told him that it became affixed to the building, that
10   when he terminated his lease, that it would stay.  And he
11   agreed.
12   Q.  Okay.
13            MS. LIEBER:  Court's indulgence.
14            THE COURT:  What was the day the lease was signed?  Do
15   you have the documents in front of you?
16   BY MS. LIEBER:
17   Q.  And this part of the --
18            THE COURT:  I just asked him the date the lease was
19   signed.
20            MS. LIEBER:  Oh, I'm sorry.
21   BY MS. LIEBER:
22   Q.  I was going to show you this anyway.
23        Looking at this, when was the lease signed, sir?
24   A.  The lease was signed November 17, 2003.
25   Q.  And was it signed by Mr. Jones, and anybody else?
```
                                                                    89
```
 1   A.  Mrs. Jones.
 2   Q.  Did she actually come there in person, herself?
 3   A.  She came at least once.  I don't know if he brought it
 4   signed or if she came.
 5   Q.  Okay.  But you actually -- she came at least one time?
 6   A.  Yes.
 7   Q.  Okay.  And finally, sir, with respect to the overhead door,
 8   how much do those cost, do you know?
 9            MR. BALAREZO:  Objection.
10            THE COURT:  And how would he know?
11            MS. LIEBER:  Well --
12            THE COURT:  Do you know?
```
                              Page 37

20061115 PM.txt

13    BY MS. LIEBER:
14    Q.   Do you have firsthand knowledge of how much an overhead
15    door like that costs?
16    A.   Approximately, yes.
17             MR. BALAREZO:  Objection.
18    BY MS. LIEBER:
19    Q.   And how do you know?
20    A.   I've had other doors like that installed.
21             THE COURT:  Did you pay for them or see the bill?
22             THE WITNESS:  I paid for them.
23             THE COURT:  Okay.  Overruled.
24    BY MS. LIEBER:
25    Q.   And how much does an overhead door like that cost?

90

1    A.   Between 3,000 and $3,500.
2    Q.   Okay.  Thank you very much, sir.
3             THE COURT:  Go ahead.
4             MS. LIEBER:  Oh, I'm sorry.  I said "Thank you very
5    much."  I meant that's all I had.
6             Thank you very much.
7             THE COURT:  That's why she sat down.
8             Okay.                                    *S + AR +*
9                       CROSS-EXAMINATION
10   BY MR. BALAREZO:
11   Q.   Good afternoon, Mr. Schaeffer.  How are you?
12        My name is Eduardo Balarezo.  I think you might recall, you
13   and I spoke a few times over the phone?
14   A.   Yes.
15   Q.   How are you?
16   A.   Fine, thank you.
17   Q.   Mr. Schaeffer, what was the date of this lease that we were
18   talking about?
19   A.   November 17, 2003.
20   Q.   So that was approximately three years ago?
21   A.   Approximately, yes.
22   Q.   Did you, yourself, accept the lease from this Mr. Jones?
23   A.   I did.
24   Q.   Okay.  And you've identified an individual here that is Mr.
25   Jones; right?

91

1    A.   I did.
2    Q.   Okay.  Now, you've also talked about Mrs. Jones.
3         Did you do anything to confirm that the person you are
4    calling Mrs. Jones was, in fact, Mrs. Jones?
5    A.   When they first came in, they came in together.  They
6    were -- I believe there were three people.  There was
7    Mr. Jones, Mrs. Jones, and Lawrence.
8         And I asked for their driver's licenses at that time.  And
9    then I ran a credit check.  And they came back later once the
10   process had been completed, but I'm not sure if Mrs. Jones came
11   back.
12   Q.   Right.
13        But my question -- and I'll try to make it very specific,
14   is, did you do anything to confirm that Mr. Jones and
15   Mrs. Jones were, in fact, married, besides check their
16   licenses?
17   A.   No, that's all I did, yes.         *Lease Holders*
18   Q.   Okay.  So --
19   A.   I mean, and I did run a credit report, but I -- I -- that's
20   all I did, yes.
21   Q.   And the -- the warehouse that you own over in Hampton Park,
22   that is a large -- well, a fairly large --
23             THE COURT:  What town is it in again?
                       Page 38

20061115 PM.txt

24      THE WITNESS:  Capitol Heights.
25  BY MR. BALAREZO:

92

1   Q.  Let me show you or put up on the Elmo, ICE-19.  I think
2   it's already been admitted.
3       Okay.  Do you see that, sir?
4   A.  I do.
5   Q.  Exhibit 19?
6       Now, is this the -- would this diagram, would that
7   represent the entirety of the warehouse that you own in Hampton
8   Park?
9   A.  It does.
10  Q.  And the one that -- the space that we've been talking about
11  is Number 400; right?
12  A.  It is.
13  Q.  As that's -- as we can see, that's at the end of the
14  warehouse?
15  A.  It is.
16  Q.  Okay.  What's -- what's on this side over here?
17  A.  There's a fence.
18  Q.  Okay.
19  A.  And then there's a parking lot.  And then there's a --
20  another industrial building.  I believe it's Con Paper
21  Products.
22  Q.  All right.  Now, the -- the area, it's basically -- let's
23  say after hours, it's pretty desolate, is it not?
24  A.  I would say yes.
25  Q.  It's a parking lot and some other industrial complex;

93

1   right?
2   A.  Yes.
3   Q.  There's not a lot of people coming and going; correct?
4   A.  The tenant next to him sometimes stays open until 7:00 or
5   8:00, yeah, 404 and 408.
6   Q.  And that's the --
7   A.  Snack food --
8   Q.  And that's the Snack Shack; is that right?
9   A.  Yes.
10  Q.  And the Snack Shack is still there?
11  A.  It is.
12  Q.  Now, you are aware, since you're the owner and you deal
13  with these people, that the snack shack, in the past -- I'm not
14  asking about right now -- but in the past, had a lot of
15  break-ins; correct?
16  A.  I don't recall that.  I remember when there was a bicycle
17  shop in unit -- I think it was 412 or 418, they were broken
18  into.  I don't remember the snack shack being broken into, but
19  I remember at least one break in.
20  Q.  And most of these -- most, if not all of those spaces,
21  again, each of these spaces is an individual warehouse; right?
22  A.  Some of them are combined units like 404 and 408, there
23  would be no wall in-between, it would be just open space.
24  Q.  But the front of these were all the same, basically that
25  plate grass that you were talking about; right?

94

1   A.  Right.
2   Q.  Okay.  So, for example, when the bicycle shop was broken
3   into, somebody broke the plate glass and got in; correct?
4   A.  Yes.
5   Q.  Now, you indicated that Mr. Jones told you that he was
6   going to use this as -- what was it, a furniture --
7   A.  I thought he said moving and storage.
8   Q.  A moving and storage company.

Page 39

20061115 PM.txt
```
 9        Did you ever go into the space at the time that Mr. Jones
10   had the lease?
11   A.  Not that I remember, no.
12   Q.  Can you tell this jury that Mr. Jones never had any
13   furniture in that -- in that particular space, Number 400?
14   A.  No, I couldn't say that.
15   Q.  Now, if Mr. Jones was conducting this business, this
16   furniture moving business, and considering that you've had
17   break-ins into your other warehouse spaces, it's not really
18   unusual for him to want to secure his space, is it?
19              MS. LIEBER:  Objection.
20              THE COURT:  Sustained.  Sustained.
21   BY MR. BALAREZO:
22   Q.  Now, you indicated that you, yourself, had some of these
23   overhead doors installed.
24        Were they installed in these other spaces?
25   A.  They were not installed in this building, no.
```
95
```
 1   Q.  Why did you have those installed?
 2   A.  For security.
 3   Q.  To prevent break-ins; correct?
 4   A.  Yes.
 5   Q.  Now, you indicated that you gave the documents that Miss
 6   Lieber showed you, the lease and the brochures, you gave them
 7   to somebody named Katerina?
 8   A.  Yes.
 9   Q.  Do you recall when you gave her those documents?
10   A.  No.
11   Q.  Was it within the last month, or was it within the last
12   year, do you recall?
13   A.  It certainly wasn't within the last year.
14   Q.  Was it before last year, let's say?
15   A.  It was.
16   Q.  Okay.  And that was in response to a subpoena; is that
17   correct?
18   A.  It was.
19   Q.  All right.  And is it not true that you also agreed to
20   allow her agency, the Immigration and Customs Enforcement
21   Agency, to use another location to conduct surveillance?
22   A.  I never did that, no.
23   Q.  Are you -- you're the owner of this location; right?
24   A.  I'm the owner of this building, yes.
25              MR. BALAREZO:  If I could just have one second.
```
96
```
 1   BY MR. BALAREZO:
 2   Q.  Do you know who someone by the name of Larry Gasner
 3   (phonetic) is?
 4   A.  No.
 5   Q.  Do you know what Crystal Management, LLC is?
 6   A.  No.
 7   Q.  How about Hampton Park Center, LLC?
 8   A.  No.
 9   Q.  What is the name of your particular company?
10   A.  9000 Hampton Park Limited Partnership.
11   Q.  And do you know what the building at 401 Hampton Park
12   Boulevard is -- where that is?
13              MS. LIEBER:  Objection.  Beyond the scope.
14              THE COURT:  It is.
15        If you know, you can answer this.
16              THE WITNESS:  I assume it's across the street.  You
17   know, without going out there, I don't know.  I assume 401
18   would be across from 400, I assume.
19              THE COURT:  But you don't have any interest?
```
Page 40

20061115 PM.txt
```
20              THE WITNESS:  No.
21              THE COURT:  Okay.  Go ahead.
22   BY MR. BALAREZO:
23   Q.  No interest, just to clarify that -- because I anticipate
24   the following witness.
25              You have no interest as in you have no ownership interest?
                                                                              97
1    A.  That and this is the only building I own in Hampton Park.
2    Q.  I understand.
3              MR. BALAREZO:  And, Your Honor, actually, can we
4    approach before I continue, just so -- I know it's late.
5              THE COURT:  Just finish it up please.
6              Go ahead.
7    BY MR. BALAREZO:
8    Q.  This person, Katerina, did there come a time when she --
9    when you allowed her to enter the premises at 400 Hampton Park?
10   A.  I may have.
11   Q.  As best as you can, did you, or did you not?
12   A.  I didn't have a key when the tenant was in.  After the
13   tenant left, if she asked me for the key, I would have given
14   her the key.
15   Q.  Well, but my question is -- I'm not asking you to speculate
16   as to whether you did or not.
17              To the best of your recollection, did she ask you to --
18   whether --
19   A.  I do not remember.
20   Q.  All right.  Do you remember speaking to an individual by
21   the name of Mark Glick?
22   A.  Yes.
23   Q.  About a month ago?
24   A.  Yes.
25   Q.  And you're aware that Mr. Glick is my investigator?
                                                                              98
1    A.  I am.
2    Q.  Okay.  And do you recall Mr. Glick asking you questions to
3    that effect, whether or not you allowed agent Katerina -- Gikas
4    is her last name -- to enter the premises?
5    A.  I do.
6    Q.  And do you remember that you told Mr. Glick that you did
7    not give Agent Gikas authority to enter the premises?
8    A.  No.  I said I did not remember.
9    Q.  Now, the -- the inside of 400, it just wasn't one big open
10   space; correct?
11              There was an office --
12   A.  There was an office in the front part, yes.
13   Q.  And that office had doors -- well, the office is what
14   fronted the glass partition at the front; correct?
15   A.  Yes.
16   Q.  All right.  Now, were you aware that Mr. Jones kept
17   furniture in the office?
18   A.  No.
19   Q.  So you had no inspections of the premises while he had the
20   lease?
21   A.  He was there a very short time.  I don't remember going out
22   while he was a tenant.
23              THE COURT:  When did he leave?  When was the tenancy
24   over?
25              THE WITNESS:  April 30th.  I think he was there for
                                                                              99
1    about five months.
2              THE COURT:  April 30, '04?
3              THE WITNESS:  '04.
4    BY MR. BALAREZO:
```
Page 41

20061115 PM.txt
```
 5   Q.  And did you, yourself, enter the premises upon his
 6   departure?
 7   A.  I don't remember, but it's customary for me to go out and
 8   inspect the premises, so he could get his security deposit
 9   back.
10   Q.  And did you give Mr. Jones his --
11   A.  I did.
12   Q.  And part of the reason you gave the security deposit back
13   was because there was no damage to the property; right?
14   A.  Correct.
15   Q.  And when Mr. Jones left the property, he cleared it out; is
16   that correct?
17   A.  I don't -- I don't remember.
18   Q.  Well, if Mr. Jones had left garbage and equipment and all
19   kinds of items in the -- in the location, would you have
20   considered that basically completing his lease and given him
21   all his money back, or would you have taken money for cleanup,
22   let's say?
23   A.  Yes.  Normally, if there's a small amount of debris or
24   stuff left, I still return the security deposit.
25   Q.  Let me ask you this, do you recall whether or not once
```
                                                                    100
```
 1   Mr. Jones left the premises, whether there was a -- any
 2   clothing, any uniforms, anything of that nature?
 3   A.  I do not know.
 4   Q.  Don't know or don't recall?
 5   A.  I guess I would say I don't recall.  I don't remember
 6   anything like that.
 7   Q.  Do you remember whether or not when Mr. Jones left the
 8   premises, if there were any sort of inflatable mattresses or
 9   any sort of equipment like that?
10   A.  I don't recall.
11   Q.  Do you know whether or not when Mr. Jones left the
12   premises, if there were any bags, duffle bags, suitcases,
13   anything of that nature?
14   A.  No, I don't know.
15   Q.  And do you know when Mr. Jones left the premises, if there
16   were any heat-sealing equipment, any wrapping materials,
17   anything of that nature?
18   A.  I do not know.
19   Q.  And when Mr. Jones left the premises do you know if there
20   was --
21           THE COURT:  Can we ask you, do you have any idea what
22   was in it when he left?
23           THE WITNESS:  I have no idea, Your Honor.
24           MR. BALAREZO:  Well, Your Honor, I have to ask those
25   specific ones.
```
                                                                    101
```
 1           THE COURT:  Well, you did.  Thank you.
 2           MR. BALAREZO:  Am I done?
 3           THE COURT:  I hope so.
 4           Anybody else?
 5           MR. BALAREZO:  I may have had one more, but I'll defer
 6   to the --
 7           MR. NORRIS:  I'll defer to Mr. Balarezo.
 8           THE COURT:  Do you want to give him your one question,
 9   that will be fine.  Go ahead.
10           MR. BALAREZO:  I'll turn it into three.
11           THE COURT:  Okay, Mr. Norris.
12           MR. NORRIS:  Thank you.
13                        CROSS-EXAMINATION
14   BY MR. NORRIS:
15   Q.  Good afternoon, Mr. Schaeffer.
```
                        Page 42

20061115 PM.txt

```
16    A.  Good afternoon.
17    Q.  I believe you've mentioned three names in connection with
18    this lease, Mr. Antoine Jones, his wife, I believe you said was
19    Denise Jones, and someone named Lawrence; is that correct?
20    A.  Yes.
21    Q.  Okay.  And Lawrence, would that be Lawrence Maynard?
22    A.  It would be.
23    Q.  Okay.  And the name Adrian Jackson is not anything that
24    you're familiar with in connection with the rental of this
25    unit; is that correct?
                                                                    102
1     A.  No.
2     Q.  And that's not one that you've met --
3              THE COURT:  Wait, no.  Is that correct meaning yes?
4     Correct, you're agreeing with him?
5              The name Adrian Jackson is meaningless to you?
6              THE WITNESS:  Yes, I have no knowledge of him.
7     BY MR. NORRIS:
8     Q.  No knowledge of Adrian Jackson?
9     A.  Correct.
10    Q.  Okay.
11             MR. NORRIS:  Nothing further.
12             MR. MCDANIEL:  No thank you, Your Honor.
13             MR. ACREE:  No, Your Honor.
14
15                             REDIRECT
16    BY MS. LIEBER:
17    Q.  Mr. Schaeffer, very briefly, I'm going to show you -- I'll
18    just put them on the monitor here.
19             THE COURT:  They're not in evidence?
20             MS. LIEBER:  They're not in evidence yet.
21    BY MS. LIEBER:
22    Q.  Photo 61, do you see that?
23    A.  Yes.
24    Q.  And what is Photo 61?
25    A.  It's a driver's license of Lawrence Maynard.
                                                                    103
1     Q.  Is it a photocopy of that driver's license?
2     A.  It is.
3     Q.  Okay.  Now I'm going to show you Photo 62; do you see that?
4     A.  I do.
5     Q.  And what is that?
6     A.  That's a photocopy of a driver's license of Mrs. Jones.
7     Q.  Now, Mr. Schaeffer, were these also kept in your rental
8     file in the ordinary course of business?
9     A.  It was.
10    Q.  Okay.  Were these actual photocopies that you or someone
11    like you made of the driver's licenses presented by Mrs. Jones
12    and Mr. Maynard?
13    A.  It was.
14    Q.  Okay.
15             MS. LIEBER:  Your Honor, at this time I would move
16    Photos 61 and 62 into evidence.
17             THE COURT:  Are these copies from your files?
18             THE WITNESS:  They are, Your Honor.
19             THE COURT:  Any objection?
20             MR. BALAREZO:  No.
21             THE COURT:  Photo 61 and -2 are in.
22             (Government's Exhibits Photo 61 and Photo 62 were
23             received into evidence.)
24    BY MS. LIEBER:
25    Q.  And finally, Mr. Schaeffer --
                                                                    104
```

20061115 PM.txt

```
 1              THE COURT:  Are you going to put them on the screen
 2   though?
 3              MS. LIEBER:  I'm sorry.
 4   BY MS. LIEBER:
 5   Q.  Here's Photo 62; is that right?
 6   A.  Yes, it is.
 7   Q.  Okay.  And that's Denise Jones?
 8   A.  Yes, it is.
 9   Q.  Now Photo 61?
10   A.  That's Lawrence.
11   Q.  Okay.  Thank you.
12       Did you actually see Lawrence around that property from
13   time to time?
14   A.  I did.
15   Q.  Finally, Mr. Schaeffer, when Mr. Jones was the renter of
16   that space, so we're talking now the winter of 2004, did you
17   have a key to that overhead door?
18   A.  I did not.
19   Q.  How did you get the key when he vacated the premises?
20   A.  He took the locks off the door when he left.
21   Q.  Okay.  And it was at that time that you had access to it?
22   A.  It was.
23   Q.  Okay.  Thank you.
24              MS. LIEBER:  Nothing else.
25              THE COURT:  Thank you, you may step down.
```
                                                                    105
```
 1              MR. BALAREZO:  Your Honor, administratively, can I
 2   just discuss one quick issue with Mr. Schaeffer?
 3              THE COURT:  You mean on the stand?
 4              MR. BALAREZO:  No, no, just before he have leaves.
 5              THE COURT:  I don't know.  You can walk out with him,
 6   as far as I'm concerned.
 7              MR. BALAREZO:  I'll let --
 8              THE COURT:  In the meantime, can you get your next
 9   witness?
10              Did you finish?
11              MR. BALAREZO:  Yes, thank you, Your Honor.
12              MS. LIEBER:  My next witness is coming.
13              THE COURT:  Good afternoon.  Welcome back from
14   Atlanta.  We haven't gone anywhere since you left.
15              You're still under oath.
16              MS. LIEBER:  Can I object to that, actually?
17              THE COURT:  I don't mean that we haven't progressed.
18   We're still in the same courtroom --
19              MS. LIEBER:  I think we would all object to that.
20              THE COURT:  Yeah.  Some people are wearing different
21   clothes, I hope.
22              Have a seat.  You're still under oath.  I just wanted
23   to reorient you to where you are.
24              (Special Agent Katerina Gikas, 4:10 p.m.)
25                    DIRECT EXAMINATION (continued)
```
                                                                    106
```
 1   BY MS. LIEBER:
 2   Q.  Good afternoon, ma'am.
 3   A.  Good afternoon.
 4   Q.  Welcome back.
 5   A.  Thank you.
 6   Q.  Now, when last we spoke a few weeks ago, you were talking
 7   about an investigation that was begun by a phone call from ICE
 8   agents in McAllen, Texas; is that right?
 9   A.  Yes.
10   Q.  Okay.  And the first -- just want to step back for a
11   minute, but first, did you ultimately, in the course of your
```
                        Page 44

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
UNITED STATES OF AMERICA        :
                                :        Criminal Case No. 05-386
                                :
              v.                :             Washington, D.C.
                                :        Monday, November 19, 2007
ANTOINE JONES, ET AL,           :             1:40 p.m.
                                :             Day 5
              Defendants,       :
------------------------------x


                    PM SESSION
                   VOLUME TWO
              TRANSCRIPT OF TRIAL
       BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
       UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:        JACK GEISE, Esquire
                           RACHEL LIEBER, Esquire
                           Assistant United States Attorneys
                           555 4th Street, NW
                           Washington, DC   20560
                           (202) 616-9156

For Defendant Jones:       EDUARDO BALAREZO, Esquire
                           400 Fifth Street, NW
                           Suite 500
                           Washington, DC   20001


For Defendant Maynard:     JAMES L. LYONS, Esquire
                           Kellogg, Williams & Lyons
                           1350 Connecticut Avenue, NW
                           Suite 600
                           Washington, DC   20036
                           (202) 496-0722

1  Q.    And as I said, it's your job to lease them out to other

2  businesses, right?

3  A.    Yes.

4  Q.    Who need it for storage or to conduct a business or

5  whatever reason they want to run a warehouse, rent a warehouse?

6  A.    Yes.

7  Q.    If you look at 404 and 408.  There is a business there

8  now, the Snack Shop?

9  A.    Yes.

10 Q.    There was a business called the Snack Shack, was it 2003,

11 2004 when Mr. Jones leased that property?

12 A.    Yes.

13 Q.    And there were businesses in the other locations, right?

14 A.    Yes.

15 Q.    You are aware that some of those other businesses had

16 break insurance?

17          THE COURT:  Had what?

18          MR. BALAREZO:  Had break insurance.

19          THE COURT:  Oh, break-ins.

20          THE WITNESS:  I wasn't aware of that.

21 BY MR. BALAREZO:

22 Q.    This is not the only warehouse that you lease is it?

23 A.    No.

24 Q.    And excuse me one second.

25    (Pause.)

1    You said you were not aware of any break-ins?

2  A.    I was not.

3  Q.    I don't see it on this particular diagram, but where would

4  412 or 418 be?

5  A.    There is no 418.  There's a 412 and 416.

6  Q.    And 412 obviously, would be here?

7  A.    Yes.

8  Q.    Now, do you recall, you've testified previously in

9  relation to this case, right?

10  A.    I did.

11  Q.    And --

12          THE COURT:  Perhaps this would be a good time to tell

13  the ladies and gentlemen of the jury before we get too far

14  afield.

15      A defendant here has been tried before that is of no

16  concern to you.  So when there's this reference every once in a

17  while to people's testimony before or meeting people before or

18  ICE agent, her name is, was Gikas.

19      In any case, the fact that there was a prior trial is of

20  no concern to you and should not enter into or influence your

21  deliberations in any way.  The law requires you to render a

22  verdict based on the evidence presented in this trial and do

23  not be concerned about the fact that this may have been tried

24  before.

25          Okay.  Go ahead.

1            MR. BALAREZO:   Thank you.

2    BY MR. BALAREZO:

3    Q.   Now as I said, you testified previously in relation to

4    this matter, right?

5    A.   Yes.

6    Q.   And you recall testifying Wednesday, November the 15th,

7    2006 in the afternoon.  You may not remember the exact date?

8    A.   I remember being here.

9    Q.   Okay?

10   A.   Yes.

11   Q.   And you testified under oath at that time, right?

12   A.   I did.

13   Q.   Before a jury just like this group of people?

14   A.   I did.

15   Q.   Now, page 93 line 12, question, and I'm asking you the

16   question now?

17            THE COURT:   Wait a·minute.

18         You up with us?

19            MS. LIEBER:   I am, thank you.

20            MR. BALAREZO:   Page 93.

21            THE COURT:   I don't have this.

22   BY MR. BALAREZO:

23   Q.   Do you recall at that time I asked you the following

24   question:  Now, you are aware since you're the owner and you

25   deal with these people that the Snack Shack in the past.  I'm

1  not asking about right now, but in the past had a loss,

2  break-in, correct?

3      And your answer at that time was:  Answer, I don't recall

4  that.  I remember when there was a bicycle shop unit.  I

5  believe it was unit 412 or 418, they were broken in.  I don't

6  remember the Snack Shack broken into but there was at least one

7  break-in.

8      Do you remember that question and answer?

9  A.  Yes.

10 Q.  So when you said you are not aware of any break-ins

11 perhaps you didn't recall, but you previously testified under

12 oath that there had been at least one break-in to your

13 knowledge in that warehouse, right?

14 A.  Yes.

15 Q.  Okay.  And do you recall that now?

16 A.  Yes.

17 Q.  Now, for someone who is about to run a storage business or

18 furniture business in number 400, wanting to put up a security

19 gate, it's not particularly unusual is it?

20          MS. LIEBER:  Objection.

21          THE COURT:  Wait.

22          MS. LIEBER:  How would he know?

23          THE COURT:  I don't know if he knows the people do it

24 ordinarily in your place.

25          THE WITNESS:  Not actually but --

1  warehouse, right?

2  A.   Yes.

3  Q.   All right.  And do you recall whether or not she contacted

4  you to gain access into the warehouse?  Just yes or no for

5  right now?

6  A.   Yes.

7  Q.   Okay.  And that you in fact gave her access to the

8  warehouse?

9  A.   Yes.

10 Q.   When was it, do you recall?

11 A.   After the tenant had vacated the premises.

12 Q.   Without telling me what you said or what she said, just

13 tell us how exactly that came about?  How did you give her

14 access to the warehouse?

15 A.   She had contacted me, she wanted some information about

16 the tenant.  I told her that she would have to subpoena the

17 information which she did.  Then she asked to gain access and I

18 told her that it was not possible until the space was vacant.

19 Q.   Okay.  And as you sit here today, you are certain that you

20 gave her access?

21 A.   Yes.

22 Q.   Okay.  Now do you recall that you testified again in that

23 same proceeding back on November the 15th, 2006 in the

24 afternoon, page 97 line eight.

25     My question to you at that time was this person Katalina,

1 | did there ever come a time she, when you allowed her to enter

2 | the premises at 400 Hamilton Park?

3 | Your answer was I may have.

4 | Do you recall that question and answer?

5 | A. I did.

6 | Q. I may have is a little different in your mind than I did.

7 | Do you agree?

8 | A. Yes.

9 | Q. When you say I may have means you're not sure, is that

10 | right?

11 | A. Yes.

12 | Q. So back on November 15th, 2006 you have testified under

13 | oath in front of a jury and you told them that you may have and

14 | you weren't sure if you had let her in, correct?

15 | A. Yes.

16 | Q. But you're telling these people here today, this jury

17 | here, that you did in fact let her in?

18 | A. Yes.

19 | Q. Now do you also remember that prior, about a month prior

20 | to your testimony in November of '06 some time around October,

21 | '06 you were contacted by an investigator who was working for

22 | me?

23 | MS. LIEBER: Objection.

24 | THE COURT: You want to approach, please?

25 | Excuse us, ladies and gentlemen.

1  show you a few exhibits that have already been admitted into

2  evidence.    This is Government's Number 12, ICE 12.    You see

3  that sir?

4  A.    Yes.

5  Q.    Now that is the inside of the warehouse number 400,

6  correct?

7  A.    Yes.

8  Q.    And you see all of these items that are depicted in the

9  picture?

10  A.    Yes.

11  Q.    You see some, looks to be a trash can over here?

12  A.    Yes.

13  Q.    Okay, looks to be like a chair, right?

14  A.    Yes.

15  Q.    See that, various boxes?

16  A.    Yes.

17  Q.    See those things, see what appears to be a TV of some kind

18  up here?

19  A.    I think that's an air conditioner.

20  Q.    Or an air conditioner?

21  A.    Yeah.

22  Q.    Did you put that there?

23  A.    It had an air conditioner, yes.

24  Q.    Do you see this moving cart right here?

25  A.    Yes.

1    Q.    Do you see these items, looks to be some kind of blankets?

2    A.    Yes.

3    Q.    Blue items, do you see these things kind of hanging look

4    to be like jackets of some kind?

5    A.    Yes.

6    Q.    You see all of these other items that are located there?

7    A.    Right.

8    Q.    Would you care to count how many different items are left

9    in that picture?

10          MS. LIEBER:  Objection.

11          THE COURT:  No, no, no.

12   BY MR. BALAREZO:

13   Q.    When Mr. Jones vacated the premises was this the state of

14   the warehouse?

15   A.    There were something left in the warehouse, but I really

16   don't remember how much.

17   Q.    Well, I'm not concerned about, I'm asking these items that

18   are depicted in these pictures.  Were they there to your

19   recollection when Mr. Jones --

20   A.    I do not know.

21   Q.    Don't know?

22   A.    Do not know.

23   Q.    Okay, government's Number 15.  You see these items.  A

24   little, a big picture.

25   A.    Yes.

1              THE COURT:  Fifteen.

2              MR. BALAREZO:  Fifteen Your Honor, ICE 15.

3   Q.   I don't know if that helps.  Do you see that?

4   A.   Yes.

5   Q.   Do you recall seeing this, what appears to be a blue

6   jacket and a brown overalls at the time that Mr. Jones -- let

7   me finish the question.

8   BY MR. BALAREZO:

9   Q.   At the time Mr. Jones vacated the premises?

10  A.   I do not remember.

11  Q.   Do you see this box looks to be one of those tasty cake

12  boxes right next to it, do you see that?

13  A.   Yes.

14  Q.   You see these little, looks like little stuffed animals

15  with hearts and that kind of thing.  Do you remember if you saw

16  that box there when Mr. Jones vacated the premises?

17  A.   I do not remember.

18  Q.   ICE Number 16?

19             MS. LIEBER:  I would object as to the rest of the

20  pictures that's as to what was left.

21             THE COURT:  He can finish.

22             MR. BALAREZO:  Thank you, Your Honor.

23  BY MR. BALAREZO:

24  Q.   Do you see these blue items, blue perhaps blankets,

25  wrappers?

1              THE COURT:  Ask him the question.

2    BY MR. BALAREZO:

3    Q.   Do you remember seeing that at the time Mr. Jones vacated

4    the premises?

5    A.   I don't remember.

6              THE COURT:  Do you remember anything that was left

7    there when he vacated?

8              THE WITNESS:  No.

9              THE COURT:  Okay, all right.

10             MR. BALAREZO:  Can I just publish the rest?

11             THE COURT:  Yes, you can publish them.

12   BY MR. BALAREZO:

13   Q.   Number 17.  You don't recall that either?

14   A.   No.

15   Q.   Okay, number 18.  A box of plastic brown --

16   A.   I don't remember.

17   Q.   Okay, Number 19.  I don't know if the jury can see that,

18   Number 19.  Seems to be that same box that I just showed opened

19   with some plastic wrapping?

20   A.   I don't remember.

21   Q.   Okay, and let me just show you so that you can see the

22   picture up close because it's a little difficult.

23             THE COURT:  He doesn't remember.  I mean move along

24   please.

25   BY MR. BALAREZO:

1  may have granted access to the ICE agents to go through that

2  warehouse facility.  And today you recall actually letting them

3  in, is that right?

4  A.    Yes.

5  Q.    Why do you have a better memory now?

6  A.    Because I don't remember if I went with them or gave them

7  the key and brought the key back.  But I remember them gaining

8  access after the it was vacated.

9          MS. LIEBER:  Thank you very much, sir.

10          THE COURT:  Okay, thank you.

11          THE WITNESS:  Thank you, Your Honor.

12          (Witness excused.)

13          THE COURT:  Can we bring back the agent then and

14  finish her testimony.

15          THE COURT:  All right, you're still under oath.

16          GOVERNMENT WITNESS KATALINA KAROUSOS

17                  DIRECT EXAMINATION CONTINUED

18  BY MS. LIEBER:

19  Q.    Good afternoon again ma'am?

20  A.    Good afternoon.

21  Q.    I think where we broke before the lunch break you were

22  testifying about the Hampton Park storage facility rented by

23  Mr. Jones?

24  A.    Yes.

25  Q.    Okay, and I just, in the course of your investigation did

Agency?

A.    No, I don't.

3  Q.    When, can you tell when this was submitted, like about the

4  date here this application?

5  A.    November 14th of 2003.

6  Q.    Looking at this rental application for the Summit Circle

7  property, submitted also on November of 2003?

8  A.    Yes.

9  Q.    Did Mr. Jones include this FTN Consultant business as one

10  of his employers on that?

11  A.    No, he did not.

12        THE COURT:  What's the date again?

13        MS. LIEBER:  Do you see that date?

14        MR. LYONS:  Which exhibit is that?

15        THE WITNESS:  It shows move in date as November 11th,

16  2003.  The application may have been signed on a different

17  date.

18        THE COURT:  What's the Exhibit Number?

19        MS. LIEBER:  I'm sorry, that's ICE 2.  I'll show you

20  the lease, ICE 3.  When was that signed?

21  A.    November 18th, 2003.

22  Q.    Again, this was?

23  A.    November 14th, 2003.

24  Q.    Now did there come a time, Special Agent Karousos that you

25  were granted permission to enter, to look around that warehouse

1  facility at 400 Hampton Park Boulevard?

2  A.    Yes.

3  Q.    Tell the jury about how that happened?

4  A.    I found out from the management company that --

5           MR. BALAREZO:  Objection, hearsay.

6           THE COURT:  Yes, sustained.

7           MS. LIEBER:  Your Honor, if I may show what the state

8  of mind, what she did next?

9           THE COURT:  Yes, I'll let her testify to that.

10          Go ahead, overruled.  Sorry.

11          THE WITNESS:  I was informed that Mr. Jones was

12  breaking the lease early and vacating the property.

13          THE COURT:  Who was telling you this?

14          THE WITNESS:  Mr. Schaeffer.

15          THE COURT:  Okay.

16          When was this approximately, do you know?

17          THE WITNESS:  It would have been in the early April,

18  I believe he was vacating April 30th.  And I obtained copy of

19  the letter that he gave.

20  BY MS. LIEBER:

21  Q.    We're talking about now ICE 21.  Is this the letter that

22  you're talking about, April 13th, letter to Mr. Schaeffer from

23  Mr. Jones?

24  A.    Yes.

25  Q.    Okay.  So based on the information you had that he was

1  going to vacate on April 30th, what did you do?

2  A.   I asked if, after Mr. Jones vacated, if we could look in

3  the properties.

4  Q.   Without telling the jury what information you provided to

5  Mr. Schaeffer, did you provide to Mr. Schaeffer information

6  about your investigation?

7  A.   Yes, on a minimal scale.

8  Q.   Okay.  So on April 30th of 2004, did you actually go into

9  that warehouse facility once Mr. Jones had vacated?

10 A.   Yes.

11 Q.   How did you get in?

12 A.   I can't remember if it was earlier in the day, it must

13 have been earlier in the day.  I obtained, I went into

14 Mr. Shaeffer's office and obtained the key.

15 Q.   Now, when you went into that warehouse facility, was it

16 empty?

17 A.   Pretty much except there were some items left behind but

18 it looked empty.

19 Q.   Special Agent Karousos, I'm going to show you what are in

20 evidence now are a series of photographs and also a diagram.

21    The diagram is not yet in evidence.  I'll show this to

22 defense counsel.  ICE 10.

23    Special Agent Karousos, I'm going to ICE Number 10.

24    Do you recognize what ICE Number 10 is?

25 A.   Yes, it's a sketch of the facility at 400 Patrick Park

1  walls is this the items that you've been talking about?

2  A.    Yes.

3  Q.    Did someone, maybe not you, take close up photos of those

4  items?

5  A.    Yes.

6  Q.    I just want to show you a few of those.  You mentioned

7  coveralls, is that what we're talking about?

8  A.    Yes.

9  Q.    That would be ICE 15, I'm sorry.  ICE 16, what is that?

10  A.    Moving blankets.

11  Q.    ICE 17?

12  A.    That's the deflated inflatable mattress with a battery

13  pack.

14  Q.    You talk about this inflatable mattress.  How does this

15  compare to what you saw inside of Myrtle Avenue?

16  A.    It looks similar.  The mattress in Myrtle Avenue was blown

17  up.  But it looked like a similar type mattress.

18  Q.    So this is a type of mattress when you say inflatable

19  mattress?

20  A.    Oh, yes, yes.

21  Q.    ICE 18.  What is that?

22  A.    That's a picture of the box containing the, I guess it's

23  labeled as hand film but like giant rolls of Saran wrap.

24  Q.    ICE 19, is that what we're talking about?

25  A.    That's the wrapping itself, what was inside of the box.

1  Q.   Similarly ICE 20?

2  A.   Yes, that's the same material.

3  Q.   Finally, I want to ask you with respect to that storage

4  facility, do you recall the front window?  I'll show you ICE

5  Number 13.

6  A.   Yes, that's the, actually like a towel covering what would

7  have been like a little garage window but it's covered with a

8  towel.

9  Q.   Is that, lifted up for you, ICE 14?

10 A.   Yes, there's a little note.

11 Q.   Maybe you can take that out, that trailed off.  That's the

12 note.

13     Finally, this is really finally, Special Agent Karousos.

14 Let's talk about what happened.  You have identified the

15 Hampton Park unit.  Did you again not get nothing.  What

16 information you learned, did you get more information from

17 Texas?

18 A.   No.

19 Q.   Okay.

20 A.   Very little.

21 Q.   Okay.  And what was then your focus?  I mean, if we're

22 talking about information, not the actual substance of the

23 information but we're talking about information coming from

24 Texas and information that you're developing up here in your

25 jurisdiction, where was your focus?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


------------------------------x
UNITED STATES OF AMERICA        :
                                :      Criminal Case No. 05-386
                                :
              v.                :         Washington, D.C.
                                :      Monday, November 19, 2007
                                :           1:40 p.m.
ANTOINE JONES, ET AL,           :             Day 5
                                :
              Defendants,       :
------------------------------x


PM SESSION
VOLUME TWO
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:        JACK GEISE, Esquire
                           RACHEL LIEBER, Esquire
                           Assistant United States Attorneys
                           555 4th Street, NW
                           Washington, DC  20560
                           (202) 616-9156


For Defendant Jones:       EDUARDO BALAREZO, Esquire
                           400 Fifth Street, NW
                           Suite 500
                           Washington, DC  20001



For Defendant Maynard:     JAMES L. LYONS, Esquire
                           Kellogg, Williams & Lyons
                           1350 Connecticut Avenue, NW
                           Suite 600
                           Washington, DC  20036
                           (202) 496-0722

1  warehouse, right?

2  A.    Yes.

3  Q.    All right.  And do you recall whether or not she contacted

4  you to gain access into the warehouse?  Just yes or no for

5  right now?

6  A.    Yes.

7  Q.    Okay.  And that you in fact gave her access to the

8  warehouse?

9  A.    Yes.

10  Q.    When was it, do you recall?

11  A.    After the tenant had vacated the premises.

12  Q.    Without telling me what you said or what she said, just

13  tell us how exactly that came about?  How did you give her

14  access to the warehouse?

15  A.    She had contacted me, she wanted some information about

16  the tenant.  I told her that she would have to subpoena the

17  information which she did.  Then she asked to gain access and I

18  told her that it was not possible until the space was vacant.

19  Q.    Okay.  And as you sit here today, you are certain that you

20  gave her access?

21  A.    Yes.

22  Q.    Okay.  Now do you recall that you testified again in that

23  same proceeding back on November the 15th, 2006 in the

24  afternoon, page 97 line eight.

25       My question to you at that time was this person Katalina,

1  did there ever come a time she, when you allowed her to enter

2  the premises at 400 Hamilton Park?

3      Your answer was I may have.

4      Do you recall that question and answer?

5  A.    I did.

6  Q.    I may have is a little different in your mind than I did.

7      Do you agree?

8  A.    Yes.

9  Q.    When you say I may have means you're not sure, is that

10 right?

11 A.    Yes.

12 Q.    So back on November 15th, 2006 you have testified under

13 oath in front of a jury and you told them that you may have and

14 you weren't sure if you had let her in, correct?

15 A.    Yes.

16 Q.    But you're telling these people here today, this jury

17 here, that you did in fact let her in?

18 A.    Yes.

19 Q.    Now do you also remember that prior, about a month prior

20 to your testimony in November of '06 some time around October,

21 '06 you were contacted by an investigator who was working for

22 me?

23         MS. LIEBER:   Objection.

24         THE COURT:   You want to approach, please?

25      Excuse us, ladies and gentlemen.

1    second.

2        (Pause.)

3        MR. BALAREZO:  Your honor, that's all I have for

4    Mr. Schaeffer.

5        THE COURT:  Okay.

6                    REDIRECT EXAMINATION

7    BY MS. LIEBER:

8    Q.    Mr. Schaeffer, good afternoon.

9    A.    Good afternoon.

10   Q.    Mr. Balarezo asked you whether or not Mr. Jones did

11   anything inconsistent with the moving and storage business.  Do

12   you have any knowledge of what he was doing?

13   A.    No.

14   Q.    Any firsthand knowledge of his activities at all?

15   A.    No.

16   Q.    Do you know whether he did anything consistent with moving

17   and storage?

18   A.    I do not know.

19   Q.    Mr. Balarezo also asked you questions about complaints and

20   no information about Mexicans running in and out of there in

21   the middle of the night and all of that into that storage

22   facility.  Do you have any idea what Mr. Jones was doing behind

23   that door?

24   A.    No.

25   Q.    You also testified in the prior trial you said that you

1  may have granted access to the ICE agents to go through that

2  warehouse facility.  And today you recall actually letting them

3  in, is that right?

4  A.    Yes.

5  Q.    Why do you have a better memory now?

6  A.    Because I don't remember if I went with them or gave them

7  the key and brought the key back.  But I remember them gaining

8  access after the it was vacated.

9           MS. LIEBER:  Thank you very much, sir.

10           THE COURT:  Okay, thank you.

11           THE WITNESS:  Thank you, Your Honor.

12           (Witness excused.)

13           THE COURT:  Can we bring back the agent then and

14  finish her testimony.

15           THE COURT:  All right, you're still under oath.

16              GOVERNMENT WITNESS KATALINA KAROUSOS

17                  DIRECT EXAMINATION CONTINUED

18  BY MS. LIEBER:

19  Q.    Good afternoon again ma'am?

20  A.    Good afternoon.

21  Q.    I think where we broke before the lunch break you were

22  testifying about the Hampton Park storage facility rented by

23  Mr. Jones?

24  A.    Yes.

25  Q.    Okay, and I just, in the course of your investigation did

Cilias
Pos 33 thru 39

1

1                    UNITED STATES DISTRICT COURT

1                   FOR THE DISTRICT OF COLUMBIA

2

2      ----------------------------X

3                                  x

3    THE UNITED STATES OF AMERICA  x    Docket No. CR-05386

4                                  x

4        vs.                       x        Washington, D.C.

5                                  x   Thursday, November 16, 2006

5    ANTOINE JONES,                x          2:12 p.m.

6    ADRIAN JACKSON,               x

6    MICHAEL HUGGINS,              x           (Day 13)

7    KEVIN HOLLAND,                x

7                                  x      (AFTERNOON SESSION)

8    Defendants.                   x

8      ----------------------------X

9

10

11                       TRANSCRIPT OF TRIAL

11         BEFORE THE HONORABLE ELLEN SEGAL HUVELLE

12         UNITED STATES DISTRICT JUDGE, AND A JURY

13

14   APPEARANCES:

15   For the Government:          JACK GEISE, ESQUIRE

15                                RACHEL LIEBER, ESQUIRE

16                                Office of the U.S. Attorney

16                                555 Fourth Street, N.W.

17                                Washington, D.C.  20560

3                                        (Jury not present.)

4              THE COURT:  Are we ready to bring in the witness so we

5    can then bring in the jury?

6              MS. LIEBER:  We have gone to get the witness right

7    now.

8              THE COURT:  Did you make inquiry?

9              MS. LIEBER:  Your Honor, I'm sorry.  She was gone when

10   I went out.  I can go do that right now.

11             MR. BALAREZO:  The pictures, what about the one

12   question about the maintenance man, can I ask that or not?

13             THE COURT:  Wait for Miss -- you mean whether or not

14   she talked to a maintenance man?

15             MR. BALAREZO:  Right.

16             THE COURT:  I'll ask her.  We will move it along here.

17             MR. GEISE:  I won't object if you ask her, Your Honor.

18             THE COURT:  Move it along.  All right.

19             Can we get the witness and Miss Lieber to come back?

20   Thank you.

21             (Katerina Gikas resumes the stand.)

22             THE COURT:  Good afternoon, one or two little

23   questions remaining whether or not, have you inquired about the

24   pictures?

25             MS. LIEBER:  I have, Your Honor.  And there are no

                                                                    4

1    pictures of the inside of Summit Circle.

2              THE COURT:  Okay.  Have a seat if you don't mind.  I

3    had one further question.  There were no -- no one took

4    pictures of what was inside, we are now talking Myrtle Avenue

5    on the -- Summit, sorry.

6            MS. LIEBER:  Summit Circle on February 7th.

7            THE COURT:  Correct?

8            THE WITNESS:  Correct.

9            THE COURT:  And second of all, did you ever have

10   occasion, you personally, to talk with a maintenance man

11   associated with that apartment?

12           THE WITNESS:  Yes.

13           THE COURT:  Can you give me an approximate date when

14   you might have had that conversation, or do you recall when you

15   had the conversation with the maintenance man?

16           THE WITNESS:  It would have been at least a week

17   later.

18           THE COURT:  Okay.

19           THE WITNESS:  It was long after that, that weekend.

20           THE COURT:  Anything else?  You now know that she

21   talked to the maintenance man later on, so.

22           MR. BALAREZO:  Could I ask one question?

23           THE COURT:  What is it?

24           MR. BALAREZO:  Why is she talking to the maintenance

25   man a week later if they already went into the apartment?


                                                              5


1            THE COURT:  I don't care.

2            MR. BALAREZO:  I do, Your Honor.

3            THE COURT:  Then ask her.  And then you open the cans.

4    These why's are not useful information.

5            Okay.  Let's bring in the jury.  It's up to you if you

6    want to ask why she would have talked to the maintenance man,

7    then you can establish what the maintenance man told her.

8             (Jury present at 2:17 p.m.)

9             THE COURT:  Good afternoon, ladies and gentlemen.

10            THE JURORS:  Good afternoon.

11            THE COURT:  I hope that you had a good lunch.  Okay.

12   We are ready to proceed.

13            I believe the ball is in your court.

14            You are still under oath.

15            MR. BALAREZO:  Good afternoon again, ladies and

16   gentlemen.

17            THE JURORS:  Good afternoon.

18                         CROSS EXAMINATION

19   BY MR. BALAREZO:

20   Q.  Good afternoon, Agent Gikas.

21   A.  Good afternoon.

22   Q.  Going back to the Summit Street location, I think we have

23   established no drugs, no money found; right?

24   A.  Correct.

25   Q.  Now, you also testified about a vehicle that picked up

                                                                    6

1    somebody and took them to the airport?

2    A.  Yes.

3    Q.  To your knowledge was that vehicle ever stopped?

4    A.  Later that evening, yes.

5    Q.  Okay.  Now, the time that the --

6             THE COURT:  Can we describe the vehicle so, perhaps,

7    we can remember exactly what we're talking about?  What was the

8    vehicle?

3    A.   Yes.

4    Q.   Couple of weeks?

5         And you have testified that you didn't see a lot of

6    commercial activity, I think is your words?

7    A.   Correct.

8    Q.   Now, you yourself were not posted in front of that building

9    24, 7; right?

10   A.   No.

11   Q.   And all you did was see the videotapes?

12   A.   No, I was there in person for some, like a couple hours on

13   several days but not 24, 7.

14   Q.   Did you see every hour, every minute of those videotapes?

15   A.   Yes.

16   Q.   And you are saying that there was not a lot of commercial

17   activity; right?

18   A.   Yes.

19   Q.   Were you aware that the location, at least the purpose that

20   Mr. Jones rented that was for a moving service?  Were you aware

21   of that?

22   A.   I had found out that he, that it was a delivery service

23   that he was, was running out of there, yes.

24   Q.   And the white box truck that you saw deliver those

25   mattresses was seen at that location on several occasions;

                                                                    33

1    correct?                  Start

2    A.   Yes.

3    Q.   Now, you, you never got a search warrant for that location;

4    correct, for the warehouse?

5    A.  Correct.

6    Q.  During these 35 days when you didn't see commercial

7    activity, when you saw Lawrence Maynard go there, and you saw

8    Mr. Jones there a few times, too; right?

9    A.  Yes.

10   Q.  You never got a warrant?

11   A.  Correct.

12   Q.  You waited until, at least according to your testimony,

13   until Mr. Jones left and then you went to Andy Schaefer; is

14   that correct?

15   A.  Yes.

16   Q.  You went to Andy Schaefer and had him let you into the

17   location, is that what you are saying?

18   A.  I asked for consent to, to go into the property and he gave

19   me the key.

20   Q.  So the answer is yes, Mr. Schaefer let you in?  You went to

21   him to let you in and he let you in?

22   A.  He gave me the key.  He didn't -- when you say let me in,

23   it sounds like he opened the door.  He gave me the key.

24   Q.  He gave you have access to the location?

25   A.  Yes.

34

1    Q.  So if Mr. Schaefer had indicated that he didn't remember

2    that --

3              MS. LIEBER:  Objection.

4              THE COURT:  Sustained.

5    BY MR. BALAREZO:

6    Q.  And, when you went into that location, this was supposedly

7   after Mr. Jones had cleared out; correct?

8   A.  Yes.

9   Q.  This is No. ICE 22, which has already been admitted.  This

10  is one of the pictures that you indicated showed the warehouse

11  space at the time that you went in with Mr. Schaefer's consent;

12  right?

13  A.  Yes.

14  Q.  And you indicated all these things were left there.  For

15  example, ICE 25, there was -- going the wrong way -- there was

16  some sort of work clothing that was left; right?

17  A.  Yes.

18  Q.  As you can see right next door there was a whole box of

19  what appear to be valentines type material.  Do you see that?

20  I think you can see the hearts on it.  Stuffed animals of some

21  kind, do you remember that?

22  A.  Yes.

23  Q.  You saw that; right?

24      ICE 26.  There was a whole pack of these moving blankets;

25  right?

35

1   A.  Yes.

2   Q.  That's one -- are these the same packs?  This is ICE 27.

3   It looks a little bit different.  Can you recall if it's two

4   separate packs?

5   A.  I don't know if it's a different angle or two separate

6   packs.

7   Q.  Okay.  Or at least one pack; right?  You said that you

8   found an inflatable mattress with batteries in it, it still

9    seems?

10   A.  Yes.

11   Q.  Right here are the batteries.  And you also indicated that

12   you found a box of what you characterized as shrink wrapping?

13   A.  Right.

14   Q.  Or, in fact, this is just that plastic film that movers

15   wrap furniture with; right, and boxes and that kind of thing?

16   A.  I suppose so.

17   Q.  So when you say that it was shrink wrapping, that's just

18   your characterization; right, because you don't know what that

19   was used for?

20   A.  Correct.

21   Q.  And here is another picture of that same thing.  And you

22   also mentioned a couple of times something about the window

23   having been covered.  And I believe at one point you said he,

24   meaning Mr. Jones, had done this; right?

25   A.  I think I said they and someone, yeah.  I don't know who.

36

1    Q.  They meaning Mr. Jones; right?

2            THE COURT:  She said they.

3    BY MR. BALAREZO:

4    Q.  Well, you have no idea who put that cover on it; right?

5    A.  Correct.  I would presume the current renters, but I don't

6    know for sure.

7    Q.  Can I just show her what I have marked as No. 29.  Can you

8    see that?

9            THE COURT:  It's not on the screen.

10           MR. BALAREZO:  It's just for her.

11          THE COURT:  All right.

12          THE WITNESS:  It's upside down.

13  BY MR. BALAREZO:

14  Q.  Is it?  What is this a picture of?  Can you see it?  Is

15  there a light -- well, can you make out what it is?

16  A.  It looks like another garage window covered with that same

17  stuff that the other window was covered with.

18  Q.  Look at it closely.  Actually it's right there.  Look at it

19  closely.  Can you see both of them?

20  A.  Is it the same one?  I'm not sure.

21  Q.  Look at them.  You tell me, does it appear to be the same

22  one?  Why don't I do this so you can --

23  A.  Yeah.

24  Q.  I'll show you ICE 23 and Jones 29.

25  A.  It looks like the same one.


                                                                37


1   Q.  I'm sorry?

2   A.  It looks like the same one.

3   Q.  And when these, at least --

4           THE COURT:  You want to put it into evidence so we

5   know what are you talking about?

6           MR. BALAREZO:  Sure.

7           THE COURT:  Okay.

8           MR. BALAREZO:  Then I move No. 29 into evidence.

9           THE COURT:  Do you have any objection?

10          MS. LIEBER:  Yes.  I don't have any idea where it came

11  from.

12          THE COURT:  I assume it came from you, the government.

13          MR. BALAREZO:  Subject to connection later, I have no

14   problems with that, Your Honor.

15          THE COURT:  I'm sorry.  I thought it was government

16   produced.  Sorry, no.  Okay.

17   BY MR. BALAREZO:

18   Q.  It appears to be the --

19          THE COURT:  We will have to wait.

20   BY MR. BALAREZO:

21   Q.  It appears to be the same; correct?

22   A.  It appears to be, yes.

23   Q.  Now, your pictures were taken in 2004 when you went into

24   the warehouse?

25   A.  Yes.


                                                              38


1    Q.  All right.  Looking at No. 29 that I showed you, would it

2    surprise you --

3          THE COURT:  No, no, no.  It's not in evidence.  Sorry.

4          MR. BALAREZO:  Well, I can ask her, Your Honor.  I'm

5    not showing it to the jury.

6          THE COURT:  Would it surprise you, if she didn't take

7    it and doesn't know when it was taken, then you can't ask her.

8          MR. BALAREZO:  Very well.

9          THE COURT:  You can put it in later.

10         MR. BALAREZO:  I may be done, Your Honor, if I can

11   have one second.

12   BY MR. BALAREZO:

13   Q.  As far as you know, are all these pictures that we have of

14   the warehouse, are these the extent of all the pictures?

15    A.   Yes.

16    Q.   Okay.  And you indicated that there was an office, which --

17    and this is ICE 20, which is in evidence.  Right?

18    A.   Yes.

19    Q.   You have indicated there was an office over here in this

20    little location where it says office?

21    A.   Yes.

22    Q.   All right.  You didn't take any pictures of the inside of

23    that office?

24    A.   No.

25    Q.   Do you recall that there was furniture stored in that

39

1    office when you went in?

2    A.   No, I don't remember.

3    Q.   Did you go into the office to look at it?

4    A.   I looked at -- yes.

5    Q.   But no pictures were taken of that office?

6    A.   No.

7         MR. BALAREZO:  If I can have just one second, Your

8    Honor.

9    BY MR. BALAREZO:

10    Q.   Agent, what time did you go into the warehouse, do you

11    recall?

12    A.   I remember it being dark.

13    Q.   Was it about 11:00 o'clock at night?

14    A.   I don't recall the exact time, but in the evening sometime.

15         MR. BALAREZO:  Your Honor, I believe that's all I have

16    for the agent.                  S t o p

17          THE COURT:  Mr. Norris.

18          MR. NORRIS:  No questions.

19          THE COURT:  Mr. McDaniel.

20          MR. McDANIEL:  No, Your Honor.

21          THE COURT:  Thank you.  Let's finish up, then.  Maybe

22   the agent would like to do something else.

23          MS. LIEBER:  Your Honor, just a few questions.  Before

24   I do, so as to speed this along, if we can approach about one

25   question I'm going to ask.  But before I do it, I want to clear

                                                                40

1    it.

2           THE COURT:  Fine.  I understand.  Come on.

3           Excuse us, ladies and gentlemen.  Take a stretch.  It

4    won't take us long.

5           (Bench conference.)

6           MR. BALAREZO:  What door did I open up now?

7           THE COURT:  I don't know.  We will find out.

8           I have advice for the government at the end of this

9    trial.  Okay.

10          MS. LIEBER:  The question is the last set of questions

11   about you didn't take any pictures of the office.  I'm going to

12   ask her why did you take pictures of the, some of this other

13   stuff, the coveralls and that sort of thing.

14          THE COURT:  Sure.

15          MS. LIEBER:  The answer to which is because the drug

16   dog came in and alerted on them.  And so I just wanted to clear

17   that now.

18          MR. BALAREZO:  How does that get --

19          THE COURT:  -- when the drug dogs -- you know, drug

20    dogs hit on a lot of things.  If there is any kind of cocaine,

21    even on money that passes hands in lots of places, so --

22          MS. LIEBER:  I didn't know that.

23          THE COURT:  But that doesn't explain why they took

24    pictures of some things and not others.  I don't know what

25    difference it makes whether she took pictures of all these

41

1     things.  That's why I just wonder what we are doing.

2           MS. LIEBER:  Why would you take pictures of overalls.

3     The only reason they took pictures of the overalls as opposed

4     to -- I mean, the air mattresses make sense, the shrink

5     wrapping makes sense.  The overalls --

6           THE COURT:  Did they examine them or take anything out

7     of them?

8           MS. LIEBER:  There was no cocaine found.  And I would,

9     of course, ask that -- obviously, I would ask that follow-up

10    question.

11          MR. BALAREZO:  Your Honor, first of all, was she there

12    when the dog --

13          MS. LIEBER:  Yes.

14          MR. BALAREZO:  -- did it?

15          What's her experience with the dog?  How does she know

16    what the dog does?  Did somebody tell her or did the handler

17    tell her the dog came up positive?

18          I don't know what the dog does when -- does he wag his

19    tail?  Does he point?  I don't know.

20          THE COURT:  I believe he barks.  But we can ask those

21   questions, if you want.  That's fine.  She can say what --

22        MS. LIEBER:  What she saw.

23        MR. NORRIS:  Isn't that expert testimony whether a dog

24   is alerting or just something that dogs do?

25        THE COURT:  But we are not offering it for the truth

42

1    of it.  It only being offered to show why they took these silly

2    pictures of some things and not others.  Then you wanted to

3    make a point about why they didn't take pictures of the office.

4    Here's the reason why they took a picture.  It's not for the

5    truth at all.  The fact the thing was -- it might have alerted

6    or they thought it alerted.  It doesn't matter if there was

7    coke there or not.  That's irrelevant.  So, we're not offering

8    to show that --

9        MR. NORRIS:  It could have meant Timmy was stuck in

10   the well.

11        THE COURT:  Seems to me there is some insinuation they

12   didn't do some arbitrary thing about taking pictures.  And

13   that's why she's doing it.

14        MR. BALAREZO:  She took pictures of everything else

15   except the office.  I mean, I was just wondering why she didn't

16   take a picture.  And I guess she's going to ask.

17        THE COURT:  She can ask also why you didn't take

18   pictures of the office.  I'm going to allow it.  But we will

19   tell the jury that there is no evidence of cocaine found.

20   Okay.  Go ahead.

21        (Open court)

22        THE COURT:  Sorry.  Come on back.

UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

Antoine Jones                                    Jury Trial
DC# 241-912
1901 D Street, SE
Washington, DC 20003
Plaintiff

-V-                                              Civil Action No.  07-

Defendant:
Agent Katerina Gikas, DHS, ICE
  And Unknown Agents

Motion to Supplement Original Complaint Filed *pro se* by Plaintiff

Plaintiff, Antoine Jones, comes before this court to request the Courts to allow the supplemental to attach to the original complaint.

Plaintiff Antoine Jones is currently housed at the District of Columbia Jail in Washington, DC.  Plaintiff Jones has not received any response from the Court or the defendant (or counsel) regarding the matter of Antoine Jones v Katerina Gikas and Unknown ICE Agents.

Plaintiff Jones herewith submits a monetary amount in damages.  Plaintiff is asking to be awarded $5,000,000.00 (Five million dollars) in monetary damages from the defendants for invading the plaintiff's privacy in the illegal entry of Summit Circle apartment, and breaking and entering the Hampton Blvd warehouse, and perjury committed during the Grand Jury trial and trial of *US v Jones, et al. CR-05-0386.*  Plaintiff is suing Special Agent Katerina Gikas and all *unknown* ICE agents who entered Summit Circle apartment and who entered the Hampton Blvd warehouse, all in their individual capacity and their employer.

As noted in Plaintiff's original filing, the correct mailing address for Plaintiff Antoine Jones is:

Antoine Jones
DCDC #241-912
1901 D Street, SE
Washington, DC 20003

Plaintiff requests the Defendant's and/or their counsel make the correct mailing address notation and respond to plaintiff at this address unless notified otherwise by plaintiff.

*Antoine Jones*  12-19-2007

**Complaint filed by Antoine Jones (pro se)**

<u>ICE (Immigration & Customs) Investigation</u>
<u>9719 Summit Circle, Largo, (apartment)</u>   and   <u>400 Hampton Park Blvd, Capitol Heights (warehouse)</u>
<u>Trespassing, Intrusion and Breaking and Entering</u>

**Complaint 1:**

I, Antoine Jones, hereby charge that ICE agents broke the law and violated my constitutional rights, by trespassing and breaking and entering into the apartment which was leased by me located at **9719 Summit Circle, Largo, Maryland** on February 7, 2005.

<u>Illegal Search</u> – Agent Gikas testified in trial, under oath, the ICE Agents went into the Summit Circle apartment without a search warrant. (Agent Katerina Gikas, Thursday November 16, 2006 10:00 a.m. testimony.) Agent Gikas first perjured herself when Mr. Balarezo questioned her, asking her "now, your team never went into Summit Circle, correct, into the apartment itself? Agent Gikas responded, correct (perjury). See trial transcript page 72, lines 13 & 14.

Mr. Balarezo asked her the question again, Did any of your agents go into the apartment? Agent Gikas responded, "I think some did."

Mr. Balarezo then questioned her again, Do you know when they went into that apartment? Her answer: "I'm not exactly sure of the date, it might have been February 7th, the second day. Mr. Balarezo further questioned: "Was that pursuant to a warrant Agent Gikas?" Agent Gikas' replied, "no". He then asked: How did you get into there? She answered: The maintenance man. (This is clearly perjury because it was a Sunday night, the office was closed and no maintenance man was working on Sunday night.)

I therefore submit that the entry and search of the Summit Circle apartment as an illegal entry and search; and hereby moves to suppress evidence from the Summit Circle apartment.

Mr. Balarezo orally moved to suppress evidence from the Summit Circle apartment B3, (see trial transcript page 102, line 16). (Refer to Agent Gikas' trial testimony, Thursday November 16, 2006, 10:00 a.m., pages 72 through 106.)

I further charge that ICE agents broke the law and violated my constitutional rights by trespassing and breaking and entering into warehouse space which was leased by me located at **400 Hampton Park Blvd., Capitol Heights, Maryland**. Katerina Gikas, Special Agent for the US Immigration and Customs Enforcement testified that she and other agents along with a trained dog entered into the warehouse and photographed the contents.

<u>Illegal Search</u> –Before vacating the warehouse, Mr. Schaffer (the property manager) and I went on a walk-through to inspect and make sure the place was cleaned out before he would agree to return the security deposit. The photos presented at trial which were taken by the ICE agents during their investigation show a lot of items (including some Valentine's Day gift baskets). All of these items were in the warehouse while we were still tenants. This demonstrates that the ICE agents went into the warehouse while my lease was still in effect and clearly before the last day or the day after I moved out as Agent Gikas stated in her testimony. When Mr. Schaffer and I conducted the walk-through the warehouse was vacant and completely cleaned out.

Also, Scott, the new tenant moved into the space (May 1, 2004) the day after we moved out of the space. Scott is my witness to collaborate the truth about the "cleaned-out" condition of the warehouse.

GiKAS

20061116 AM

Intimidating
Spectators
iHampton Bivo
P6 43

1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2

3      ----------------------------X

4   THE UNITED STATES OF AMERICA    Criminal Case No.

5       v.                              05-386

6   ANTOINE JONES, et al,

7              Defendants,

8      ----------------------------X   Washington, D.C.
                                        Thurs., November 16, 2006
9                                       10:00 A.M.

10               VOLUME 13  A.M. SESSION
                 TRANSCRIPT OF TRIAL
11     BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
        UNITED STATES DISTRICT JUDGE, and a jury
12

13  APPEARANCES:

14  For the Government:          JACK GEISE, ESQUIRE
                                 RACHEL LIEBER, ESQUIRE
15                               Office of the U.S. Attorney
                                 555 4TH Street, N.W.
16                               Washington, D.C.  20560
                                 (202) 616-9156
17

18  For Defendant Jones:         EDUARDO BALAREZO, ESQUIRE
                                 400 Fifth Street, N.W.
19                               Suite 500
                                 Washington, D.C.  20001
20                               (202) 639-0999

21
    Court Reporter:          Lisa Walker Griffith, RPR
22                           U.S. District Courthouse
                             Room 6409
23                           Washington, D.C.  20001
                             (202) 354-3247
24  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
25
    2


1   APPEARANCES: (Cont'd.)

20061116 AM

1    Q    Right.  When you went to the airport, you knew what you
2    were going to do.  It's not like it was serendipity.  It
3    wasn't coincidence, right?
4    A    Yes.
5    Q    So you didn't have a camera.  You didn't have a video
6    camera, right?
7    A    Right.
8    Q    You don't have a camera [sic] of this car picking up
9    this third person and going to the airport, right?  You don't
10   have a picture of Javier with his ostrich boots going up to
11   the third floor.  You don't have any of that?
12   A    No.
13   Q    Now, your team never went into Summit Circle, correct,
14   into the apartment itself?
15   A    Correct.  PERJURY
16   Q    That you subsequently identified Number Three -- what
17   was the number?  What was the apartment you later identified
18   as being rented by Antoine Jones?
19   A    3B.
20   Q    You never went into that apartment, right?
21   A    I didn't, no.
22   Q    Did any of your agents go into that apartment?
23   A    I think some did.
24   Q    Do you know when they went into that apartment?
25   A    I'm not exactly sure of the date.  It might have been
73


1    February 7th, the second day.
2    Q    Was that pursuant to a warrant?
                              Page 63

20061116 AM

3    A    No, sir.

4    Q    How did they get into there?

5    A    The maintenance men.

6    Q    So, you have an apartment that's rented presumably by

7    Mr. Jones, am I correct there?  You have some interest in

8    that apartment and your law enforcement capacity; is that

9    correct?

10   A    Yes.

11   Q    Did you understand the question?

12   A    Yes.

13   Q    Okay.  You want to see what's going on in the apartment,

14   right?  You're interested in what's going on in there, right?

15   You can't see from outside.

16   A    Yes.

17   Q    So you don't go to a court and get a search warrant; is

18   that correct?

19              MS. LIEBER:  Objection, Your Honor.

20              THE COURT:  Wait a second.  Let's approach.

21              (Bench conference.)

22              MR. BALAREZO:  You are objecting?

23              MS. LIEBER:  Just to, she can testify about what

24   she did.  whether or not she got a search warrant, she didn't

25   do all of this.
       74


1              THE COURT:  He's asking for all this hearsay.

2              MR. BALAREZO:  This is news to me, Your Honor.

3              THE COURT:  They didn't introduce anything that was

4    found there.  I suspect your guy is not going to stand up and

5    say.  If they don't introduce anything, so you have some kind

6    of possible, in a civil action, I don't know.  But what good
                                 Page 64

20061116 AM

7   does it, where are we?

8            MR. BALAREZO:  Your Honor, it just shows the

9   conduct of these investigations of my client.  They're going

10  into an apartment without a warrant.

11           THE COURT:  I don't know that they are or not.

12           MR. BALAREZO:  She just said that they didn't have

13  one.

14           THE COURT:  It is not for the jury to pass on the

15  legality.

16           MR. BALAREZO:  I'm not asking that.  I think the

17  jury should be aware of the steps these people took to

18  investigate my client.

19           THE COURT:  That may be fine.  Maybe the Government

20  wants people to know, but they're not going to be told.  You

21  can't argue the legality of it.

22           MR. BALAREZO:  I'm not doing that.  I'm trying to

23  get the facts out.  I just found out about this.

24           THE COURT:  The more you ask, the more you learn.

25  Sometimes it doesn't actually turn out to be that helpful.
    75


1            MS. LIEBER:  Your Honor, the reason I let it go

2   that far, now I'm going to ask her on redirect what did they

3   see.

4            THE COURT:  What did she see?

5            MS. LIEBER:  Air mattresses, shrink wrap and

6   devotional candles.  I didn't seek to put that in my case

7   because --

8            MR. BALAREZO:  Did she see it?  Was she there?

9   Your Honor, if the Government gave me this information from

10  the beginning, then I would know where I'm going.
                        Page 65

20061116 AM

11          THE COURT:  You are asking for hearsay.  Why are
12   you inviting it?  She doesn't have any first-hand knowledge.
13          MR. BALAREZO:  Your Honor, she was testifying about
14   not first-hand knowledge during the, this is not for the
15   truth of the matter.  This is to show why she did what she
16   did, to show her investigative technique.
17          MR. NORRIS:  If this line of questioning is opening
18   up the credibility, I don't see why that would open the door
19   to what they found from the illegality.
20          THE COURT:  You are suggesting that it is illegal.
21   We have not determined that.  We can't determine that here
22   because it can't be a motion to suppress unless they put the
23   stuff in.  But if you want to know --
24          MR. NORRIS:  They went into the requirements for
25   the search warrant for the sneak and peek investigation.  So,
     76

1    it's already out there.  The fact that these agents follow
2    the letter of the law and get these warrants for sneak and
3    peeks, their credibility is at issue at that point, not what
4    they found illegally or not illegally inside.
5           THE COURT:  First of all, your guy doesn't have any
6    standing here.  But I think it's a terrible mistake to keep
7    on opening all these big fat doors over nothing.  She doesn't
8    have first-hand knowledge.  She isn't there.  So you can't
9    keep asking her what did she learn.  I don't want her to go
10   into what she saw.
11          MR. BALAREZO:  She was not there for a lot of what
12   she testified about.
13          THE COURT:  Why are you going backward?  As far as
14   I can tell, she saw what she saw.  And I don't have any
                              Page 66

20061116 AM

15  problem with the testimony to date.  If you keep talking

16  about this one, they'll be able to bring out what she found.

17  Otherwise we're stopping it.

18          MR. BALAREZO:  Can I at least confirm that they

19  didn't have a warrant and I'll move on then?

20          THE COURT:  She told you.

21          MR. BALAREZO:  Was she the lead agent?

22          THE COURT:  I don't know how much of this argument

23  about her credibility based on some people going into an

24  apartment without a warrant when, first of all, the legality

25  is not before the jury.  So what are you going to make of it?

77

1           MR. BALAREZO:  Your Honor, I would probably then

2  move to suppress whatever was found there.

3           THE COURT:  It has not been introduced.

4           MR. BALAREZO:  If I want to ask the question,

5  they're going to introduce it.

6           THE COURT:  I'm not going to let them.  So you are

7  not going to have any argument about the legality of this

8  search warrant.  Somebody would have to, I'm the only one

9  that can pass on it.  I don't think you can make any argument

10  about this witness' credibility based on some allegation that

11  somebody on her team may or may not have entered with the

12  permission of the maintenance man.

13          MR. NORRIS:  There is all this testimony about what

14  she learned and how it affected the investigation.  I think

15  what is relevant is what she believes about the search, not

16  whether or not it is actually legal.

17          THE COURT:  I don't care what she thinks about the

18  legality of the search, unless you want to bring in

Page 67

20061116 AM

19  everything they found there.  You can't have it both ways.

20  Do you want everything to come in that they found?  Then we

21  can figure out what she believed.

22          MR. NORRIS:  I think just because someone is caught

23  with their hand in the cookie jar does not open the door to

24  what flavor the cookie was.

25          THE COURT:  I don't agree.  You are trying to

        78


1  suggest something that is terribly illegal.  <u>I have not ruled</u>

2  <u>on it.</u>  Who can make that argument?  I don't even know except

3  for maybe your client.

4          But the only way you can argue the legality of what

5  they see is if we let in what they seize.  You can't have it

6  both ways.  You can't argue to this jury the legality.

7          MR. BALAREZO:  The problem I'm having with all

8  this, the paperwork that I got regarding the ICE

9  investigation, everything I saw about what was in that

10  apartment is written as if the, Summit Circle, the

11  maintenance man told us this, the maintenance man told us

12  that.

13          So based on what I've gleaned from this report, I

14  have no idea they're in there with the maintenance man.  Now

15  this witness said I'm there and they want to bring in all

16  these other things.

17          THE COURT:  She's not saying that, listen to her.

18  Do you want to voir dire her whether or not the maintenance

19  man told her, the agents told her?  But you are not going to

20  get it in before the jury.  It is completely inadmissible.

21  If you want it for truth, which you must be --

22          Sustained, move on.

                        Page 68

20061116 AM

23          (Open Court.)

24          THE COURT:  Go ahead.

25          MS. LIEBER:  Your Honor with respect to an
     79


1    instruction, perhaps?

2          THE COURT:  We can think about it later, thank you.

3    BY MR. BALAREZO:

4    Q   Now, with respect to this Summit Circle, which is the

5    only location we're talking about at this point, the

6    information that you had gotten up until this point was that

7    Javier was going to come to collect money, right?

8    A   Yes.

9    Q   Money for drugs in effect is what you understood?

10   A   Money from the proceeds of the sale of drugs, yes.

11   Q   At least to your knowledge, and let's get this out, were

12   you the lead agent, in a way, of this investigation?  Were

13   you in charge?

14   A   This was a phone call that came in --

15   Q   I'm not asking about the phone call.  I'm asking about

16   the ICE investigation from February until May or whenever it

17   was that you left, were you the lead agent?

18   A   Yes.

19   Q   You were in charge of the investigation?

20   A   Yes.

21   Q   You were familiar with all the details of the

22   investigation, right?

23   A   Yes.

24   Q   Up until that point of February the 7th, let's say, when

25   Javier left the location at Summit Circle and the other two
     80

Page 69

20061116 AM

1    individuals left the location at Summit Circle, you never
2    placed Mr. Jones at that location physically, correct?
3    A    Correct.
4    Q    And as far as you know, no money was ever seized at that
5    location, correct?
6    A    Correct.
7    Q    As far as you know, no drugs were ever seized at that
8    location, correct?
9    A    Correct.
10   Q    Now, there were some items that were in that location,
11   is that true, when you went in?
12           THE COURT:  She didn't go in.
13           THE WITNESS:  I didn't go in.
14   BY MR. BALAREZO:
15   Q    Well, as case agent or lead agent, you are aware that --
16           THE COURT:  We discussed this, Mr. Balarezo.  If
17   you want to pursue that question, I've told you.  You'll
18   proceed at your risk.
19   BY MR. BALAREZO:
20   Q    So no money, no drugs, we're clear on that?
21   A    Correct.
22   Q    Now, after that, you began following up on tag numbers
23   and Mr. Jones.  I think you said you went to the apartment
24   and got the lease for the apartment, right?
25   A    Yes.
     81

1    Q    And you found out that Mr. Jones, or at least someone by
2    the name of Jones, rented that apartment 3 B?

Page 70

20061116 AM

3   A   Yes.

4   Q   But you can't say that that's the apartment that Javier

5   and the other Mexicans, whoever they were, were in; is that

6   correct?

7   A   Correct.

8   Q   Either you can or you can't?

9   A   Well, I didn't physically see them go into that door.

10  Q   I don't want your belief?

11          THE COURT:  Let's approach.  Excuse us, ladies and

12  gentlemen.

13          (Bench conference.)

14          THE COURT:  You are trying to insinuate that they

15  have no good basis for fingering 3B.  But if they went in

16  there and found stuff in there, whether or not it is a good

17  or bad search, you are begging for it.

18          MR. BALAREZO:  She already said she didn't see any

19  of these guys go into apartment 3B.  All I, she got the

20  information on Jones.  She can't say it was the same

21  apartment.  She can say it on an assumption.

22          THE COURT:  Not on assumption.

23          MR. BALAREZO:  She never saw it.  No agent saw the

24  three Mexicans go into that apartment.  It's a stupid little

25  point.
82

1           THE COURT:  No, it's not stupid.  They didn't see

2   three people go into 3B.  But they went in there and saw the

3   remains of what people were doing.  It is clear.  So if you

4   want the inference to get in there, you can't keep going at

5   her as if she doesn't know things and then suggest that

6   they're doing something without a basis to connect this

Page 71

20061116 AM

7   apartment to him.  He is clearly associated with your client

8   in this evidence.  It is not going to get any better.

9           MR. BALAREZO:  I don't dispute that.  I'm not

10  disputing that Jones is associated somehow with 3B or that

11  the Mexicans were seen going to the third floor.  All I'm

12  saying is she can't say they were going to 3B.

13          THE COURT:  I think the remains is consistent with

14  every other address, the warehouse, the Myrtle Avenue

15  apartment, the candles.

16          MR. BALAREZO:  The religious candles don't have to

17  be Mexicans.

18          THE COURT:  You can make that argument, the

19  Government can make these other arguments.  So keep

20  suggesting that 3B didn't have the Mexicans in there because

21  then she'll be able to put this stuff in.  Then you'll be

22  able to criticize the tactics but not the evidence that comes

23  in.

24          MR. BALAREZO:  So I can make my decision, can the

25  Government tell us what was found in 3B?

83


1           THE COURT:  Inflatable mattresses, candles, similar

2   to the candles found in two other locations.

3           MS. LIEBER:  Shrink wrap.  I think the bags of

4   clothes were still there just like Myrtle.

5           THE COURT:  It is a pretty similar course of

6   conduct is the problem.

7           MR. NORRIS:  I think the argument is even stronger       *Very*

8   now that she has testified that she was the lead agent.  If    *Important*

9   she authorized this search, which is illegal.

10          THE COURT:  You are assuming something that I have

Page 72

20061116 AM

11  not ruled on.

12       MR. NORRIS:  I understand.  It might be worth the

13  hearing out of the presence of the jury.

14       THE COURT:  Wait.  Let me tell you.  How can we

15  have a hearing unless there is a motion to suppress?  Who has

16  the standing to suppress if they don't introduce the

17  evidence?  Since when do we get to have hearings about

18  evidence?

19       MR. NORRIS:  I think it effects her credibility.

20  If their decision is we're going to do something illegal, we

21  won't use the proceeds of it, but we're going to do it for

22  our own knowledge.

23       THE COURT:  They're saying, she authorized an

24  illegal search.  We'll have to take it up outside the

25  presence of the jury.

84

1       MS. LIEBER:  This is an area I never went into

2  because I was not intending to use this information.  She has

3  testified this was February 7th.  She got the call, the

4  triggering call late in the day on February 6th.  So, the

5  notion that she was the lead agent and she authorized this is

6  nonsense.  It does not go to her credibility.  That's the

7  issue.

8       THE COURT:  Mr. Norris' point is what if they said

9  to her, should we go in there without a search warrant.  I

10  don't know if it is illegal because I don't know enough about

11  facts.  Assuming that is, you can't hold her responsible if

12  nobody asked, just because she got the call and thereby

13  became the lead agent.  I don't buy that.  She has to have

14  some involvement.

20061116 AM

15      We'll take it up outside the presence of the jury.

16  Her credibility in a sense is clearly at issue.  But I think

17  you are going to hear a lot of stuff about what is in this

18  apartment.  I'm not going to let you pick and choose these

19  arguments.

20          MR. GEISE:  Your Honor, I would just say this, if

21  the notion is that someone's credibility is at stake because

22  they authorized an illegal search.

23          THE COURT:  I don't know that it is.

24          MR. GEISE:  I'm just saying he begins to perhaps --

25          THE COURT:  You are assuming.

85

1       We'll let them go to lunch.  We'll only take this

2  outside of the presence of the jury.  If it gets in front of

3  the jury, there are consequences of what they found in there,

4  which is going to be remarkably similar.  So I think you have

5  to figure out whether or not you care about this.

6          MR. BALAREZO:  If I go into the warrant thing --

7          THE COURT:  I'm not going to let you go into the

8  warrant anymore unless we have some basis for Mr. Norris'

9  argument.  Then you have to decide whether you really want to

10  go into it in some fashion in front of the jury to insinuate

11  her people searched.

12          But once you get into her people's search being

13  good, bad or indifferent, the consequences of the search are

14  going to come out too.  That's part of it.  Okay.

15          (Open Court.)

16          THE COURT:  Ladies and gentlemen, we're taking a

17  slightly long lunch.  We have to take up a short legal issue.

18  We hope it's short.  So I'm going to, instead of holding you

Page 74

20061116 AM

19   here, ask you to return please at 2:00.  Have a good lunch.

20   Don't discuss the case and keep dry.

21             (Jury Out.)

22             THE COURT:  Agent, would you take the stand again,

23   just a couple of quick questions.

24             Could you tell us, do you know from your, any of

25   the people on your investigation, did they report to you what
     86


1    they found in the apartment at Summit Circle?

2              THE WITNESS:  What they told me was that, the

3    candles were burning.  They, I believe, saw a money counter

4    and ammunition boxes, cartridges, not cartridges, but empty

5    ammo boxes, ammunition boxes.

6              THE COURT:  Anything else that you recall being

7    told that they saw in there?

8              THE WITNESS:  Inflatable mattresses.

9              THE COURT:  As far as you understand, the

10   maintenance man let them in?

11             THE WITNESS:  Yes.                    civil suit

12             THE COURT:  This was on the 7th?

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.  Mr. Norris, go ahead.

15                        VOIR DIRE

16   BY MR. NORRIS:

17   Q   Good day, Agent Gikas.  So you received a call the

18   previous day on the 6th; is that correct?

19   A   Yes.

20   Q   That's when all your surveillance work began was on the

21   6th, correct?

22   A   Yes.

Page 75

20061116 AM

23   Q   Is it fair to say that, because you received the call,

24   you were the agent that instigated the investigation that

25   followed, the surveillance that day and the surveillance that

87

1    led to Summit Circle?

2    A   The call -- let me back up -- actually my supervisor

3    received from the agent.

4           THE COURT:   What's that person's name?

5           THE WITNESS:   Bill Winter.   *Civil Suit*

6    BY MR. NORRIS:

7    Q   What did Mr. Winter ask you to do in relation to the

8    call you received?

9    A   Well, he got the group together, to organize activity.

10   And it was, you know, informally, cat, you take the lead on

11   this, but the whole group was summoned.   *Civil Suit*

12   Q   And that you take the lead on this, occurred before

13   Javier actually arrived at the airport.   Is that fair to say?

14   A   I honestly don't remember.   I honestly don't remember.

15   We were scrambling that evening just to get ready for the

16   arrival, but it was that day or shortly thereafter.

17   Q   That you took the lead on the investigation?

18   A   Yes.

19   Q   When did the maintenance man and the other agents go

20   into the apartment, if you know?

21   A   I don't know.   I don't know what time.   I was told, I

22   don't know if it was the next day or Monday, that some people

23   went into the apartment and observed those items.

24   Q   Okay.

25          THE COURT:   Did you learn after the fact or before

88

Page 76

20061116 AM

1    the fact?
2              THE WITNESS:  After the fact.  After the fact.
3              THE COURT:  Somebody told you what they saw in the
4    apartment and how they got in?
5              THE WITNESS:  Yes, Your Honor.
6              THE COURT:  Can I see the lease a minute, please,
7    for this apartment on Summit Circle and any other documents
8    that came in?
9              MS. LIEBER:  The other documents also, Your Honor.
10             THE COURT:  Two and three and I don't know what
11   else, two and three, please.
12   BY MR. NORRIS:
13   Q   Now, when you were conducting the surveillance at Summit
14   Circle before you left, that would have been up until the
15   morning of the 7th; is that correct?
16   A   Early, late morning, yes.
17   Q   You actually saw individuals go up to the third floor;
18   is that correct?
19   A   Yes.
20   Q   That's the point you didn't know which apartment, but
21   you knew it was third floor?
22   A   Correct.
23   Q   Was there a discussion amongst yourself and the agents
24   that were with you as to, you know, we wonder which
25   apartment.  We want to know what's in the apartment.  We're
     89


1    curious what was in the apartment?
2    A   We want to know which apartment, yes.
3    Q   And did you also want to know what was going on in the
                              Page 77

4    apartment?

5    A    Well, we pretty much, you know, we were thinking that

6    there was money in the apartment, yes.

7    Q    Okay.  And money, the proceeds of drug sales?

8    A    Yes.

9    Q    And were you also assuming that there could be drugs in

10   the apartment as well?

11   A    Possibly.

12   Q    Was there any discussion that you had as to ways in

13   which you could answer that question, how you could find out

14   what was in the apartment?

15   A    No.

16   Q    Any discussion about the need for a warrant or the way

17   to go in there without a warrant?

18   A    Did I have any discussions?

19   Q    Yes.

20   A    No, I wasn't part of that at all.  No.

21   Q    Do you know how it is the maintenance man came to let

22   the other agents in?

23           THE COURT:  That's hearsay.

24           MS. LIEBER:  I object to this point because if the

25   point is voir dire --
90


1            THE COURT:  I know.  Overruled.

2            What did they tell you after the fact regarding how

3    they got in there?

4            THE WITNESS:  That the maintenance guy had let them

5    in.  There was some discussion about immigration authority,

6    which I'm from the customs background, so I'm not extensively

7    knowledgeable on the immigration authorities we have, as far

Page 78

*Civil Suit*

20061116 AM

8   as, you know, if there is a belief that there are illegal

9   aliens.

10          THE COURT:  This is all stuff that came to you some

11  time after the event?

12          THE WITNESS:  Yes, Your Honor.  I found out about

13  it after.

14          THE COURT:  I have one other question though.  So,

15  when did you piece together who was the lessee of this place?

16          THE WITNESS:  From the registrant of the Cadillac

17  matching one of the renters in that building.

18          THE COURT:  Cadillac?

19          THE WITNESS:  The black Cadillac that picked up the

20  third individual and took them to BWI.

21          THE COURT:  I'm sorry, I'm having some difficulty

22  remembering that in prior testimony.  So a black Cadillac

23  picked up the third individual at BWI?

24          THE WITNESS:  I'm sorry.  When the three

25  individuals fled that location on Saturday afternoon at some
    91


1   time, Javier and one of the other individuals got into the

2   silver Impala and drove off.

3          The third individual was picked up by someone

4   driving a black Cadillac, and that black Cadillac was

5   registered to Antoine Jones.

6          THE COURT:  And that pick-up occurred at the Summit

7   Circle address?

8          THE WITNESS:  Yes, Your Honor.  And it went, the

9   black Cadillac went from the Summit Circle address to BWI.

10          THE COURT:  Okay.  So, that's how you, when you ran

11  those tags on the black Cadillac, that's what got you to,
    Page 79

20061116 AM

12  that revealed Jones's name?

13           THE WITNESS: Yes, I mean the match.

14           THE COURT: All right. Go ahead, Mr. Norris,

15  finish it up.

16  BY MR. NORRIS:

17  Q   When did that occur in terms of running of the tags?

18  A   As soon as they saw the car. Again, I wasn't there at

19  that point, but the agent who actually followed the car to

20  the airport or agents, they would have, we run tags by making

21  a phone call to our central communication.

22           THE COURT: WAILS, I take it.

23           THE WITNESS: Sector, we call it.

24           THE COURT: Okay.

25
     92


1  BY MR. NORRIS:

2  Q   As to the maintenance man, I'm assuming that the

3  maintenance man going into the apartment with the agents was

4  done at the agent's request?

5           MS. LIEBER: Objection.

6           MR. NORRIS: It's hearsay but it's for the purposes

7  of the hearing?

8           THE COURT: Only if somebody told her.

9  BY MR. NORRIS:

10  Q   You were told that the agents asked the maintenance man

11  to let them in?

12           THE COURT: What were you told about this?

13           THE WITNESS: I asked, you know, how did you guys

14  get in. The maintenance man let us in. I don't know what

15  was asked of the maintenance man. I don't know, you know,
                        Page 80

20061116 AM

16   there was a candle burning, and, you know, the candles were

17   left burning.  I don't know.  I don't know.  You know, you

18   are going to have to ask the maintenance man.  I don't know.

19          MR. NORRIS:  Thank you.  Nothing further.

20          THE COURT:  Okay.  Mr. Norris.

21          Mr. Balarezo, anything further?

22          MR. BALAREZO:  Your Honor, number one, we may need

23   to continue this hearing because we have spoken to the

24   maintenance man and he indicated that he never let anybody

25   in.  I can tell you that.
     93

1           THE COURT:  All right.  Do you have any more

2    questions for the witness?  I am going to excuse the agent.

3           MR. BALAREZO:  I think Mr. Norris covered it.

4           THE COURT:  Fine.  All right.

5           That's good.  Thank you.

6           (Witness excused.)

7           THE COURT:  Mr. Norris, I'll hear from you as soon

8    as the agent walks out.

9           I don't really know where we're going except

10   opening doors that I don't see in anyone's interest to open.

11   But that's your choice, not mine.

12          MR. NORRIS:  Your Honor, I think any arguments to

13   be made are Mr. Balarezo's.

14          THE COURT:  Okay.

15          MR. BALAREZO:  Your Honor, I would like, number

16   one, to continue my examination with respect to the procedure

17   of this warrant, or warrantless search that they conducted

18   for various reasons.  As Mr. Norris explained at the bench, I

19   think a lot of it has to do with the conduct of the
                              Page 81

20061116 AM

20  investigation, number one, the steps that they took, why they

21  did certain things that they did, and, quite frankly, how

22  they got to know certain things that they came to know.

23         I've consulted with my client with respect to the

24  Court's indication that if we continue down this road that

25  the things that were found are going to get before the jury.

94

1   I hope I'm not violating attorney/client, but we don't have a

2   problem with that. But I think it's important for us --

3          THE COURT: What is the relevance that some agents

4   may or may not have entered an apartment without proper

5   authority. I don't know whether they did or they didn't. So

6   you can't really argue it to the jury. It seems to me you're

7   asking some, you're trying to make an argument that somebody

8   has done something wrong without a Court ruling.

9          They're not in a position. She hasn't lied. She

10  didn't order it. There is no evidence before me that she

11  either authorized or ordered an unlawful search. There is

12  not going to be any evidence of the search coming in.

13         I don't see, based on the record in front of me,

14  that her credibility is affected one iota. So I don't

15  understand where we're going.

16         MR. BALAREZO: Your Honor, I think her credibility

17  is affected for this simple reason. She has written several

18  voluminous reports, these reports of investigation. She

19  testified at the Grand Jury. At no point, and I know the

20  Government is going to say, well, she wasn't asked, at no

21  point did she mention that they went into the house.

22         In the Grand Jury, she was specifically asked about

23  what was in the apartment. And basically, what she said is

Page 82

20061116 AM

24    that the maintenance man told us that there was -- and I'll

25    quote, this is Page 12 of the March 14, 2006, Grand Jury
      95


1    testimony.

2                THE COURT:  Do you have a copy that I can look at?

3                MR. BALAREZO:  Do you want me to put it on the

4    Elmo?

5                THE COURT:  That's fine.

6                MR. BALAREZO:  I'll have this marked as Hearing

7    Exhibit 1?

8                THE COURT:  Call it Jones, what's the next number?

9                MR. BALAREZO:  27.

10               THE COURT:  Twenty-seven is the Grand Jury

11   testimony of the agent from what date?  Okay.

12               MR. BALAREZO:  March 14, '06, Your Honor.

13               THE COURT:  Fine.

14               MR. BALAREZO:  And here at Page 11, she's asked

15   questions about how -- I'll read it, when you went, when you

16   sort of began to conduct some further investigation of this

17   apartment and what was going on there, did you have a chance

18   to talk to the grounds keeper.  Yes, I interviewed both the

19   property manager and one of the maintenance persons.

20   Question, and what specifically, first --

21               THE COURT:  I'm sorry.  I don't even know where you

22   are.

23               MR. BALAREZO:  I'm right here, Your Honor.  I'll

24   turn it back so the Court can read it.

25               THE COURT:  Bring it up.  I never saw the bottom.
      96


Page 83

20061116 AM

1    Fine.

2              MR. BALAREZO:  I'm sorry.

3              THE COURT:  Could you make sure the agent is still

4    around out there in case I have a question for her?

5              All right.  When you began conducting the

6    investigation -- go ahead.

7              MR. BALAREZO:  Your Honor, if I could have this

8    admitted as an exhibit, or admitted into evidence for this

9    hearing, not just as an exhibit.

10             THE COURT:  Well, it's an exhibit and it's for this

11   hearing, but I don't want to put it in evidence for the jury.

12   All right.

13             Would you remind me.  The silver Impala is

14   registered to whom?

15             MR. BALAREZO:  I think eventually it's going to be

16   shown that it was registered to Guadalupe Barrone.

17             THE COURT:  Any more on that page?

18             MR. BALAREZO:  That's it of that page, Your Honor,

19   but the gist of that is that --

20             THE COURT:  She talks to maintenance?

21             MR. BALAREZO:  You know, that she testified under

22   oath that they asked the maintenance man and the maintenance

23   man told them what happened, you know, which may have

24   happened.  I don't know.  But the fact is now we know that

25   they went in themselves to the apartment, and they're
     97


1    claiming to have seen these things.  So somewhere along the

2    line the truth lies.

3              THE COURT:  Well, I don't know.  You're insinuating

                         Page 84

20061116 AM

4    that what's in her Grand Jury in some fashion is not

5    accurate.  I don't know whether she talked to the maintenance

6    man or she didn't.

7           MR. BALAREZO:  Well, additionally, Your Honor, in

8    those reports, that's what I was getting at, there's at least

9    four that I have, and you saw the fifth, there's absolutely

10   no mention of them having gone into this apartment, which

11   would lead me to question, why are you hiding it?  Why aren't

12   you putting it down?  We went into the apartment and this is

13   what we found.

14          And I think that goes to credibility.  Do they

15   think or does she think that her agents did something wrong?

16   Why are you not documenting the fact that you went into this

17   apartment that you're investigating?  I think that's, and I

18   know the Court's making faces, Your Honor, but that's the

19   gist of it.

20          THE COURT:  I know.  I don't think it goes to her

21   credibility is the problem.

22          MS. LIEBER:  Your Honor, if I may, with respect to

23   the Grand Jury, I purposely did not ask her about what the

24   other agents told her about that because I don't know whether

25   or not it was a legal search.  We didn't sort of run, look at

98

1    all the immigration issues and other possible authority to do

2    so.  In lieu of that, I just didn't ask about it.

3           THE COURT:  Did she talk to a maintenance man?

4           MS. LIEBER:  Yes.

5           THE COURT:  So the, I mean, the problem of her

6    credibility in the Grand Jury, that may be fair game.  But

7    you can ask her if she talked to a maintenance man and

Page 85

20061116 AM
8    learned these things.  It's getting really cumulative whether

9    or not they learned anything from this search.

10             I find the issue of her credibility so attenuated,

11   not the question of her credibility but the relevance of a

12   search, which I'm not in the position to say whether it's

13   legal or not legal, whether it was improper or not improper,

14   as long as we don't have anybody offering the evidence to go

15   in.

16             If she talked to a maintenance man and learned

17   this, we can verify that because that's what goes to her

18   credibility, what she testified under oath.  I don't think

19   that the absence of a discussion of what was seen in there in

20   her reports is sufficiently probative of her credibility

21   because the suggestion is there's something wrong with this

22   search.

23             And the search is really not before me as long as

24   they don't put in the evidence.  So, if you want to ask her

25   whether she ever talked to a maintenance man and learned
     99


1    these things, if she's telling the truth in the Grand Jury.

2    But I wouldn't do it -- you can do it out of the presence of

3    the jury.  Otherwise, you just keep getting more information

4    you don't want.

5             MS. LIEBER:  Your Honor, I would just, just so

6    we're clear, if Mr. Balarezo asks her in front of the jury

7    whether or not she spoke to the maintenance man about what

8    happened in that apartment, I just want to be sure I can then

9    ask her and what did he tell you?  That he has opened --

10            THE COURT:  Right.  It's really a little bit of

11   thin ice here.  If you want to know what the maintenance man

                              Page 86

20061116 AM

12    told her, if she in fact spoke to the maintenance man, I

13    don't see anything about this Grand Jury testimony that's

14    useful to go into.

15          MR. BALAREZO:  Well, I think we should be able to

16    impeach her by omission, Your Honor.  I mean, she's being

17    asked a specific question, and you know, she's, in effect,

18    saying one thing knowing that they got the information

19    another way.

20          THE COURT:  No.  The latter is if you had any basis

21    for that.

22          MR. BALAREZO:  Well, I do because -- we spoke to

23    the maintenance man.  My investigator spoke with him.  He

24    said the guy who worked there as the maintenance man at that

25    time, he never let anybody in, never spoke to an agent.

100

1          THE COURT:  Well, you can ask her if she ever

2    talked to a maintenance man and what she learned from the

3    maintenance man.  All that might do is burn you.  But you're

4    suggesting that something about her learning things from the

5    maintenance man is untrue.

6          I don't know what the maintenance man has to say

7    about what the information that she got from the maintenance

8    man.  The impeachment by omission, the fact that she did not

9    include in her report that they had learned something from

10    looking in the apartment, I think is really attenuated.  I'm

11    not going to let you go into it.

12          If you want to ask her out of the presence of the

13    jury, whether she in fact had a conversation with the

14    maintenance man to try to impeach her Grand Jury testimony,

15    that may go to credibility.  That's the only thing I can see.

Page 87

20061116 AM

16          I'm not the least bit persuaded by the argument

17   that somebody, who was working with her, without her

18   authorization, may or may not have conducted a proper or

19   improper search.  In some way or another it's going to go to

20   her credibility and that her failure to include something in

21   a report, that omission should be used to impeach her, I

22   don't see it.

23          MR. BALAREZO:  Well, Your Honor, if I could get the

24   Government to give me the information of who went in the

25   apartment and make them available for me to talk to.

   101


1          THE COURT:  You have a subpoena power.

2          MR. GEISE:  I'm going to say, not to be more petty

3   than my nature requires me to be, but I think it's fully

4   appropriate what we did here.  I don't think Mr. Balarezo was

5   entitled to ask this witness out of the presence of the jury

6   whether she talked to the maintenance man.

7          If he wants to ask that in front of the jury and

8   find out and live with the result, that's fine.  I think what

9   we did so far is absolutely appropriate.  But I don't think

10   he's entitled to free questions until he finds out what's

11   going to happen.

12          THE COURT:  I agree that, to the extent that she          Civil Suit

13   could have given the Grand Jury false testimony, that's

14   certainly fair game.  But they're representing that she did

15   talk to a maintenance man.  And the problem with all that is,

16   once you open it up, you learn what she learned from the

17   maintenance man.

18          MR. BALAREZO:  I understand, but this is the

19   problem we get when they don't tell us things.  That's why we

Page 88

20061116 AM

20    have discovery.  I know they weren't seeking to introduce the

21    stuff --

22          THE COURT:  They don't have to tell you everything

23    the Government does.  Do they have to tell you everything the

24    Government's going to introduce and everything that is

25    material to the defense?  I don't see that this is --

102

1          MR. BALAREZO:  Well, Your Honor, in this case, I do

2    think it's something that they should have disclosed because,

3    if they saw something as a result of this search which may or

4    may not have been illegal, which caused them or gave them

5    information that they then subsequently used to conduct other

6    investigation, we could argue that it's the fruit of the

7    poisonous tree because of an illegal search initially.

8          So yes, we should have been told that.  Yes, I

9    would have filed a motion to suppress, and we would have had

10   this hearing before the trial.  For them now to say, I can't

11   a get a free question because I can't get free discovery from

12   this witness, that's crazy.  Because they don't tell us these

13   things, so yes, I'm flying blind half the time because I

14   don't know.

15         THE COURT:  You can file any motion you want.

16         MR. BALAREZO:  Then I orally move to suppress.

17   I'll move, I'll file a oral motion asking the Judge to

18   disclose, to have the Government disclose this evidence to

19   us, tell me who these people are, when they went in, what

20   they saw, pictures, the whole thing.

21         I've requested all these things.  I haven't been

22   given them before.  Many times that I've asked the Government

23   give them to me.  So I'm asking for them in front of the

Page 89

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :
     :
        v.             :       Criminal No. 05-386(1) (ESH)
     :
ANTOINE JONES            :

### DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE FROM 9719 SUMMIT CIRCLE, APT. 3B, LARGO MD

Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby respectfully moves to suppress tangible evidence found at an apartment at 9719 Summit Circle, Largo, MD. In support of this Motion, Mr. Jones states as follows:

### FACTS

In February 2004, ICE began an investigation into alleged narcotics trafficking by several Hispanic individuals in Maryland. From this investigation, the government allegedly learned that some Hispanic males at some point were present at 9719 Summit Circle, Largo, MD and that Jones leased that apartment. A stakeout of the apartment led to the viewing of a black Cadillac registered to Jones pick up one of the males and drive him to BWI – Jones himself was never seen.

At some point after the Cadillac left the scene, ICE agents entered the apartment without a warrant and observed air mattresses, shrink wrap and devotional candles. At the prior trial, the government presented evidence of the same type of evidence being located at other locations associated with Jones. The government alleged that these items are common to narcotics trafficking. Thus, the government tried to connect the Summit Circle apartment to narcotics trafficking also.

Because the ICE agents conducted a warrantless search and there were not exceptions to the warrant requirement, any tangible evidence seized and testimony derived from their illegal entry must be suppressed as the fruit of the poisonous tree.

## ARGUMENT

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized ..." U.S. Const. amend. IV. The Supreme Court has consistently held that the Fourth Amendment only prohibits *unreasonable* searches and seizures. *See Maryland v. Buie,* 494 U.S. 325 (1990); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602 (1989).

In evaluating the reasonableness of a challenged governmental action, it is necessary to balance the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *United States v. Villamonte-Marquez,* 462 U.S. 579 (1983); *Delaware v. Prouse,* 440 U.S. 648, 654 (1979). A search of a house, apartment, or office is generally unreasonable without a warrant issued on probable cause. The Court has consistently expressed a preference for the use of search warrants. *See United States v. Ventresca,* 380 U.S. 102 (1965). "Resort to the warrant process, the Court has declared, is to be preferred because it 'interposes an orderly procedure' involving 'judicial impartiality' whereby 'a neutral and detached magistrate' can make 'informed and deliberate determinations' on the issue of probable cause." 1 LaFave, Search & Seizure, § 3.1(b), 548-49 (1987) (citations omitted).

2

In this case, the government presented evidence at trial that Jones leased apartment 3B at 9719 Summit Circle, Largo, MD. The lead ICE Agent, Katarina Gikas, testified at trial that agents on her team went into the apartment without a warrant and purportedly with the consent of a maintenance man:

13    Q    Now, your team never went into Summit Circle, correct,

14    into the apartment itself?

15    A    Correct.

16    Q    That you subsequently identified Number Three -- what

17    was the number? What was the apartment you later identified

18    as being rented by Antoine Jones?

19    A    3B.

20    Q    You never went into that apartment, right?

21    A    I didn't, no.

22    Q    Did any of your agents go into that apartment?

23    A    I think some did.

24    Q    Do you know when they went into that apartment?

25    A    I'm not exactly sure of the date. It might have been

1    February 7th, the second day.

2    Q    Was that pursuant to a warrant?

3    A    No, sir.

4    Q    How did they get into there?

5    A    The maintenance men.

6    Q    So, you have an apartment that's rented presumably by

7    Mr. Jones, am I correct there? You have some interest in

3

8    that apartment and your law enforcement capacity; is that

9    correct?

10    A    Yes.

11    Q    Did you understand the question?

12    A    Yes.

13    Q    Okay. You want to see what's going on in the apartment,

14    right? You're interested in what's going on in there, right?

15    You can't see from outside.

16    A    Yes.

(Trial testimony of Katarina Gikas, Nov. 16, 2006, morning session at 72:13 – 73:10). Agent

Gikas further testified outside the presence of the jury:

13    Q    Now, when you were conducting the surveillance at Summit

14    Circle before you left, that would have been up until the

15    morning of the 7th; is that correct?

16    A    Early, late morning, yes.

17    Q    You actually saw individuals go up to the third floor;

18    is that correct?

19    A    Yes.

20    Q    That's the point you didn't know which apartment, but

21    you knew it was third floor?

22    A    Correct.

23    Q    Was there a discussion amongst yourself and the agents

24    that were with you as to, you know, we wonder which

25    apartment. We want to know what's in the apartment. We're

4

1   curious what was in the apartment?

2   A   We want to know which apartment, yes.

3   Q   And did you also want to know what was going on in the

4   apartment?

5   A   Well, we pretty much, you know, we were thinking that

6   there was money in the apartment, yes.

7   Q   Okay.  And money, the proceeds of drug sales?

8   A   Yes.

9   Q   And were you also assuming that there could be drugs in

10  the apartment as well?

11  A   Possibly.

12  Q   Was there any discussion that you had as to ways in

13  which you could answer that question, how you could find out

14  what was in the apartment?

15  A   No.

16  Q   Any discussion about the need for a warrant or the way

17  to go in there without a warrant?

18  A   Did I have any discussions?

19  Q   Yes.

20  A   No, I wasn't part of that at all.  No.

(Voir Dire testimony of Katarina Gikas, Nov. 16, 2006, morning session at 88:13 – 89:20).

5

Nathaniel Richburg, the maintenance man, testified as follows:

10   Q. Okay. Sorry.

11   Now, Mr. Richburg, did there come a time when you

12   actually went into that apartment in the company of some agents?

13   A. Yes.

14   Q. Okay. Tell the jury how that happened, that you went

15   into the apartment with agents.

16   A. Well, actually, one -- I think it was -- I'm not sure

17   what time it was. They had came to the rental office and they

18   spoke to my manager and my manager called me over the radio and

19   she asked me to come to the office.

20   And I went to the office and she said you need to let

21   them in the apartment. And I went up there into the apartment,

22   you know, opened the door and everything, went in the apartment

23   with them. And they basically was, you know, searching the

24   apartment and stuff like that.

25   THE COURT: Can you give us a date?

1   THE WITNESS: I'm not sure what really, date-wise, you

2   know.

3   BY MS. LIEBER:

4   Q. Do you remember generally, was it around the same time

5   frame that we've been talking about, February of 2004?

6   A. Yeah, yeah. Uh-huh.

6

7       Q. Okay. And did you go in with them at that time?

8       A. Yes.

9       Q. Okay. What did you see when you went in with them at

10      that time?

11      A. The only thing I saw was the blow-up mattress and the

12      candle -- a candle on the breakfast bar. That was it.

13      Q. Okay. Again, was there any other furnishing in that

14      apartment?

15      A. No, there wasn't.

(Trial testimony of Nathaniel Richburg, Nov. 29, 2006, afternoon session at 33:8 – 34:15).  The

testimony of Agent Gikas and Mr. Richburg indicates clearly that the ICE agents went the

apartment without a warrant and conducted a search.

The Supreme Court has determined that a warrantless search of a person's home

does not violate the Fourth Amendment where police officers have obtained the consent of a

third party who possesses "common authority" over the premises. *See United States v. Matlock,*

415 U.S. 164, 171 (1974).  The Court defined common authority as "mutual use of the property

by persons generally having joint access or control for most purposes, so that it is reasonable to

recognize that any of the co-inhabitants has the right to permit the inspection in his own right and

that the others have assumed the risk that one of their number might permit the common area to

be searched." *Id.* n. 7.  Such common authority does not include that of a landlord to consent to a

search of a tenant's locked house or apartment. *See Chapman v. United States,* 365 U.S. 610, 81

S.Ct. 776 (1961); *McDonald v. United States,* 335 U.S. 451 (1948); *United States v. Warner,* 843

7

F.2d 401 (9th Cir.1988); *see also Stoner v. California*, 376 U.S. 483 (1964) (hotel clerk does not have authority to consent to search of guest's room).

Here, the agents could not reasonably have believed the landlord or maintenance man had authority to consent to this search. Under *United States v. Matlock*, 415 U.S. at 171 n. 7, "the authority which justifies third-party consent" rests on "*mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their numbers might permit the common area to be searched" (emphasis added). It is the government's burden to establish that a third party had authority to consent to a search. *See United States v. Rodriguez*, 497 U.S. 177 (1990). The burden cannot be met if agents, faced with an unambiguous situation that Jones had a landlord/tenant relationship with the building manager nevertheless proceed to enter and search the apartment.

In this case, because the circumstances made it clear that the apartment was not subject to "mutual use" by the person giving consent, "then warrantless entry is unlawful . . . ." *Rodriguez*, 497 U.S. at 188-89 (emphasis added). *See also* W. LAFAVE, SEARCH AND SEIZURE § 8.3(g), at p. 267 (1987).

The maintenance man was in the apartment at the request of his manager who apparently was told by the agents that they needed to go in the apartment. Had it not been for the agents' illegal conduct, the maintenance man would not have been in the apartment and in position to see the items he claims he saw. Because the warrantless entry and search into the apartment was illegal, any evidence either tangible or visual, derived from the search must also

8

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EX PARTE BENCH CONFERENCE WITHIN

-------------------------------X

THE UNITED STATES OF AMERICA          Criminal Case No.

                v.                    05-386

ANTOINE JONES, et al,

                Defendants,
-------------------------------X   Washington, D.C.
                                Tuesday, November 6, 2007
                                    9:30 A.M.


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Government:     JACK GEISE, ESQUIRE
                        RACHEL LIEBER, ESQUIRE
                        Office of the U.S. Attorney
                        555 4TH Street, N.W.
                        Washington, D.C.  20560
                        (202) 616-9156


For Defendant Jones:  EDUARDO BALAREZO, ESQUIRE
                      400 Fifth Street, N.W.
                      Suite 500
                      Washington, D.C.  20001
                      (202) 639-0999


Court Reporter:         Lisa Walker Griffith, RPR
                        U.S. District Courthouse
                        Room 6507
                        Washington, D.C.  20001
                        (202) 354-3247

Proceedings recorded by mechanical stenography,
transcript produced by computer.

159

1                    MR. BALAREZO:  Good afternoon, agent.

2                         CROSS EXAMINATION

3    BY MR. BALAREZO:

4    Q    First of all, you gave your name today as Katerina

5    Karousos?

6    A    Yes.

7    Q    Just so the record is complete, you are formerly

8    known as Katerina Gikas?

9    A    Yes.

10   Q    You testified at a grand jury on March 14, 2006 in

11   this case under the name of Katerina Gikas?

12   A    Yes.

13   Q    You previously testified at trial in this case

14   last year, which began October 6 through December

15   something or other under the name of Katerina Gikas?

16   A    Yes.

17   Q    You indicated that you subpoenaed records relating

18   to 9719 Summit Circle?

19   A    Yes.

20   Q    When did you subpoena those records?

21   A    I don't remember the exact date.

22   Q    Did you make any notes?

23   A    I probably have a copy of the subpoena.  I just

24   don't have it with me.

25                    MR. BALAREZO:  Your Honor, I would make a

160

1   request that the government provide that. I don't

2   recall seeing any subpoena.

3          THE COURT: Why would you subpoena? That's

4   what I don't understand. What would you be doing

5   subpoenaing anything. You mean before you went there?

6          THE WITNESS: Are you asking before?

7          MR. BALAREZO: I'm asking you when you

8   subpoenaed the records.

9          THE COURT: Wait. Can we please focus on

10  what happened up to the time of the going into Summit

11  Circle. She didn't subpoena anything I suspect.

12         MR. BALAREZO: That's my simple question.

13  When did she subpoena the lease, the information that

14  she said she --

15         THE COURT: How did you get the lease? You

16  assume it came by subpoena. I don't know that.

17         Do you know? Did you do that?

18         THE WITNESS: Yes, Your Honor. I subpoenaed

19  and went to the management office and requested the

20  records. But it would have been the week after the

21  weekend of February 6, 7, 2004.

22  BY MR. BALAREZO:

23  Q   How do you know that?

24  A   Because that's when we first became aware of that

25  property and we, that's when we first became aware of

1    that property.  So I would have subpoenaed the

2    information after that.

3           THE COURT:  I'm confused by the notion of

4    subpoenaing here.

5           MR. BALAREZO:  I believe she testified that

6    she subpoenaed the lease.  I'm only trying to find out

7    when she subpoenaed the lease.

8           THE COURT:  I know.

9           You don't have subpoena power.  What am I

10   missing here?  Was there a grand jury going on at the

11   time?

12          MS. LIEBER:  Admin subpoenas in drug cases.

13   You can do administrative subpoenas.

14          THE COURT:  Okay, so after the sixth and

15   seventh, you issued an administrative subpoena?

16          Okay.  Sorry.

17          MR. BALAREZO:  Your Honor, may I make a

18   request?  Just to keep this record absolutely clear

19   because I think there are some issues that will be

20   important, can we finish whatever is going on right

21   now?

22          THE COURT:  We're finishing today.

23          MR. BALAREZO:  Can we do this all in one

24   sector, in one part, the 9717 Summit Circle motion?

25   Let Myrtle Avenue finish and then I'll call her as a

162

1    witness.

2              THE COURT:  No, just finish up.

3              MR. BALAREZO:  I don't want to be constrained

4    by what's been said.

5              THE COURT:  You are not constrained.

6              MR. BALAREZO:  Very well.

7              THE COURT:  But I have to see what the

8    relevance is to the motion.  They're constrained by

9    the motion.  This is not a fishing expedition.  But

10   that's fine.  She got the lease some way or another.

11   It came by way of a subpoena.  Go ahead.  I want to

12   finish hearing the witnesses.

13             MR. BALAREZO:  I'm trying, Your Honor.

14   BY MR. BALAREZO:

15   Q   So you can't give me a date that you subpoenaed

16   the lease for 9719 Summit Circle; is that right?

17   A   An exact date, no.

18   Q   Have you reviewed the subpoena recently?

19             MS. LIEBER:  Objection, relevance.

20             THE COURT:  I can't tell.  Go ahead.

21             MR. BALAREZO:  The problem is I can't either,

22   Your Honor, that's why I need to ask.

23             THE COURT:  I know, that's why I'm letting

24   you.

25   BY MR. BALAREZO:

163

1    Q    Have you reviewed the subpoena recently?

2    A    No.

3    Q    Do you have any notes that relate to your

4    subpoenaing of that document?

5    A    Not with me here, no.

6    Q    What prompted the subpoena of the records from

7    9719 Summit Circle?

8              MS. LIEBER:  Objection of the relevance to

9    the motion at issue.

10             THE COURT:  I can't tell.  When did the

11   agents go in there and take pictures at Summit?

12             MR. BALAREZO:  They did not take pictures at

13   Summit.  Maybe it changed this time around but last

14   time there were no pictures taken.

15             THE WITNESS:  Your Honor, are you asking me?

16             THE COURT:  Let's get a date.  I know it was

17   in February '04.  When did the people who worked for

18   you, if you know, go into this apartment?

19             THE WITNESS:  The people I worked with went

20   in, it was either late February 7th or early

21   February 8th early in the morning.  I'm not exactly

22   sure what time.

23             THE COURT:  Had you or anybody that worked

24   for you seen the lease by this point in time?

25             THE WITNESS:  No, I don't believe so.  The

164

1    actual lease?

2              THE COURT:  Yeah.

3              THE WITNESS:  No, I don't believe so.

4              THE COURT:  So, when they entered, nobody you

5    know of that worked for you, had seen the lease?

6              THE WITNESS:  I don't think so.

7              THE COURT:  All right.  So, when you went in,

8    but you don't know, you didn't go in.  All you did in

9    what you testified to is -- all we know from your

10   testimony before is you got a lease, exhibit one.

11             THE WITNESS:  That was after that weekend,

12   yes.

13             THE COURT:  Okay.  And that came by

14   administrative subpoena.

15             So, what do you want to know now?  This is

16   after they did whatever it is you want to suppress.

17   That's what I'm confused about.  That much we have

18   established.  So, she nor her agents as far as the

19   record is going to be at the moment, did not review

20   the lease--

21             Correct me if I'm wrong.

22             --prior to going into the Summit Circle

23   apartment 3-B.

24             MR. BALAREZO:  Can I approach, Your Honor, ex

25   parte so I can just make a brief proffer as to what

1    I'm trying to do here?

2            THE COURT:  Yes, I guess you can.

3            (Ex Parte Bench Conference)

4            MR. BALAREZO:  First of all, I'm just trying

5    to clarify something because there was testimony at

6    trial.  And I've just come into possession of several

7    reports of investigation that this agent made.

8            I think that there is a real problem with the

9    time line that they established here before because I

10   have reason to believe that these agents entered the

11   apartment at Summit Circle on another occasion besides

12   the one where they said that the, besides the time

13   that is the subject matter of the motion to suppress.

14   I'm trying to find out if it was before or after so

15   that I can move to suppress either whatever is before

16   or after.  I just don't know.

17           THE COURT:  You are wasting a lot of time.

18   You can ask her whether she knows.  Right now, I'm

19   trying to focus on -- if I suppress it once you don't

20   have to worry about it coming in a second time.

21           MR. BALAREZO:  It depends on when it was.

22           THE COURT:  No, they're not going to come

23   through back door if I said it was wrong on the 7th, it

24   be wrong thereafter.

25           All right.

166

1          (Open Court)

2          THE COURT:  Do you know, did you or anybody

3   else enter that apartment any other time besides late

4   February 7 --

5          MR. BALAREZO:  Your Honor, I object.

6          THE COURT:  Overruled.

7          --or the eighth of February.  Do you have any

8   knowledge of anybody entering that apartment on behalf

9   of law enforcement at any other time?

10         THE WITNESS:  No.

11         THE COURT:  I'm not going to spend forever

12  here.

13         MR. BALAREZO:  Your Honor, I'll take that and

14  I'll sit down and wait for my motion to question her.

15  And I'll ask that the agent be on call for me to call

16  her.

17         THE COURT:  You can be on call.  I want to

18  hear the last person now on this.

19         You are finished.  You don't have anything

20  else.  Can you wait outside while I hear the other

21  person?

22         Can I clarify a thing or two here?

23         Can she sit outside just a minute?  We're

24  going to finish the evidence if I can help it.

25         MS. LIEBER:  I have one redirect question

167

1    based on Mr. Lyons' question about Myrtle Avenue.

2              THE COURT:  Quick, yes.

3                   REDIRECT EXAMINATION

4    BY MS. LIEBER:

5    Q    Mr. Lyons, Mr. Maynard's attorney, asked you

6    questions about entering the Myrtle Avenue property

7    the day after the sneak and peek in the company of the

8    resident manager.  Do you remember that?

9    A    Yes.

10   Q    What did that resident property manager say to you

11   about why he was doing a walk-through with you?

12   A    There is apparently something in the lease, I

13   suspect in all Maryland leases, that states that if

14   there is any suspicion of criminal activity that the

15   lessee is in violation of the lease.

16   Q    Did that particular rental manager explain that to

17   you?

18   A    Yes.  He was explaining that's how, that's why he

19   was allowing us to walk through with him.

20             THE COURT:  But you didn't see or do anything

21   different that day than the day before?  All your

22   observations were the same except that some things

23   were not there anymore?

24             THE WITNESS:  Yes, Your Honor.

25             THE COURT:  Just for clarification here, on

168

1    the time that they entered Summit, she does not know

2    what was seen or not seen anyway.   The subject of the

3    suppression is they took some pictures and made some

4    observations.

5          MS. LIEBER:  Observations only.

6          THE COURT:  But that is what would be

7    suppressed.

8          MS. LIEBER:  Right.  No photos.

9          THE COURT:  Thank you.

10          Could you step down.  Don't discuss your

11    testimony.

12          MR. LYONS:  I have a couple of questions as a

13    result of this last question by the prosecution.

14          MS. LIEBER:  Your Honor, that was redirect

15    tied specifically to an area that I didn't go into the

16    first time around.

17          THE COURT:  I know.  Let's go ahead.  You can

18    ask.

19                    RECROSS EXAMINATION

20    BY MR. LYONS:

21    Q   You are talking about the resident manager.  Is

22    that Mr. William Kelly at Remax?

23    A   It was Remax.

24    Q   Isn't it a fact that you asked when you went in there

25    and said you had to get into the apartment --

169

1    A    I'm sorry.

2    Q    To the premises, I'm talking about Myrtle Avenue

3    now.

4    A    Okay.

5    Q    The lady said well, I'm going to have to check

6    with the tenant.  You indicated in effect, the tenant

7    is not available, well I'm going to have to check with

8    the owner.  You checked with the owner and got the

9    owner's permission?

10    A    I believe I had checked with the owner first.  And

11    the owner directed me to the real estate agent and

12    told, I had tracked down the owner first.  I had

13    already talked to the owner.  And the owner directed

14    me to the real estate agent.

15    Q    It is your testimony that Bill Kelly or the

16    resident manager or whoever it was that let you in,

17    that he was the one that came up with initially this

18    business about the lease?

19    A    Yes, of course.

20            MR. LYONS:  No further questions.

21            THE COURT:  Thank you.

22            Would you wait outside.

23            (Witness excused)

24            (William Winter, witness for the government,

25    was sworn.)

1                    DIRECT EXAMINATION

2    BY MS. LIEBER:

3    Q    Good afternoon, sir.

4    A    Good afternoon.

5    Q    Would you please introduce yourself to the Court.

6    A    My name is William Winter.  W. I. N. T. E. R.

7    Q    Sir, how are you employed?

8    A    I'm employed by U.S.  Immigration and Customs

9    Enforcement.

10    Q    What is your current position title?

11    A    I'm on temporary duty to the Department of Justice

12    as the Associate Director of OCDETF program, OCDETF

13    executive office.

14    Q    Can you give the letters?

15    A    Organized Crime Drug Enforcement Task Force.

16    Q    How long have you been a law enforcement agent?

17    A    More than 20 years.

18    Q    Specifically back in the winter say February

19    specifically of 2004, where were you assigned?

20    A    I was assigned in Baltimore.

21    Q    Was that also for Immigration and Customs

22    Enforcement?

23    A    Yes.

24    Q    How long had you worked for ICE in Baltimore as of

25    February of 2004?

171

1            THE COURT:  Or its predecessor?

2            THE WITNESS:  I worked in Baltimore since

3    1996, I think, January of '96.

4    BY MS. LIEBER:

5    Q    In February of 2004, did you have a particular

6    leadership position for ICE in Baltimore?

7    A    Yes, I was a group supervisor.

8    Q    What does that mean?

9    A    Basically, you are supervisor of a group of agents

10    and at the time I had the airport narcotics group.

11    Q    The Baltimore Washington International Airport --

12            MR. BALAREZO:  Objection.

13            THE COURT:  Because it's leading?

14            MR. BALAREZO:  It is, Your Honor.

15            THE COURT:  It is not objectionable to talk

16    about the Baltimore Washington Airport.  Overruled.

17    BY MR. GEISE:

18    Q    Special Agent Winter, let me direct you

19    specifically to a premises, an apartment, 9719 Summit

20    Circle,  apartment 3-B in Largo, Maryland.  Are you

21    familiar with that property?

22    A    Yes.

23    Q    I want to specifically direct your attention to

24    the weekend of February 6, 7 and 8 of 2004.  Were you

25    part of a team that investigated potential illegal

1   happenings in that apartment?

2   A    Yes.

3   Q    Specifically, did you, did there come a time -

4   well, first of all, tell the Court, did you actually

5   do any surveillance of that property?

6   A    Yes, I was involved in some surveillance of that

7   property.

8   Q    Give the Court a sense of what the surveillance

9   team was like in the hours from February 6 to

10  February 8 of 2004? Was it around the clock

11  surveillance? Give the Court a sense of what the

12  surveillance was like.

13  A    It was armed the clock surveillance.  And it was

14  for multiple groups, from the SAC Baltimore.

15  Q    You say SAC, S. A. C?

16  A    Yes, Special Agent in Charge that would be the

17  Baltimore field office of ICE.

18  Q    In the course of that surveillance, did you

19  yourself personally take part in some stint

20  surveillance on that apartment?

21  A    Yes, I did.

22  Q    I'm going to fast forward to a particular point in

23  time.  Were you part of a decision about, that was

24  made trying to investigate what was going on inside

25  the apartment as opposed to outside?

174

1    A    Yes.

2    Q    Who did you talk to about that?

3    A    We spoke to the maintenance person first, he put

4    us in contact with someone who represented the

5    apartment complex.

6    Q    I want to break that down a little bit.  Where

7    were you, well, first of all, did you personally have

8    a conversation with the apartment complex rental

9    manager?

10    A    Over the phone, yes.

11    Q    Where were you when that telephone conversation

12    took place?

13    A    In the rental office at Summit Circle.

14              THE COURT:  Who did you talk to over the

15    phone?

16              THE WITNESS:  It was someone who was involved

17    in the building, I guess management, the properties

18    manager for Summit Circle.

19    BY MS. LIEBER:

20    Q    Sitting here today, do you recall the name of the

21    person you spoke to on the phone on February 7?

22    A    No, I do not.

23    Q    Prior to your speaking with this rental manager

24    person, did the maintenance person have a

25    conversation, do you know?

1    A    I believe he did, yes.

2    Q    Could you hear the conversation?

3    A    No.

4    Q    Could you see the maintenance person having a

5    conversation on the phone?

6    A    I think he had a conversation before, at several

7    point during the night.  But I think at some point,

8    yes, he had a conversation in my presence.  But it was

9    in the office.  I didn't really hear what he was

10    saying.

11    Q    Who gave you the telephone, who handed you the

12    phone to talk to the rental manager?

13    A    The maintenance person, Mr. Richburg.

14    Q    Is it Nate Richburg?

15    A    Yes, Nate Richburg.

16    Q    Specifically, what did you tell the rental manager

17    about your intention for that property?

18    A    I told him as little as possible.  I told him that

19    there was a criminal investigation and there was a

20    drug investigation and that I wanted to see if we

21    could get consent to get into the apartment.

22    Q    Okay.  Why would you tell the rental manager as

23    little as possible?

24    A    For the security of the investigation.

25    Q    What does that mean?

176

1    A    I didn't want the people that we were

2    investigating to know that we were investigating them.

3    Q    Based on what you told the rental manager about

4    your suspicions about illegal activity, did you say

5    drugs, money, what specifically did you tell him?

6    A    We told him it was a drug investigation.

7    Q    Based on what you told him, what did the rental

8    manager tell you about whether or not you could be

9    allowed into the apartment?

10   A    I don't remember the exact conversation but I

11   believe it went back and forth.  In the end, I told

12   him that we would just look for contraband.  We

13   wouldn't remove any items in the apartment.  I think

14   the word "contraband" is what I used, meaning drugs.

15   Q    Have you ever actually yourself seen the lease to

16   9719 Summit Circle apartment 3-B?

17   A    No.

18   Q    Did the rental manager talk to you about the

19   lease?

20   A    He mentioned if there was illegal activity going

21   on in the apartment that they could be voided a lease.

22             THE COURT:  They could be what?

23             THE WITNESS:  Void.

24             THE COURT:  I don't understand.

25             THE WITNESS:  They would be in violation of

177

1   the lease.

2   BY MS. LIEBER:

3   Q   Was that the authority that he cited to you in

4   allowing you to actually go in and look around for

5   contraband in that apartment?

6   A   Yeah, that was what he said.  I don't recall if he

7   actually told me that we could go in the apartment or

8   whether, I know that he, the phone went back to

9   Mr. Richburg, and then, shortly thereafter he let us

10  into the apartment.

11  Q   When you went into that apartment, did you take

12  anything from the apartment?

13  A   No.

14  Q   What was your intent when you went into that

15  apartment?

16  A   The intent was to look for drugs.  We were on the

17  apartment for a long period of time.  I didn't want to

18  leave there without, I was concerned that there was a

19  large amount of drugs in there.

20  Q   What was this concern based on?

21  A   Based on information that I had received from,

22  during the investigation.

23  Q   Just so we all know which search scene we're

24  talking about, first of all, did you see any drugs or

25  weapons in the apartment?

178

1    A    No, there were no drugs, no weapons.  We saw empty

2    weapons boxes and some ammunition.

3    Q    Did you see anything else in the apartment of

4    note?

5    A    There was air mattresses.  And there was, in one

6    of the closets, there were several duffle bags.

7    Q    Were they empty or full?

8    A    Empty.

9    Q    Anything else that you recall being in there?

10   A    There was one of the rooms had some rubber bands

11   and some plastic wrapping.

12          MS. LIEBER:  That's all I have, thank you.

13          THE COURT:  Mr. Balarezo.

14                    CROSS EXAMINATION

15   BY MR. BALAREZO:

16   Q    Good afternoon, agent.

17   A    Hi, how are you?

18   Q    I'm fine thank you.

19        You know Agent Gikas, right, or Karousos now?

20   A    Yes.

21   Q    You were her supervisor back at that time?

22   A    At the time, yes.

23   Q    The time I'm talking about is February 2004,

24   right?

25   A    Yes.

179

1    Q    You said you had been with the Baltimore office

2    since 1996; is that right?

3    A    That is correct.

4    Q    How long had you been a law enforcement officer?

5    A    Since 1987.

6    Q    1987 to 2004, that's about 17 years?

7    A    Yes.

8    Q    So, in 2004 then it's accurate to say that you

9    were familiar with the process for obtaining a search

10   warrant?

11   A    Yes.

12   Q    And what it took to get search warrant?

13   A    Yes.

14   Q    Just to cut to the chase, at no point did you

15   obtain a search warrant for the apartment known as 97

16   something Summit Circle, I forget.

17           THE COURT:  The Summit Circle apartment.

18   BY MR. BALAREZO:

19   Q    The Summit Circle apartment that we're talking

20   about.

21   A    No.

22   Q    At the time that you, you personally were involved

23   in physical surveillance of the apartment, right?

24   A    Some of the time, not all of the time.

25   Q    So the answer is yes, you were involved?

180

1    A    Yes.

2    Q    When did your involvement in the actual physical

3    surveillance of that apartment begin?

4    A    It would have been late Friday night, which would

5    have been the fifth.

6    Q    Now, let me ask you this before we go down that

7    route.  Are you more certain of the date as in the

8    number or are you certain of the day as in the Friday,

9    Saturday, Sunday?  What are you more certain of?

10    A    It was the evening that the gentlemen arrived into

11    town and we followed them to the Summit Circle

12    address.

13    Q    That's nice, but answer my question.  Are you more

14    certain --

15            MS. LIEBER:  Objection.

16            THE WITNESS:  I believe it was Friday night.

17            MR. BALAREZO:  My question again, in case you

18    didn't understand, was are you more certain of the --

19            THE COURT:  He said he was more certain that

20    it was Friday night.

21            MR. BALAREZO:  He did not answer my question,

22    Your Honor.  I would like to have the question

23    answered if I could.

24    BY MR. BALAREZO:

25    Q    Are you more certain that it was the day of the

1    week, as in Friday, Saturday, Sunday, Monday, Tuesday,

2    Wednesday, Thursday?  Or are you more certain of the

3    date as in the number?

4  ·  A    I believe it was Friday the 5th.

5    Q    So you are more certain of the day; is that what

6    you're saying?

7    A    I know it was Friday.

8    Q    Okay.  Friday the fifth.

9          Now, how did you become involved with

10   surveillance on Friday the 5th?  And we're talking

11   about Friday, the 5th, 2004, right?

12   A    Yes.

13   Q    How did you become involved in the physical

14   surveillance?

15   A    We got information from our office in Texas.  We

16   did a surveillance at the airport.  They gave us

17   information about a certain individual that was flying

18   into the Baltimore Washington International.  We

19   followed them.  I picked them up at the airport.  I

20   think we followed them up to Arundel Mills Mall.  And

21   then, to the Summit Circle address.

22   Q    The information that you got from the McAllen

23   office was that an individual wearing ostrich boots

24   and ostrich belt-- do you remember that?

25   A    I believe it was ostrich boots was mentioned, yes.

1   Q   Let's talk about him.  The information you got

2   from McAllen was that that individual was coming from

3   Texas to Maryland to pick up money, correct?

4   A   I don't know if it was definitely money.  There

5   was talk about a truck that was loaded with drugs that

6   was, had left a couple days prior to that.

7   Q   Would you have any reason to know why Agent Gikas

8   testified that --

9           MS. LIEBER:  Objection.

10          THE COURT:  Sustained.

11  BY MR. BALAREZO:

12  Q   You were Agent Gikas' supervisor, right?

13  A   Yes.

14  Q   You were familiar with the information she

15  received back in February regarding what the

16  individual in Texas was going to do in Maryland,

17  right?

18  A   I'm familiar with the information.

19  Q   You've read her reports of investigation, right?

20          MS. LIEBER:  Objection, you can't cross-

21  examine this witness with what the other agent --

22          THE COURT:  He may have read them, I don't

23  know.

24          Are you arguing the probable cause for this

25  search or what?  I don't get it.  That's the problem.

183

1          MR. BALAREZO:  There is none.  I don't think

2    there is any question about that, Your Honor.

3          THE COURT:  I don't know that that is the

4    government's position here.

5          MR. BALAREZO:  Of course not.

6          THE COURT:  But maybe we want to ask him

7    whether he --

8          MR. BALAREZO:  I asked him if he had read her

9    reports of investigation.

10          THE COURT:  Before the search here or after?

11          MR. BALAREZO:  Let me get to this and make

12   this easy for everyone.

13   BY MR. BALAREZO:

14   Q    During the periods that you personally conducted

15   surveillance, you, Agent Winter, you never saw any

16   narcotics, right?

17   A    No.

18   Q    You never saw any large amounts of money, did you?

19   A    No.

20   Q    You never saw Antoine Jones hand off anything to

21   anybody else, correct?

22   A    No, I never did.

23   Q    You never saw anyone hand off anything to Antoine

24   Jones, right?

25   A    No.

184

1    Q    Besides perhaps some shopping bags from some store

2    in Arundel Mills, you never saw any of the individuals

3    that you were observing going into the apartment,

4    bring in any large duffle bags, correct?

5    A    I don't believe there was any.

6    Q    Let me back up.

7    A    I didn't witness it, no.

8    Q    Did you personally see anybody go into that

9    apartment?

10    A    No.

11    Q    Were you told that other people were going into

12    the apartment?

13    A    There was, yes, I was told there were people going

14    in and out of the apartment.

15    Q    Who told you?

16    A    At the time, who ever was on points of the

17    surveillance.

18    Q    Was Agent Gikas one of those people who told you?

19    A    No, I don't believe she was ever on point.

20    Q    Wasn't she the lead agent at that time?

21    A    Yes.

22    Q    But she wasn't on point?

23    A    No, not necessarily.

24    Q    What were you told about the apartment as far as

25    people coming or going?  Were you told anything like

1   that?

2   A    No.  I know there was just some people had gone

3   in.  They had gone back to Arundel Mills Mall.  They

4   went back into the apartment.  Some people had come

5   out and used the cell phone.

6   Q    Those people, who ever came out to use the cell

7   phone, there was never any information provided to you

8   that a truck had come and unloaded at the apartment,

9   right?

10  A    No.

11  Q    There was no information provided to you about

12  anyone coming into the apartment with large duffle

13  bags of any kind, right?

14  A    No.

15  Q    Or anyone coming out of the apartment with large

16  duffle bags of any kind, right?

17  A    No.

18  Q    In fact, you never received any information from

19  any source saying that anyone in that apartment was

20  bringing out drugs, or money, correct?

21  A    No.

22  Q    Now, at some point you indicated that you decided

23  that you wanted to see inside the apartment, right?

24  A    Right.

25  Q    This was because you were conducting a drug and

186

1   money laundering investigation and you wanted to

2   obtain evidence; is that correct?

3   A   No, I think -- no, that's not correct.

4   Q   You didn't go in there just because you had

5   nothing else to do, right?

6   A   No, I went in there because we were on

7   surveillance and there was information that there was

8   a large amount of drugs coming to that area.  We

9   didn't have continuous surveillance on that apartment

10  prior to the fifth.  And the truck had left a few days

11  before that.  And I was concerned that there was a

12  large amount of drugs in there.

13  Q   Right.  So my point again, the question is, the

14  reason you wanted to go see the inside of the

15  apartment was because you wanted to find some evidence

16  of either large amounts of money or drugs, right?

17  A   I wanted to find a large amount of drugs is what I

18  was looking for, yes.

19  Q   The reason you wanted to go into the apartment was

20  because you either wanted to find evidence of drugs

21  and/or money related to the drugs.  Is that correct?

22  A   I think at the time that I was in the apartment, I

23  was looking for drugs, sir.

24  Q   So you were not concerned about money at that

25  time?

1          MS. LIEBER:  Objection, asked and answered,

2     three times.

3          MR. BALAREZO:  If he could answer the

4     question I won't ask it a fourth.

5          THE COURT:  You were looking for drugs.  Go

6     ahead and answer it.

7          THE WITNESS:  At the time we went into the

8     apartment, we were looking for drugs.

9     BY MR. BALAREZO:

10    Q   My question was, prior to your going to the

11    apartment, at the time that you decided, in your

12    words, that you wanted to see inside the apartment.

13    Do you remember you testified to that a few minutes

14    ago?

15    A   Well, we were doing surveillance at the apartment

16    to gain evidence, yes.

17          THE COURT:  I would like to see exhibit three

18    from her testimony please.

19    BY MR. BALAREZO:

20    Q   Let me back up a little.  Before going into the

21    apartment, you had no direct evidence of narcotics, of

22    drugs, right, I mean, you had not seen any, you hadn't

23    seized any, right?

24    A   Only the information that we received.

25    Q   Talking about direct, like physical evidence,

186

1    right?

2    A    No.

3    Q    You didn't have any physical evidence relating to

4    the money or anything that you had heard about, right?

5    A    No.

6    Q    So the reason you wanted to go into the apartment

7    was to see if you could find, in your words, drugs?

8    A    Correct.

9    Q    So you wanted to look for evidence, right?

10   A    Drugs are the evidence, yes.

11   Q    So the answer is yes?

12   A    Yes.

13   Q    At no time did you go to a magistrate or to a

14   judge in any court --

15           THE COURT:  That we know, everybody agrees.

16   That is uncontested.

17           MR. BALAREZO:  Very well.

18           THE COURT:  We wouldn't be here if that was

19   the case.

20   BY MR. BALAREZO:

21   Q    Why did you not go to a judge or a magistrate to

22   get a search warrant for the apartment?

23           MS. LIEBER:  Objection.

24           MR. BALAREZO:  Goes to bad faith, Your Honor.

25           THE COURT:  I don't think I care about bad

1    faith.  They didn't have a warrant.

2              MS. LIEBER:  Why is it relevant?  What is his

3    rationale for not going to the magistrate judge is not

4    relevant.

5              THE COURT:  Probably not.  But I'll let him

6    answer it if he can.

7    BY MR. BALAREZO:

8    Q    Why did you not get a search warrant for the

9    apartment?

10   A    Most of it was on logistics.  It was a Saturday

11   night.  And I would have had to keep people out all

12   the rest of the weekend until Monday to obtain a

13   search warrant.  So I was trying to, I wanted to get

14   basically consent to see what was in the apartment.

15   Q    In your 17 years as a law enforcement agent, you

16   become aware that there are means by which you can get

17   an emergency warrant or search warrant, right?

18   A    I wasn't aware of them, being able to get one over

19   the weekend.

20             THE COURT:  In your year's experience though,

21   when you say you wanted a consent, you got a consent

22   from whom?

23             THE WITNESS:  From the apartment complex.

24             THE COURT:  Well, I don't want to be

25   sarcastic but the apartment complex does not talk.

1    Who were you getting quote "consent" from?

2            THE WITNESS:  It was an individual who

3    Mr. Richburg put me in contact with, represented as

4    someone who was the apartment manager, complex

5    manager.

6            THE COURT:  I would like to take a break

7    right now and excuse the witness.

8            Could you step outside.

9            (Witness excused).

10           THE COURT:  I don't want to spin wheels if I can

11   help it.

12           You may have witnesses on this.  I don't see

13   your legal argument on Summit Circle.  I can rule now

14   if you want.  I don't see it at all.  I am not

15   prepared to hold that they can go to quote, a landlord

16   or resident manager and get consent under these

17   circumstances for a search.

18           I don't think the lease supports your

19   argument.  I don't think the law in Maryland supports

20   your argument.  I'm troubled by it.  And we're

21   spending a lot of time.  I don't see what more

22   testimony I need on that.  I've heard what I heard.

23           And Myrtle Avenue there is a warrant, a sneak

24   and peek.  Frankly, he could have done that here.

25   There is no exigency whatsoever.

1          I'll give you a tentative ruling but there is

2    no more.  You can tell me why I'm legally wrong but I

3    don't need any more.  I understand what happened here.

4    I think it is uncontested.

5          As to Summit Circle, there are observations

6    in there.  The law is very clear and you would agree,

7    I'm sure, that a landlord cannot consent.

8                MS. LIEBER:  Unless.

9                THE COURT:  Well, unless, but the law does

10   not say just because the landlord thinks that, he is

11   given some information by some agent.  And we don't

12   know who the quote, "landlord" is here.  That there

13   could be drug activity that the Fourth Amendment goes

14   out the door.  I won't hold that.

15         If you want me to be more explicit about it

16   and write about it at all, I will.  I think that

17   cannot be the law.  Just because the lease says, I

18   think this is a legal analysis of the agents premised

19   on an erroneous view of the law.  You cannot now say

20   that they relied on the landlord.  For instance, under

21   all law, and Maryland law for instance, you can't just

22   go in and find somebody without any notice in

23   violation of the lease, and basically seize the

24   tenancy or open it up.  That's what you are saying

25   here.  He could have gotten a warrant.

192

1          I am very bothered by this.  You can sit on

2     it.  But I don't see I need any more testimony.  It is

3     exactly what he says.  He wanted consent.  It was not

4     logistically impossible, for one thing, we all know

5     that.  But that is not important.  What is important

6     here is, they go to a maintenance person who puts them

7     in touch with, I'm not even sure whether we have

8     somebody who is, quote, really in the position to give

9     consent under the lease.

10          But I also don't agree that that is possible

11    under the lease in the provisions that you've cited to

12    me.

13          I think it's an erroneous view of the law to

14    say under the lease, I can consent as long as I, the

15    landlord, let's assume that's who we're talking to and

16    I don't even know that, believe based on what I'm

17    told, there could be drug activity going on.  That

18    means any agent can go to any landlord and say drug

19    activity, you have a standard lease, I go in.

20          So I'm prepared to grant that motion.  You

21    can sit on it.  I don't want any -- I don't know.

22          Do you have any other testimony?

23          Do you, Mr. Lyons?

24          The government can think about it and argue

25    some more.  I've told them what I think about this.

1  But he is not going to say anything, his facts are the

2  facts.

3          MS. LIEBER:  Your Honor, it may be that I can

4  get a witness here from the rental company to say this

5  is what I knew.  There is more to it than they knew.

6          THE COURT:  Look at the lease.  Where does it

7  say that if you think there is drug activity going on,

8  you can let in any old officer at all?

9          MS. LIEBER:  Provision 19, lessor's right of

10  entry.

11          THE COURT:  "The lessor reserves the right to

12  enter the premises at reasonable times--" whatever

13  that is, "--for purposes of inspecting the conditions

14  and making repairs."  That didn't happen.

15          So we have to go to the next one.  "Reserves

16  the right to enter the premises to protect life and

17  prevent damage to the premises."

18          That in my view does not allow the agents to

19  say drug activity going on.  The landlord has rights

20  to terminate the lease, but he has to give notice to

21  the guy.  You don't cite, the one case you cite

22  doesn't have much to do with that.  I think that if

23  the law says you can't rely on a landlord to give

24  consent, it does not change by virtue of those two

25  lease provisions, 19.

1        So, Mr. Lyons, do you have any more witnesses

2   on the Myrtle?  That's a different situation.

3        MR. LYONS:  No, not on Myrtle.  Just for the

4   record, I believe that Your Honor's analysis and

5   ruling would be equally applicable to what happened at

6   Myrtle.

7        THE COURT:  No, we got the warrant.  That

8   makes all the difference in the world.

9        MR. LYONS:  I'm talking about the next day

10  when they went in supposedly --

11       THE COURT:  Nothing happened, there is no

12  suppression.

13       MR. LYONS:  That's what I'm saying.  We

14  didn't move to suppress because the government didn't

15  put any evidence in on the 28th.  I'm assuming that

16  they're not going to try to put that in, in this

17  trial.

18       THE COURT:  No, but everything they saw that

19  was relevant to the trial came out on the 27th.  So I'm

20  not worried about the 28th.  Whether they went in or

21  didn't go in, you can only suppress if they got

22  something and they didn't.

23       The 27th, they got a warrant.  They certainly

24  don't have any problem with that.  I can rule on that,

25  too.

1              But have we concluded the testimony?  That's

2    really what I want to know.

3              Ms. Lieber, you can think about it over

4    night.  I don't read the lease the way you read it.

5    You are giving a carte blanche to somebody.  Even

6    assuming it is a party to the lease, who I assume

7    would be the only person who really has any authority

8    here, but otherwise you could take over a lease any

9    time, any where and any place.

10             That's not state law.  So, I don't know why I

11   should interpret the lease to allow them to basically

12   say, okay, anybody I want to let in who says there is

13   drug activity, I'll let you in, law enforcement.  I'll

14   give you tonight to come up with some better law.

15             But there is a tentative ruling on Myrtle, I

16   have no problem upholding it.  I think any facial

17   deficiency in that is not attributable to the agents

18   here.  So any argument that Grimm didn't put in enough

19   information in the warrant I find, it will be covered

20   by Leon.  And she got a warrant, a sneak and she got

21   an extension.  And by the time she got the extension,

22   she, one, had very good reason to believe that Maynard

23   had abandoned it.

24             So, therefore, so I hold factually I credit

25   her that she had a basis to think he had abandoned.

1    Moreover, even when that's legally the right

2    conclusion, i.e., I can go in there under an extension

3    when I learn that he has abandoned it.  She relied in

4    good faith on her conversation with chambers.  I think

5    that's totally proper.

6         But I think it is sufficient, the fact that she

7    has reliable information at the time of the, before the

8    second 30-day requirement or if the 30-day notice had

9    expired.  She has good information that he has abandoned.

10   And that is uncontradicted.

11        And two, when she goes to the magistrate's

12   chambers, I think that's, I would agree entirely with the

13   legal conclusion and advice that she was given.  And she is

14   entitled under Leon to rely on it.  So, I will not,

15   we'll take up the North Carolina tomorrow morning.

16        If you have anything to add on this.  I've

17   looked at this very carefully.  I looked at the lease.

18   You start with the premise you can't, the landlord

19   can't consent.  The only thing that could get you out

20   of that is the lease itself.  And I don't think that

21   we can do it the way they did it here.

22        But I don't also, I don't see that it has any

23   taint effect on anything that the government -

24        You can address that as well, Mr. Balarezo.

25   I don't see that it taints anything.  There was all

1  kinds of independent information that was available

2  all the way up the line, which includes they never

3  used the mattresses and the duffle bags to get any

4  other affidavits.

5       You can look but I've carefully considered

6  it.  I think we'll have to resume tomorrow.  We'll

7  have argument on North Carolina which is a more

8  complicated legal issue.

9       Subject to the government coming up with a

10  better argument than they have managed to do so far,

11  Mr. Jones' motion on Summit in terms of what they

12  quote "saw," i.e., seized, that doesn't mean the

13  comings and goings of the surveillance.  That's not

14  suppressed.  They saw people come and go out of there.

15  They knew who rented the place.  They knew the guy

16  with the ostrich.  But that's different.  But what

17  they saw inside the apartment, I will preclude them

18  from testifying about.

19       I will deny Mr. Maynard's motion as to

20  Myrtle.

21       MR. BALAREZO:  Your Honor, you raised an

22  issue with that.

23       THE COURT:  You can look tonight and tell me

24  about it.

25       MR. BALAREZO:  I will with that, but there is

1    one that comes to mind right now.  That's the - I'm

2    sure the government will correct me, Nate Richburg, I

3    think testified at trial that he went in and saw

4    certain things.  My understanding is that he went in

5    with these agents at the time that the, quote, rental

6    manager allowed entry.

7         THE COURT:  I don't know factually, but the

8    government will have to address that.  If he is there

9    as part of what I suppressed, he can't get in there

10   any better than, I mean, he could have gone by

11   himself. But if he's there hand in hand with the

12   police, I don't think they're going to argue that

13   Richburg can come in and say what the police can't

14   say.

15        MS. LIEBER:  No.

16        MR. BALAREZO:  Right, that's -- So I would

17   again amend my motion to include suppression or

18   exclusion of whatever Richburg has to say regarding --

19        THE COURT:  The contents of this place, if it

20   is part and parcel.  He had no independent information

21   other than walking in there with the police.  I would

22   agree.

23        MS. LIEBER:  He went in twice.  He went in

24   independently.

25        THE COURT:  Before?

199

1          MS. LIEBER:  I think it was before.  He was

2     changing a filter.  I forget what it was.  He had been

3     in twice.

4          THE COURT:  He testified, right?

5          MS. LIEBER:  He did.

6          THE COURT:  He is from North Carolina.

7          MR. BALAREZO:  Michael Bob?

8          THE COURT:  He is free to testify as to any

9     independent observations, but not the ones that were

10    made on that weekend.

11         MR. BALAREZO:  Your Honor, I'm still unclear as

12    to the letter from the jail cell.

13         THE COURT:  No, I'm saying I'm going to wait.

14    I don't quite get their probative -- I don't see it is

15    probative.  Then I have to weigh whether it is too

16    prejudicial.  But until I hear these two confidential

17    informants and your cross examination, I can't judge

18    its probativeness.

19         MR. BALAREZO:  Should I address the issue of

20    the 16th tomorrow?

21         THE COURT:  Tell me now.  That's the date,

22    Friday.

23         MR. BALAREZO:  Yes.

24         THE COURT:  Thank you.

25         We'll excuse everybody, we'll resume tomorrow

200

1    at quarter to 10:00 for argument on North Carolina.

2    You are welcome to tell me anything else you have but

3    I'll make a formal ruling.  Thank you.

4              (Whereupon, at 4:26 P.M., the hearing

5    recessed.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| OFFICER WHITEHEAD | | | | |
| By Mr. Geise | 24 | | | 87 |
| By Mr. Lyons | | | 45 | |
| | | | | |
| CHARLES SOLE, JR. | | | | |
| By Mr. Geise | 92 | | | |
| By Mr. Lyons | | | 112 | |
| | | | | |
| KATARINA KAROUSOS | | | | |
| By Ms. Lieber | 132 | | 167 | |
| By Mr. Lyons | | 145 | | 168 |
| By Mr. Balarezo | | 159 | | |
| WILLIAM WINTER | | | | |
| By Ms. Lieber | 170 | | | |
| By Mr. Balarezo | | 178 | | |

**EXHIBITS**

| | PAGE |
|---|---|
| GOVERNMENT: | |
| Sole 5 | 110 |
| No. 1 | 136 |
| No. 3 | 141 |

202

## CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Lisa Walker Griffith, RPR             Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTOINE JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 07-1068 (RJL) |
| | ) |
| v. | ) |
| | ) |
| KATERINA GIKAS, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FEDERAL DEFENDANTS' MOTION TO
## STAY CIVIL PROCEEDINGS DURING PENDENCY OF CRIMINAL TRIAL

Defendants, through undersigned counsel, respectfully moves for a stay of this case until

conclusion of the pending criminal trial in which plaintiff is a defendant. Antoine Jones, Register

Number, DCDC 241-912, *pro se* in this action ("Plaintiff"), is a pretrial detainee incarcerated at

the District of Columbia Jail in Washington, D.C., who presently is pending trial on the charges

of conspiracy to possess with intent to distribute cocaine and cocaine base. Plaintiff's trial on

these charges is presently set to begin on November 13, 2007. See Criminal Action No. 05-386

(ESH), Docket # 389.   On or about June 15, 2007, Plaintiff commenced this action against

Katerina Gikas ("Federal Defendant Gikas"), a U.S. Immigration and Customs Enforcement

("I.C.E.") agent and several unidentified I.C.E. agents ("Unidentified Federal Defendants")

allegedly involved in searches of an apartment occupied by plaintiff in Largo, Maryland, and of

warehouse space rented by plaintiff in Capitol Heights, Maryland.  The alleged illegal searches

complained of by plaintiff in the case before this Court were undertaken as part of the above

criminal prosecution pending trial.  Plaintiff has filed numerous pretrial motions to suppress

evidence, including a motion to suppress the evidence obtained in the search of his apartment at

9719 Summit Circle, Apt. 3B, Largo, Maryland, one of the acts described in plaintiff's civil

Complaint.  Criminal Action No. 05-386 (ESH), Docket # 373.  The Court in that case has not

yet ruled on this motion to suppress evidence, nor has it made any rulings with regard to the

search of warehouse space described in plaintiff's civil complaint.

Argument

The courts enjoy broad discretion to "grant or deny stays so as to 'coordinate the business

of the court efficiently and sensibly.'"  McSurely v. McClellan, 426 F.2d 664, 671 (D.C. Cir.

1970) (footnote omitted).  The United States recognizes that such discretion "may be abused 'by a

stay of indefinite duration in the absence of a pressing need.'"  Id.  But where, as here, there is a

compelling governmental interest in staying the proceedings and the request for a stay is

specifically tailored to protect that interest, the granting of a stay is appropriate.  As the courts

have recognized:

> There is a clear-cut distinction between private interests in civil
> litigation and the public interest in a criminal prosecution, between
> a civil trial and a criminal trial . . . .  The very fact that there is a
> clear distinction between civil and criminal actions requires a
> government policy determination of priority:  which case should be
> tried first.  Administrative policy gives priority to the public
> interest in law enforcement.  This seems so necessary and wise that
> a trial judge should give substantial weight to it in balancing the
> policy against the right of a civil litigant to a reasonably prompt
> determination of his civil claims or liabilities.

Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir. 1962), cert. denied, 371 U.S. 955 (1963).[1]  In

---

[1] This case has been consistently cited with approval.  See e.g., Gordon v. FDIC, 427
F.2d 578, 580 n.5 (D.C. Cir. 1970);  McSurely v. McClellan, supra, 426 F.2d at 671 n.49;
Founding Church of Scientology of Washington, D.C., Inc. v. Kelley, 77 F.R.D. 378, 380-812
and n.4 & 5 (D.D.C. 1977);  Capital Engineering & Mfg. Co., Inc. v. Weinberger, 695 F. Supp.

deciding a motion for a stay of civil proceedings pending disposition of a criminal prosecution on related matters, "a judge should be sensitive to the difference in the rules of discovery in civil and criminal cases." Id.

Plaintiff is requesting relief in the form of an "internal investigation on these I.C.E. agents" as well as money damages in the sum of $1,000,000. *Pl. Compl.* at 4. The facts alleged in his Complaint are the subject of an ongoing criminal prosecution and pending trial. Of particular relevance here is the proscription against pre-trial discovery of statements of a governmental witness. Criminal discovery rules generally preclude the discovery or inspection of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500. See Fed. R. Crim. P. 16(a)(2). Section 3500, in turn, provides that "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States, which was made by a Government witness or prospective Government witness (other than a defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500. In short, the statements of government witnesses or prospective government witnesses are not discoverable prior to trial.

The boundaries of criminal discovery established by Rule 16 and 18 U.S.C. § 3500 reflect important public policy considerations and are not subject to waiver. As the District of Columbia Court of Appeals emphasized in overturning a criminal trial court's expansion of those boundaries in Middleton v. United States, 401 A.2d 109, 117 (D.C. 1979), the bounds of

---

36, 41
(D.D.C. 1988).

3

discovery established by

> Rule 16 and the Jencks Act . . . represent careful attempts to
> balance the competing interests of society and the accused in a
> manner consistent with the objective of truth while being faithful
> to the mandate of the Constitution, and any venture beyond their
> limited principles must be subject to close scrutiny.

Middleton, 401 A.2d at 117.  See also United States v. Spagnuolo, 515 F.2d 818, 821 (9th Cir.

1975); Robinson v. United States, 361 A.2d 199, 201 (D.C. 1976) (expedients undertaken to

circumvent Rule 16 will not be condoned); United States v. McMillen, 489 F.2d 229 (7th Cir.

1972), cert. denied, 410 U.S. 955 (1973) (protection against the examination and discovery of

witnesses prior to trial under Fed. R. Crim. P. 16 and 18 U.S.C. § 3500 is sacrosanct, and breach

of those rules by district court in a criminal proceeding entitles government to relief by

mandamus).  It was for these reasons that the Fifth Circuit barred civil discovery in Campbell v.

Eastland, supra.

The Federal Defendants currently ask only that civil proceeding be stayed until the

conclusion of the criminal trial in this case.  The McSurely court, which rejected the notion of a

blanket stay without a limited time factor, implicitly sanctioned this kind of limited stay: "in the

present case, we have no indication that the District Court considered the possibility of more

narrowly framed protective orders -- as, for example, to stay discovery procedures only until the

taking of evidence is concluded in the criminal cases . . . ." McSurely v. McClellan, supra, 426

F.2d at 672.

In sum, "civil discovery may not be used to subvert limitations on discovery in criminal

cases, either by the government or by private parties." McSurely v. McClellan, supra, 426 F.2d

at 672. See also, Founding Church of Scientology v. Kelley, 77 F.R.D. 378, 380 (D.D.C. 1977)

4

("improper to allow plaintiffs to obtain documents in a civil case to be used in a related criminal proceeding"). The integrity of the criminal process would be directly compromised if persons under indictment were permitted to subvert the express limitations of Rule 16(a)(2) by filing civil actions and then taking discovery regarding the government's evidence. "Judicial discretion and procedural flexibility should be used to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other." Campbell v. Eastland, supra, 307 F.2d at 487. A grant of the requested stay here is, therefore, appropriate. See, United States v. Mellon Bank, 545 F.2d 869, 873 (3d Cir. 1976); McSurely v. McClellan, supra, 426 F.2d at 672; Campbell v. Eastland, 307 F.2d at 487-490; Founding Church of Scientology v. Kelley, supra, 77 F.R.D. at 380-381.


### Conclusion

For the foregoing reasons the United States requests that the Court stay this case pending conclusion of the criminal trial set to begin on November 13, 2007.

Respectfully submitted,


_____//_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney




_____//_____
RUDOLPH  CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


5

_____//_____
ALEXANDER D. SHOAIBI, D.C. BAR # 423587
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Room 4218E
Washington, D.C.  20530
(202) 514-7236

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTOINE JONES, | ) |
| | ) |
| Plaintiff, | )     Civil Action No.: 07-1068 (RJL) |
| | ) |
| v. | ) |
| | ) |
| KATERINA GIKAS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER</u>

**UPON CONSIDERATION** of defendants' motion to stay civil proceeding during pendency of criminal trial, it is hereby **ORDERED** that the motion is **GRANTED**. Defendants shall respond to Plaintiff's Complaint within thirty days of the conclusion of the trial set for November 13, 2007 in Criminal Action No. 05-386 (ESH).

_____

UNITED STATES DISTRICT JUDGE

Dated: _____, 2007.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by first class mail, postage prepaid upon plaintiff pro se,

Antoine Jones
DC 241-912
1901 D Street, SE
Washington, DC 20003

this 7th day of November, 2007.

_____//_____
ASSISTANT UNITED STATES ATTORNEY